KENNETH JACOBUS
Attorney for Plaintiff
310 K Street, Suite 200
Anchorage, AK 99501-2064
(907) 277-3333 – Phone
(907) 264-6666 - Fax
kpjlaw@yahoo.com

ALLAN S. RUBIN*
Co-Counsel for Plaintiff
DRAPER & RUBIN, P.L.C.
29800 Telegraph Road
Southfield, Michigan 48034
(248) 358-9400 – Phone
(248) 358-9729 – Fax
allan@draper-rubin.com
*Admitted Pro Hac Vice

RECEIVED
MAY 15 2006
CLERK U.S. DISTRICT COURT
ANCHORAGE ALASKA

## UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

SANDS NORTH, INC., d/b/a FANTASIES
ON 5th AVENUE, an Alaska Corporation,

           Plaintiff,

vs.

THE CITY OF ANCHORAGE, ALASKA,
an Alaska Municipal Corporation,

           DEFENDANT.

Case No: 3:05-cv-256

HON. Timothy M. Burgess

## MOTION AND BRIEF FOR TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.    INTRODUCTION .............................................................................................1

II.   FACTUAL BACKGROUND..............................................................................2

      A.    THE PLAINTIFF'S BUSINESS .............................................................2

      B.    THE ANCHORAGE ORDINANCE BEFORE AMENDMENT............................4

      C.    THE ORDINANCE AMENDMENTS .................................................10

III.  STATEMENT OF QUESTIONS PRESENTED AND RELIEF REQUESTED ..............13

      A.    QUESTION PRESENTED...................................................................13

      B.    RELIEF REQUESTED........................................................................13

IV.   ARGUMENT IN SUPPORT OF GRANTING INJUNCTIVE RELIEF ...........................13

      A.    THE STANDARD FOR ISSUANCE OF TEMPORARY RESTRAINING
            ORDER/PRELIMINARY INJUNCTION.............................................13

      1.    THE PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON
            THE MERITS .............................................................................15

      A.    GENERAL FIRST AMENDMENT CONSIDERATIONS .................................15

      B.    CLAIMS UNDER THE ALASKA CONSTITUTION ………………………….. 26

      C.    VAGUENESS AND OVERBREADTH .................................................30

      D.    EQUAL PROTECTION CONSIDERATION........................................................36

      E.    THE FIRST AMENDMENT AND COMMERCE CLAUSE CONSIDERATIONS
            RELATIVE TO PROHIBITIONS ON BROADCASTING ...........................................39

            A.    FIRST AMENDMENT VIOLATIONS ...................................................40

            B.    COMMERCE CLAUSE VIOLATIONS...................................................43

      2.    THE PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT THE
            ENTRY OF THE INJUNCTION.............................................................46

i

3.    THE PUBLIC INTEREST FAVORS ENTRY OF THE INJUNCTION..............46

4.    THE BALANCE OF HARM FAVORS ENTRY OF THE INJUNCTION..........48

V.    CONCLUSION         ...........................................................................................48

VI.    RELIEF REQUESTED    ...........................................................................................49

## INDEX OF AUTHORITIES

**Cases**

4805 Convoy, Inc. v. City of San Diego, 183 F.3d 1108 (9th Cir. 1999).......................................34

AAK, Inc. v. City of Woonsocket, 830 F. Supp. 99 (D.R.I. 1993)...................................................22

ACLU of Ken. v. McCreary, 354 F.3d 438 (6th Cir. 2003) ............................................................14

ACLU v. Johnson, 194 F. 3d 1149 (10th Cir. 1999) .......................................................................45

Allen v. Wright, 468 U.S. 737, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984)....................................34

AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796 (7th Cir. 2002) ...............................13

Am. Booksellers Found. v. Dean, 342 F.3d 96 (2nd Cir, 2003) .....................................................45

American Trucking Ass'n v. Michigan P.S.C, ___ U.S. __, 125 S. Ct. 2419; 162 L. Ed. 2d 407 (2005)............................................................................................................................................43

Ashcroft v. ACLU, 535 U.S. 564 (2002)........................................................................................40

Ashcroft v. Free Speech Coalition, 535 U.S. 234, 152 L. Ed. 2d 403, 122 S. Ct. 1389 (2002) ...............................................................................................................................................33, 42

Ayres v. City of Chicago, 125 F 3d 1010 (7th Cir. 1997) ..............................................................14

Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 79 L. Ed. 1032, 55 S. Ct. 497 (1935) ................43

Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).... 16, 18, 46

Bartnicki v. Vopper, 532 U.S. 514, 149 L. Ed. 2d 787, 121 S. Ct. 1753 (2001) ..........................41

Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 3 L. Ed. 2d 988, 79 S. Ct. 948 (1959)...........13

Ben's Bar, Inc. v. Vill. of Somerset, 316 F.3d 702 (7th Cir. 2003) ................................. 15, 18, 21

Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983)40

Boos v. Berry, 485 U.S. 312; 108 S. Ct. 1157; 99 L. Ed. 2d 333 (1988) ......................................41

Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318, 50 L. Ed. 2d 514, 97 S. Ct. 599 (1977)............................................................................................................................................43

Breese v. Smith, 501 P.2d 159 (Alaska 1972) ............................................................................. 27

Broadrick v. Oklahoma, 413 U.S. 601; 93 S. Ct. 2908; 37 L. Ed. 2d 830 (1973) ........................ 41

Brownell v. City of Rochester, 190 F. Supp. 2d 472 (WDNY 2001) ............................................ 24

Brownsburg Area Patrons Affecting Change v. Baldwin, 137 F.3d 503 (7th Cir. 1998) ............. 14

California v. La Rue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) ................................... 38

Carey v. Brown, 447 U.S. 455, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980) ............................. 36, 37

City of Chicago v. Morales, 527 U.S. 41, 144 L. Ed. 2d 67, 119 S. Ct. 1849 (1999) ................. 33

City of Erie v. Pap's A.M.,120 S. Ct. 1382, 529 U.S. 277, 146 L.Ed.2d 265 (2000)  16, 18, 19, 46

City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 152 L. Ed. 2d 670, 122 S. Ct. 1728
(2002) ..................................................................................................................... 18, 19, 20, 21

City of Newport, Kentucky v. Iacobucci, 479 U.S. 92, 107 S.Ct. 383, 93 L.Ed.2d 334 (1986)... 38

Cohen v. California, 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971); ................................ 40

Congregation Lubavitch v. City of Cincinnati, 807 F. Supp. 1353 (S.D. Ohio 1992) ................. 38

Connection Distrib. Co. v. Reno, 154 F.3d 281 (6th Cir. 1998) .................................................... 14

Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 100 S. Ct. 2326, 65 L. Ed. 2d
319 (1980) ............................................................................................................................... 36

Cyberspace Communs., Inc. v. Engler, 142 F. Supp. 2d 827 (D. Mich. 2001) ............................ 45

DiMa Corp. v. Town of Hallie, 185 F.3d 828 (7th Cir. 2000) ....................................................... 39

Discotheque v. City Council of Augusta, 449 S.E.2d 608 (Ga. 1994) .......................................... 23

Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) ......................... 38

Dream Palace v. Maricopa, 384 F.3d 990 (9th Cir. 2004) ........................................................ 24, 25

Durham v. Brock, 498 F. Supp. 213 (M.D. Tenn. 1980) ................................................................ 17

East Brooks Books, Inc. v. City of Memphis, 48 F.3d 220 (6th Cir. 1995) .................................. 23

Edenfield v. Fane, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)............................ 22, 25

Elrod v. Burns, 427 U.S. 347, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976) .......................... 14, 46, 48

Encore Video v. City of San Antonio, 310 F. 3d. 812 (5th Cir. 2002) ........................................... 21

Erickson v. Trinity Theatre, 13 F.3d 1061 (7th Cir. 1994)............................................................ 14

Erznoznik v. Jacksonville, 422 U.S. 205, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975)................ 28, 40

First Nat'l Bank v. Bellotti, 435 U.S. 765, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978). .................. 38

Forsyth County v. Nationalist Movement, 505 U.S. 123, 120 L. Ed. 2d 101, 112 S. Ct. 2395
  (1992)......................................................................................................................................... 34

Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir. 1999) ..................................................... 33

G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071 (6th Cir. 1994).... 14, 16, 46

Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979)........... 47

Gonzales v. Raich, 125 S. Ct. 2195 (2005)................................................................................... 44

Granholm v. Heald, 125 S. Ct. 1885 (U.S. 2005) ......................................................................... 44

Grayned v. City of Rockford, 408 U.S. 104; 925 S.Ct. 2294; 33 L.Ed.2d 222 (1972) ................ 30

Healy v. The Beer Institute, et al., 491 U.S. 324, 105 L. Ed. 2d 275, 109 S. Ct. 2491 (1989)..... 45

Hess v. Indiana, 414 U.S. 105, 38 L. Ed. 2d 303, 94 S. Ct. 326 (1973) ....................................... 41

Holmberg v. City of Ramsey, 12 F.3d 140 (8th Cir. 1993) ........................................................... 23

Homans v. Albuquerque, 264 F.3d 1240 (10th Cir. 2001) ............................................................ 14

Jaffe v. Alexis, 659 F.2d 1018 (9th Cir. 1981) .............................................................................. 37

Jefferson Lines, supra, at 180, 131 L. Ed. 2d 261, 115 S. Ct. 1331.............................................. 40

Joelner v. Village of Wash. Park, 378 F.3d 613 (7th Cir., 2004) ................................................. 15

Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952)................... 46

Jott, Inc. v. Charter Township of Clinton, 569 N.W.2d 841 (Mich. App. 1997).......................... 46

Kev, Inc. v. Kitsap County, 793 F.2d 1053 (9th Cir. 1986) ......................................... 26

Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).................. 30

Kingsley Int'l Pictures Corp., 360 U.S. at 689; ........................................................... 41

Kolender v. Lawson, 461 U.S. 352, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983) .......................... 30

Kowalski v. Chicago Tribune Co., 854 F 2d 168 (7th Cir. 1988) ...................................... 14

Lamont v. Postmaster General of U.S., 381 U.S. 301, 14 L. Ed. 2d 398, 85 S. Ct. 1493 (1965). 40

Llewelyn v. Oakland County Pros., 402 F. Supp. 1379 (E.D. Mich. 1975) ................................ 47

Lounge Management, Ltd. v. Trenton, 580 N.W.2d 156 (Wis. 1998) ........................................ 37

Marks v. United States, 430 U.S. 188, 51 L. Ed. 2d 260, 97 S. Ct. 990 (1977) .......................... 21

Martin v. City of Struthers, Ohio, 319 U.S. 141, 87 L. Ed. 1313, 63 S. Ct. 862 (1943) .............. 40

Maryland v. Wirtz, 392 U.S. 183, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968) .............................. 44

MD II Entertainment, Inc. v. City of Dallas, 935 F. Supp. 1394 (N.D. Tex. 1995) ..................... 22

Messerli v. State, 626 P.2d 81 (Alaska 1980) ............................................................... 27

Mickens v. Kodiak, 640 P.2d 818 (Alaska 1982 ) ........................................................... 27

Miller v. California Pac. Med. Ctr., 19 F.3d 449 (9th Cir. 1994) ..................................... 13

Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L. Ed. 2d  419 (1973) ............................. 16

Nakatomi Investments, Inc. v. City of Schenectady, 949 F. Supp. 988 (N.D.N.Y. 1997) ..... 22, 46

National Audubon Soc'y, Inc. v. Davis, 307 F.3d 835 (9th Cir.) .......................................... 45

Nat'l People's Action v. Vill. of Wilmette, 914 F.2d 1008 (7th Cir. 1990) ................................ 14

Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) .............. 47

New York State Liquor Authority v. Bellanca, 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981) ................................................................................................................. 38

Newsom v. Albemarle County Sch. Bd., 354 F.3d 249 (4th Cir. 2003) ...................................... 14

vi

Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 131 L. Ed. 2d 261, 115 S. Ct. 1331 (1995).................................................................................................................................. 43

Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co., 367 F.3d 1108 (9th Cir. 2004)....... 13

Palco v. Connecticut 302 US 319 (1937)...................................................................................... 48

Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 14 L. Ed. 249 (1851) .................................................................................................................................................... 13

