Thomas M. McDermott
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
(907) 343-4545

Attorney for Defendants
Municipality of Anchorage

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SANDS NORTH, INC., d/b/a FANTASIES ON 5TH AVENUE, an Alaskan Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| MUNICIPALITY OF ANCHORAGE, ALASKA, an Alaskan Municipal Corporation, | ) ) ) |
| Defendant. | ) ) ) |

U.S. District No. 3:05-cv-00256 (TMB)

## OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

**I.**     **Introduction**:

Sands North Inc. has moved for a preliminary injunction, seeking to preclude enforcement of certain sections of Assembly Ordinance (AO) 2005-139 (the "amendments") which amends the Municipality's adult entertainment ordinance. At the hearing on May 17, 2006, the Court and the parties clarified that only three specific sections of AO 2005-139 are challenged in this motion. Sands North seeks to enjoin Section 1.A.c of AO 2005-139, which proscribes certain sexual activities; Section 1.A.e,

which imposes a four foot "buffer zone" between dancers and patrons; and Section 1.J.3.d, which provides that no adult entertainment shall be visible outside the licensed premises.

The motion for preliminary injunction should be denied. The likelihood that Sands North will prevail on the merits or suffer irreparable harm is very low. The Municipality's four foot "buffer zone" restriction is intended to prevent dancers and patrons from touching each other, which is not constitutionally protected conduct. To the extent that constitutionally protected conduct is affected, the amendments are subject only to intermediate scrutiny, because they are intended to ameliorate the negative secondary effects of sex-oriented businesses, such as crime, disease, and urban blight. The restrictions on "specified sexual activities" are neither vague nor overbroad; nor do they violate equal protection principles. Sands North's dormant commerce clause claim fails, because the amendments do not burden out-of-state commerce. The proposed injunction does not promote the public interest; the only interest at stake is Sands North's profit motive. The motion should be denied.

**II.    Facts**:

Sands North Inc. operates an adult cabaret known as Fantasies on 5th Avenue ("Fantasies"). As an adult cabaret, Fantasies offers entertainment that features strippers and topless dancers, but Fantasies is not permitted to serve alcohol. See Anchorage

Municipal Code (AMC) 10.40.050A.  Although Sands North attempts to portray this club as an innocuous "juice bar" that serves pop and juice, this is misleading.  Fantasies operates in tandem with a bar, Club Elixir (formerly known as the Irish Setter) which is located in the same building.  Club Elixir is owned by the same principal that owns the controlling interest in Fantasies: Kathleen Ann Hartman, a/k/a Kathy Hartman.[1] Although they are separate in name, Fantasies and Club Elixir are both operated as one enterprise.

The events leading to the recent amendments of the adult entertainment ordinance began in 2005, when two other sex-oriented businesses moved to the same street where Fantasies was located, raising concerns about potential deterioration of the neighborhood. In February 2005, the Castle Megastore - a 5,500 square foot retail store that sells "sex toys" and pornography - opened for business at 1851 East 5th Avenue.  Exhibit 2.  A few months later, Terry Stahlmann, owner of the Showboat Show Club, announced plans to open an adult cabaret called "Pinettes Showgirls" at 2037 East 5th Avenue.  Exhibit 3. Fantasies is located between these two businesses, at 1911 East 5th Avenue.  The popularity of this locale as a site for sex-oriented businesses raised concerns that the neighborhood would suffer problems of crime and urban blight that are commonly

---

[1] Kathy Hartman owns 88% of Sands North, Inc. and 100% of Club Elixir (technically, Club Elixir has two owners, Kathleen Ann Hartman and a corporation named "Debco, Inc.", but "Debco, Inc." is wholly owned by Kathy Hartman.)  Exhibit 1.

associated with businesses of this nature.  (See, e.g., exhibit 9, testimony by Stacy Papinough before Anchorage Assembly.)

Sands North exacerbated these concerns by applying for a conditional use permit to roughly double the square footage for Fantasies and the Setter Bar, in June of 2005. Exhibit 4.   While the Anchorage Assembly was already concerned about this neighborhood, the Setter Bar's application forced it to take action, because the application required an Assembly vote of approval (or disapproval) of a conditional use permit.  See AMC 21.50.160B.

In response to these events, the Assembly held several hearings to explore ways to regulate the conduct and proliferation of adult businesses in Anchorage.  One alternative was to deny the conditional use permit that the Setter Bar had applied for.  The Assembly ultimately decided it was legally required to approve the conditional use permit, and did so.  The Assembly also considered a zoning ordinance (AO 2005-115) that would have required a 1000-foot separation between adult businesses.   This was postponed indefinitely, in part because it was unclear whether the ordinance left sufficient alternative sites for adult businesses.  Finally, the Assembly enacted AO 2005-139, the amendments at issue in this case, on October 11, 2005.

At the hearings on the above-described initiatives, the Assembly heard testimony about "lap dancing"[2] at Fantasies. This testimony raised a number of health, safety, and welfare concerns. Kara Nyquist, the Director of Advocacy at Covenant House (an adolescent homeless shelter), testified that some of her clients had been physically assaulted, sexually assaulted, or solicited for prostitution, while working at Fantasies. Exhibit 5. Ms. Nyquist also testified that:

> This is not about art. This is about 18-year-olds having their vaginas in the faces of drunk men. This is not about women between the ages of 18 and 20 having a right to dance. This is about their right to be protected . . . .

Exhibit 5.

Jennifer Johnson, a former employee at Fantasies, described the dancing:

> It's extreme physical contact. It's basically -- they're topless. They're bottomless and they're straddling -- it's a straddle dance, which means both your legs are on both sides [of the customer] and you're that close to the person. The closer you are to the person, the more you can ensure selling

---

[2]During a "lap dance" (as opposed to ordinary nude dancing) "the nude or semi-nude dancer performs in the patron's lap". *Colacurcio v. City of Kent*, 163 F.3d 545, 556 (9th Cir. 1998). Lap dancing consists of "physical contact between the genital areas of a scantily clad female dancer and fully clothed male customers." *Colonial First Properties, LLC v. Henrico County Virginia*, 236 F.Supp.2d 588, 589 (E.D.Va. 2002). "In essence, the term is a euphemism for simulated coitus in which the female dancer gyrates her genital area on the male customer's genital area." *Id.* During a lap dance, the dancer typically "sit[s] on the lap of a patron while slowly gyrating her buttocks or crotch on the patron's crotch and permit[s] the patron to fondle her breasts and buttocks." *Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Commissioners*, 32 F.3d 1436, 1439 (10th Cir. 1994). The dancers sometimes "put their nipples of their breasts inside [the customer's] mouth . . . and/or touch[] the penis area of [the customer's] body." *BGHA, L.L.C. v. City of Universal City, Texas*, 210 F.Supp.2d 821, 829, (W.D. Tex. 2002). The performance also may include:

> engaging in other physical contact with patrons continuing to the point of ejaculation, opening their vaginas while placing it [sic] in close proximity to the patron's face, rubbing or slapping their breast on the patron's face, grinding their genitals or buttocks on the laps of patrons, allowing patrons to use their hands and mouths to place paper money in dancers' vaginas or buttocks, and even permitting patrons to insert their fingers into dancers' vaginas.

*2025 Emery Highway, L.L.C. v. Bibb County, Georgia*, 377 F.Supp.2d 1310, 1331 (M.D.Ga. 2005).

> more dances because the patrons like the closeness of the dance . . . .
> [A]t one point in time, [Fantasies] had a bondage room where they did
> horizontal lay [lie] down lap dances in a closed room with no security. The
> only thing they had to keep close watch of the girls was a video camera that
> I believe is black and white, so you couldn't really make out what was
> going on . . . ."

Exhibit 6.

Dr. Becky Usry, a sociologist with 25 years experience, testified that "the nature of the

lap dance is that the dancer continues until the man has an orgasm. That is what a lap

dance is." Exhibit 7.

Stacy Papinough, Chair of the Anchorage Women's Commission, testified that she

visited Fantasies, and:

> I saw nude, totally nude females gyrating on the laps of male patrons and
> female patrons, physical contact, they were sitting on the laps like we heard
> earlier, legs wrapped around, gyrating on the men's penis area. I saw
> nipples on men's mouths.
>     I saw a vagina right in a man's face. There was no way he could
> have moved his face without touching her vagina, and that was all. I stayed
> about an hour. That was [going on] the whole time. It wasn't isolated
> incidences and I've heard testimony tonight that the patrons are not allowed
> to touch the women back and it may be a rule, but that does happen. I saw
> several instances of men's hands being on the woman's hips right here as
> they were gyrating on their penis area.