Perez v. United States, 402 U.S. 146; 28 L. Ed. 2d 686; 91 S. Ct. 1357 (1971) .......................... 43

Perry Education Ass'n. v. Perry Local Educator's Ass'n., 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)..................................................................................................................................... 17

Perry v. Los Angeles Police Dep't, 121 F.3d 1365 (9th Cir. 1997) ............................................... 37

Philadelphia v. New Jersey, 437 U.S. 617, 57 L. Ed. 2d 475, 98 S. Ct. 2531 (1978) .................. 44

Phillips v. Borough of Keyport, 107 F.3d 164 (3d Cir. 1997)....................................................... 17

Planned Parenthood Ass'n. v. City of Cincinnati, 822 F.2d 1390 (6th Cir. 1987) ....................... 47

Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972) ............................................................................................................................................... 36, 41

Quincy Cable TV, Inc. v. FCC, 248 U.S. App. D.C. 1, 768 F.2d 1434 (DC Cir. 1985). ............. 42

R.A.V. v. St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)................................. 16

Ranch House, Inc. v. Amerson, 238 F.3d 1273 (11th Cir. 2001) .................................................. 21

Reno v. ACLU, 521 U.S. 844, 138 L. Ed. 2d 874, 117 S. Ct. 2329 (1997)...................... 40, 41, 42

Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ............... 41

Roth v United States 354 US 476 (1957)....................................................................................... 17

Sable Communications of California, Inc. v. FCC, 492 U.S. 115 (U.S. 1989) ...................... 17, 40

Schad v. Mt. Ephraim, 452 U.S. 61, 68 L.Ed.2d 671, 101 S.Ct. 2176 (1981)......................... 15, 46

Schultz v. City of Cumberland, 228 F.3d 831 (7th Cir. 2000) ................................... 17, 18, 24, 25

Simon & Schuster, Inc. v. New York Crime Victims Bd., 502 U.S. 105, 116 L. Ed. 2d 476, 112
    S. Ct. 501 (1991)................................................................................................................. 25

Triplett Grille, Inc. v. City of Akron, 40 F.3d 129 (6th Cir. 1994)................................................. 16

Tucson Woman's Clinic v. Eden, 379 F.3d 531 (9th Cir. 2004)..................................................... 33

Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497
    (1994)........................................................................................................................ 23, 26, 42

Turney v. Pugh, 400 F.3d 1197 (9th Cir. 2005)............................................................................. 34

United States v. Adams, 343 F.3d 1024 (9th Cir. 2003)................................................................. 30

United States v. Darby, 312 U.S. 100, 85 L. Ed. 609, 61 S. Ct. 451 (1941) ................................. 44

United States v. Lopez, 514 U.S. 549 (1995) ........................................................................... 43, 44

United States v. Morrison, 529 U.S. 598; 146 L. Ed. 2d 658; 120 S. Ct. 1740 (2000) ................ 44

United States v. O'Brien, 391 U.S. 367, 20 L. Ed. 2d 672, 88 S. Ct. 1673 (1968)........................ 18

United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 120 S. Ct. 1878, 146 L.Ed.2d
    864 (2000)............................................................................................................ 25, 40, 41, 42

United States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ..................... 23

Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ................................... 28

Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976)
    ............................................................................................................................... 18, 24, 41

Young v. City of Simi Valley, 216 F.3d 807 (9th Cir. 2000) ......................................................... 34

## TABLE OF CONTENTS

I.      INTRODUCTION        ..........................................................................................1

II.     FACTUAL BACKGROUND..................................................................................2

        A.      THE PLAINTIFF'S BUSINESS ............................................................2

        B.      THE ANCHORAGE ORDINANCE BEFORE AMENDMENT............................4

        C.      THE ORDINANCE AMENDMENTS ..................................................................10

III.    STATEMENT OF QUESTIONS PRESENTED AND RELIEF REQUESTED ..............13

        A.      QUESTION PRESENTED.....................................................................13

        B.      RELIEF REQUESTED...........................................................................13

IV.     ARGUMENT IN SUPPORT OF GRANTING INJUNCTIVE RELIEF .........................13

        A.      THE STANDARD FOR ISSUANCE OF TEMPORARY RESTRAINING
                ORDER/PRELIMINARY INJUNCTION..............................................13

        1.      THE PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON
                THE MERITS        .........................................................................................15

        A.      GENERAL FIRST AMENDMENT CONSIDERATIONS ...................................15

        B.      CLAIMS UNDER THE ALASKA CONSTITUTION …………………………….. 26

        C.      VAGUENESS AND OVERBREADTH .................................................................30

        D.      EQUAL PROTECTION CONSIDERATION........................................................36

        E.      THE FIRST AMENDMENT AND COMMERCE CLAUSE CONSIDERATIONS
                RELATIVE TO PROHIBITIONS ON BROADCASTING    ...........................................39

                A.      FIRST AMENDMENT VIOLATIONS ......................................................40

                B.      COMMERCE CLAUSE VIOLATIONS.....................................................43

        2.      THE PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT THE
                ENTRY OF THE INJUNCTION............................................................................46

i

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Now comes the Plaintiff, by and through its attorneys and pursuant to Fed. R. Civ. Pro. 65 hereby moves this Honorable Court for Entry of a Temporary Restraining Order and Preliminary Injunction prohibiting enforcement of recent Amendments to the Section 10.40.050 of the Anchorage Municipal Code, a copy of which are attached hereto as **Exhibits 1** and **2**. This Motion is supported by the accompanying Brief along with a Verified Complaint, each of which are incorporated hereto by reference as if fully set forth herein, as well as the attached Affidavit of Carol Hartman, **Exhibit 3**. In addition, Plaintiff moves this Honorable Court to waive the requirements for posting a bond in that no harm will be caused to the Defendant via the entry of the requested injunction.

## BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.    INTRODUCTION

This matter is before the Court on Plaintiff's Complaint, which challenges on both federal and state constitutional grounds, certain recent amendments to Section 10.40.050 of the Anchorage Municipal Ordinance dealing with adult entertainment. While the Ordinance is subject to a detailed Complaint challenging the Ordinance on numerous constitutional grounds, the Plaintiff is before the Court seeking a Temporary Restraining Order and Preliminary Injunction based upon only two provisions in the Ordinance. The first is the amendment to the definition of "Specified Sexual Activites" and the second is a prohibition on broadcasting the performances to locations outside the facility. Plaintiff raises a number of constitutional objections to these provisions.

1

First, Plaintiff alleges that the Ordinance is a content based restriction, which violates the First Amendment to the United States Constitution and Article I, Section 5 of the Alaska Constitution, and is therefore subject to strict scrutiny. Plaintiff alleges that the Ordinance fails to advance and compelling governmental interest through the most narrowly tailored alternative. Second, Plaintiff alleges the Ordinance amendments are vague; third, Plaintiff alleges the Ordinance amendments are overbroad; fourth, Plaintiff alleges that the Ordinance amendments violate the equal protection clause of the Fourteenth Amendment; and, lastly, Plaintiff alleges that certain provisions of the Ordinance violate the Commerce Clause. As a result, Plaintiff asserts that it has a substantial likelihood of success on the merits.

The Ordinance in this matter infringes upon First Amendment Rights. Because the ordinance infringes on First Amendment rights, Plaintiff alleges it has established irreparable harm. Likewise, Plaintiff alleges the public interest favors granting of the requested injunction and that the balance of harms favors the Plaintiff. As a result, Plaintiff alleges that it is entitled to a TRO and thereinafter, a Preliminary Injunction. The arguments in support of such relief are set forth below.

## II.    FACTUAL BACKGROUND[1]

### A.  The Plaintiff's Business

The Plaintiff Sands North, Inc. is a duly authorized Alaska Corporation which conducts business under the trade name of Fantasies on 5th Avenue ("Fantasies"). Plaintiff opened Fantasies on October 15, 1998. Previously, Plaintiff operated as the Sands North Show Club in 1989. The Plaintiff's business is located at 1911 E. Fifth Avenue in Anchorage, Alaska. (See

Affidavit ¶ 3, **Exhibit 3**). The Plaintiff's business is a non-alcoholic "juice bar" which sells pop and juice, but does not serve alcoholic beverages. At the premises of Plaintiff it provides at its business establishment what is commonly referred to as non-obscene nude and semi-nude performance dance entertainment. (See Affidavit ¶ 4, **Exhibit 3**). All performances that take place on the premises are provided by adult entertainers strictly for adults, 18 years of age and older, to view. (See Affidavit ¶ 5, **Exhibit 3**). The Plaintiff is presently licensed by the City of Anchorage as an "Adult Oriented Business." Plaintiff's business has been open and operating in Anchorage for 17 years, without significant incidents or problems. (See Affidavit ¶ 6, **Exhibit 3**).

The Plaintiff's business is connected to another business, called the "Club Elixir," formerly "The Setter." Club Elixir is a traditional bar, which shares a common entrance with the Plaintiff's business. For many years, The Setter was separated from Fantasies by a glass wall. As a result of a recent renovation to the building, the traditional bar was moved to the upper level of the building and Fantasies was expanded over the first floor of the building. While patrons from Club Elixir are allowed into Fantasies, they are not allowed to bring alcoholic beverages into Fantasies at any time. (See Affidavit ¶¶ 7 and 9, **Exhibit 3**).

Despite seventeen years of operations without significant incident or problems, the expansion of the business brought Fantasies to the attention of the Anchorage Assembly. A proposal to separate non-alcoholic adult cabarets from liquor license establishments by 1,000 feet was brought before the assembly. This proposal was discussed at length by the Assembly and public testimony was taken. However, this proposal failed to win support of the assembly. (See

---

[1] In addition to the Affidavit attached to this motion, this Motion is also supported by a Verified

Affidavit ¶¶ 10 and 11, **Exhibit 3**). Thereinafter, without further testimony or any evidence being taken, the Assembly adopted a series of amendments to the current Adult Entertainment Ordinance. (See Affidavit ¶ 12, **Exhibit 3**). These amendments were made without the City making any legislative findings in that 1.) the Ordinance Amendments were related to any governmental purpose, let alone a substantial one; 2.) consideration of whether the Ordinance provisions were designed to further that purported governmental interest; 3.) they were without consideration of whether the Ordinance was narrowly tailored to achieve the asserted governmental interest; and 4.) they were without any evidence of "alleged secondary effects." (See Affidavit ¶ 12, **Exhibit 3**).

In addition, and as will be discussed in greater detail below, the Ordinance seeks to impose regulations on Plaintiff's business which are greater than those imposed upon alcoholic serving establishments offering the identical type of entertainment as the Plaintiff. No justification is found for this disparate treatment and no legislative findings are stated to support this distinction.

The Anchorage Ordinance, both before and after the amendment are discussed below.

### B.  The Anchorage Ordinance before Amendment

Anchorage has adopted an ordinance which attempted to regulate what is generally referred to adult entertainment. This Ordinance was codified at Section 10.40.050 of the Anchorage Municipal Code (the "Code") (see **Exhibit 1**). This Code was amended on October 11, 2005 to add additional provisions to the Code (the "Amendments") (see **Exhibit 2**). The Amendments were adopted on a split vote, with the most controversial provisions having been adopted by a 6-5 vote of the assembly. The Amendment was given immediate effect.

Complaint.

4

Under the Code an "*adult-oriented establishment,*" or "*adult business,*" is defined to include "…adult bookstores, adult motion picture theaters, adult mini-motion picture establishments, <u>adult cabarets</u>, physical culture studios, massage parlors, escort services, or similar type businesses where, by the nature of the business, minors under the age of 18 are denied entry, or businesses which are prohibited by law from having minors or unaccompanied minors on the premises for reasons other than the sale of liquor. If a premises, whose primary business is overnight lodging, offers adult movies via a cable, closed circuit or pay per view system, in the absence of any other adult entertainment activities, the availability of such movies, does not render the business an adult-oriented establishment for the purposes of this section. (See **Exhibit 1**, Ordinance, 10.40.050(A), before Amendment,).

Under the Code, the Plaintiff operates as an adult business, having been licensed as an adult cabaret since 2004.