Exhibit 8.

Beverly Wooley, Director of the Municipality's Department of Health and Human

Services, testified about her observations from a visit to Fantasies:

> While I was there I observed female dancers who were coming into sexual
> contact with patrons. From the dance stage there were patrons who were
> actually, basically encouraged by the dancer to come up and where mouths
> came in contact with breasts.

Exhibit 9.

In addition to this testimony, the Municipal Assembly also considered an abundance of documentary evidence. Many of these documents showed that sex-oriented businesses tended to generate adverse secondary effects, such as prostitution, increased crime, decline in property values, and increased disease. Those documents include:

Written comments prepared by Kara Nyquist. Exhibit 10.

A summary of studies and legal findings concerning adverse secondary effects of sex-oriented businesses, prepared by Susan Lutz, Legal Secretary to the Assembly. Exhibit 11.

Article titled Strip Clubs are Gateways to Addiction, Prostitution by Heather Resz, Anchorage Chronicle Exhibit 12.

Written coments by Nancy Fair, Vice President of Service High School PTSA. Exhibit 13.

Findings from court cases, research, and other jurisdictions showing links between sex-oriented business, and crime and disease. Exhibit 14.

A National Law Center compilation of studies documenting the secondary effects of sexually oriented businesses. Secondary effects include an increase in live sex acts on the premises, prostitution, increase in violent crime, decline in property values. Exhibit 15.

Testimony of David Sherman, former strip club manager, before the National Organization Against Lewd Activities, documenting links between strip clubs and prostitution and illegal drug use. Exhibit 16.

These exhibits are just a small sample of the documents in the Assembly files. In addition to these, the Assembly also considered numerous legal cases pertaining to regulation of sex-oriented businesses, as well as ordinances from other jurisdictions.

The hearings also revealed that the practice of lap dancing was limited mainly to adult cabarets, and did not occur in bars that served alcohol. This was because Municipal ordinances regarding adult cabarets were not as thorough as state regulations for alcohol establishments. Alcohol establishments are regulated by the State, and their employees are prohibited from engaging in "sexual contact" with patrons. See 13 AAC 104.180(a)(3). "Sexual contact" is defined as "the touching of genitals, anus, or female breast or the intrusion of any object into the genital or anal opening regardless of whether the act was consensual." *Id*. This effectively prohibits lap dancing, since it is not feasible to prevent patrons from touching the aforementioned anatomical areas during a lap dance. By contrast, adult cabarets do not serve alcohol, so they are not subject to the restrictions in 13 AAC 104.180. Prior to the enactment of AO 2005-139, no state or local law prohibited physical contact between dancers and patrons in adult cabarets.

These concerns were addressed in October 2005, when the Anchorage Municipal Assembly enacted AO 2005-139. Exhibit 17. AO 2005-139 amended the Municipality's already-existing adult entertainment ordinance. The original adult entertainment ordinance was enacted in 1993, as AO 93-157(S-6), and codified as AMC 10.40.050.

*Suburban Video, Inc. v. City of Delafield,* 694 F.Supp. 585, at 595 (E.D.Wis. 1988).  Exhibit 19, 20.

Like the ordinance in *Delafield*, AO 93-157(S-6) was enacted to counteract the secondary effects of sex-oriented businesses.  In enacting AO 93-157(S-6) the Assembly found:

> Whereas, adult businesses have been determined, by court accepted independent studies, to produce secondary impacts on surrounding land uses.  The impacts include a decline in property values, and increase in the level of criminal activity including prostitution, rape, and assaults in the vicinity of these types of enterprises . . .

Exhibit 18.

The amendments in AO 2005-139 refine and improve upon legislative efforts originally begun in 1993.  The specific amendments at issue in this motion are:

Section 1.I.1.g.3 of AO 2005-193, which provides that a license may be revoked if the operator allows anyone on the premises to engage in "specified sexual activities", which as stated in Section 1.A.c, include "fondling or touching of human genitals, pubic region, buttock, anus, or female breasts."  This provision describing "specified sexual activities" was originally enacted in AO 93-157(S-6), but at the time its purpose was solely definitional.  In AO 93-157(S-6) the showing of "specified sexual activities" was a characteristic that distinguished adult theatres and adult bookstores from ordinary theatres and bookstores.  See AO 93-157(S-6) section 1.A.2, 1.A.3.  Section 1.I.1.g.3 of AO 2005-139 clarifies that adult businesses are still allowed to portray <u>images</u> of sexual

activities, but they are now prohibited from actually allowing such acts to be committed on the premises.

The next amendment at issue is Section 1.A.e. of AO 2005-139, which states that "a separation of a minimum of four feet shall be maintained between entertainers, dancers and/or strippers, and patrons." This amendment prohibits sexual contact between patrons and employees in adult cabarets. It rectifies the disparity between state and municipal code concerning sexual contact.

The last amendment at issue is Section 1.J.3.d. of AO 2005-139, which provides that no adult entertainment shall be open to view from outside the licensed premises, or broadcast to any site outside the licensed premises, and imposes certain screening requirements to ensure that persons outside the premises cannot see inside. This provision protects the public (and children especially) from undesired exposure to adult entertainment, and protects neighborhood property values. Displaying nude dancers to the public in general constitutes indecent exposure, if such conduct is offensive to the persons exposed. See AMC 8.10.080A.1. Exposing children to adult entertainment is a crime in some circumstances. See, Alaska Statute (AS) 11.66.300. Moreover, such a public display would impart a tawdry appearance to the neighborhood, further aggravating the problems of urban blight that are associated with businesses of this nature.

When the challenged amendments are reviewed under the applicable constitutional standards, and the standard for preliminary injunction, it is clear that Sands North's motion for injunction should be denied.

## III.    <u>Standard of Review</u>:

To obtain a preliminary injunction, a party must establish either: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation with the balance of hardships tipping decidedly in its favor. *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *United States v. Nutri-cology, Inc.,* 982 F.2d 394, 397 (9th Cir.1992) (quoting *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985)). They are not separate tests but rather "outer reaches of a single continuum." *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).

While loss of First Amendment rights, even for minimal periods, is irreparable injury, "the question of purely economic injury is not relevant to the issue of whether a moving party faces hardship." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993). It is also logical that no irreparable harm is threatened if it is

doubtful that plaintiffs will suffer any deprivation of First Amendment rights. See *DFW Vending, Inc. v. Jefferson County*, 991 F.Supp. 578, 597 (E.D.Tex. 1998) (denying injunctive relief regarding six-foot buffer zone between nude dancers and patrons). The movant's claim of irreparable injury is also attenuated when "the true substance of their battle [is] economic success of the sexually oriented business[] . . ." *Id.*

In *DFW Vending*, as here, the real issue was not First Amendment rights, but money. The court explained "any potential losses directly relate to the dancers' ability to generate tips and Baby Dolls' and Robinson's ability to increase revenues at the cabaret." 991 F.Supp. at 597. The same is true in this case – the real injury at issue is Sands North's ability to generate income. At the hearing on May 17, 2006, Sands North's counsel acknowledged that his clients were more concerned about the four-foot restriction than any of the other amendments. The reason for this concern is transparent: fees charged for "lap dancing" are a major source of revenue for Sands North. Cessation of this practice does not constitute a cognizable injury, because lap dancing is not constitutionally protected conduct. Sands North's other arguments are likewise meritless. Sands North's motion for injunction lacks merit and should be denied.

**IV.** <u>**Argument**</u>:

    **A.** <u>**Lap Dancing is not Constitutionally Protected Conduct, so the Four Foot "Buffer Zone" is only Subject to Rational Basis Scrutiny**</u>.

1.      **Lap Dancing is not Constitutionally Protected Under Federal Law.**

In examining a challenge to a statute based on federal or state freedom of expression principles, the threshold question is whether the enactment reaches a substantial amount of constitutionally protected expression. See *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 494, 102 S.Ct. 1186 (1982); *Bachlet v. State*, 941 P.2d 200, 204 (Alaska 1997). If the expression at issue is not constitutionally protected, then the First Amendment claim usually fails. See. e.g. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002).