An "Adult Cabaret" is defined as "a cabaret which features topless dancers, strippers, male or female impersonators, or similar entertainers. *An adult cabaret does not include an establishment licensed for sale of alcoholic beverages.*" (See **Exhibit 2**, Ordinance 10.40.050(A), before amendment.) Pursuant to the definitions in the Code, business which offer similar entertainment as Plaintiff, but which also hold a liquor license are not required to be licensed under the Code, nor are they required to comply with the licensing and regulatory provisions of the Code. <u>Id</u>.

The term "*adult entertainment*" is also defined under the Code and "means any exhibition of any motion pictures, live performance, display or dance of any type, which has as its dominant theme, or is distinguished or characterized by an emphasis on, any actual or simulated specified sexual activities, or specified anatomical areas, as defined in this section."

The Code prior to amendment defined the term, *Specified anatomical areas* to mean:

a.    Less than completely and opaquely covered human genitals, pubic region, buttocks, and female breast below a point immediately above the top of the areola.

b.    Human male genitals in a discernible turgid state, even if opaquely covered.

Prior to amendment, the Code defined *Specified sexual activities to* mean:

Simulated or actual:

a.    Showing of human genitals in a state of sexual stimulation or arousal.

b.    Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sado-masochistic abuse, fellatio or cunnilingus.

c.    Fondling or erotic touching of human genitals, pubic region, buttock or female breasts.[2]

In order to operate as an adult business, the Code requires licensure by the City. (See Ordinance, 10.40.050, Section B(5)). In Order to obtain a license under the Code, a corporate applicant, such as the Plaintiff, must meet the following requirements:

(1)    All officers, directors and stockholders required to be named under subsection C.2.d of this section shall be at least 18 years of age.

(2)    The applicant must have not been convicted of a violation of this section or any of the offenses listed in subsection I.1.f(1) of this section within the two years immediately preceding the date of application.

c.    If the applicant is a partnership, joint venture or any other type of organization where two or more persons have a financial interest:

(1)    All persons having a financial interest in the partnership, joint venture or other type of organization shall be at least 18 years of age.

(2)    The applicant must have not been convicted of a violation of this section or any of the offenses listed in subsection I.1.f(1) of this section within the two years immediately preceding the date of application.

---

[2] As will be discussed, infra, prior to amendment, the definitional provision were just that – definitional.

6

2.    The location for which the license is sought must meet the requirements of <u>Section 21.45.240</u> or comply with that section as an existing nonconforming use. Provided however, that any structural changes required to comply with the physical layout requirements of subsection J of this section shall not terminate an existing nonconforming use right. (See **Exhibit 1**, Ordinance, 10.40.050, Section D).

In order to renew a license, the Ordinance provided, prior to Amendment, as follows:

Every license issued pursuant to this section will terminate at the expiration of one year from the date of issuance, unless sooner revoked, and must be renewed before operation is allowed in the following year. Any operator desiring to renew a license shall make application to the municipal clerk. The application for renewal must be filed not later than 60 days before the license expires. The application for renewal shall be filed in triplicate with and dated by the municipal clerk. A copy of the application for renewal shall be distributed promptly by the municipal clerk to the municipal police department and to the operator. The application for renewal shall be upon a form provided by the municipal clerk and shall contain such information and data, given under oath or affirmation, as is required for an application for a new license.[3]

2.    A license renewal fee of $300.00 shall be submitted with the application for renewal. In addition to the renewal fee, a late penalty of $100.00 shall be assessed against the applicant who files for a renewal less than 60 days before the license expires. If the application is denied, the renewal fee only shall be returned.

3.    If the municipal police department is aware of any information bearing on the operator's qualifications, or that of the applicant's employees, that information shall be filed in writing with the municipal clerk. Approval or clearance by the municipal police department is not a prerequisite to the issuance of a license under this chapter.

The Code, prior to amendment, also provided for revocation of a license, as follows:

1.    The municipal clerk may revoke or suspend a license or permit for any of the following reasons:

a.    Discovery that false or misleading information or data was given on any application or material facts were omitted from any application.

b.    The operator violates any provision of subsection J.1.b.2 or K of this section or any rule or regulation adopted pursuant to this section.

c.    The operator becomes ineligible to obtain a license or permit.

---

[3] Presently, this includes, among other matters, the applicant's social security number.

d.    Any cost or fee required to be paid by this section is not paid.

e.    Any intoxicating liquor or other alcoholic beverage is served on the premises of the adult-oriented establishment.

f.    The licensee, manager or designated representative, is convicted of the following offenses at the location to which an adult business license has been issued:

(1)    Involving any of the following offenses as described in Chapter 8 of the Anchorage Municipal Code:

(a)    Assignation for prostitution;

(b)    Prostitution;

(c)    Offering to secure another for prostitution;

(d)    Maintaining a place of prostitution;

(e)    Owning or leasing a place of prostitution;

(f)    Coercing another to become a prostitute;

(g)    Violation of Section 8.50.010 , relating to prohibited performances and exhibitions to minors;

(h)    Violation of Section 8.50.020 , relating to disseminating indecent material to minors; or

(i)    Violation of Section 8.50.040 , relating to sexual exploitation of minors.

(2)    The fact that a conviction is being appealed shall have no effect on the revocation of the license.

g.    Any of the reasons set forth in Section 10.10.035 .

(See **Exhibit 1**, Ordinance, before amendment, Section 10.40.050, (I))

As noted above, the Plaintiff operated as a licensed business, without suspension or revocation of its license and at the time of adoption of the Amendments, the Plaintiffs license was in good standing.

8

The Code, prior to amendment, provided for the exterior and interior configuration as follows:

3.   *Exterior.*

a.   Shall be maintained in a neutral tone to conform with surrounding building appearance.

b.   Building will be repaired and maintained in a timely manner.

c.   Fences to be maintained in conforming appearance and maintained in good condition.

7.   *Interior.*

a.    Appropriate window coverings to maintain conforming appearance (no foil, sheets, boards, et cetera).

b.   Premises to be maintained in a clean and sanitary manner.

c.    The operator shall maintain at least ten footcandles of light in the public portions of the establishment, including aisles, at all times. However, if a lesser level of illumination in the aisles shall be necessary to enable a patron to view the adult entertainment in a booth, room or cubicle adjoining aisles, a lesser amount of illumination may be maintained in such aisles, provided, however, at no time shall there be less than one footcandle of illumination in such aisles, as measured from the floor. (See **Exhibit 1**).

The Ordinance also imposes the following requirements on a licensee:

K.   *Responsibilities of operator.*

1.    Every act or omission by an employee constituting a violation of the provision of this section shall be deemed the act or omission of the operator if such act or omission occurs either with the authorization, knowledge or approval of the operator, or as a result of the operator's negligent failure to supervise the employee's conduct, and the operator shall be punishable for such act or omission in the same manner as if the operator committed the act or caused the omission. Such acts or omissions can be considered in determining whether to revoke, suspend or renew a license.

2.    No employee of an adult-oriented establishment shall allow any minor to enter, to loiter around or to frequent an adult-oriented establishment or to allow any minor to view adult entertainment as defined in this section.

3.    No licensee shall have any other license or permits for games of chance to be played or sold on that premises licensed as an adult business. (See **Exhibit 1**).

## C.    The Ordinance Amendments

On October 11, 2005, Anchorage adopted the Amendments to the code.  A copy of the Amendments are reproduced as **Exhibit 2**. Pursuant to the Amendments, section A of the definitional section was amended to read as follows:

*Specified sexual activities* means simulated or actual:

    a.      Showing of human genitals in a state of sexual stimulation or arousal.

    b.      Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sado-masochistic abuse, fellatio or cunnilingus.

    **c.**      **Fondling or touching of human genitals, pubic region, buttock or female breasts.**

    d.      The intrusion of any object into the genital or anal opening regardless of whether the act was consensual;

    **e.**      **A separation of a minimum of four (4) feet shall be maintained between entertainers, dancers, and/or strippers and patrons. [4]**

    (Emphasis added)

Section H of the Ordinance was also amended. As amended, Section H(3)(4) now reads as follows:

> 3. If the municipal police department, health and human services, or other department are  aware of any information bearing on the operator's qualifications, or that of the applicant's employees, that information shall be filed in writing with the municipal clerk. Approval or clearance by the municipal police department is not a prerequisite to the issuance of a license under this chapter.
>
> 4. The Municipal Clerk may deny renewal of license or permit for any of the reasons identified in section 10.40.050.1.

Section I of the ordinance has also been amended. As amended, Section I now reads:

---

[4] This provision of the Ordinance will be referred to as the "buffer zone."

1.    The municipal clerk may revoke or suspend a license or permit for any of the following reasons:

a.    Discovery that false or misleading information or data was given on any application or material facts were omitted from any application.

b.    The operator violates any provision of subsection J.1.b.2 or K of this section or any rule or regulation adopted pursuant to this section. [5]

c.    The operator becomes ineligible to obtain a license or permit.

d.    Any cost or fee required to be paid by this section is not paid.

e.    Any intoxicating liquor or other alcoholic beverage is transported unto the premises, or served or consumed_on the premises of the  adult-oriented establishment, by any person, where the licensee knew or reasonably should have known.

f.    Any person under the age of eighteen is permitted to enter or remain on the premise.

g.    Any of the following offenses are committed by any person at the location to which an adult business license has been issued:

(1)    Any of the offenses described in chapter 8.65 involving or relating to prostitution.

(2)    Any of the offenses described in chapter 8.50 involving sexual exhibition, dissemination of indecent material, or sexual exploitation harmful to minors; or

**(3)    Allowing any person on the premise to engage in any of the specified sexual activities listed in 10.40.050A.**

h.    Any of the reasons set forth in Section 10.10.035 .

(See **Exhibit 2**, Ordinance with amendment, Section 10.40.050, (I))

Section J of the Ordinance was also amended. As amended, Section J now reads:

3.    *Exterior.*

---

[5] As noted in the definitional sections above, an alcohol serving establishment is not subject to this requirement. Rather, such business are regulated pursuant to Section 10.50.015 M, which prohibits "a person in licensed premises to induce, entice or procure another to engage in any sexual conduct prohibited by this Code, the state or the United States."

a. Shall be maintained in a neutral tone to conform with surrounding building appearance.

b. Building will be repaired and maintained in a timely manner.

c. Fences to be maintained in conforming appearance and maintained in good condition.

**d. No adult entertainment shall be open to view from outside the licensed premise, or broadcast to any site outside the licensed premise. Permanent barriers shall be installed and maintained at each entrance and exit to screen the interior of the premise from public view. Exterior windows shall be covered with opaque covering at all times.**

(See **Exhibit 2**). (Emphasis added).

While the Plaintiff believes that many of the provisions of both the original ordinance and the amended ordinance are unconstitutional, this Motion and Brief seek only to enjoin certain of the recent amendments to the Ordinance. These include the provisions relating to the definitions of specified sexual activities found in Section A, subparagraphs (c) & (e) and the Exterior requirements found is Section J(3)(d) of the amendments to the Ordinance.

**D. The Status Quo Order**

Prior to the filing of this Motion, the parties had agreed to a "status quo" Order. Specifically, it was agreed by the parties that Anchorage would not enforce the Ordinance Amendment pending a final judgment in this matter. (See Ex. 4, Stipulation) On April 14, 2006, Anchorage served notice on the Plaintiff that it would no longer abide by the Stipulation and would in fact seek to enforce the provisions of the Amended Ordinance as of May 14, 2006. (See Ex. 5, Letter from Municipal Attorney). As a result of this threatened enforcement, this Motion has been filed and the injunction sought herein requested.

12

### III.    STATEMENT OF QUESTIONS PRESENTED AND RELIEF REQUESTED

#### A.    Question Presented

Whether the Plaintiff is entitled to entry of a Temporary Restraining Order and Preliminary Injunction against enforcement of the recently enacted amendments to Section 10.40.050 of the Anchorage Municipal Code?

Plaintiff answers: Yes.

Defendant necessarily answers: No.

#### B.  Relief Requested

Plaintiff respectfully requests that this Court enter and Order enjoining enforcement of the recently enacted amendments to Section 10.40.050 of the Anchorage Municipal Code pending final judgment in this matter.