Lap dancing is not constitutionally protected expression. While ordinary nude dancing is sometimes constitutionally protected, "[n]o court has ever held that [lap dancing] enjoys the First Amendment protection extended to nude, or semi-nude, dancing by decisions of the Supreme Court of the United States." *Colonial First Properties, LLC v. Henrico County Virginia*, 236 F.Supp.2d 588, 589 n.1 (E.D.Va. 2002). The rationale for this was explained in *Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1251 (5th Cir.1995):

> . . . intentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself. The conduct at that point has overwhelmed any expressive strains it may contain. That the physical contact occurs while in the course of protected activity does not bring it within the scope of the First Amendment. . . . Similarly, *patrons* have no First Amendment right to touch a nude dancer. [emphasis in original]

The Ninth Circuit Court of Appeals has repeatedly upheld "buffer zone" requirements like the one at issue here, and in each case ruled that the practice of lap dancing is not constitutionally protected.  In *Kev, Inc. v. Kitsap County*, 793 F.2d 1053 (9th Cir. 1986) the challenged ordinance required *inter alia* that nude dancing occur at least ten feet from patrons, on a stage raised at least two feet from the floor.  *Id.*, at 1061. The Court held that the County's regulatory scheme was a justifiable exercise of police power.  *Id.*, at 1059.  The separation distance advanced a legitimate government interest unrelated to freedom of expression, because it deterred prostitution and drug transactions; *id* at 1061.  The court concluded that the regulations did not significantly burden first amendment rights, explaining "[w]hile the dancer's erotic message may be less effective from ten feet, the ability to engage in the protected expression is not significantly impaired.  Erotic dancers still have reasonable access to their market." *Id.*, at 1061.

In *BSA, Inc. v. King County*, 804 F.2d 1104 (9th Cir. 1986) the court considered an ordinance requiring all nude entertainment to be performed on a stage eighteen inches high and six feet from the nearest patron.  *Id.* at 1110.   The Court stated:

> We note at the outset that BSA and Chase <u>have failed to explain how the distance requirement impinges upon their First Amendment rights</u>. The requirement does not prohibit nude entertainment. It also does not diminish the expressiveness of nude entertainment. There is no allegation that the distance between entertainer and patron is an integral part of the expressive activity, or that the viewing public is less able to satisfy its appetite for sexually explicit fare.

*Id.*, at 1111 (citations omitted; emphasis added).   The Court then explained that "curtailing public sexual contact and sexual criminal offenses represents a significant state interest.  The six foot/eighteen inch distance requirement furthers this interest by keeping nude entertainers just out of reach of the nearest patron."  *Id*.  The Court concluded that the ordinance "clearly furthers a legitimate goal, is adapted to accomplish that end, and imposes at most a very minimal restriction on protected activity."  *Id.*, at 1112.

Interestingly, the court in *BSA v. King County* affirmed the ordinance even though the King County Council considered <u>no evidence</u> regarding the need for a distance requirement prior to adopting the ordinance.  *Id.*, at 1111.  The court explained that this was not problematic, because "there is no evidence that King County passed the distance requirement to suppress protected speech rather than to deter illegal conduct.  Given this, <u>there is no reason to require a 'factual basis' in support of the ordinance</u>".  *Id.* (emphasis added).

Twelve years later, the Ninth Circuit decided *Colacurcio v. City of Kent*, 163 F.3d 545 (9th Cir. 1998).  The disputed ordinance required nude dancing to occur at least ten feet from patrons, on a stage elevated at least twenty-four inches.  *Id.,* at 549.   This time the appellants added a new wrinkle to the debate: they argued (in contrast to *BSA v. King*

*County*, supra) that "table dancing[3] is a unique form of protected expression that is qualitatively different from nude stage dancing" because it offered "not just vision but multi-sensory perception . . . within the patron's intimate perimeter". *Colacurcio*, at 555. The court rejected this argument, concluding that "table dancing in private nightclubs, with documented links to prostitution and drug dealing, is a highly unlikely candidate for special protection under the First Amendment." *Id.*, at 556.

More recently, in *Gammoh v. City of La Habra*, 395 F.3d 1114 (9th Cir. 2005), the court upheld an ordinance requiring dancers to perform at least two feet away from patrons. The court dispensed with several constitutional claims in short order, holding that the ordinance was not void for vagueness, *id.* at 1119-1121; it was not overbroad, *id.* at 1121-1122; it was not a regulatory taking, *id.* at 1122; and it did not violate First Amendment rights, because it was "narrowly tailored to combat the negative side-effects of adult businesses", *id.*, at 1128. Overall, the applicable Ninth Circuit precedent makes clear that the Municipality's buffer zone should be upheld.

<strong>2.    <u>Lap Dancing does not Merit Protection Under the Alaska Constitution.</u></strong>

The Alaska Supreme Court has not yet addressed the specific question whether lap dancing is constitutionally protected expression. However, Alaska case law indicates this

---

[3] Described as a dance performed from one to six inches away from the customer, see *id.* at 554 n.8.

conduct would not enjoy constitutional protection.[4]  Alaska recognizes that nude dancing does not enjoy the same degree of protection as other forms of expression, because the government has a legitimate interest in regulating nudity and obscenity.  In *Mickens v. City of Kodiak*, 640 P.2d 818, 820 (Alaska 1982) the Alaska Supreme Court declared that nude dancing was protected under the state constitution, but the court was careful to temper this holding:

> Although we have concluded that the ordinance does not pass constitutional muster for the above reasons, it is well to keep in mind what this case does not involve. It does not involve <u>an ordinance which prohibits only obscene performances</u>.  It does not involve unwilling or captive viewers whose personal sensibilities are offended by the performances in question. And it does not involve an effort to protect children from sexually oriented displays which are not obscene by adult standards. <u>If these factors had existed, a different and stronger case for the ordinance could be made.</u>

*Mickens v. City of Kodiak*, at 822-823 (emphasis added).  Clearly, while *Mickens* states that nude dancing is a constitutional right, it does not state that nude dancing is absolutely protected under all circumstances.   The suggestion that "obscene performances" could be banned or regulated indicates that the court envisioned some limit to the protection that this expressive conduct would enjoy.  The Alaska Supreme Court has acknowledged that "the state has a legitimate interest in regulating nudity in certain contexts."  *Powell v. City of Anchorage*, 536 P.2d 1228, 1233 n.6 (Alaska 1975).

---

[4] For similar reasons, Sands North's constitutional privacy argument fails.  A lap dance is a commercial transaction, and the constitutional right of privacy does not extend to commercial transactions.  See *State v. Page*, 932 P.2d 1297, 1302 (Alaska 1997).

Further, while Alaska's constitution may protect sexual expression, it does not extend the same protection to sexual <u>conduct</u>, which may be penalized.  In *Summers v. Anchorage*, 589 P.2d 863 (Alaska 1979), the Alaska Supreme Court rejected a claim that an ordinance prohibiting prostitution violated the appellants' constitutional right of expression.  *Id.*, at 867.  The court explained:

> The ordinance supporting the convictions of Summers and Kitchen does not threaten first amendment rights. The questioned ordinance seeks to prohibit certain <u>sexual conduct and patterns of sexual relations</u> [emphasis added]. Appellants characterize these prohibitions as infringing on first amendment values of free expression and association. The expressive conduct and speech-related terms in the ordinance, however, regulate speech only as an element of prohibited prostitution activities. . . .
>
> The ordinance challenged here proscribes only expressive behavior which, under the general rubrics of solicitation and assignation, is directed solely at inciting or producing lawless prostitution activities.

*Summers v. Anchorage*, 589 P.2d at 867 (citations and quotation marks omitted).  The Alaska Supreme Court has held that an ordinance forbidding employees in massage parlors from exposing their genitals to patrons or touching the patrons' genitals was constitutional.  *Hilbers v. Municipality of Anchorage*, 611 P.2d 31 (Alaska 1980).  The court has acknowledged that the government has a legitimate interest in controlling prostitution, and an ordinance forbidding employees from exposing their genitals or touching patrons' genitals is an appropriate means to achieve that goal.  *Id.*, at 37-38.