### IV.   ARGUMENT IN SUPPORT OF GRANTING INJUNCTIVE RELIEF

#### A.  The Standard for Issuance of Temporary Restraining Order/Preliminary Injunction

This matter is before the Court on the Plaintiff's Motion for Temporary Restraining Order and for a Preliminary Injunction. The Ninth Circuit has established the following "traditional equitable criteria" for deciding whether to grant a preliminary injunction:

> (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief. The moving party must show either *(1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits.* These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.

13

Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co., 367 F.3d 1108, 1111 (9th Cir. 2004);

citing, Miller v. California Pac. Med. Ctr., 19 F.3d 449, 456 (9th Cir. 1994) (en banc) (citations

and quotation marks omitted, emphasis added); see also Beacon Theatres, Inc. v. Westover, 359

U.S. 500, 506-07, 3 L. Ed. 2d 988, 79 S. Ct. 948 (1959) ("The basis of injunctive relief in the

federal courts has always been irreparable harm and inadequacy of legal remedies.") (citing, inter

alia, Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 561, 14 L. Ed.

249 (1851)).

If the movant can meet this threshold burden, then the inquiry becomes a "sliding scale"

analysis where these factors are weighed against one another. See AM General Corp. v.

DaimlerChrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002); Connection Distrib. Co. v. Reno, 154

F.3d 281, 288 (6th Cir. 1998); Erickson v. Trinity Theatre, 13 F.3d 1061 (7th Cir. 1994); see also

Nat'l People's Action v. Vill. of Wilmette, 914 F.2d 1008, 1010-11 (7th Cir. 1990). Where

irreparable harm is established, the balance of harm tips in favor of the plaintiff and there is a

subsequent lowering of the threshold to establish a substantial likelihood of success on the

merits. Kowalski v. Chicago Tribune Co., 854 F 2d 168, 170 (7th Cir. 1988); Ayres v. City of

Chicago, 125 F 3d 1010 (7th Cir. 1997)

When a party seeks a preliminary injunction on the basis of a potential First Amendment

violation, the likelihood of success on the merits will often be the determinative factor. Joelner v.

Village of Wash. Park, 378 F.3d 613, 620 (7th Cir., 2004); citing Connection Distrib. Co., 154

F.3d at 288, cited in ACLU of Ken. v. McCreary, 354 F.3d 438, 445 (6th Cir. 2003); citing,

Brownsburg Area Patrons Affecting Change v. Baldwin, 137 F.3d 503, 507 (7th Cir. 1998). "The

loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

14

irreparable injury," <u>Elrod v. Burns</u>, 427 U.S. 347, 373, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976),

and money damages are therefore inadequate, <u>Id</u>. Concomitantly, there can be no irreparable

harm to a municipality when it is prevented from enforcing an unconstitutional statute because

"'it is always in the public interest to protect First Amendment liberties.'" <u>Connection Distrib.</u>

<u>Co.</u>, 154 F.3d at 288 (citing <u>G & V Lounge, Inc. v. Mich. Liquor Control Comm'n</u>, 23 F.3d 1071,

1079 (6th Cir. 1994)); cf. <u>Homans v. Albuquerque</u>, 264 F.3d 1240, 1244 (10th Cir. 2001) ("We

believe that the public interest is better served by . . . protecting core First Amendment rights"),

cited in <u>Newsom v. Albemarle County Sch. Bd.</u>, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely,

upholding constitutional rights serves the public interest.").

In this case, the Court should grant the injunctive relief requested herein as the Plaintiff has a

substantial likelihood of success on the merits, will suffer irreparable harm in the absence of the

injunction, the public interest supports entry of the injunction, and the balance of harm favors the

entry of the injunction, which merely restores the last peaceful status quo between the parties.

As a result, the requested injunction should issue.  The arguments in support of granting the

injunction are set forth below.

**1.      The Plaintiff has a Substantial Likelihood of Success on the Merits**

**A.  General First Amendment Considerations**

The First Amendment to the United States Constitution provides that: "Congress shall

make no law . . . abridging the freedom of speech . . . ." U.S. Const. Amend. I. The Free Speech

Clause applies to the states by operation of the Fourteenth Amendment's due process clause.

<u>Joelner v. Village of Wash. Park</u>, 378 F.3d 613, 619 (7th Cir., 2004); See e.g., <u>Ben's Bar, Inc. v.</u>

15

Vill. of Somerset, 316 F.3d 702, 707 (7th Cir. 2003) (citations omitted).  As succinctly stated by

the Supreme Court:

> "Entertainment, as well as political and ideological speech, is
> protected; motion pictures, programs broadcast by radio and
> television, and live entertainment, such as musical and dramatic
> works, fall within the First Amendment guarantee. . . .  Nor may an
> entertainment program be prohibited solely because it displays the
> nude human figure.  '[N]udity alone' does not place otherwise
> protected material outside the mantle of the First amendment. . . .
> Furthermore, . . . nude dancing is not without its First Amendment
> protections from official regulation."

Schad v. Mt. Ephraim, 452 U.S. 61, 65-66, 68 L.Ed.2d 671, 101 S.Ct. 2176 (1981) (internal

citations omitted).

More recently, the Supreme Court and the federal appellate courts have reiterated the

position that nude, "topless," and erotic performance dance entertainment fall within the

protections of the First Amendment.  *See, e.g.*, Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111

S.Ct. 2456, 115 L.Ed.2d 504 (1991); City of Erie v. Pap's A.M.,120 S.Ct. 1382, 529 U.S. 277,

146 L.Ed.2d 265 (2000); G&V Lounge, Inc. v. Michigan Liquor Control Com'n., 23 F.3d at

1075 n.1 ("it nevertheless remains true that topless dancing is (still) constitutionally protected

under the First Amendment") (parenthetical in original); and Triplett Grille, Inc. v. City of

Akron, 40 F.3d 129 (6th Cir. 1994) (invalidating an overbroad anti-nudity ordinance).

Nevertheless, expression which is legally obscene falls outside of the scope of the First

Amendment.  Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

However, expression short of legal obscenity, regardless of how erotic or controversial, cannot

be legally proscribed.  The Supreme Court has clearly held that "sexual expression which is

16

*indecent* but not obscene is protected by the First Amendment." Sable Communications v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed. 93 (1989) (emphasis added).

When determining the constitutionality of the Ordinance at issue, the first thing that this Court must do is to determine the level of constitutional scrutiny that must be applied to this calculus.

Regulations enacted for the purpose of restraining expression on the basis of its *content* are *presumptively invalid*. Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). A law is facially unconstitutional if it prohibits otherwise permitted expression solely on the basis of its *content*. R.A.V. v. St. Paul, 505 U.S. 377, 381, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (emphasis added). If the ordinance or regulation is content-based, then in order to be upheld, it must pass the "most exacting" ("strict") scrutiny of being *necessary* to a *compelling* state interest, and must be *narrowly drawn* to achieve that end. Widmar v. Vincent, 454 U.S. 263, 270, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (emphasis added). In this context, narrow tailoring requires that the government choose the "*least restrictive means* to further the articulated interest." Sable Communications, 492 U.S. at 126 (emphasis added).

When considering the constitutionality of this Ordinance, this Court must also keep two further matters in mind. First, because of the recognized preferred position of First Amendment rights, there is no general presumption of constitutionality that would normally attach to other legislative enactments. *See, e.g.,* Durham v. Brock, 498 F. Supp. 213, 221 (M.D. Tenn. 1980), aff'd, 698 F.2d 1218 (6th Cir. 1982), and cases cited therein. Second, it is the government's general burden to substantiate the constitutionality of the deprivation of protected rights. *See, e.g.,* Perry Education Ass'n. v. Perry Local Educator's Ass'n., 460 U.S. 37, 45, 103 S.Ct. 948, 74

17

L.Ed.2d 794 (1983) (strict scrutiny). This evidentiary burden is not diminished in any regard merely because these Plaintiffs are engaged in adult entertainment. *See, e.g.,* Phillips v. Borough of Keyport, 107 F.3d 164, 172-73 (3d Cir. 1997) (en banc), cert. denied, 522 U.S. 932 (1997).

Sex and obscenity are not synonymous. The portrayal of sex, e.g. in art, literature, and scientific works is not itself sufficient reason to deny the constitutional protection of freedom of speech and of the press. Sex a great mysterious motive force in human life, has indisputably been a subject of absorbing interest throughout the ages; it is one of the vital problems of human interest and concern. Roth v United States 354 US 476, 487 (1957). But the First Amendment tolerates governmental interference with general categories of expressive conduct, as opposed to actual speech. Schultz v. City of Cumberland, 228 F.3d 831, 841 (7th Cir. 2000). Very generally, whether conduct regulations will be subject to intermediate or strict scrutiny most often actually hinges upon the regulation's intended purpose, rather than some strained interpretation of content-neutrality. See Ben's Bar, 316 F.3d at 723; Schultz, 228 F.3d at 845 ("Courts often called [regulations] content-neutral without explaining that [they] are in fact content-based and only analyzed as content-neutral when certain preconditions are met.").

There are two distinct, yet overlapping, lines of Supreme Court jurisprudence addressing the degree of First Amendment protection afforded to adult entertainment, a particular type of expressive conduct. Ben's Bar, 316 F.3d at 712-13. One group of cases addresses public indecency regulations. See Barnes v. Glen Theatre, Inc., supra; City of Erie v. Pap's A.M., supra. The other considers adult entertainment zoning ordinances. See Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976); Renton, supra.; City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 152 L. Ed. 2d 670, 122 S. Ct. 1728 (2002). However, the

analytical framework under-pinning both strains of jurisprudence is rooted in United States v. O'Brien, 391 U.S. 367, 376-82, 20 L. Ed. 2d 672, 88 S. Ct. 1673 (1968). Ben's Bar, 316 F.3d at 714. Consequently, the Supreme Court has held that the distinctions between the test used to assess the constitutionality of public indecency statutes, see Pap's A.M., 529 U.S. at 289, and that used to evaluate adult entertainment zoning ordinances, see Renton, 475 U.S. at 46-47, are irrelevant. Ben's Bar, 316 F.3d at 714; Joelner, supra.

In City of Erie v. Pap's A.M., 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d. 265 (2000), the Supreme Court specifically rejected all bases for adoption of anti-nudity ordinances, save one, that being the "alleged secondary effects" of adult entertainment. City of Erie, 120 S.Ct. at 1393-94, 1402. An ordinance attempting to alleviate alleged secondary effects of adult entertainment must be based upon evidence. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses. City of Renton v. Playtime Theatres, 474 U.S. at 51-52.

In City of Erie, the Supreme Court stated: "We now clarify that a government's restriction on public nudity such as the ordinance at issue here should be evaluated under the framework set forth in O'Brien for content neutral restrictions on symbolic speech. " City of Erie, 120 S.Ct. at 1391. Specifically, the Court stated:

> We conclude that Erie's asserted interest in controlling *negative secondary effects* associated with adult entertainment establishments like Kandyland, was unrelated to the suppression of the erotic message conveyed by nude dancing.  The ordinance prohibiting public nudity is therefore valid *if it satisfies the four-factor test from O'Brien* for evaluating restrictions on symbolic speech.  (Emphasis Added)

19

In <u>City of Los Angeles v. Alameda Books, Inc.</u> supra the question of what evidence, if any, is reasonable was presented to the court.  As with many of the recent decisions impacting First Amendment rights, no single opinion of the Court in <u>Alameda</u> received a majority of the votes of the Justices of the Supreme Court.  Rather, there was a four-member plurality authored by Justice O'Connor and a critical concurrence written by Justice Kennedy.  The four-member plurality in <u>Alameda</u> noted that in <u>Renton</u>, the Court did not set a "high bar for municipalities that want to address merely the secondary effects of protected speech."  (122 S. Ct at 1736 (O'Connor, J.))  The plurality, however, sounded a very strong cautionary note when analyzing laws supposedly directed at the "secondary effects" of "adult entertainment establishments."

> This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rational for its ordinance.  If plaintiff fails to cast direct doubt on this rational, either by demonstrating that the municipality's evidence does not support its rational, or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standards set forth in <u>Renton</u>.  If plaintiffs succeed in casting doubt on a municipality's rational in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.  (122 S. Ct at 1736 (O'Connor, J.)). (Emphasis added.)