Like the ordinances in *Summers* and *Hilbers*, the buffer zone at issue here is intended to discourage prostitution, and prevent sexual contact which is both unlawful

and unhealthy.   The four foot separation only proscribes physical contact between dancers and patrons, which legitimately may be proscribed.

In addition to its own precedent, and the federal authority cited above, the Alaska Supreme Court would likely notice the consensus of other states which reject the notion that lap dancing is constitutionally protected.   The general rule among other states is that intentional touching of a patron by a nude dancer (or vice versa) is not constitutionally protected expression, and "buffer zone" provisions like the one at issue here are usually constitutional.[5]   Although the Alaska Supreme Court is not required to follow decisions by other state courts, it would doubtless recognize that any decision to extend constitutional protection to lap dancing would be a departure from established jurisprudence.   It seems unlikely that the Alaska Supreme Court would take such an approach.

### 3.    <u>Since no Constitutional Right is Affected, the 'Buffer Zone' Restriction is Subject to Rational Basis Scrutiny</u>.

Since lap dancing is not constitutionally protected conduct, the buffer zone requirement is subject only to "rational basis" scrutiny under federal law.   See, e.g.,

---

[5] See *State ex. rel. Rothal v. Smith*, 783 N.E.2d 1001, 1015 (Ohio App. 9 Dist. 2002);  *People v. Hill*, 333 Ill.App.3d 783, 787 (Ill.App. 2 Dist.2002); *Krontz v. City of San Diego*, 39 Cal.Rptr.3d 535 (Cal.App. 4 Dist. 2006); *State v. Bouye,* 484 S.E.2d 461, 463 n. 2 (S.C. 1997); *American Show Bar Series, Inc. v. Sullivan County*, 30 S.W.3d 324, 338 (Tenn.Ct.App.2000); *Hoskins v. Dep't of Bus. Regulation, Div. of Alcoholic Beverages & Tobacco*, 592 So.2d 1145, 1146 (Fla. 2d DCA 1992); *State v. McGraw,* 879 P.2d 1147, 1155 (Kan.App. 1994); *City of Elko v. Abed*, 677 N.W.2d 455 (Minn.App.,2004); *Restaurant Ventures, LLC v. Lexington-Fayette Urban County Government*, 60 S.W.3d 572 (Ky.App.,2001); *Ino Ino, Inc., v. City of Bellevue*, 937 P.2d 154 (Wash. 1997), *cert. denied*, 522 U.S. 1077, 118 S.Ct. 856 (1998); *Club Southern Burlesque, Inc. v. City of Carrollton*, 457 S.E.2d 816 (Ga. 1995).

*O'Neal v. City of Seattle*, 66 F.3d 1064, 1067 (9th Cir. 1995). Alaska applies a slightly more stringent[6] test, described as a sliding scale; at "the low end of the sliding scale", where no fundamental right or suspect class is affected, "a substantial relationship between means and ends is constitutionally adequate." See *Kenai Peninsula Borough v. State*, 743 P.2d 1232, 1371 (Alaska 1987). This is "a twofold inquiry that requires courts to determine, first, whether a legitimate objective for legislative action actually existed and, second, whether the specific legislation adopted bears a close and substantial relationship to the underlying state interest." *Evans ex. rel. Kutch v. State*, 56 P.3d 1046, 1073 (Alaska 2002). This test is still fairly deferential, and very few legislative enactments have been invalidated under it. See *Chiropractors for Justice v. State*, 895 P.2d 962, 972 (Alaska 1995) (noting, as of 1995, only three enactments had ever been invalidated under state-law rational basis scrutiny).

The Municipality has a rational basis for the four foot buffer zone. This restriction is intended to eliminate the prostitution that is associated with the practice of lap dancing, as well as the risk of disease. There is abundant evidence in the Assembly record that prostitution and solicitation for sexual favors are by-products of lap dancing or table dancing. There is also support for this conclusion in the case law. See. e.g. *Gammoh*, 395 F.3d at 1127 n.6 (report based on interviews with former adult dancers indicated that

---

[6] For that reason, this section focuses mainly on the Alaska rational basis test; if the ordinance survives Alaska's test it will also survive under the more lenient federal test.

solicitations for sexual favors occurred and that drugs were frequently passed during tipping); *Colacurcio*, 163 F.3d at 553 (affidavits and statements by police officers and vice detectives documenting the connection between table dancing and illegal sexual activity.)

The prohibition against sexual contact also protects the public health. The Assembly's investigation of this issue found a link between sex-oriented businesses and unhygienic conditions or sexually transmitted diseases. Exhibit 14, 15. The casual sexual contact that occurs during lap dances poses a risk of transmission of disease. Other court cases have reached the same conclusion. For example, in *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403 (6th Cir. 1997), an officer of the Chattanooga Health Department testified that such contact poses a risk of the transmission of disease, which justified imposing a six-foot separation distance. *Id*. at 410. The court also noted that "particular dances described in the record--such as one instance in which a dancer invited customers to spoon-feed themselves whipped cream off of her breasts, buttocks, and vaginal area--pose a particularly acute risk of the transmission of disease." *Id*. See also *Gammoh v. City of La Habra*, 395 F.3d 1114, 1125 (2005) "the two-foot rule and the no-touching rule are reasonably linked to the secondary effects that the City identifies as its purpose in enacting the Ordinance" which include "increased threat of the spread of sexually transmitted diseases".

Moreover, much of the conduct involved in lap dancing is criminal in itself. For example, if a patron touches a dancer's genitals, anus, or breast without the dancer's consent, the patron has committed sexual assault in the second degree.[7] A patron who inserts his finger into the dancer's vagina without the dancer's consent (see, e.g. *2025 Emery Highway, L.L.C. v. Bibb County* 377 F.Supp.2d at 1331) commits sexual assault in the first degree.[8] Likewise, a dancer who touches or rubs her body against a customer's genitals with the intent of sexually stimulating him (i.e., the primary purpose of a lap dance) commits prostitution.[9] See, e.g. *People v. Hill*, 776 N.E.2d 828, 831 (Ill.App.2 Dist. 2002) (upholding conviction for prostitution where nude dancer rubbed undercover officer's penis through his clothing). Clearly, the Municipality has a rational basis for prohibiting this conduct.

      **B.**      <u>To the Extent that they Affect Constitutionally Protected Expression (i.e. Conduct other than Lap Dancing) the Amendments are Subject to Intermediate Scrutiny, because they are Intended to Prevent the Adverse Secondary Effects of Sexually-Oriented Business, not to Suppress Expression.</u>

            **1.**      <u>Under Federal Law, Content-Neutral Regulations of Sexually Explicit Expression are Analyzed under Intermediate Scrutiny</u>

---

[7] Under AS 11.41.420(a)(1), a person commits sexual assault in the second degree if the offender engages in sexual contact with another person without consent of that person. AS 11.81.900(b) defines "sexual contact" as knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast.

[8] Under AS 11.41.410(a)(1), a person commits sexual assault in the second degree if the offender engages in sexual penetration with another person without consent of that person. AS 11.81.900(b) defines "sexual penetration" includes "an intrusion, however slight, of an object or any part of a person's body into the genital or anal opening of another person's body".

[9] Under AMC 8.65.010 "Prostitution" means the giving or receiving of the body for sexual conduct for hire. "Sexual conduct" means sexual intercourse, anal intercourse, masturbation or oral-genital contact.

**(Not Strict Scrutiny, as Defendants Argue) if the Primary Motivation Behind the Regulation is to Prevent Secondary Effects.**

Ordinarily, (outside the realm of pornography and sex entertainment) content-based regulation of speech is subject to "strict scrutiny", which means the regulations must be "necessary to serve a compelling state interest." *Gammoh v. City of La Habra*, 395 F.3d 1114, 1123 (9th Cir. 2005). However, under federal law this rule does not apply to sexually explicit forms of expression like nudity or pornography. See *Young v. American Mini-Theatres, Inc.*, 427 U.S 50, 70-71, 96 S.Ct. 2440, 2452 (1976). The principle that nudity and pornography warrant less protection than other forms of expression was explained in *Young*:

> . . . even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . . few of us would march our sons and daughters off to war to preserve the citizen's right to see "Specified Sexual Activities" exhibited in the theaters of our choice. Even though the First Amendment protects communication in this area from total suppression, we hold that the State may legitimately use the content of these materials as the basis for placing them in a different classification . . . .