Justice Kennedy delivered, in his concurrence, the critical fifth vote necessary to reverse the decision in <u>Alameda Books</u>.  Accordingly, his opinion has particular weight (See <u>Bens Bar,</u> supra.) First, and most importantly, Justice Kennedy agrees with the four-member dissent that these types of regulations are not "content neutral." (122 S. Ct. at 1741 (Kennedy, J.))  Second, and even more importantly, Justice Kennedy notes that while secondary effects doctrine may be utilized to reduce secondary effects, it cannot have the consequent effect of reducing either speech or expression related activities, stating:

20

In <u>Renton</u>, the Court determined that while the material inside adult bookstores and movie theatres is speech, the consequent sordidness outside is not. The challenge is to correct the latter while leaving the former, as far as possible, untouched. If a city can decrease the crime and blight associated with certain speech by the traditional exercise of its zoning power, and at the same time leave the quantity and accessibility of the speech substantially undiminished, there is no First Amendment objection. This is so even if the measure identifies the problem outside by reference to speech inside - - that is, even if the measure is in that sense content based. On the other hand, a city may not regulate the secondary effects of speech by suppressing the speech itself. (122 S. Ct. at 1739 (Kennedy, J.))

Justice Kennedy summed up his analysis (which, therefore, represents the "holding" of the Court) as follows:

At the outset, we must identify the claim a city must make in order to justify a content-based zoning ordinance. As discussed above, a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact. The ordinance may identify the speech based on content, but only as a short hand for identifying the secondary effects outside. A city may not assert it will reduce secondary effects by reducing speech in the same proportion. On this point, I agree with Justice Souter. See Post, at 5. The rational of the ordinance must be that it will suppress secondary effects - - and not by suppressing speech. (122 S. Ct. at 1742   (Emphasis added.)[6]

In other words, the city must at least present evidence that the burden on speech imposed by an ordinance is no greater than necessary to further the city's interest in combating secondary effects. <u>Encore Video v. City of San Antonio</u>, 310 F. 3d. 812 (5th Cir. 2002). [Applying the <u>Alameda Books</u> decision to an adult zoning ordinance].

---

[6] As Justice Kennedy's concurrence is the narrowest opinion joining the judgment of the Court in <u>Alameda Books</u>, it controls. <u>Marks v. United States</u>, 430 U.S. 188, 193, 51 L. Ed. 2d 260, 97 S. Ct. 990 (1977) … The municipality's inference that the ordinance "may reduce the costs of secondary effects without substantially reducing speech," must appear reasonable. <u>Joelner</u>, 378 F.3d at 624. (citations omitted)

The "content-neutrality" inquiry is therefore subsumed by the inquiry into a municipality's purpose in enacting the regulation. Joelner, 378 F. 3d. at 623-4; See also Ben's Bar, 316 F.3d at 724 (citing Alameda Books, 535 U.S. at 432-39 (plurality opinion); id, at 448-49 (Kennedy, J. concurring); Pap's A.M., 529 U.S. at 294-96 (plurality opinion); and id, at 310 (Souter, J., concurring in part and dissenting in part)). In evaluating a municipality's underlying regulatory motivations, Court's may consider a "'wide variety of materials including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware.'" Ben's Bar, 316 F.3d at 723 n.28 (quoting Ranch House, Inc. v. Amerson, 238 F.3d 1273, 1280 (11th Cir. 2001)). And while a municipality need not conduct new studies or produce evidence independent of that already generated by other cities, id. at 716-17 (citing Renton, 475 U.S. at 51-52), there still must be some reasonably relevant evidentiary basis for a municipality's action. Joelner at 624.

This burden is not satisfied by mere speculation or conjecture, and the government must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. Edenfield v. Fane, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543, 555 (1993) (emphasis added). Succinctly put, then, the *Defendants* are required to *prove* the causal connection between the asserted governmental interests and the enacted regulations. *See, e.g.*, Keyport, 107 F. 3d at 175; MD II Entertainment, Inc. v. City of Dallas, 935 F. Supp. 1394, 1397-98 (N.D. Tex. 1995); AAK, Inc. v. City of Woonsocket, 830 F. Supp. 99, 104 (D.R.I. 1993); and Nakatomi Investments, Inc. v. City of Schenectady, 949 F. Supp. 988, 997-98 (N.D.N.Y. 1997).

If this connection is not proven, the law cannot stand. *See, e.g.,* East Brooks Books, Inc. v. City

of Memphis, 48 F.3d 220, 226 (6th Cir. 1995)

When analyzing whether regulations impermissibly infringe upon protected expression,

courts *must not accept at face value* the supposed legislative motivation for enacting such laws.

*See, e.g.,* Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 645-46, 114 S.Ct. 2445, 129

L.Ed.2d 497 (1994); Holmberg v. City of Ramsey, 12 F.3d 140 (8th Cir. 1993), cert. denied, 513

U.S. 810 (1994); Discotheque v. City Council of Augusta, 449 S.E.2d 608 (Ga. 1994); United

States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735.  The City of Anchorage has

ignored all of these well-settled precepts of Constitutional law in enacting the ordinance at issue.

The prohibition in the Anchorage Ordinance has to be understood in the context of the

several other provisions in the ordinance, starting with the proposition that the ordinance

regulates "adult oriented businesses." Those businesses are "adult arcades, adult bookstores,

adult cabarets, adult motion picture theaters, adult theaters, and massage establishments." (See

Ordinance 10.40.050A). Each of these terms is in turn defined under the ordinance.

"Specific sexual activity," in turn, means simulated or actual:

a.    Showing of human genitals in a state of sexual stimulation or arousal.

b.    Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sado-masochistic abuse, fellatio or cunnilingus.

c.    Fondling or touching of human genitals, pubic region, buttock or female breasts.

d.    The intrusion of any object into the genital or anal opening regardless of whether the act was consensual;

e.    A separation of a minimum of four (4) feet shall be maintained between entertainers, dancers, and/or strippers and patrons.

23

Section 10.40.050(I), the challenged provision, provides that the municipal clerk may revoke or suspend the license of an adult business for any of the following reasons, including, "allowing any person on the premise to engage in any of the specified sexual activities listed in 10.40.050. These ordinance provisions proscribe activity that comes within the First Amendment's protections. Dream Palace v. Maricopa, 384 F.3d 990, 1018 (9th Cir. 2004)

In prohibiting dancers from engaging in "simulated sex acts," whatever they may be, the city appears to have proscribed the particular movements and gestures that a dancer may make during the course of a performance. Id. This is a total ban on nude and semi-nude dancing in everything but name, … . Id. The Ninth Circuit, in Dream Palace, has recently explained that such restrictions are analyzed under strict, as opposed to intermediate, scrutiny, stating:

> The prohibition at issue in this case is of a different order. It is not a content-discriminatory time, place and manner regulation, so it is not like the ordinances at issue in *Renton* and *Young*. Nor is it a facially-neutral law of general applicability, so it is not like the ordinances in *Barnes* and *Erie*. Section 13(e) "does not . . . simply ban or restrict certain conduct, irrespective of any message that the conduct may be intended to convey; instead, by its own terms the Ordinance is directed to activity that conveys eroticism or sexuality." Brownell v. City of Rochester, 190 F. Supp. 2d 472, 489. The Seventh Circuit considered the same prohibition on "specific sexual activity" in Schultz [v. Cumberland], 228 F.3d [831 (7th Cir. 2000)] at 846-48, and struck it down as an unconstitutional infringement on protected expression.
>
> By restricting the particular movements and gestures of the erotic dancer . . . the Ordinance unconstitutionally burdens the protected expression. The dominant theme of nude dance is an emotional one; it is one of eroticism and sensuality. [The Ordinance] deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate her erotic message. It interdicts the two key tools of expression in this context that imbue erotic dance with its sexual and erotic character -- sexually explicit dance movements and nudity. . . .*Id.* at 847 (internal citations and quotation marks omitted).

24

The Seventh Circuit further explained that the government could not hide behind Renton because "a secondary-effects rationale by itself does not bestow upon the government free license to suppress specific content of a specific message . . . ." *Id.* at 845. "Such a regime would permit the government to single out a message expressly, formulate a regulation that prohibits it, then draw content-neutral treatment nonetheless simply by producing a secondary effects rationale as pre-textual justification." *Id.* at 844; *see also* Brownell, 190 F. Supp. 2d at 484-93 (following Schultz and striking prohibition on "specified sexual activities").

Dream Palace, at 384 F. 3d at 1020-21


In concluding that such restrictions are subject to strict scrutiny, the 9th Circuit stated:

"We are inclined to agree with the Seventh Circuit. Maricopa County cannot avoid the constitutional prohibition on proscribing non-obscene speech "by regulating nude dancing with such stringent restrictions that the dance no longer conveys eroticism nor resembles adult entertainment." Schultz, 228 F.3d at 844. Section 13(e), in preventing erotic dancers from practicing a protected form of expression, does precisely that. We therefore apply strict scrutiny to section 13(e).

In this case, the Anchorage Ordinance at issue attempts to regulate the performance of

adult entertainment by regulating the content of expression in the same way Maricopa County

did in Dream Palace. Therefore, it is subject to strict scrutiny. As the Supreme Court pointed out

in United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 120 S.Ct. 1878, 146

L.Ed.2d 864 (2000) "almost no statute or regulation can meet this standard." In Dream Palace,

the Ninth Circuit reached the same conclusion, finding that the ordinance there failed to meet a

compelling state interest and it was not narrowly drawn to achieve that end. (citing, Simon &

Schuster, Inc. v. New York Crime Victims Bd., 502 U.S. 105, 118, 116 L. Ed. 2d 476, 112 S. Ct.

501 (1991)). The same conclusion must be reached here. In choosing to define the term

"specified sexual activity" to prohibit not only actual sexual activities, but also simulated acts,

the Anchorage Ordinance impermissibly regulates the conduct of dancers. As such, it is subject

to strict scrutiny and most likely will fail for the same reasons the ordinances in Maricopa

County and Cumberland failed. As such, Plaintiff has established a substantial likelihood of success on the merits.

In addition, the Ordinance was adopted by Anchorage without express legislative findings in the record. Nor does the text of the ordinance, its preamble or express legislative findings associated with it demonstrate the legislative motivation behind the Ordinance. Nor does the Ordinance reference any studies and information of which legislators were clearly aware. As the 7th Circuit recently pointed out, "there still must be some reasonably relevant evidentiary basis for a municipality's action." Joelner at 624. This burden is not satisfied by mere speculation or conjecture, and the government must *demonstrate* that the harms it recites are real and that its restriction will in fact alleviate them to a *material degree*. Edenfield, *supra*. As such, the *Defendants* are required to *prove* the causal connection between the asserted governmental interests and the enacted regulations. And while it is true that in this area of the law municipalities are given some deference, it is also true that courts must not accept at face value the supposed legislative motivation for enacting such laws. *See, e.g.*, Turner Broadcasting System, Inc. The Anchorage ordinance lacks the findings of fact or necessary conclusions to demonstrate that it was adopted to reduce a harm that the government found to exist and that the Ordinance is narrowly tailored to alleviate those harm to a *material degree*. In such circumstance, the Plaintiff has met its burden of demonstrating a substantial likelihood of success for this reason as well and therefore the injunction requested should be issued.

**B.    Claims under the Alaska Constitution**

The Plaintiff, in its Complaint, has asserted that the Anchorage Ordinance, as amended also violates the Alaska Constitution. Article I, Sec. 5 of the Alaska Constitution states:

Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

The Alaska Constitution also protects free speech, but in a more explicit and direct manner than the Federal Constitution. Messerli v. State, 626 P.2d 81, 83 (Alaska 1980). Nude dancing is protected under Article I, Section 5 of the Alaska Constitution. Mickens v. Kodiak, 640 P.2d 818, 820 (1982)[7] Laws prohibiting free expression, based on the content of the expression, are sustainable [under the Alaska Constitution] only for the most compelling of reasons. Mickens, 640 P.2d at 821. (emphasis added).