*Young v. American Mini-Theatres, Inc.*, 427 U.S at 70-71 (emphasis added).

Under federal law, content-neutral regulations of nude dancing may be analyzed under intermediate scrutiny if two conditions are met: 1) the ordinance regulates speech that is sexual or pornographic in nature; and 2) the primary motivation behind the

regulation is to prevent secondary effects rather than suppressing expression. *Gammoh v. City of La Habra*, 395 F.3d 1114, 1123 (9th Cir. 2005).

The amendments in AO 2005-139 meet this standard. The speech regulated by AO 2005-139 is clearly sexual in nature, and the purpose of the regulation is to counteract the secondary effects of sexually-oriented businesses. The secondary effects that the Municipality seeks to curb here are prostitution, drug trafficking, assaults, and disease. All of these have been shown to be associated with sexually-oriented businesses in other jurisdictions. These effects were also identified as specific problems at Fantasies by witnesses who testified before the Assembly, based on personal experience or observations.

Although the Assembly did not make specific findings to this effect on the record, there was no need to do so. These findings are set out in the original adult entertainment ordinance AO 93-157(S-6). In enacting that ordinance the Assembly found:

> Whereas, adult businesses have been determined, by court accepted independent studies, to produce secondary impacts on surrounding land uses. The impacts include a decline in property values, and increase in the level of criminal activity including prostitution, rape, and assaults in the vicinity of these types of enterprises . . .

Exhibit 19. There was no need for the Assembly to reiterate these findings in AO 2005-139 because that would be redundant.

Sands North's attempt to challenge the sufficiency of the Municipality's findings must fail. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses. *Gammoh v. City of La Habra,* 395 F.3d 1114 at 1126, citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 at 51-52, 106 S.Ct. 925 (1986). If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.  Gammoh*, at 1126 citing *City of Los Angeles v. Alameda Books,* 535 U.S. 425 at 438-39, 122 S.Ct. 1728 (2002).  This is a fairly deferential standard.  In making this evaluation, the judiciary does not act as a super-legislature wherein judges sit to "apprise the wisdom" of a municipality's discretion. *Renton,* 475 U.S. at 52, 106 S.Ct. 925.

## 2.    The Amendments Meet the Test for Intermediate Scrutiny.

The amendments in AO 2005-139 pass the intermediate scrutiny test.  Under this test, "[a] statute will survive intermediate scrutiny if it: 1) is designed to serve a substantial government interest; 2) is narrowly tailored to serve that interest; and 3) [does

not unreasonably limit] alternative avenues of communication."  See *Gammoh* 395 F.3d at 1125-1126 and as amended, 402 F.3d 875.

There is no reasonable dispute that the interests advanced by AO 2005-193 are substantial government interests.  It is beyond peradventure at this point in the development of the doctrine that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial.  *Gammoh v. City of La Habra*, 395 F.3d 1114, 1126 (9th Cir. 2005).  The Municipality has a substantial interest in regulating the secondary effects of sex-oriented businesses.

The next requirement, narrow tailoring, is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.  *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1016 (9th Cir. 2004). Intermediate scrutiny does not require the government to establish the means it has chosen to address the secondary effects as the least restrictive.  *Renton*, 475 U.S. at 50-52, 106 S.Ct. 925.  In *Gammoh*, the Ninth Circuit held that a separation distance was narrowly tailored, explaining:

> The two-foot rule merely requires that dancers give their performances from a slight distance; it does not prohibit them from giving their performances altogether. The rule limits the dancers' freedom to convey their erotic message but does not prohibit them from performing erotic one-on-one-dances for patrons. . . .  Because the dancers' performances may continue, albeit from a slight distance, this case stands in sharp contrast to our recent decision in *Dream Palace v. County of Maricopa,* where we applied strict scrutiny to an ordinance regulating adult businesses because

> even the county conceded that the ordinance was a complete ban on nude
> and semi-nude dancing. . . . Here, the Ordinance prescribes where offstage
> dancing can occur (at least two feet away from patrons) but it does not ban
> any form of dance.

*Gammoh*, at 1122-23 (citations omitted.)  In *Colacurcio*, the court held that a separation requirement of <u>ten feet</u> was narrowly tailored, and rejected the appellant's argument that the distance should be reduced.  163 F.3d 545 at 554.  The court held that the ten foot separation was justified because it enabled enforcement officers to readily discern whether the dancers were complying with the ordinance, and explained "we leave the fine-tuning of the distance requirement to the legislative body". *Colacurcio v. City of Kent*, 163 F.3d 545 at 554.  See also *DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 413 (6th Cir.1997) (upholding six-foot separation; "it is not for us to say that a seven-foot zone or a five-foot zone would strike a better balance.")

The "no touch" provisions in AO 2005-139 are likewise narrowly tailored.  Rather than prohibiting all touching, they prohibit only touching of specific anatomical areas.  A requisite mental state can be read into the statute to ensure that licensees will not be penalized if their dancers inadvertently scratch themselves or the like.  A similar issue was adressed in *Fantasyland Video, Inc. v. County of San Diego*, 373 F.Supp.2d 1094, (S.D.Cal.,2005).  There the licensee argued that a "no touch" provision was not narrowly tailored because it "runs from shaking the hand of a regular customer to hugging a relative or close friend, even when the entertainer is fully clothed." *Id.*, at 1128.  The

court rejected this argument, holding that the statute could be interpreted to preclude touching only on the premises, and only by employees who were at least partially nude. *Id*. A similar narrowing construction applies in the present instance: because the Municipality's "no touch" provision is part of an adult entertainment ordinance, it only precludes touching that is conducted intentionally, as a form of entertainment; it does not preclude inadvertently scratching oneself or shaking hands with a friend.

Finally, the amendments in AO 2005-139 leave open sufficient alternative avenues of communication. In most cases, courts will reach this conclusion so long as the dancers are still able to engage in some form of nude dancing; the fact that lap dancing would be eliminated carries little weight, as this conduct is unprotected. See *Gammoh*, at 1128; *Colacurcio*, at 555. The question of whether dancers could be prohibited from touching their own genitals was addressed in *Threesome Entertainment v. Strittmather*, 4 F.Supp.2d 710, N.D.Ohio,1998:

> While it is possible to find some kernel of expression in almost every activity a person undertakes," *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), it is clear that the First Amendment does not protect any such kernel contained in the activities of sexual intercourse or fondling of genitals. This aspect of the Ordinance "is not a means to some greater end, but an end in itself"- prohibiting overtly sexual acts in public places.

*Threesome Entertainment* makes clear that the right to engage in nude dancing may be protected, but the right to fondle one's genitals in a public place is not. See also *SOB*,

*Inc. v. County of Benton*, 317 F.3d 856 (8th Cir. 2003) (ordinance prohibiting any person from fondling their own genitals in a public place did not violate First Amendment rights of nude dancing establishment.) Like the ordinance at issue in *Threesome Entertainment,* the Municipality's "no touch" provisions are not intended to suppress protected expression; they are narrowly tailored to prohibit public sex acts. The dancers at Fantasies are still able to engage in nude dancing; they simply cannot touch the patrons, or touch certain parts of their own body while they are performing. This is constitutionally permissible because it does not significantly foreclose any significant avenue of communication.

3.     **The Amendments also Meet the Test that Applies under Alaska Law.**

Under Alaska law, no standard has been articulated for content-neutral regulation of nude dancing. The most recent case dealing with the subject of nude dancing is *Mickens v. City of Kodiak*, 640 P.2d 818 (1982). While that case held that a content-based restriction seeking to ban all nude dancing would be subject to strict scrutiny, *id*. at 821, it did not address the question of content-neutral restrictions intended solely to counteract the secondary effects of sexually oriented businesses. The free speech clause of the Alaska Constitution is construed to be at least as protective of expression as the First Amendment to the United States Constitution, *Mickens*, at 820, thus it is safe to

assume that the Alaska Supreme Court would apply at least as much protection for speech as the federal cases cited here.