Unlike the U.S. Supreme Court, which has permitted the regulation of nudity and expressive conduct on the basis of a showing of alleged "secondary effects of adult entertainment," the Alaska Supreme Court has stated on more than one occasion, that "it is absurd to punish a person 'because his neighbors have no self-control and cannot refrain from violence.'" Mickens, 640 P.2d at 822; [Stating "it is not permissible to suppress constitutionally protected forms of expression in order to curb the lawless conduct of some of those who are reacting to it, unless other law enforcement techniques which do not infringe first amendment freedoms are unavailable or likely to be ineffective."], citing, Breese v. Smith, 501 P.2d 159, 174

---

[7] Art. I Sec. 22 of the Alaska Constitution specifically also recognizes that "The right of the people to privacy is recognized and shall not be infringed." The Alaska Supreme Court has held that this express right to privacy is broader than that afforded by the United States Constitution Messerli, 626 P.2d at 83. Furthermore, Article I, section 1, of the Alaska Constitution provides:

*Inherent Rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

n.60 (Alaska 1972), *Quoting* from Z. Chaffee, Jr., Free Speech in the United States 151-52 (1941).

Once a fundamental right under the constitution of Alaska has been shown to be involved and it has been further shown that this constitutionally protected right has been impaired by governmental action, then the government must come forward and meet its <u>substantial burden</u> of establishing that the abridgment in question was justified by a <u>compelling governmental interest</u>. This strict scrutiny standard has been stated to "best comports with the kind of ordered liberty which represents the core of Alaska's constitutional heritage." <u>Messerli</u>, 626 P.2d at 84. In order for a governmental enactment to be upheld under "strict scrutiny", it must be *necessary* to a *compelling* state interest, and must be *narrowly drawn* to achieve that end.   <u>Widmar v. Vincent</u>, 454 U.S. 263, 270, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (emphasis added). As the Supreme Court pointed out in <u>Playboy</u>, supra, "almost no statute or regulation can meet this standard."

Furthermore, the Ordinance in this case discriminates against business which offer expressive activities but do not sell liquor from those that do.[8] Specifically, the Ordinance only applies to those business which <u>do not sell alcoholic beverages on the premise.</u> In <u>Mickens</u>, the Alaska Supreme Court held that "discrimination on the basis of the content of protected forms of expression cannot be tolerated except where there are 'clear reasons' for it." <u>Mickens</u>, 640 P.2d at 822; citing <u>Erznoznik v. City of Jacksonville</u>, 422 U.S. 205, 215, 45 L. Ed. 2d 125, 134, 95 S. Ct. 2268 (1975). In <u>Mickens</u>, the Alaska Supreme Court went on to state that "our state constitution, …, 'draws no distinction between free speech in a bar and free speech on a stage,

---

[8] The Ordinance only applies to adult cabarets which are specifically defined to not include a business licensed to sell alcohol by the glass. (See Ex. 2, Ordinance 10.40.050(A))

28

and no provision of our Constitution gives a preferred position to regulation of alcoholic beverages." Mickens, 640 P.2d at 821. As with Mickens, [albeit reversed] it is unlikely that Anchorage can offer a justification for distinguishing between entertainment involving expression where alcohol is not sold from establishments where expression is permitted and intoxicating liquor is sold. Without such a justification, the ordinance cannot stand.

In the case at bar, Anchorage has attempted to impose certain restrictions on expression under the terms of the Ordinance, which only apply to businesses, such as Plaintiff's, which offers expressive activities, but do not sell alcoholic beverages. No justification is provided in the Ordinance for these restrictions, let alone a substantial and compelling reason for its enactment. Furthermore, in order to justify such restrictions, the Government must come forth not only with a compelling governmental reason, but also must demonstrate that the means chosen are the most narrowly tailored means for achieving the stated harm it is attempting to alleviate. In this case, it is suggested that the government will not be able to meet this significant burden of demonstrating not only a compelling governmental reason to restrict performances before adult audiences who knowingly and willingly have come to view them but also that the means chosen to do so are the most narrowly drawn means available to serve that interest. [9] Because Anchorage likely cannot meet its burden under the Alaska Constitution to justify this Ordinance, the Plaintiff has a substantial likelihood of success on the merits and therefore enforcement of the Ordinance should be enjoined.

---

[9] For example, the Government must demonstrate that a no sexual contact provision as found in the liquor code would not be sufficient to serve the governments interest or that a 1, 2, or 3 foot restriction on the space between dancers and patrons would not be sufficient.

## C.    Vagueness and Overbreadth

The Anchorage Ordinance is also unconstitutionally vague. It is recognized that "a regulation must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" Kolender v. Lawson, 461 U.S. 352, 357, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983); see also United States v. Adams, 343 F.3d 1024, 1035 (9th Cir. 2003), cert. denied, 159 L. Ed. 2d 779, 124 S. Ct. 2871 (2004). A greater degree of specificity and clarity is required when First Amendment rights are at stake. Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1057 (9th Cir. 1986). As the Supreme Court has noted, constitutional concerns are heightened when a vague statute "abuts upon sensitive areas of basic First Amendment freedoms," as such a statute:

> ". . .'operates to inhibit the exercise of [those] freedoms.'  Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone'. . . than if the boundaries of the forbidden areas were clearly marked.'"

Grayned v. City of Rockford, 408 U.S. 104, 109; 925 S.Ct. 2294; 33 L.Ed.2d 222 (1972). Succinctly put, *precision in draftsmanship* is the touchtone of constitutionality for a regulation which impacts upon First Amendment rights. *See, e.g.*, Keyishian v. Board of Regents, 385 U.S. 589, 603-04, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

In addition to these concerns, there is an additional component to the vagueness doctrine. In Kolender, the Supreme Court observed that:

> ". . .the more important aspect of the vagueness doctrine 'is not actual notice [to the accused], but the other principal element of the doctrine - *the requirement that a legislature establish minimal guidelines to govern law enforcement*.'
>
> * * *
>
> Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policeman, prosecutors, and juries *to pursue their personal predilections*."

Kolender, 461 U.S. at 358 (emphasis added, clarification added and in original).

In this case, the Anchorage Ordinance uses subjective and confusing language in its description of the activities prohibited, thus rendering the definition "specified sexual activities" unconstitutionally vague. To this end, Section A of the Ordinance defines as specified sexual activities, and includes in its definition of specific sexual activity, "simulated or actual: a.) Showing of human genitals in a state of sexual stimulation or arousal; b.) Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sado-masochistic abuse, fellatio or cunnilingus; c.) Fondling or touching of human genitals, pubic region, buttock or female breasts; d.) The intrusion of any object into the genital or anal opening regardless of whether the act was consensual; and e.) A separation of a minimum of four (4) feet shall be maintained between entertainers, dancers, and/or strippers and patrons.

These provision, however, are not contained in a regulatory provisions of the ordinance; rather they are contained in the definitional section of the Ordinance. Thus, the first question that arises is whether this provision is a regulatory provision at all, or rather is that a term which is merely definitional without any regulatory impact at all.

To this end, *Adult-oriented establishment, or adult business,* is defined to

include, but is not limited to, adult bookstores, adult motion picture theaters, adult mini-motion picture establishments, adult cabarets, physical culture studios, massage parlors, escort services, or similar type businesses where, by the nature of the business, minors under the age of 18 are denied entry, or businesses which are prohibited by law from having minors or unaccompanied minors on the premises for reasons other than the sale of liquor. If premises, whose primary business is overnight lodging, offers adult movies via a cable, closed circuit or pay per view system, in the absence of any other adult entertainment activities, the availability of such movies, does not render the business an adult-oriented establishment for the purposes of this section.

31

Under the definitions contained in the Ordinance, an adult cabaret, such as Plaintiff's business is an adult business, as it meets the definition of an adult cabaret, which is defined under the code as a cabaret which features topless dancers, strippers, male or female impersonators, or similar entertainers. An adult cabaret does not include an establishment licensed for sale of alcoholic beverages."

In fact, the term adult entertainment is defined under the ordinance as "any exhibition of any motion pictures, live performance, display or dance of any type, which has as its dominant theme, or is distinguished or characterized by an emphasis on, any **actual or simulated specified sexual activities**, or specified anatomical areas, as defined in this section." [10]

Thus, to offer adult entertainment, and thus fall within the definitions of an adult business, one must first offer adult entertainment, which includes offering actual or simulated specified sexual activities. In other words, to be adult entertainment, one must engage in specified sexual activities. [11]

---

[10] The definition of specified sexual activities is important to other definitions in the Ordinance as well. For example, an *Adult mini-motion picture theater* means an enclosed building with a capacity of less than 50 persons used for presenting material having as its dominant theme, or distinguished or characterized by an emphasis on, matters depicting, describing or relating to specified sexual activities, or specified anatomical areas, as defined in this section, for observation by patrons therein. Likewise, an *Adult motion picture theater* means an enclosed building with a capacity of 50 or more persons used for presenting material having as its dominant theme, or distinguished or characterized by an emphasis on, matters depicting, describing or relating to specified sexual activities, or specified anatomical areas, as defined in this section, for observation by patrons therein.

[11] It is unclear how someone could simulate fondling or touching of the genitals or breasts or simulate "a separation of a minimum of four (4) feet shall be maintained between entertainers, dancers, and/or strippers and patrons" or how a movie or performance of any kind, characterized by depicting specified sexual activities could comply with or for that matter, could not fall within this definition.

The language used in the Ordinance in defining specified sexual activities and thus adult entertainment is unconstitutionally vague. See City of Chicago v. Morales, 527 U.S. 41, 56-64, 144 L. Ed. 2d 67, 119 S. Ct. 1849 (1999) (holding a provision criminalizing loitering, which is defined as "to remain in any one place with no apparent purpose," void for vagueness because the provision was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene"); Tucson Woman's Clinic v. Eden, 379 F.3d 531, 554-55 (9th Cir. 2004) (holding a statute requiring physicians to treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" void for vagueness because it "subjected physicians to sanctions based not on their own objective behavior, but on the subjective viewpoint of others") (internal quotation and citation omitted); Free Speech Coalition v. Reno, 198 F.3d 1083, 1095 (9th Cir. 1999), aff'd sub nom. Ashcroft v. Free Speech Coalition, 535 U.S. 234, 152 L. Ed. 2d 403, 122 S. Ct. 1389 (2002) (holding a provision that criminalized sexually explicit images that "appear to be a minor" or "convey the impression" that a minor is depicted unconstitutionally vague because it was unclear "whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution"). In this case, it is abundantly clear that the Anchorage ordinance is inherently subjective. For example, how does one know if they are simulating the showing of human (and more particularly female) genitals in a state of sexual stimulation or arousal? Likewise, how does one know if they are simulating the fondling or touching of human genitals, pubic region, buttock or female breasts[12] or simulating a separation of a minimum of four (4) feet

---

[12] Apparently under the Anchorage Ordinance, one would engage in specified sexual acts by merely scratching an itch in a particularly private area or by brushing lint from ones sweater or pants.

shall be maintained between entertainers, dancers, and/or strippers and patrons? The answer is they don't and as a result, enforcement based upon "the subjective viewpoint of others." As such, the Anchorage Ordinance is vague.

The Anchorage Ordinance is also overbroad. Under the overbreadth doctrine, a plaintiff may challenge government action by showing that it may inhibit the First Amendment rights of parties not before the court. *See* Young v. City of Simi Valley, 216 F.3d 807, 815 (9th Cir. 2000); 4805 Convoy, Inc. v. City of San Diego, 183 F.3d 1108, 1111 (9th Cir. 1999). The overbreadth doctrine functions as an exception to "the general prohibition on a litigant's raising another person's legal rights," Allen v. Wright, 468 U.S. 737, 751, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984), and is based on the idea that "the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." Forsyth County v. Nationalist Movement, 505 U.S. 123, 129, 120 L. Ed. 2d 101, 112 S. Ct. 2395 (1992). When examining a law for overbreadth, a court's first task is to determine "whether the enactment reaches a substantial amount of constitutionally protected conduct." Turney v. Pugh, 400 F.3d 1197, 1200-1201 (9th Cir. 2005). When government "restricts the expression of ideas, alarm bells should sound for all of us. The freedom of speech -- including both a speaker's freedom to convey an idea, and a listener's freedom to receive it -- is at the heart of the protections that our Constitution guarantees so that our society may remain a free one. Turney, at 1205. In this case, the Plaintiff, whose own speech is chilled under by the ordinance, has standing to raise an overbreadth challenge and the overbreadth of the Ordinance amendments is obvious.