As to communicative conduct generally (i.e., not "pure speech") the Alaska Supreme Court applies the standard set out in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673 (1968).  See *Scudero v. State*, 917 P.2d 683, 687 (1996) citing *United States v. O'Brien*.   This standard allows criminal sanctions to apply to conduct that has a communicative element when the challenged statute or regulation "is within the constitutional power of the [g]overnment; ... it furthers an important or substantial governmental interest; ... the governmental interest is unrelated to the suppression of free expression; and ... the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *Scudero*, at 687, citing *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679.   This standard is very similar to the intermediate scrutiny standard discussed above; thus while Alaska has not articulated a standard specifically for content-neutral regulation of nude dancing, its decisions indicate that the standard would be similar to the federal intermediate scrutiny standard.

## C.     Sands North's Vagueness Challenge Lacks Merit.

Sands North's constitutional challenge on vagueness grounds must fail.  Since the disputed provisions have never been enforced against Fantasies, this motion presents a facial challenge to the ordinance, as opposed to a claim that the ordinance is

unconstitutional as applied. See, e.g *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1049 (Alaska 2002). A facial challenge presents a high threshold. A statute is facially unconstitutional if no set of circumstances exists under which it would be valid. *Javed v. Department of Public Safety,* 921 P.2d 620, 625 (Alaska,1996) citing *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Sands North cannot meet this burden.

Sands North has no standing to argue that the amendments are vague as to other persons, when there is no doubt that the conduct at Fantasies falls squarely within the stated prohibitions. Second, the amendments are not unduly vague; although they deal with terms that cannot be defined with mathematical certainty, this does not trigger a constitutional problem. Finally, any vagueness problems that do exist can be cured by a narrowing construction from the court or the Municipality.

## 1.    <u>Sands North has no Standing to Raise a Vagueness Claim</u>.

Although Sands North combines their arguments concerning vagueness and overbreadth into one discussion, in fact these are two separate areas of jurisprudence: overbreadth is a first amendment doctrine, while a vagueness challenge is derived from principles of due process. See *Marks v. City of Anchorage*, 500 P.2d 644, 646 (Alaska 1972). A statute is overbroad if it prohibits not only acts the legislature may forbid, but also constitutionally protected conduct. *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346

(9th Cir. 1984).  By contrast, a statute is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes . . . or if it invites arbitrary and discriminatory enforcement.  *Id.*, at 1345 (citations omitted).

This distinction is significant.  Courts are willing to entertain facial overbreadth claims, but generally reluctant to entertain claims of facial vagueness; if there is no doubt that the statute applies to the plaintiff, the argument that it might be vague as to other is irrelevant.  This is particularly true in the realm of sexually explicit speech, which warrants less protection than other forms of expression.  In *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440 (1976) the Supreme Court explained:

> Because the ordinances affect communication protected by the First Amendment, respondents argue that they may raise the vagueness issue even though there is no uncertainty about the impact of the ordinances on their own rights. . . .  Nevertheless, if the statute's deterrent effect on legitimate expression is not "both real and substantial," and if the statute is "readily subject to a narrowing construction by the state courts," . . . the litigant is not permitted to assert the rights of third parties. . . .
>
> We are not persuaded that the Detroit zoning ordinances will have a significant deterrent effect on the exhibition of films protected by the First Amendment. . . . [T]o the extent that an area of doubt exists, we see no reason why the ordinances are not "readily subject to a narrowing construction by the state courts." Since there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance, and since the limited amount of uncertainty in the ordinances is easily susceptible of a narrowing construction, we think <u>this is an inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court</u>.

*Young v. American Mini Theatres, Inc.*, 427 U.S. at 59-61, 96 S.Ct. at 2447-48 (emphasis added; citations and footnotes omitted).

This holding in *Young v. American Mini-Theatres* is directly controlling here. Sands North's vagueness challenge cannot succeed if it is purely hypothetical and there is no "real and substantial" chilling effect.  For example, Sands North's discussion about the possible effect of the amendments on adult theatres is purely hypothetical; there are no adult theatres in Anchorage.  There is no evidence that this statute might chill productions with significant artistic value (e.g. *Hair*, *Equus*, or *A Chorus Line*).  The amendments cannot have that effect because they do not apply to ordinary theatres; they only apply to adult entertainment businesses.  Certainly there is no suggestion that Sands North has a frustrated desire to stage a production of *Hair*, *Equus*, or *A Chorus Line*.

Aside from questions about chilling effect, the court will not entertain a vagueness challenge to a statute when "there can be no question as to its applicability to the particular offense involved".  *Anderson v. State*, 562 P.2d 351, 356 (1977); see also *Young v. American Mini-Theatres*, 427 U.S. at 59-61.  As far as Sands North is concerned, there is no question that its conduct falls squarely within the prohibitions of the ordinance.  The lap dances offered at Fantasies clearly violate the four-foot buffer zone requirement.  Sands North also routinely violates Section 1.A.c. of AO 2005-139, which prohibits "simulated or actual . . . fondling or touching of human genitals, pubic

region, buttock, anus, or female breasts."  During the course of a lap dance, the dancers and patrons at Fantasies routinely and intentionally fondle and touch the aforementioned anatomical areas.

Sands North's objection about the alleged vagueness of "simulated" touching is a moot point, because there is no "simulated" touching at issue.  The dancers and patrons at Fantasies <u>actually</u> touch each other.  Since this clearly violates the ordinance, Sands North cannot be heard to argue that the amendments might be unduly vague in some other circumstances.

**2.     <u>The Challenged Provisions are not Unduly Vague</u>.**

Sands North's vagueness challenge also fails because the provisions at issue are simply not vague.  The mere fact that Sands North professes some confusion is irrelevant, so long as the allegedly unclear terms can be clarified by interpreting them in context with the other terms in the ordinance.  This was explained in *Dykstra v. Municipality of Anchorage*, 83 P.3d 7, 9 (2004):

> The fact that people can, in good faith, litigate the meaning of a statute does not necessarily (or even usually) mean that the statute is so indefinite as to be unconstitutional. The question is whether the statute's meaning is unresolvably confused or ambiguous *after* it has been subjected to legal analysis. If study of the statute's wording, examination of its legislative history, and reference to other relevant statutes and case law makes the statute's meaning clear, then the statute is constitutional.

In general, so long as a statute is not specifically aimed at regulating speech, a court will find a statute unconstitutionally vague only when it reaches a "substantial amount of constitutionally protected conduct," or when it "is impermissibly vague in all of its applications." *Bachlet v. State*, 941 P.2d 200, 204 (Alaska 1997) citing *United States v. Dischner,* 974 F.2d 1502, 1510-11 & n. 5 (9th Cir.1992).   Courts also afford "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."   *Lazy Mountain Land Club v. Matanuska-Susitna Borough,* 904 P.2d 373, 383 (Alaska1995) citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193 (1982).

The alleged vagueness of a buffer zone requirement was addressed in *Gammoh v. City of La Habra*, 395 F.3d at 1119-1121.   The court concluded: "the act that is prohibited - being within two feet of a patron - is certainly not vague."   *Id.* at 1120. Likewise, in *Kentucky Restaurant Concepts, Inc. v. City of Louisville,* 209 F.Supp.2d 672, (W.D.Ky. 2002), the court rejected a claim that a three foot separation requirement between nude dancers and patrons was unduly vague.   *Id.*, at 683.   The court reached this conclusion in part because the Director of the enforcing agency testified about the intended enforcement of the buffer-zone provision, and clarified exactly how he would

measure the three foot distance and under what circumstances it would be enforced.  *Id*. at 682-683.

Sands North suggests it cannot tell whether this provision is intended to be regulatory, or just a definition with no regulatory application.  That argument is specious. AMC 10.40.050A.e. is not subject to more than one reasonable interpretation.  It states that "A separation of a minimum of four (4) feet <u>shall</u> be maintained between entertainers, dancers, and/or strippers and patrons" (emphasis added).  It is a basic canon of statutory construction that use of the word "shall" indicates a mandatory intent.  *U.S. v. Myers*, 106 F.3d 936, 941 (10th Cir. 1997).  The use of the word "shall" in AMC 10.40.050A.e. indicates that the dancers are required to maintain a four foot separation distance between themselves and patrons.  It is not a definition, it is a command.  There is no vagueness or ambiguity in this provision.