To this end, the Ordinance provision at issue is not a regulatory provision; rather, it is a definitional provision, required to be construed as part of the definition of specified sexual

activities. In fact, any material which is distinguished by a dominant theme of actual or simulated specified sexual activities is adult entertainment, which is defined under the ordinance as "any exhibition of any motion pictures, live performance, display or dance of any type, which has as its dominant theme, or is distinguished or characterized by an emphasis on, any **actual or simulated specified sexual activities**, or specified anatomical areas, as defined in this section." As such, any of the following acts are now specified sexual act, including "simulated or actual: a.) Showing of human genitals in a state of sexual stimulation or arousal; b.) Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sado-masochistic abuse, fellatio or cunnilingus; c.) Fondling or touching of human genitals, pubic region, buttock or female breasts;  d.) The intrusion of any object into the genital or anal opening regardless of whether the act was consensual; and e.) A separation of a minimum of four (4) feet shall be maintained between entertainers, dancers, and/or strippers and patrons. Pursuant to Ordinance 10.40.050(B)(5) "No person shall advertise or offer services regulated by this chapter unless they are licensed to provide such services pursuant to this chapter."  Pursuant to the now amended Ordinance, the clerk may now revoke the adult license of any licensee for "[a]llowing any person on the premise to engage in any of the specified sexual activities listed in 10.40.050A." (See Ordinance 10.40.050 (I)(g)(3)).

Thus any business which simulates an entertainer, dancer or stripper touching themselves, who simulates sexual acts, or who simulates coming within 4 feet of a patron is now performing specified sexual activities and is now required to have an adult license. [Provided, of course, such a business does not serve alcohol]. As a result, performance by just about every dance troupe in Anchorage is now rendered adult and required to be licensed under the

35

ordinance, as is every performance by the likes of Brittney Spears, Madonna, or Michael Jackson as is just about every tavern or bar which permits entertainers of any scope to come within four feet of its patrons. Similarly, performances of Hair, Equus, and a Chorus Line are now adult entertainment as these performances not only have performers who perform dance movements which include "touching their breasts, buttocks or pubic area" but simulate sexual activities as defined under the Ordinance. Finally, all dancing, even that which is done by performers fully clothed, whether performed by professional entertainers or customers wearing a formal wedding dress or a pant suit are now performing "specified sexual activities" and therefore the location in which they perform must now be licensed as and adult cabaret by the City. Of course, once licensed these activities can no longer be performed or the clerk may revoke or suspend the license.[13] As such the Ordinance is unconstitutionally overbroad and should be enjoined.

**D.    Equal Protection Considerations**

It is well-recognized that the Equal Protection Clause of the Fourteenth Amendment and the First Amendment restrict the power of the state to discriminate between speakers with respect to the ideas, subject matter or content of messages in forums which have been thus opened. Police Department of Chicago v. Mosley, 408 U.S. 92, 96, 92 S. Ct. 2286, 2290, 33 L. Ed. 2d 212 (1972). When the state attempts such a restriction, "the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." Carey v. Brown, 447 U.S. 455, 461-62, 100 S. Ct. 2286, 2290, 65 L. Ed. 2d 263 (1980); accord, Consolidated Edison Co. v.

---

[13] Of course one of the requirements under Renton, is the sufficiently of alternative avenues of communication. It is doubtful if any city could provide enough locations to meet the number of

Public Service Comm'n, 447 U.S. 530, 537, 100 S. Ct. 2326, 2333, 65 L. Ed. 2d 319 (1980). It is

the state's burden to justify content-based discrimination. See Carey v. Brown, supra, 447 U.S. at

461-62, 100 S. Ct. at 2290. Unless resting upon substantial state interests, the discrimination may

not continue. Jaffe v. Alexis, 659 F.2d 1018, 1020-1021 (9th Cir. 1981) When a government

allows some forms of protected speech but prohibits other forms of protected speech, the Equal

Protection Clause is implicated, and the government must show that the distinctions are "finely

tailored to serve substantial state interests." Perry v. Los Angeles Police Dep't, 121 F.3d 1365,

1368 (9th Cir. 1997), citing, Carey v. Brown, supra.

Assuming arguendo that the definition of the dancer buffer zoned contained in Section e

of Ordinance 10.40.050 is 1.) an operative provision of the Ordinance and is not unconstitutional

for the reasons set forth above, this provision, which creates differing rules for liquor and non-

liquor establishments is facially suspect. Courts, including the Supreme Court, have consistently

held that there are *increased* risks of secondary effects when combining nudity (or partial nudity)

and alcohol. *See, e.g.*, Jott, Inc. v. Charter Township of Clinton, 569 N.W.2d 841, 854-55 (Mich.

App. 1997) (regulation banning nudity in establishments that sold alcoholic beverages was

constitutional as a measure to "eradicate the effects of 'undesirable behavior' stemming from a

*combination of alcohol and nudity*") (emphasis added); Lounge Management, Ltd. v. Trenton,

580 N.W.2d 156, 161-62 (Wis. 1998), cert. denied, 119 S.Ct. 511 (1998) (ordinance which

prohibited all depictions of nudity -- whether live or pictorial -- in all business establishments

was unconstitutionally overbroad because the regulation had "no connection to the *potential*

*harmful secondary effects arising from nude dancing in liquor licensed establishments*")

---

sites that are now required for all of the newly defined adult entertainment. And of course, there

(emphasis added); New York State Liquor Authority v. Bellanca, 452 U.S. 714, 718, 101 S.Ct.

2599, 69 L.Ed.2d 357 (1981) (in upholding a regulation that banned topless dancing in

establishments that were licensed to serve alcoholic beverages, the Court cited to the New York

State Legislative Annual 150 (1977), which stated that "[c]ommon sense indicates that any form

of *nudity coupled with alcohol in a public place begets undesirable behavior*") (emphasis

added); City of Newport, Kentucky v. Iacobucci, 479 U.S. 92, 96, 107 S.Ct. 383, 93 L.Ed.2d 334

(1986) (the city commission in the preamble to an ordinance prohibiting nude or nearly nude

activity on premises licensed to sell alcoholic beverages had determined that "*nude dancing in*

*establishments serving liquor was 'injurious to the citizens' of the city*") (emphasis added). *See,*

*also*, California v. La Rue, 409 U.S. 109, 114, 118, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); and

Doran v. Salem Inn, Inc., 422 U.S. 922, 932-33, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

Accordingly, if anything, the government has *greater* power to restrict expression when

combined with alcohol. Here, however, Anchorage turns this concept on its head, and permits

liquor bars to present erotic dancing without the buffer zone, while at the same time imposing the

buffer zone only on non-liquor facilities. Given the precedent set forth immediately above, it is

impossible for Anchorage to constitutionally justify this distinction. "An ordinance that by its

terms makes it burdensome, expensive or unreasonably difficult for certain groups to exercise

First Amendment rights by its very nature violates that Amendment." Congregation Lubavitch

v. City of Cincinnati, 807 F. Supp. 1353, 1358 (S.D. Ohio 1992). If the economic effect of an

ordinance provisions constitute a "significant impairment" to the financial viability of an adult

---

is no evidence in the record to justify such restrictions in the first instance.

business, it is unconstitutional.  DiMa Corp. v. Town of Hallie, 185 F.3d 828, 831, (7th Cir. 2000).

In this case, the Anchorage Ordinance seeks to impose greater restrictions on non-alcohol entertainment facilities than it does on alcohol facilities. Pursuant to Mickens, supra, this in not permissible under Alaska Constitutional law; nor is this distinction justified by the text of the ordinance, any study identified in the ordinance (there are none), nor are factual findings made to support the ordinance. Accordingly, the City has failed to justify why it is treating some members of the public in a manner which makes it more expensive and burdensome for them to engage in expression, while at the same time ignoring similarly situated persons, in a commonly recognized environment where it is more likely to cause adverse effects.  For this reason as well, Plaintiff has a substantial likelihood of success on the merits and the requested injunction should issue.

### E. The First Amendment and Commerce Clause Considerations Relative to Prohibitions on Broadcasting

Section J 3(d) of Ordinance 10.40.050, as amended, states:

No adult entertainment shall be open to view from outside the licensed premise, **or broadcast to any site outside the licensed premise**. Permanent barriers shall be installed and maintained at each entrance and exit to screen the interior of the premise from public view. Exterior windows shall be covered with opaque covering at all times.

In essence, this provision prohibits the broadcast of dance entertainment performance from outside the premise to any other location. This prohibition violates not only the First Amendment to the U.S. Constitution, but also the Commerce Clause. These various constitutional violations will be discussed herein.

39

## A.   First Amendment Violations

Sexual expression which is indecent but not obscene is protected by the First Amendment The Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. (i.e. Strict Scrutiny). Sable Communications of California, Inc. v. FCC, 492 U.S. 115, 126 (U.S. 1989).   The First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it." Martin v. City of Struthers, Ohio, 319 U.S. 141, 143, 87 L. Ed. 1313, 63 S. Ct. 862 (1943). It protects material disseminated over the internet as well as by the means of communication devices used prior to the high-tech era. Reno v. ACLU, 521 U.S. 844, 868, 138 L. Ed. 2d 874, 117 S. Ct. 2329 (1997). "The right to receive publications is . . . a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." Lamont v. Postmaster General of U.S., 381 U.S. 301, 308, 14 L. Ed. 2d 398, 85 S. Ct. 1493 (1965) (Brennan, J., concurring).

Supreme Court precedents teach that "where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities "simply by averting [our] eyes." U.S. v. Playboy, 529 U.S. at 813, citing, Cohen v. California, 403 U.S. 15, 21, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971); accord, Erznoznik v. Jacksonville, 422 U.S. 205, 210-211, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975). "As a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" Ashcroft v. ACLU, 535 U.S. 564, 573 (2002), citing, Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65, 77 L. Ed. 2d 469, 103 S.

40

Ct. 2875 (1983) (quoting <u>Police Dep't of Chicago v. Mosley</u>, 408 U.S. 92, 95, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972)). The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse. "The possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted . . . ." <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. at 255 (2002); citing, <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 612; 93 S. Ct. 2908; 37 L. Ed. 2d 830 (1973). To preserve these freedoms, and to protect speech for its own sake, the Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct. See <u>Kingsley Int'l Pictures Corp.</u>, 360 U.S. at 689; see also <u>Bartnicki v. Vopper</u>, 532 U.S. 514, 529, 149 L. Ed. 2d 787, 121 S. Ct. 1753 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it"). The government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." <u>Hess v. Indiana</u>, 414 U.S. 105, 108, 38 L. Ed. 2d 303, 94 S. Ct. 326 (1973) (per curiam). As the <u>Playboy</u> Court pointed out, restrictions which attempt to do so are subject to strict scrutiny. <u>Playboy</u>, at 813.[14]

The Supreme Court has emphasized that strict scrutiny applies to content-based regulation of Internet speech. See <u>Reno v. ACLU</u>, 521 U.S. at 874. To satisfy strict scrutiny, the

---

[14] The Supreme Court stated in <u>Playboy</u>: "Our zoning cases, on the other hand, are irrelevant to the question here. Post, at 4 (Breyer, J., dissenting) (citing <u>Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986), and <u>Young v. American Mini Theatres, Inc.</u>, supra. We have made clear that the lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content-based regulations targeting the primary effects of protected speech. <u>Reno</u>, 521 U.S. at 867-868; <u>Boos v. Berry</u>, 485

law in question must be (1) narrowly tailored to (2) promote a compelling government interest. See Playboy, 529 U.S. at 813. The government has the burden of showing that a content-based regulation of speech "is necessary to serve a compelling state interest." See First Nat'l Bank v. Bellotti, 435 U.S. 765, 786, 788-89, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978). This burden is not insignificant. Merely asserting that the government has an interest in preventing some harm cannot justify the suppression of free speech if insufficient evidence exists to suggest that such harm is likely to occur in the absence of regulation. That is, "that the Government's asserted interests are important in the abstract does not mean, however, that the [regulation] will in fact advance those interests. When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" Turner Broad. Sys. v. F.C.C., at 664 (quoting Quincy Cable TV, Inc. v. FCC, 248 U.S. App. D.C. 1, 768 F.2d 1434, 1455 (DC Cir. 1985)).