The other amendment challenged on vagueness grounds is Section 1.A.c of AO 2005-139, which prohibits "simulated or actual . . . fondling or touching of human genitals, pubic region, buttock, anus, or female breasts."  This provision is not unduly vague, and other courts construing similar provisions support that conclusion.  In *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, the court construed a similar ordinance that stated "no dancer shall fondle or caress any patron and no patron shall fondle or caress any dancer."  *Id.*, at 1057.  The court found that "'fondling' and 'caressing' are ordinary,

commonly used terms." *Id*. The court also explained "in the context of the other definitions provided in the ordinance . . . [the challenged provision] is easily understood to prohibit sexual conduct between dancers and patrons whom the dancers intend to arouse sexually while the dancers are acting in the scope of their employment at the erotic dance studio." *Id*.

Like the ordinance at issue in *Kev, Inc.*, the municipality's prohibition on touching or fondling must be construed in context with the other provisions in the ordinance, and with the legislature's intent in mind. When this provision is construed in context with the definition of "adult entertainment", the meaning of the provision is clear: it prohibits touching that is conducted intentionally <u>as part of the entertainment</u>. There is no merit to Sands North's assertion that a dancer might violate the ordinance inadvertently by scratching herself or by brushing a piece of lint off her sweater.

Sands North's objection to the term "simulated" is equally groundless. The case that Sands North relies upon, *Dream Palace v. Maricopa*, 384 F.3d 990 (9th Cir. 2004), is distinguishable. In that case the court addressed a prohibition against "simulated sex acts" – a far more sweeping prohibition than the one at issue here. *Id.*, at 1018. The court noted "[o]ne is left to speculate as to what movements, precisely, a dancer may incorporate in a performance without running afoul of [the challenged provision], and yet still effectively convey an essentially adult, erotic, message to the audience." *Id*. Not

surprisingly, the court found this ordinance was unconstitutional, because it prohibited any simulated sexual act of any kind, and thus amounted to a total ban on adult entertainment.  *Id.*

By contrast, where the proscription on "simulated" activity is narrowly drawn to have only a *de minimis* impact, rather than effecting a total ban, it will be upheld.  See *Schmitty's City Nightmare, LLC v. City of Fond du Lac*, 391 F.Supp. 2d 745 (E.D. Wis. 2005).  The Municipality's proscription in AMC 10.40.050A.c. is sufficiently narrowly tailored: it lists a specific set of anatomical areas that one cannot touch or simulate touching.  In cases like this, the use of "simulated" as a modifier does not render the provision unduly vague.  For example, in *Dodger's Bar & Grill, Inc.* v. *Johnson County Board Of County Commissioners*, 32 F.3d 1436 (10th Cir. 1994) the court rejected a vagueness challenge directed at an ordinance which proscribed "acts which constitute or simulate: the touching, caressing, or fondling of the breast [or] buttocks." *Id.*, at 1444. The court held that it would not strike down legislation as vague when a court could "extrapolate . . . the allowable meaning." *Id*.  It went on to explain:

> In sum, although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with. . . .  We do not find any of the provisions attacked in the district court to be so vague that they fail to give adequate warning of the activities proscribed, or fail to set out "explicit standards" for law enforcement

*Dodger's Bar & Grill, Inc.* at 1445.  As in *Dodger's Bar & Grill*, the amendments in AO

2005-139 describe the prohibited conduct with sufficient clarity that the ordinary person

exercising ordinary common sense can sufficiently understand what is prohibited.

### 3.     Any Provisions that are Vague can be Saved by a Narrowing Construction.

When a statute is challenged on constitutional grounds, "it is a cardinal principle

that this Court will first ascertain whether a construction of the statute is fairly possible

by which the question may be avoided."  *U.S. v. Thirty-Seven Photographs*, 91 S.Ct.

1400, 1404, 402 U.S. 363, 369 (1971).  A statute should not be declared unconstitutional

unless it "could not be construed so as to avoid all constitutional difficulties."  *Id.*, 91

S.Ct. at 1405, 402 U.S. 363.  To the extent that any of the amendments are unduly vague,

the Municipality must be allowed an opportunity by implementation to narrow the

construction of those terms so any vagueness problems are alleviated.

### 4.     Sands North's Overbreadth Challenge Lacks Merit.  The Buffer Zone Provision is not Overbroad, and the Other Restrictions may be Preserved Via Limiting Construction or by Severing the Parts that Cannot be Limited.

Although overbreadth is derived from a different doctrinal source, it shares some

common principles with vagueness doctrine.  Facial overbreadth challenges are viewed

with disfavor; the claim of overbreadth is attenuated if there is no question that the statute

applies to the plaintiff's case; and a statute challenged on overbreadth grounds will not be

struck down in its entirety if some portion of it can be saved.  This was explained in

*VECO International, Inc. v. Alaska Public Offices Commission*, 753 P.2d 703 (Alaska

1988):

> Analytically, there are two ways a statute could be overbroad, which might
> loosely be termed "systemic" and "local."  An overbroad statute is
> *systematically* overbroad if there is "no core of easily identifiable and
> constitutionally proscribable conduct that the statute prohibits."  *Maryland
> v. J.H. Munson Co.,* 467 U.S. 947, 965-66, 104 S.Ct. 2839, 2852, (1984).
> On the other hand, a *locally*-overbroad statute is one where the
> unconstitutional applications can easily be lumped together and severed.  To
> strike such a statute would be "manifestly[ ] strong medicine," *Broadrick v.
> Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916 (1973),  particularly
> when the litigant's own activities are not protected, and the legislation
> clearly intended to proscribe them.  In such cases, most courts will excise
> or construe the challenged portion, whenever possible, to avoid an
> unconstitutional result.

*VECO International,* 753 P.2d at 713.

Overbreadth challenges to "no touching" provisions like the one at issue here are

usually rejected.  For example, in *Kentucky Restaurant Concepts v. City of Louisville,*, the

court explained:

> To be sure, the Department could read the plain language of this Ordinance
> as applying to incidental and general social touching in a way
> impermissible under First Amendment jurisprudence. However, to do so
> would require an interpretation entirely inconsistent with the obvious
> purpose of the Ordinance, which is to limit touching between entertainers
> and others during any erotic dance performance. Given both the evident
> legislative intent and the actual text, the Department's interpretation is a
> reasonable one, and the Court should not contort the Ordinance to conjure
> up a hypothetical constitutional clash where none actually exists. . . .  If the
> City should ever enforce the Ordinance in a way that infringes upon

constitutional rights, Plaintiffs and others would have cause for an as-
applied challenge. However, Plaintiffs have failed to show that this
provision of the Ordinance facially violates the Constitution.

*Id.,* 209 F.Supp.2d 672 at 683. Likewise, in *Hang On, Inc. v. City of Arlington*, 65 F.3d

1248 (5th Cir. 1995) the court rejected the appellant's claim that Arlington's "no touch"

provision was unconstitutionally overbroad.. *Id.* at 1255. The court held that the statute

did not criminalize accidental or inadvertent touching, because a culpable mental state

could be read into the statute by implication. See *Id.* at 154-55.

Finally, if any of the challenged amendments are overbroad, they can be severed

from the rest of the ordinance. The Anchorage Municipal Code has a presumption of

severability. AMC 1.05.040 provides: "[t]he sections, paragraphs, sentences, clauses and

phrases of this Code are severable, and, if any phrase, clause, sentence, paragraph or

section of this Code is declared unconstitutional by the valid judgment or decree of any

court of competent jurisdiction, such unconstitutionality shall not affect any of the

remaining phrases, clauses, sentences, paragraphs and sections of this Code."

     **5.**     **The Plaintiff's Equal Protection Claim Must Fail[10]. The
Municipality has Chosen not to Regulate Establishments that
Serve Alcohol, because they are Already Regulated by the State.
This Measure is Subject to Rational Basis Scrutiny.**

---

[10]The equal protection argument not only lacks merit, it is also irrelevant to this motion. The only provisions
challenged in this motion are the specified sexual activities listed in 10.40.050.A.c; the four foot buffer zone in
10.40.050.A.e; and the prohibition on broadcasting in 10.40.050.J.3.d. None of these are challenged on equal
protection grounds. The equal protection claim alleges that the Municipality unreasonably discriminates between
alcohol and non-alcohol establishments; that argument has no bearing on the three challenged provisions.