In this case, the Ordinance in question prohibits the broadcasting of adult entertainment from inside the premise to locations outside the premise. Such restrictions are no different than those found to be unconstitutional in Playboy, Ashcroft, Reno, or Turner. It defines and prohibits speech based upon its content. As such, it is subject to strict scrutiny and is presumptively invalid. Thus to survive strict scrutiny, the Anchorage must demonstrate that its (1) narrowly tailored to (2) promote a compelling government interest. As the Supreme Court in Playboy pointed out, "It is rare that a regulation restricting speech because of its content will ever be permissible." Playboy 529 U.S. at 882-883. As such, the Plaintiff's have a substantial likelihood of success on the merits and the requested injunction should be granted for this reason as well.

---

U.S. 312, 320-321; 108 S. Ct. 1157; 99 L. Ed. 2d 333 (1988)  The statute now before us burdens

### B.    Commerce Clause Violations

The Constitution delegates to Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. United States v. Lopez, 514 U.S. 549, 552-553 (1995). Our Constitution "was framed upon the theory that the peoples of the several states must sink or swim together." 125 S. Ct. 2419; 162 L. Ed. 2d 407; 2005 American Trucking Ass'n v. Michigan P.S.C, ___ U.S. __, 125 S. Ct. 2419, 2422; 162 L. Ed. 2d 407 (2005); Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 523, 79 L. Ed. 1032, 55 S. Ct. 497 (1935). Thus, the Supreme Court has consistently held that the Constitution's express grant to Congress of the power to "regulate Commerce . . . among the several States," Art. I, § 8, cl. 3, contains "a further, negative command, known as the dormant Commerce Clause," Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 179, 131 L. Ed. 2d 261, 115 S. Ct. 1331 (1995), that "creates an area of trade free from interference by the States," Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318, 328, 50 L. Ed. 2d 514, 97 S. Ct. 599 (1977) (internal quotation marks omitted). This negative command prevents a State from "jeopardizing the welfare of the Nation as a whole" by "placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." Id, citing, Jefferson Lines, supra. The commerce power "is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. "United States v. Lopez, at 553 (1995) three broad categories of activity that Congress may regulate under its commerce power. Id, citing, Perez v. United States, 402 U.S.

---

speech because of its content; it must receive strict scrutiny.

146, 150; 28 L. Ed. 2d 686; 91 S. Ct. 1357 (1971); First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i. e., those activities that substantially affect interstate commerce. United States v. Lopez, 558-559 (U.S. 1995) (multiple citations omitted). Just as state acquiescence to federal regulation cannot expand the bounds of the Commerce Clause, see, e.g., United States v. Morrison, 529 U.S. 598, 661-662; 146 L. Ed. 2d 658; 120 S. Ct. 1740 (2000), (Breyer, J., dissenting), so too state action cannot circumscribe Congress' plenary commerce power. See United States v. Darby, 312 U.S. 100, 114, 85 L. Ed. 609, 61 S. Ct. 451 (1941) ("That power can neither be enlarged nor diminished by the exercise or non-exercise of state power"). Supreme Court case law firmly establishes Congress' power to regulate purely local activities that are part of an economic "class of activities" that have a substantial effect on interstate commerce. Gonzales v. Raich, 125 S. Ct. 2195, 2205 (2005) In this vein, the Supreme Court has "reiterated that when "'a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'" Gonzales, supra at 2206; citing, Lopez, 514 U.S., at 558, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (emphasis deleted) (quoting Maryland v. Wirtz, 392 U.S. 183, 196, n. 27, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968)). State laws that discriminate against interstate commerce face "a virtually per se rule of invalidity." Granholm v. Heald, 125 S. Ct. 1885, 1897 (U.S. 2005); citing, Philadelphia v. New Jersey, 437 U.S. 617, 624, 57 L. Ed. 2d 475, 98 S. Ct. 2531 (1978).

44

In order to establish a claim under the so-called dormant Commerce Clause, [Defendants] must show that the state law or regulation in question penalizes interstate commerce, and does so without sufficient economic justification." National Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 857 (9th Cir.), amended, on denial of reh'g en banc, 312 F.3d 416 (2002); Two circuits, the Tenth and the Second have found the regulations attempting to impose restrictions on internet dissemination of speech are per se violations of the Commerce Clause. (See Am. Booksellers Found. v. Dean, 342 F.3d 96 (2nd Cir, 2003); ACLU v. Johnson, 194 F. 3d 1149 (10th Cir. 1999)).[15] In ruling a regulation prohibiting sexually explicit speech on the basis that it impermissibly infringed on commerce, the Tenth Circuit, in Johnson, stated:

> As the Pataki court stated in rejecting that same argument, that analysis "is unsupportable in light of the text of the statute itself . . . and the reality of Internet communications." Pataki, 969 F. Supp. at 169. Section 30-37-3.2(A) contains no express limitation confining it to communications which occur wholly within its borders. Rather, it "applies to any communication, intrastate or interstate, that fits within the prohibition and over which [New Mexico] has the capacity to exercise criminal jurisdiction." Johnson at 1161, citing, Pataki, 969 F. Supp. at 169-70.

The identical reasoning applies in this case. The Anchorage statute attempts to burden the transmission of speech which is **broadcast to any site outside the licensed premise.** Such locations would necessarily include out-state consumers, via the internet. (See **Exhibit 3,**

---

[15] See also, Cyberspace Communs., Inc. v. Engler, 142 F. Supp. 2d 827, 831 (D. Mich. 2001) A statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." Healy v. The Beer Institute, et al., 491 U.S. 324, 336, 105 L. Ed. 2d 275, 109 S. Ct. 2491 (1989). Thus, regardless of the legislature's intent to regulate solely within the State's own borders, the Act would, in effect, attempt to control communications occurring outside of the State of Michigan.

Affidavit, ¶ 13). As such, it inhibits Commerce and is a per se violation of the Commerce Clause. As such, the Ordinance should be enjoined for this reason as well.

**2.      The Plaintiff will Suffer Irreparable Harm Absent the Entry of the Injunction**

It is well established that any infringement of First Amendment rights, for even minimal periods of time, constitutes irreparable injury. Elrod v. Burns, 427 U.S. 347, 353, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Plaintiffs engage in the presentation of performance dance entertainment wherein the entertainers are at times fully clothed, at other times semi-nude ("topless"), and sometimes fully nude. Even live entertainment that is fully nude receives protections under the First Amendment. *See, e.g.*, City of Erie v. Pap's A.M., supra (2000) (plurality), *citing*, Barnes v. Glen Theatre, Inc., 501 U.S. at 565-66; and Schad v. Mt. Ephraim, 452 U.S. at 66. Similarly, topless performance dance entertainment receives constitutional protections. G&V Lounge, Inc. v. Michigan Liquor Control Comm'n., 23 F.3d at 1078 (the inability of plaintiffs there to present topless dancing constituted irreparable harm). *See also*, Nakatomi Investments, Inc. v. City of Schenectady, 949 F. Supp. at 999 ("It is immaterial for constitutional purposes that nude dancing may be performed for profit"), *citing* Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). Topless and fully nude entertainment is also protected by Article I, Section 5 of the Alaska Constitution. Mickens, supra.

As has been set forth above, Plaintiff's expressive freedoms under both the federal and state Constitutions are being, and will be, "chilled" if not out-right abrogated if the ordinance is permitted to be enforced. Neither Plaintiff nor the entertainers who perform on its premises have any way of knowing just what conduct may be considered to be a violation of this ordinance, and the entertainers are altering their performances for fear of further enforcement actions.

46

Accordingly, if this Court does not enter a temporary and preliminary injunction and restraining order, Plaintiff's First Amendment rights (as well as those of its entertainers and patrons) will be irreparably harmed, and no subsequent money judgment, or no subsequent ultimate resolution by this Court of Plaintiff's constitutional claims as asserted here, will make Plaintiff "whole." As such, Plaintiff has established irreparable harm as a matter and therefore, the Plaintiff has met this requirement for entry of injunctive relief.

### 3.    The Public Interest Favors Entry of the Injunction

The public has an unquestionable and uneradicable interest in the protection of First Amendment rights. "[I]t is *always* in the public interest to prevent the violation of a party's constitutional rights." G&V Lounge, 23 F.3d at 1079, *citing* Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 383, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979); and Planned Parenthood Ass'n. v. City of Cincinnati, 822 F.2d 1390, 1400 (6th Cir. 1987). That interest is particularly acute when freedom of expression is infringed by a prior restraint, "the most serious and least tolerable infringement on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). As demonstrated in the analysis here, the Defendants' actions infringe on constitutionally protected rights. "[S]ince it may be assumed that the Constitution is the ultimate expression of the public interest," Llewelyn v. Oakland County Pros., 402 F. Supp. 1379, 1393 (E.D. Mich. 1975), it is safe to say that the public interest would be served -- not disserved -- by the issuance of a preliminary injunction here. Thus, this element also weighs in favor of granting the requested injunction.

The potential harm to Plaintiff is that outlined above -- the deprivation of its constitutional rights. The potential harm to the Defendants is merely the inability to enforce the Ordinance,

which Plaintiff asserts is, at best, constitutionally suspect. Furthermore, the relief sought by this Motion is nothing more than that which Anchorage has already voluntarily agreed to live by pending trial in this matter. In addition, and specifically regarding the public interest, Defendants are not precluded from enforcing all other laws and ordinances against the Plaintiff during the pendency of this action. The relief sought herein by Plaintiff is strictly for the purpose of *maintaining the status quo,* as it has existed for many years, while the constitutional issues raised are properly adjudicated. It is undeniable, then, that the potential harm to the Plaintiff, if a preliminary injunction is not issued, outweighs any harm to the Defendant if such injunction is granted. Accordingly, this factor favors the issuance of a preliminary injunction as well.

### 4.    The Balance of Harm Favors Entry of the Injunction

There is no dispute as to the place that First Amendment rights exist in the hierarchy of fundamental constitutional protections. As the Supreme Court has noted, the freedoms enumerated in the First Amendment are protections upon which all other constitutional rights depend. Palco v. Connecticut 302 US 319, 326-327(1937) (Elrod, supra at 1560-1561). Because this is a facial challenge, the plaintiff is also entitled to raise the constitutional rights of all person effected by the ordinances. Whatever interests the City of Anchorage may have in the enforcement of its ordinance, those interests cannot outweigh the fundamental constitutional rights of the plaintiff. As such, the balance of harm tips sharply in favor of Plaintiff; therefore, a temporary restraining order and a preliminary injunction should issue.

### V.    CONCLUSION

Without repeating each of Plaintiff's arguments, the Plaintiff asserts that it has established the probable unconstitutionality of the Ordinance amendments via the arguments in this Brief.

Plaintiff also asserts that it has met all of the requirements for a preliminary injunction in this matter, by demonstrating that the Ordinance, as adopted by Anchorage, likely violates numerous provisions of both the U.S. and Alasaka Constitutions. As a result, this Court should grant the injunctive relief requested by the Plaintiff herein.

## VI.   RELIEF REQUESTED

For the reasons set forth herein, Plaintiff respectfully requests that this Court enter the requested Temporary Restraining Order and thereinafter enter a Preliminary Injunction enjoining the recent amendments to Ordinance 10.40.050 of the Anchorage Municipal Code.

Respectfully Submitted,

Dated: May 14, 2006

_One of Plaintiff's Attorneys_

KENNETH JACOBUS
Attorney for Plaintiff
310 K Street, Suite 200
Anchorage, AK 99501-2064
(907) 277-3333 – Phone
(907) 264-6666 - Fax
kpjlaw@yahoo.com

ALLAN S. RUBIN*
Co-Counsel for Plaintiff
DRAPER & RUBIN, P.L.C.
29800 Telegraph Road
Southfield, Michigan 48034
(248) 358-9400 – Phone
(248) 358-9729 – Fax
allan@draper-rubin.com
*Admitted Pro Hac Vice

49

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true
copy of this Motion and Exhibits was mailed
on May 14, 2006, to:

Thomas M. McDermott
Office of the Anchorage Municipal Attorney
P.O. Box 196650
Anchorage AK 99519-6650

_____
Kenneth P. Jacobus