Sands North alleges that its right to equal protection has been violated, because the Municipality regulates adult cabarets while exempting alcoholic beverage establishments. This argument is disingenuous. Alcohol establishments are certainly not exempt from regulation; these businesses are regulated by the state, and they are subject to similar restrictions prohibiting sexual contact between customers and patrons. See 13 AAC 104.180(a)(3). Sands North's claim of discrimination is made more disingenuous by the fact that the allegedly disparate treatment is self-inflicted. Fantasies is regulated as an adult cabaret (not as an alcohol establishment) because it chose to operate as an adult cabaret. It could change this if it wished to, by obtaining a liquor license and operating as an alcohol establishment instead. If Sands North is disadvantaged, it is because it chose to operate under one set of regulations rather than the other.

Sands North also undercuts its position because it argues that alcohol establishments should be subject to the same restrictions that apply to adult cabarets. An equal protection challenge brought on this basis, alleging that an ordinance is under-inclusive, is generally not actionable. See *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 53, 106 S.Ct. 925, 932 (1986). "[A] statute is not invalid merely because it might have gone further than it did. . . A legislature need not eliminate all evils at the same time; it may attack a problem step-by-step, starting with the worst abuses. *Barber v. Municipality of Anchorage*, 776 P.2d 1035 at 1039-40 (Alaska 1989) citing

*Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 1727 (1966).  The same rationale applies here.  The claim that alcohol establishments should also be included in the ordinance does not render the ordinance unconstitutional.

As to the elements of its equal protection claim, Sands North has failed to demonstrate that any suspect class or fundamental right is at issue.  An equal protection claim requires some showing that the defendant discriminated against the plaintiff "based on an arbitrary or unjustifiable classification."  *Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Board*, 991 P.2d 202, 210 (Alaska 1999).  If no fundamental right or suspect class is at issue, the regulation will be reviewed under rational basis scrutiny.  See *Kenai Peninsula Borough v. State*, 743 P.2d 1232, 1371 (Alaska 1987); *Richland Bookmart, Inc. v. Nichols,* 278 F.3d 570, 574 (6th Cir.2002).

Sexually oriented businesses are not a suspect class under equal protection jurisprudence. See *Isbell v. City of San Diego*, 258 F.3d 1108, 1116 (9th Cir. 2001); *Richland Bookmart, Inc. v. Nichols,* 278 F.3d 570, 574 (6th Cir.2002).  The sale of alcohol is not a fundamental right, because a State "has broad power under the Twenty-first Amendment to regulate the times, places, and circumstances under which liquor may be sold." *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 715 101 S.Ct. 2599, 2600 (1981).  The plaintiff's First Amendment issues add nothing to the equal protection analysis, because the First Amendment issues are separate claims in their own right, and

must succeed or fail on their own merits.  In these circumstances Sands North "can fare no better under the Equal Protection Clause than under the First Amendment itself." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 55 n. 4, 106 S.Ct. 925, 933 n. 4 (1986).

An equal protection claim very similar to this one was addressed in *Gary v. City of Warner Robins*, 311 F.3d 1334 (11th Cir. 2002).  That case involved a nude dancer's equal protection challenge to an ordinance prohibiting persons under the age of 21 from entering alcohol establishments. *Id.*, at 1337.  The court held "there is no generalized right to associate in alcohol-purveying establishments with other adults" and determined that the equal protection claim would be analyzed under rational basis scrutiny.  *Id.*, at 1338.  The court also rejected the plaintiff's First Amendment claim, since the plaintiffs were still free to engage in nude dancing; that they were precluded from doing so in alcohol establishments did not constitute an infringement on First Amendment rights. *Id.*, at 1340.

Since Sands North has failed to demonstrate that any suspect class or fundamental right is at issue, the Municipality's decision to apply different treatment to adult cabarets and alcohol establishments should be reviewed under rational basis scrutiny.  The Municipality has a rational basis for exempting alcohol establishments from its regulations.  Alcohol establishments are already regulated by the state, and the state regulations achieve the same result that the Municipality seeks to achieve in its

regulation.  In light of that fact, the Municipal Assembly saw no need to extend its regulations to bars, because doing so would have been superfluous.

**6.**     **Sands North's "Commerce Clause" Challenge Based on Internet Use is Meritless**.

On its face, Sands North's claim concerning Internet use[11] fails because AO 2005-139 does not regulate Internet use.  Sands North is not precluded from disseminating sexually explicit material over the Internet; it simply cannot do so from the premises of an adult cabaret.  This is a reasonable restriction, intended to protect children from exposure to sexually indecent material, which is unlawful.   See AMC 08.50.010, 08.50.020.

Although Sands North characterizes its claim concerning Internet services as a "Commerce Clause" claim, this is a misnomer; it is a "dormant commerce clause" claim. The "dormant commerce clause" is a judicially-created doctrine based on a logical corollary to the Commerce Clause: "If Congress has the power to regulate commerce among the states, then the states lack the power to impede this interstate commerce with their own regulations.   This 'negative' aspect of the Commerce Clause prohibits economic protectionism - that is, regulatory measures designed to benefit in-state

---

[11] Although Fantasies characterizes its proposed Internet usage as "broadcasting", this conduct does not qualify as broadcasting as defined in federal and state law.  See 47 U.S.C. s 153(o); AS 44.21.290(2).  The Municipality does not regulate Internet use *per se*.  For that matter, neither does Congress - its exercise of authority in this area is limited to a few narrowly drawn criminal statutes (e.g., the Child Online Protection Act, 47 U.S.C. § 231; the Communications Decency Act, Pub.L. 104-104, § 502, 110 Stat. 133).  Since Internet usage is not a broadcast, the Municipal Code provision that applies here is the general prohibition in AMC 10.40.050.J.3.d: "No adult entertainment shall be open to view from outside the licensed premises".

economic interests by burdening out-of-state competitors." *Dickerson v. Bailey*, 336 F.3d 388, 396 (5th Cir. 2003) (emphasis added; citations omitted).

*Dickinson* clarifies that the essential element of a dormant commerce clause claim is discrimination against out-of state competitors.  That element is missing here.  AO 2005-139 does not discriminate against out-of-state competitors.  The restrictions apply only to businesses located in the Municipality, and businesses located elsewhere are not affected.  Since AO 2005-139 does not benefit in-state economic interests or burden out-of-state competitors, it does not trigger any dormant commerce clause issues.

### 7.    Sands North's Motion does not Promote the Public Interest.

The final factor to be weighed in Sands North's request for injunctive relief is the question of public interest; the court has greater power to fashion equitable relief   The public interest is not advanced by Sands North's proposed motion.  Their main reason for bringing the motion is financial self-interest – the restrictions on nude dancing will impact their ability to generate tips.  Further, while nude dancing warrants some First Amendment protection, this is only "marginally so." *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 565-66 (1991).  Sands North's proposed injunction does not advance the public interest, and it should be denied.

## V.    <u>Conclusion</u>:

Sands North's motion for injunction does not raise serious questions going to the merits of this case, nor has it shown any likelihood that Sands North will be irreparably harmed, nor does it advance the public interest.  The Municipality's four foot buffer zone restriction prevents sexual contact between dancers and patrons, and it does not infringe on any constitutionally protected expression.  Where constitutionally protected expression is affected, the amendments are subject to intermediate scrutiny, because they are aimed at the secondary effects of sex-oriented businesses, not at expression.  The restrictions on "specified sexual activities" are not vague or overbroad.  The prohibition against display of adult entertainment outside the premises does not affect interstate commerce.  Sands North's motion does not advance the public interest; their real motive for bringing this motion is financial self-interest.  Sands North's motion for injunction should be denied.

DATED this 13th day of June, 2006.

FREDERICK H. BONESS
Municipal Attorney

By:    <u>s/    Thomas    M.    McDermott</u>
Assistant Municipal Attorney
P.O. Box 196650
Anchorage, AK  99519-6650
(907) 343-4545
(907) 343-4550 – fax

uslit@muni.org
Alaska Bar No. 9910050

The undersigned hereby certifies that on June 13, 2006 a true and correct copy of the Opposition to Motion for Preliminary Injunction was served on:

- Kenneth P. Jacobus
- Allan S. Rubin

by first class regular mail, if noted above, or by electronic means through the ECF system as indicated on the Notice of Electronic Filing

s/ Patricia A. Karella
Patricia A. Karella, Legal Secretary
Municipal Attorneys Office