**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

**U.S. District No. 3:05-cv-00256 (TMB)**

| | |
|---|---|
| **SANDS NORTH, INC., d/b/a FANTASIES ON 5TH AVENUE, an Alaskan Corporation,** | ) |

SANDS NORTH, INC., d/b/a FANTASIES      )
ON 5TH AVENUE, an Alaskan Corporation,    )
                                        )
                        Plaintiff,      )
                                        )
vs.                                     )
                                        )
MUNICIPALITY OF ANCHORAGE,              )
ALASKA, an Alaskan                      )
Municipal Corporation,                  )
                                        )
                        Defendant.      )
                                        )

<u>**AFFIDAVIT OF DANIEL LINZ, Ph.D**</u>

Affiant, being first duly sworn, deposes and states as follows:

1.      I am currently a professor in the Department of Law and Society and the

Department of Communication at the University of California Santa Barbara. I am

a tenured professor and have been at this position since 1988.

2.      I received bachelor degrees in psychology and sociology from Northern

Kentucky University in 1978, and a master's degree in psychology and sociology

and a Ph. D. in psychology from the University of Wisconsin, Madison.

3.      My research focus has been on the effects of sexually oriented and violent

entertainment upon human psychology and behavior and the effects of sexually

related expression on adults and communities.  I have been qualified as an expert

witness on the question of alleged secondary effects from adult entertainment and

the effects of such entertainment on human behavior in numerous federal courts

through out the United States. No Court has found me not qualified as an expert

witness.

4.      I am also a published author in peer-reviewed journals on these subjects.

My curriculum vitae is attached as **Exhibit 1**, which accurately reflects my

teaching positions, the honors and awards that I have received, the papers that I

have either authored or co-authored which have been published in peer-reviewed

journals, my professional activities, research grants that I have received,

professional conferences where I have presented various papers, invited addresses

where I have spoken, and public testimony that I have given.

5.      I have been asked by attorney Allan Rubin on behalf of the Plaintiffs to render

certain opinions in this case in regard to the "secondary effects" justification for the

Anchorage Ordinance the Municipality's adult entertainment ordinance AO 2005-139.

For my professional expertise, I am being compensated at a rate of $250.00 per hour.

6.      The ordinance has existed since 1993, when the Assembly enacted AO 93-157(S-

6). (It is important to note that according to Assembly Memorandum No. AM 1022-93

and the original ordinance specifically excludes "adult cabaret" establishments from its

scope.  According to the memo: "this means that businesses conducting topless dancing

or similar shows will not be regulated by this ordinance." ) The legislative justification

for ordinance AO NO. 93-157(S-6) included the following:

> WHEREAS, adult businesses have been determined, by court accepted
> independent studies, to produce secondary impacts on surrounding land
> uses.  The impacts include a decline in property values, and increases in the
> level of criminal activity including prostitution, rape, and assaults in the
> vicinity of these types of enterprises, and the degradation of the community
> standard of morality by including a loss of sensitivity to the adverse effect of

pornography upon children, upon established family relations, and upon respect for marital relationships.

Based upon the exclusion of Adult Cabarets from the regulation of the Ordinance, it is reasonable to conclude that the secondary effects justification found by the Municipality for the regulation of other adult businesses, was not found to exist for Adult Cabarets.

7.    In October 2005, the Assembly amended the adult entertainment ordinance in AO 2005-139. New provisions added by AO 2005-139 include a four-foot buffer zone between dancer and patron; the prohibition against engaging in "specified sexual activities"; and the prohibition against broadcasting. No new or additional legislative findings appear from the fact of the Ordinance to have been made by the Municipality.

8.    I am familiar with the secondary effects "information" purportedly relied upon by Anchorage in adopting AO NO. 93-157(S-6).  The city of Anchorage appeared not to have read or reviewed any specific studies or reports from other communities regarding the alleged secondary effects of adult businesses, nor did they rely on evidence obtained from their own community regarding the secondary effects of adult businesses.  Instead, the city appeared to have simply patterned its ordinance after an ordinance enacted in Delafield, Wisconsin, without conducting any independent investigation into whether adult business cause secondary effects. Moreover, to the extent that findings can be inferred from the legislative history, it appears that the legislature found that adult cabarets did not cause secondary effects based upon exclusion from coverage under the Ordinance.

9.      I have undertaken an exhaustive research project in regard to the

"secondary effects" materials utilized as a basis for the enactment of legislation

directed at "adult" entertainment, including many of the materials used by

municipalities and considered by courts across the United States.

10.      My research in the area of secondary effects has included attempts to

compile and critically analyze most if not all of the "secondary effects studies"

which are referred to in case law and which are generally referred to in preambles

to laws which attempt to, in one fashion or another, regulate and/or license

"adult" entertainment facilities.

11.      In conducting my research, I initially collected some one hundred and

twenty "studies," and analyzed them both in regard to the conclusions that they

reached and for what I generally refer to as "methodological rigor."  As part of

my research, I wanted to insure that if studies reached a certain conclusion

(regardless of whether they found or did not find "secondary effects" being

associated with "adult" entertainment businesses), that I could have *some*

confidence in those results as being trustworthy and reliable.  I therefore

undertook, along with my assistant, then Ph.D. candidate Bryant Paul, and a

critical examination of the methodology or methodologies employed in these

various "studies" in order to determine whether they met the rudimentary

scientific elements of trustworthiness.

12.      That we presented our findings in a paper submitted at the Annual

Meeting of the International Communication Association, 2000, with that paper

receiving a "Top Three Refereed Papers in Communication Law and Policy"

award following peer-review.  Our analysis was then subjected to further peer-review for consideration of publication of what ultimately resulted as the article in the academic law journal.  This journal article is entitled: "Governmental Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances; Debunking the Legal Myth of Negative Secondary Effects," Paul, et al., *Communication Law & Policy*, Vol. 6, No. 2, Spring, 2001, pp. 355-391, (hereinafter "*Paul*").  This article is attached as **Exhibit 2.**

13.    Peer review (known as refereeing in some academic fields) is a scholarly process used in the publication of manuscripts and in the awarding of funding for research. Publishers and funding agencies use peer review to select and to screen submissions.  The process also forces authors to meet the professional standards of their discipline. Publications and awards that have not undergone peer review are likely to be regarded with suspicion by scholars and professionals in many fields. The rationale for peer review is that it is rare for an individual author or research team to spot every mistake or flaw in a complicated piece of work. Showing work to others increases the probability that weaknesses will be identified, and with advice and encouragement, fixed.  The anonymity and independence of reviewers is intended to foster unvarnished criticism and discourage cronyism in funding and publication decisions.

14.    In *Paul*, we concluded that with few exceptions, the scientific validity of the most frequently used studies is ***questionable and the methods are seriously and often fatally flawed.***  These studies, relied on by communities throughout the country, do not adhere to professional standards of scientific inquiry and nearly

5

all fail to meet the basic assumptions necessary to calculate an error rate.

***Further, it was our conclusions that those studies that are scientifically credible demonstrate either no negative secondary effects associated with adult businesses or a reversal of the presumed negative effects.***

15.    In *Paul,* we develop a list of criteria that we believed are critical in order for evidence of adverse secondary effects to be reasonably relied upon or objectively sound *See, e.g., Paul, et al.*, at 355-391.  In *Paul,* it was concluded that studies of secondary effects should be examined in order to determine whether they answer the following questions that reflect important principles guaranteeing reliable information.  Colloquially, these questions are: (1) "Compared to what?" (2) "Is this just a one-time fluke?" (3) "Is crime measured according to a reliable source?" and "did the government go looking for more crime to justify its legislation?" and (4) "Did the investigators talk only to people who would give them answers they wanted to hear?"  These criteria are neither difficult nor cumbersome to apply, nor are they novel in nature--they are, however, essential features of any project attempting to gain reliable knowledge about secondary effects.  I discuss each criterion individually below:

    a.    First, a number of studies conducted by other municipalities attempting to compare areas containing adult businesses to areas containing no such businesses failed to include comparison (control) areas that were sufficiently matched regarding important characteristics, such as age of housing stock or racial make-up. This lack of comparability between study and control areas prevents researchers from determining whether neighborhood deterioration is related to the operation of adult businesses in an area or that some other confounding variable is responsible for the outcome.  In order to insure accurate and fair comparisons, a control area must be selected that is truly "equivalent" to the area containing the adult entertainment business. This approach is consistent with sound scientific principle.  See EARL BABBIE, THE

PRACTICE OF SOCIAL RESEARCH 202-10 (8th ed. 1998) at 213-14; ROYCE A. SINGLETON, JR. ET AL., APPROACHES TO SOCIAL RESEARCH 136-51 (2d ed. 1993). See also DONALD T. CAMPBELL & JULIAN C. STANLEY, EXPERIMENTAL AND QUASI-EXPERIMENTAL DESIGNS FOR RESEARCH 34 (1963) at 34-71. Since most studies of secondary effects attempt to uncover increases in crime or neighborhood economic deterioration, professional standards dictate that the control (non-adult) site must be comparable (matched) with the study (adult) site on variables related to crime and deterioration. Of particular importance when studying crime is that the study and control areas are matched for variables such as ethnicity and socioeconomic status of individuals in both areas. Additionally, economic factors, such as median home value and total individuals employed and unemployed, should be comparable in both areas. A concerted effort should also be made to include only comparison areas with similar real estate market characteristics including property values, rental rates and proportion of unused commercial and industrial space in either area. The study and control areas in a crime study should be approximately equal in total population.

b.      Second, a number of the studies using neighborhood crime measures have collected these statistics improperly. Although many studies gathered legitimate and consistent measures of crime statistics, such as police arrest reports over a sufficient period of time, a number of others used less scientifically acceptable measures, such as cross sectional survey results of residents' opinions of levels of crime. In addition, many studies and reports are based on substantial changes in police surveillance which renders any results at least suspect and most likely meaningless due to "stepped up" surveillance within the adult business areas. Put simply, the police were likely find greater amounts of crime in the adult establishment areas because they were trying harder to find it.

c.      Third, the majority of studies failed to include a sufficient period of elapsed time, both prior to and following the establishment of an adult entertainment business, when measuring the relationship between the presence of adult businesses and a number of negative outcomes, such as higher crime rates and lower property values. Without a sufficient study period, it is difficult to determine whether a relationship exists between adult entertainment businesses and negative secondary effects, or whether the data are simply a reflection of an erratic pattern of local activity.

d.      Finally, most of the studies that included survey results utilized non-random and therefore biased samples of residents and/or business owners, rendering them scientifically invalid. Even if methodologically valid, such studies offer only subjective opinions concerning the impact of

adult businesses and provide little, if any, evidence of actual negative secondary effects.

16.    *In my opinion, the City of Anchorage's reliance on the assumption that adult businesses are associated with adverse secondary effects, an assumption presumably based on inferences about what past studies and reports in other municipalities have found, is to engage in what Supreme Court Justices in the* <u>Alameda Books</u> *case call "faulty or shoddy reasoning." I conclude that the City of Anchorage had no credible evidence of such negative effects. This opinion is based on my peer reviewed published article entitled "Government Regulation of 'Adult Businesses Through Zoning and Anti-Nudity Ordinances; Debunking the Legal Myth of Negative Secondary Effects" by Bryant Paul, Daniel Linz, and Bradley J. Shafer. Our critique of the studies generally relied upon by municipalities to regulate adult businesses in this article concludes that the studies fail to follow the scientific method and are seriously flawed.*

17.    Unlike many of the previous studies conducted by other municipalities I have authored or coauthored studies that do not suffer from the basic methodological flaws we enumerate in *Paul*. These studies have attempted to address public safety or crime-related secondary effects of sexually oriented businesses including the class of businesses defined by the City of Anchorage ordinance.

18.    The methods that I rely on in the studies reported below involve formal, systematic designs. In these studies a set of empirical observations are gathered by adherence to the conventions of science and the process of data collection is guided by professional standards. The generally accepted technique of "hypothesis testing" is used to determine if a finding is reliable. This approach is what is required by minimal professional standards and it comports with common sense.

19.    In using the scientifically precise, limit-setting process of hypotheses testing—I properly control for the possibility of making the egregious mistake of asserting that adult businesses are associated with adverse effects when they are not (known as a "Type I Error").  I control for this possible mistake by calculating an error term.  I measure the error in the data against the estimates of effects that have been obtained to determine if those estimates are reliable.  ***In my professional judgment, to do less than engage in hypothesis testing using the application of a test to tell if the findings are meaningful may be to engage in what Supreme Court Justices in the <u>Alameda Books</u> case call "faulty or shoddy reasoning."***

20.    Criminal justice researchers have embraced the established set of conventions I have outlined above for determining when the claim that two variables are consistently or reliably related to one another that assists us knowing when evidence for adverse secondary effects has been reliably produced.   Dr. Terry A. Danner, Chair, Department of Criminology Saint Leo University, has offered a reasonable description of these conventions as followed by criminologists.  (Dr. Danner is author of the report "Criminogenic Impact Analysis:  Peek-A-Boo Lounge of Bradenton, 5412 14th Street West, Bradenton, FL and Temptations II, 3824 U.S. 41 North Palmetto), which was discussed in the <u>Peek-a-Boo</u> 11th Circuit Case).  Dr. Danner notes that:

> "…It is a standard and accepted practice among the community of behavioral and social science researchers for all attempts to establish the validity of an assumed causal connection between two variables of interest (in this case the existence of an adult cabaret and local crime volumes) to begin with a *null hypothesis* (Maxfield and Babbie, 1995).  Because many social variables appear to be connected but in fact are not, the methodology of proving causal connections between socially relevant phenomena (for example, yearly changes in the national unemployment

rate and yearly changes in the national burglary rate) has been developed into a set of conservative techniques that begin by assuming no causal connection until such a linkage can be adequately proven. This approach is somewhat analogous to the 'presumption of innocence' doctrine in criminal prosecution. That is, to conduct research objectively, the researcher must begin the analysis of data by assuming that there is no actual linkage between the phenomena under consideration until clear and convincing evidence is found to allow for the rejection of the null hypothesis" (pp.3-4).

21.     *I agree with this description of the conventional standards for the analyses of data and I have employed these standards embodied in the process of Hypothesis testing in my studies of the possible adverse secondary effects of adult businesses described below. Our findings using these methods cause us to doubt the City of Anchorage's theory that adult businesses are associated with adverse secondary effects.*

22.     The first study ignored by the City of Anchorage is a peer-reviewed study in the area of secondary effects conducted by Dr. Bryant Paul, (currently an assistant professor in the Department of Telecommunications at Indiana University) under my supervision. This study was an examination of adult cabarets in the City of Ft. Wayne, Indiana, which serve alcoholic beverages and provide exotic entertainment. It is surprising to me that the City was not made aware of this research as this report has been available for several years. The report of this study received a top award from the United States Department of Justice and thus has been vetted by peer review for its methodological soundness. This work was awarded "Top Student Paper" at the student paper competition at the conference: Translating Spatial Research Into Practice: The Fifth Annual International Crime Mapping Research Conference, Sponsored by the Crime

Mapping Research Center, National Institute of Justice, U.S. Department of Justice. A copy of the award letter is attached as **Exhibit 3**. A subsequent version of this report authored by Mr. Paul and myself was presented at the 2002 International Communication Association where it was peer-reviewed and was recognized as one of the "Top Four Refereed Papers in Communication, Law and Policy." The study, titled "Using Crime Mapping to Measure the Negative Secondary Effects of Adult Businesses in Fort Wayne, Indiana: A Quasi-Experimental Methodology" is attached to this hereto as **Exhibit 4.**

23.     In the Fort Wayne study a 1000 feet circumference surrounding each of eight exotic dance nightclubs in Fort Wayne was established. Comparison areas were selected in the city of Fort Wayne and matched to the club areas on the basis of demographic features associated with crime and commercial property composition. The number of calls to the police from 1997-2000 in the areas surrounding the exotic dance nightclubs that served alcohol was compared to the number of calls found in the matched comparison areas. Our analysis showed little difference, overall, between the total number of calls to the police reported in the areas containing the exotic dance nightclubs and the total number of offenses reported in the comparison areas. ***We concluded from these findings that there was no evidence of adverse secondary effects associated with this form of adult business.***

24.     The City of Anchorage also did not consider another peer-reviewed study conducted in Charlotte North Carolina which I undertook with my assistant Bryant Paul and Kenneth C. Land, Jay R. Williams and Michael E. Ezell of Duke

University.  This paper is entitled: *An Examination of the Assumption that Adult Businesses are Associated with Crime in Surrounding Areas: A Secondary Effects Study in Charlotte, North Carolina*.  This study sought to determine if a relationship exists between adult erotic dance clubs in Charlotte, North Carolina that feature topless dancing and serve alcohol and negative secondary effects in the form of increased numbers of crimes reported in the areas surrounding the adult businesses.  Specifically, the study addressed the following research question: Once variables known to be related to crime events suggested by social disorganization and routine activities theories have been taken into account we ask: does the presence of an adult business in a localized area increase the concurrence in space and time of offenders motivated to commit crimes together with suitable targets for the crimes in the absence of guardians capable of preventing or deterring the crimes? For this study of each of 20 businesses, a control site (matched on the basis of demographic characteristics related to crime risk) was compared for crime events over the period of three years (1998-2000) using data on crime incidents reported to the police.  ***We found that the presence of an adult nightclub does not increase the number of crime incidents reported in localized areas surrounding the club*** (defined by circular areas with 500 and 1,000 feet radii) as compared to the number of crime incidents reported in comparable localized areas that do not contain such an adult business.  Indeed, the analyses imply the opposite, namely, that ***the nearby areas surrounding the adult business sites have smaller numbers of reported crime incidents than do corresponding areas surrounding the three control sites studied.*** The report of

this study has been published in the peer reviewed scientific journal *Law and Society Review*, March 2004.  This report is one of two empirical secondary effects studies published in a peer-reviewed journal (the other has been authored by me and my colleagues and is described below).  This published article is attached as **Exhibit 5.**

25.      In addition, in a paper entitled: "*Measuring Secondary Effects of Adult Businesses Using Spatio-temporal Estimation of Real Estate Price Appreciation*," by George W. McCarthy and Henry Renski of the University of North Carolina at Chapel Hill, and I report on an empirical study to assess property values surrounding adult nightclubs in Charlotte North Carolina.  This study was also ignored by the City of Anchorage.

26.      In this study we adopt an expanded repeat housing sales model to estimate, over time and space, appreciation rates for real estate parcels. Using 1980-2000 tax assessment data from Mecklenburg County, North Carolina, we estimate annual appreciation rates and evaluate the extent to which appreciation rates are related to the location of adult clubs.  We show that there is little evidence of a negative impact of the location of adult clubs on house price appreciation.  While house prices show a slightly lower average appreciation rate over the entire period, when spatial and temporal controls are added, appreciation rates are actually higher for parcels in close proximity to adult clubs in 11 of the 20 years of the study.  This report is attached hereto as **Exhibit 6**.

27.      Another empirical study entitled:  *Peep Show Establishments, Police Activity, Public Place and Time:  A Study of Secondary Effects in San Diego*,

California authored by myself, Dr. Bryant Paul of the Department of Telecommunications, Indiana University and Mike Yao was also ignored by the City of Anchorage. This study was undertaken to test whether there is a greater incidence of crime in the vicinity of peep show establishments in San Diego, California than comparable "control" areas that do not contain peep show establishments. We also wished to determine whether any secondary crime effects of peep show establishments in San Diego were disproportionately greater between the hours of 2 a.m. and 6 a.m. The city of San Diego was chosen for study because of a recently passed ordinance that makes it unlawful for any person to operate a "peep show booth" or "peep show device" between the hours of 2:00 a.m. and 6:00 a.m. The city claimed that the ordinance was needed to further a substantial government interest in combating crime. "Calls for service" to the police within a 1000-foot area [1] on either side of the peep show establishment (i.e., involving an uninterrupted 2000 foot wide area) were compared to comparably sized control areas. The levels of crime within a 1000-foot area on either side of peep show establishments during the 2 a.m. to 6 a.m. hours of operation were also compared to levels for the entire day. *We found neither evidence of differences in crime levels, nor any evidence of disproportionately greater amounts of crime within the 2 a.m. to 6 a.m. time period.* We conclude that this study constitutes evidence that the city of San Diego does *not* have a special problem with crime at the peep show establishments generally, nor is there a heightened problem with crime during the 2 a.m. to 6 a.m. period.

---

28.    This study has been *peer reviewed* and presented at the annual meeting of the Western Region Conference of the Society for the Scientific Study of Sexuality, in San Diego, California, in April 2004.  This study was peer reviewed once more and now been published in the scientific periodical *The Journal of Sex Research*.  This manuscript is attached hereto as **Exhibit 7.**

29.    I have also participated in an examination of whether rates of crime are associated with the presence of adult cabarets in the 67 counties of Florida.  This study concluded that there is no evidence of secondary effects associated with adult businesses and was also ignored by the City of Anchorage.  This research is summarized in a *peer reviewed paper* entitled: Examining the Link Between Sexual Entertainment and Crime:  The Presence of Adult Businesses and the Prediction of Crime Rates in Florida.  It is coauthored by Dr. Randy D. Fisher, in the Department of Psychology at the University of Central Florida, Charles V. Benton also of the Department of Psychology of the University of Central Florida, Bryant Paul, Assistant Professor Department of Telecommunications at Indiana University.  A variation of this paper was peer reviewed and presented to the Law and Policy Division at the 2004 annual meeting of the International Communication Association: New Orleans, LA.  Another version of this paper was again independently peer reviewed and presented at the 2004 annual meeting of the Southeastern Psychological Association in Atlanta, GA, by Dr. Fisher.  This version of the paper received an "Outstanding Professional Paper Award" from the Southern Psychological Association.  A manuscript describing this study has been submitted to the scientific journal *Law and Human Behavior*.  This

journal is the official record of the Law and Psychology division of the American Psychological Association.  This manuscript was then peer reviewed once more and a revised version was resubmitted to the journal upon the request of the editor.  Currently, the manuscript is under this additional review.  The most recent version of the manuscript is attached hereto as **Exhibit 8.**

30.     This study does not rely on calls for service.  Instead, the study relies on Uniform Crime Reports (UCRs) collected by local police agencies in Florida for the FBI.  Three kinds of crime are examined: UCR Index crimes, rape, and domestic violence.  Three measures of adult businesses are included in the study: the total number of adult businesses that offer some form of live nude or semi-nude entertainment, the number of such businesses that provide nude entertainment, and the number of nude dancing clubs. The purpose of the present study was to examine whether rates of crime are associated with the rates of adult businesses in the 67 counties of Florida once other variables related to crime are controlled.  Three kinds of crime were examined: UCR property crimes, UCR violent crimes, and rape. Rates per 100K people in the population were also computed for the numbers of nonsexual adult businesses: drinking establishments, gambling establishments, and hotels and motels in each county. These measures, along with measures of social disorganization and demographic variables, were examined for their relative ability to predict the three rates of crime. Regression analyses were performed to determine the unique contributions made by the control variables, rates of nude or semi-nude businesses, and rates of nonsexual adult businesses to prediction of the three rates of crime.  ***Results revealed that***

***rates of nude or semi-nude businesses were not significantly related to rates of property crimes or violent crimes.  However, they were significantly, though inversely, related to rates of rape when other variables were taken into account.*** By contrast, rates of nonsexual adult businesses showed strong positive relationships with rates of both property crimes and rape.  These results are consistent with previous research using different methodologies and they support the predictions of routine activity theory.

31.    We have also recently undertaken an investigation of crime rates (and contributing factors to the crime rates) in and around four major Ohio cities.  ***Our study shows a lack of correlation between the presences of liquor-serving establishments featuring nude or semi-nude dancing and crime.***  Hierarchical regression analysis in Toledo revealed that the presence or absence of adult cabarets in a given neighborhood did nothing to explain the presence of crime in that same neighborhood.  Similarly, in Columbus, the addition of alcohol-serving adult cabarets as a factor in our analysis resulted in zero explanatory power.  The work in Dayton revealed a negative correlation between adult cabarets and incidents of rape, such that the presence of an alcohol-serving adult entertainment establishment is actually indicative of fewer rather than more rape events.  Finally, in Cleveland, we found that the addition of alcohol-serving adult cabarets as a factor in his analysis also added no ability to explain crime incidents.  We suggest that the negative correlation between adult establishments and violent crime might be explained by the fact that in alcohol serving establishments that do

not feature adult entertainment, people fight with one another particularly men over women. None of that exists in an adult entertainment venue.

32.    The study report entitled:  "Testing Supreme Court Assumptions in *California v. la Rue*: Is There Justification for Prohibiting Sexually Explicit Messages in Establishments that Sell Liquor? " has been peer reviewed and will be presented at the 2006 National Communication Association annual meeting at a research paper session entitled: "Top Four Refereed Papers in Freedom of Expression." This paper is attached as **Exhibit 9.**

33.    Finally, in order to test the assumption that adult cabarets are associated with negative secondary effects, an extensive and detailed empirical study of criminal activity in and around these businesses in Daytona Beach, Florida was undertaken utilizing data provided by the Police Department.  We first asked: Does the presence of an adult cabaret in a neighborhood increase the occurrence of crime in Daytona Beach?  In order to answer this question we considered the entire city using census blocks as the unit of study.  We examined demographic variables previously used by criminologists and found to be related to criminal activity, such as a local area's population, age structure (especially the presence of young adults) and race/ethnic composition.  We also examined indicators of social disorganization such as housing vacancies and female-headed households. Finally, congruent with routine activities theory we included a variable that measured the number of alcohol retail sale establishments in each block.

34.    These variables, as expected, were statistically strongly related to crime events in the final analysis. We are able to account for crime events in Daytona Beach with a relatively high level of accuracy (explaining approximately 60

percent of the variability).  The social disorganization and routine activity variables and especially the presence of an alcohol beverage retail sale establishments in the blocks accounts largely for this explanatory power.  The presence of an adult cabaret in the census block accounted for an insubstantial amount of explanatory power.  We then asked: Does the presence of adult cabarets contribute to increased crime in the local vicinity of these establishments?  We focused on the areas surrounding the adult cabarets (1000 foot radius).  We found that far from being the source of crime activity, only one to three and half-percent of the crime events could be attributed to the adult cabarets themselves.  Instead, other businesses in the area, primarily alcohol-serving establishments that do not feature adult entertainment, accounted for far more crime events.

35.    Because the City of Daytona Beach specifically maintained that the primary justification for it's regulation of nudity was because it was associated with increases in prostitution and sexual assaults we undertook a separate set of analyses using each sex crime type as an outcome variable.  ***We found that often the adult cabarets accounted for zero or near zero percent of the sex crime activity in the near vicinity.  Consequently, we concluded that there is not support for the City of Daytona Beach's theory that nudity is associated with increases in sex crime incidents such as prostitution or sexual assault.***  A copy of this study and the subsequent US District Court ruling and opinion concerning the scientific reliability and validity of this study is attached as **Exhibits 10 a-c and Exhibit 11.**

36.     That the gentlemen's clubs in the peer-reviewed studies described above are not a particularly salient source of criminal activity is completely consistent with Cohen and Felson's (1979) routine activities theory of crime.  This theory and its progeny are expertly summarized by criminologist Dr. Terry A. Danner of *Saint Leo University* (see:  Violent Times: A Case Study of the Ybor City Historic District in *Criminal Justice Policy Review*, Volume 14, Number 1, March 2003 3-29, 2003).  Danner notes that this theory explores the link between social change, routine activities, and criminal opportunities. Based on the assumption of interdependence between legal and illegal routine activities, the essence of this theory can be reduced to the following formula: $(O + V) - G = C$, where $O$ represents the "motivated offender"; $V$ indicates the victim (which can be either the victim's person or property and is thus often referred to as "target."); $G$ denotes "guardianship," which, in this version of the theory, is any person who can deter the criminal act; and $C$ is the probability that a direct contact predatory crime will occur.

37.     The theory emphasizes the idea that whenever the economic, demographic, and social forces that shape a community bring potential offenders and suitable targets together in the absence of effective guardianship, the probability that a criminal event will occur increases.  In terms of analyzing possible criminogenic locations, the three essential questions are:  How does this location influence the motivation, decision-making, and presence of potential offenders?  How does it affect the supply and suitability of potential targets?  What physical and social characteristics of the location inhibit or facilitate

guardianship. The exploration of each of these questions shows that there is nothing unique about gentleman's clubs that increases the probability of crime at this type of location relative to other locations in the community. Modern criminological theory, in contrast to the assumptions made by municipalities and courts in the past, does not support the idea that adult cabarets will any more likely to be associated with criminal activity, and in some cases are less likely to be sources of criminal activity in the community compared to other locations.

38.    First, I discuss the theory's explication of offender characteristics, then I describe the theory's notion of victim characteristics, finally I describe what has been termed place, offender, and target convergence taking special note of the implications of routine activities theory for gentlemen's clubs.

   *a. Offender Characteristics* Research studies have identified four relevant characteristics of potential offenders that, through interaction with the situational factors of place, are likely to influence the potential offender's decision-making process. They are 1) lifestyle proximity, 2) offender knowledge, 3) offender anonymity, and 4) offender impairment. ***The question for each of these factors is:  is an adult business such as a gentlemen's club more or less likely to associated with processes that capitalize on the offender's decision making processes?***

   *b. Lifestyle proximity.* Lifestyles that regularly bring potential offenders into proximity with suitable targets have been found to facilitate crime (Brantingham & Brantingham, 1981; Cohen&Felson, 1979; Eck&Weisburd, 1995; Felson, 1995).  If there exists congruence between the lifestyles of populations that tend to be at high risk for crime commission, the lifestyles of people who might be suitable targets for these potential offenders, and the activities that commonly occur at a particular place, then this would tend to increase offender-victim proximity and thus facilitate crime occurrences.

   c. Offenders are theoretically attracted to areas and locations that bring them into proximity with suitable targets.  ***Congruent with this element of the theory shopping malls, large retail store parking lots, and fast food restaurants are far are most likely to be both target rich and congruent***

*with lifestyle of people that are likely to committing crime than adult gentlemen's club locations.*

*d. The gentlemen's club does not present an environment as target rich as do most fast food restaurants or shopping malls. These businesses charge expensive entry fees as well entertainment fees that are likely incongruent with the lifestyles of high risk for crime commission populations.   Therefore, a gentlemen's club may be too expensive a location and therefore incongruent with the lifestyles of the most likely offenders.*

*e. Offender knowledge.*  The presence of potential offenders with an extensive knowledge of the areas wherein suitable targets can be found is a facilitator of crime (Brantingham & Brantingham, 1993; Clarke, 1992; Eck & Weisburd, 1995; Reppeto, 1976).  Beyond the more obvious advantages of knowing the routes of access and escape, potential offenders who are familiar with the physical layout and social rhythms of a specific environment are also more aware of the local crime opportunity structure. Familiarity with the criminal opportunities and physical layout of an environment should thus facilitate the criminal activity of potential offenders in the area wherein they possess this level of awareness.

*f. This element of the theory suggests that shopping areas adjacent to neighborhoods and bars and restaurants located within or adjacent to residential neighborhoods were most likely to be areas of areas of criminal perpetration.*  Strange areas unknown to criminals would not be favored.  Offenders would not know the routes of access and escape, potential offenders who are familiar with the physical layout and social rhythms of a specific environment are also more aware of the local crime opportunity structure.

*g. Because adult businesses including gentleman's clubs are often subject to zoning regulations that do not permit them to locate near residential areas the probability of criminal predation may be reduced compared to shopping malls, fast food restaurants, and bars.*

*h. Offender Anonymity.*  The presence of potential offenders whose identity is unknown to possible capable guardians in the area is a facilitator of crime (Felson, 1995; Roncek & Bell, 1981; Roncek & Maier, 1991; Sampson, 1987).  This anonymity can result from the sheer volume and turnover of people in an area or its lack of community solidarity, but it may also result from the potential offender's purposeful actions to remain unknown.  Whatever the source, it is a characteristic of potential offenders that facilitates their criminal activity because it can reduce the effectiveness of whatever capable guardianship (a concept discussed in greater detail below) might exist.

*i. Since anonymity can result from the sheer volume and turnover of people in an area the theory suggests that shopping malls, fast food restaurants and bars that are extremely popular would be the most likely targets for offenders.*

*j. There may be additional implications for adult gentlemen's clubs. If there are offenders in the area unknown to potential guardians the probability of crime may increase. Because of the extensive guardianship at the gentlemen's clubs in general (see further discussion below) potential offender anonymity is much less of a problem than at other nonadult business locations.*

*k. Offender Impairment.* The presence of potential offenders whose decision-making capabilities have been impaired by the ingestion of psychoactive substances is a facilitator of crime (Block & Block, 1995; Clarke, 1992; Roncek & Maier, 1991; Roncek & Pravatiner, 1989). Areas in which psychopharmacological disinhibitors are freely distributed and ingested are likely to have a higher concentration of disinhibited people, and this in turn increases the potential for offending (for a review of the literature examining the connection between alcohol intoxication and aggression, see Fagan, 1990). *This suggests that premises that sell alcohol such as liquor stores and bars and some restaurants would be most likely to be crime targets by offenders. Gentlemen's clubs that feature fully nude entertainment often do not sell alcohol. Consequently, the possibility that these businesses are a source of predators who are mentally impaired is greatly reduced compared to other venues.*

*l. Characteristics of Targets.* As Danner notes, routine activities theory also implies that people and their property vary in suitability as targets for predatory crime and that these differences influence which are chosen by offenders, or whether or not a crime even occurs at all (Brantingham & Brantingham, 1993; Felson & Cohen, 1980; Miethe & Meier, 1990). At the aggregate level, given a stable exposure to potential offenders and consistency in capable guardianship, the more a place attracts suitable targets and/or increases their suitability, the greater the frequency of crime that will result. Research has identified three constructs that can be considered characteristics of potential targets that, in interaction with the situational factors of place, are likely to influence the probability of a person or his or her property becoming a victim of crime.

*m. Target Value.* The presence of people or their property that have high value as crime targets is a facilitator of crime (Felson & Cohen, 1980; Roncek & Maier, 1991). The most obvious form of target value is economic. **This suggests that fast food customers will be the most likely**

**targets as will bar patrons. These customers are most likely to be carrying cash for their transactions. Further, a range of soft targets such as elderly men and women, mothers with small children in tow, carrying cash, would be considered theoretically the most valuable targets by potential predators. These targets are not frequent patrons of the gentlemen's club adult establishment.**

**n. In addition, because credit card transactions are widely available in gentlemen's clubs and nearly all have ATM's to dispense cash within the premises, relieving the customer of the need to carry cash, there should theoretically be no greater target attractiveness at these locations compared to nonadult venues. This would suggest that retail outlets are far more likely to attract police attention and utilize police resources than adult businesses.**

o. However, a target's usefulness as an outlet for retaliation, sexual aggression, or as a means for improving the offender's self-concept is also possible. **One would be more likely to expect sexual assault surrounding gentlemen's club if the theory is correct. However, no evidence of sexually aggressive criminal activity has been found in the studies we have conducted cited above.**

p. *Target Visibility.* The presence of people or their property that are highly visible as suitable targets is a facilitator of crime (Felson & Cohen, 1980; Roncek & Maier, 1991). Some places attract or produce large concentrations of people with high profile levels of vulnerability. People who are inattentive to their surrounding, appear to lack "street smarts," are physically incapacitated due to medical conditions or intoxication, or any combination of these characteristics, are at a higher risk of victimization when exposed to potential offenders than are those without such characteristics.

**q. The presence of people who are inattentive to their surrounding is far more likely at bars rather than adult gentlemen's clubs. Due to their controversial nature adult business venues are locations where customers are far more likely to be especially vigilant compared to other locations.**

r. *Target Guardianship.* The presence of people and their property without capable guardianship is a facilitator of crime (Cohen & Felson, 1979; Eck & Weisburd, 1995; Felson, 1995; Riccio, 1976; Roncek & Maier, 1991; Roncek & Pravatiner, 1989; Shannon, 1986; Sherman, Gartin, &Buerger, 1989). Guardianship is defined as the presence of persons who can protect would-be victims through the deterrence power of their potential to intervene in one way or another. Guardians may physically stop the offense from occurring. They may have the potential to

report the crime to authorities, identify the offender, or even apprehend or injure the perpetrator. In this sense, guardianship can be a feature of place, but it can also be a characteristic that people bring with them.

s. Although places that consistently have large numbers of people present are likely to increase contact between potential offenders and suitable targets, they can also provide high levels of guardianship. The presence of an audience should generally increase the probability that a potential offender will choose not to commit a crime.

**t. Gentlemen's clubs are often establishments with an exceptionally high level of guardianship. Most establishments employ male floor hosts and "bouncers." These security personnel also patrol the parking area and the business establishment has a multitude of security cameras that oversee every entry and egress location in the clubs.**

u. *Place of Offender/Target Convergence.* As Danner points out it is the essential nature of a place that influences the interaction of potential offenders, suitable targets, and guardianship. The context of where the place is located, what kind of people it attracts, and the routine activities that occur there are essential to its criminogenic potential. Some elements of this backcloth can work to inhibit crime while other features facilitate it.

v. Danner notes that research into the environments of crime has identified five characteristics of place that, through interactions with the characteristics of the people who frequent the location, influence the probability of a person becoming a victim of crime.

w. *Place Management.* Places in which there is little active management of behavior facilitate crime (Block&Block, 1995; Clarke, 1992; Eck & Weisburd, 1995; Felson, 1995; Mazerolle, Kadleck, & Roehl, 1998; Sherman, 1995). Places where "anything goes" can allow relatively minor incivility to escalate into crime. Conversely, it has been found that places in which managers and employees are assigned guardianship roles that include the consistent enforcement of clear rules of behavior have lower occurrences of crime.

**x. As noted above gentlemen's clubs are establishments with an exceptionally high level of guardianship. These establishments employ security personnel inside the premises and security personnel also patrol the parking area. These active guardianship practices contribute to the relatively low level of police activity found at these locations.**

y. *Ecological Labeling.* Places that have been labeled as a "devalued area" wherein deviance is tolerated facilitate crime (Block & Block, 1995;

Brantingham & Brantingham, 1991; Sherman et al., 1989). Once a place starts to develop a reputation as an environment in which deviance is tolerated, a deviation amplifying feedback loop can begin. That is, the more deviance occurs, the more normal it appears to be, and the more it is accepted as normal behavior, the more people choose to act in deviant ways. For places, being labeled as an environment of unlimited personal freedom attracts people who wish to behave without restraint. It is possible that areas with reputations of this type may also repel potential victims who want to avoid dangerous places.  Research has shown that this kind of environmental labeling does tend to attract relatively higher numbers of potential offenders and that this "attractor effect" can increase the probability of crime.

*z. The exceptionally high level of guardianship at these establishments may dampen any possibility that such an "anything goes" environment could be created.*

*aa. Place Proximity.*  The location of places close to concentrated populations of potential offenders facilitates crime (Brantingham & Brantingham, 1991, 1993; Dunn, 1980; Felson, 1986; Roncek & Maier, 1991; Roncek & Pravatiner, 1989; Sherman, 1995; Sherman et al., 1989). Affluent areas are often victimized by offenders who live in less affluent places that are close by. These more affluent areas attract predatory offenders because they provide a concentration of suitable targets in a conveniently located environment.

*bb. Youth Attractors.* Areas that attract a high number of young people are facilitators of crime (Block & Block, 1995; Brantingham & Brantingham, 1981, 1993; Roncek & Faggiani, 1985; Roncek & Lobosco, 1983; Roncek & Pravatiner, 1989).  Because age is strongly related to both offending and being victimized, places that attract large numbers of young people concentrate, and thus increase, the contact between offenders and suitable targets.

*cc. This is not a problem for gentlemen's clubs as youth under the age of 18 years are not permitted on the premises.  Instead, this may be far more of a problem for fast food restaurants and locations that concentrate youth such as high schools.*

*dd. Bars.*  Areas that contain public establishments that serve alcohol as an important part of their retail activity facilitate crime (Block & Block, 1995; Minnesota Crime Commission, 1980; Roncek & Bell, 1981; Roncek & Maier, 1991; Roncek&Pravatiner, 1989; Shannon, 1986; Sherman, 1995). Not all bars are criminogenic, but certain types of bars and clusters of bars within night entertainment areas can facilitate crime by concentrating a number of the conditions described above. These

26

circumstances can be counteracted through the practice of patron management, providing guardianship, and other types of crime prevention activities. It has also been shown that higher levels of alcohol outlet density are geographically associated with higher rates of violence (Scribner, Cohen, Kaplan, & Allen, 1999; Scribner, MacKinnon, & Dwyer, 1995). *This suggests that alcohol-serving establishments that do not feature adult entertainment may be a far larger source of criminal activity.*

39.    In summary, studies from other communities often fail on several methodological criteria. Many of the study authors themselves disavow finding secondary effects for adult businesses, yet this information is ignored by the City of Anchorage. Many of the so-called studies are not empirical studies of the communities they are attributed to at all. Many of the "studies" are summaries of legislative alternatives, legal precedents or findings from other communities. *Thus, it is my opinion the evidence from these other municipalities does not fairly support the City of Anchorage ordinance and casts direct doubt on the rationale behind the ordinance.*

40.    Further, unlike many of the previous studies conducted by other municipalities I have conducted studies that do not suffer from the basic methodological flaws enumerated above. Had the City of Anchorage considered these peer reviewed studies they would have found that the rationale advanced for the regulation of adult businesses is not fairly supported and that the findings of these studies cast direct doubt on the theory of adverse secondary effects behind the city ordinance.

41.    The finding that the gentlemen's clubs in the peer-reviewed studies described above are not a particularly salient source of criminal activity is completely consistent with Cohen and Felson's (1979) routine activities theory of

crime.  This theory suggests that those areas most likely to be criminogenic in a

community will not be gentlemen's clubs but instead are likely to be fast food

restaurants, shopping malls and other locations that are more compatible with

predator lifestyles and more target rich.

42.    That in addition to my own studies, the following studies, attached hereto

as **Exhibits 12, 13** and **14** have found also no correlation between adult

businesses and purported secondary effects:

a.  **Fulton County, Georgia, 1997.**  In 1997, the Fulton County Board of
Commissioners adopted a resolution directing the County Attorney's office to
prepare a more stringent Adult Use Ordinance, and instructed the Fulton County
Police Department to prepare a study comparing sexually oriented Adult Uses
with alcohol-serving uses, in effort to support the proposed more stringent
ordinance.  Instead, the Police Department found more crime and calls for service
at alcohol-serving establishments without sexually oriented entertainment, than at
alcohol-serving establishments which also offered sexually oriented
entertainment.  The police Department concluded:  Based on this statistical study
of calls for service and reported crime at adult entertainment establishments, there
is no statistical correlation that shows that there is an increase in crime at adult
entertainment establishments that serve alcoholic beverages.  However, there is a
statistical correlation that would indicate that there is greater instances [*sic*] of
calls for service and crime at non-adult entertainment establishment that serve
alcoholic beverages.  (no page number).  (Fuller, Captain Ron and Lt. Sue Miller,
*Fulton County Police: Study of Calls for Service to Adult Entertainment
Establishments which Serve Alcoholic Beverages, June, 1995 - May, 1997*, Fulton
County Police Department, Atlanta, GA, June 13, 1997.)

b. Finally, there are two reports by Dr. Terry A. Danner, Chair, Department of
Criminal Justice, Saint Leo University, **"Exploring the Causal Connection Between
Adult Use Enterprises and the Adverse Secondary Effect of Crime:  The
Casselberry and Seminole County Experience"** and **Criminogenic Impact Analysis:
Peek-A-Boo Lounge of Bradenton 5412 14th Street West Bradenton, FL and
Temptations II 3824 U.S. 41 North Palmetto, FL."**  These reports include a number of
empirical studies designed to measure and document crime related adverse secondary
effects in the communities directly surrounding adult cabarets in Manatee County,
Pinellas County, and Tampa, Florida.  Dr. Danner concludes that within a reasonable
degree of social scientific certainty, there was no evidence produced by this research that
would allow for the conclusion that these establishments are uniquely criminogenic in a
way that would inflict adverse crime related secondary effects on the communities in
which they are located.

43.    *I have reviewed these studies and found the methodology used in the*
*studies sound and the analysis scientifically credible.*

44.    The City of Anchorage Assembly amended the adult entertainment ordinance in
AO 2005-139. New provisions added by AO 2005-139 include a four-foot buffer zone
between dancer and patron.  The City maintains that the objective of the buffer zone is to
eliminate the risk of prostitution, sexual assaults, and disease that are associated with lap
dancing.

45.    There are no secondary effects studies that specifically examine the link between
secondary effects and adult businesses that feature individual table or lap dancing and
prostitution.

46.    The City of Anchorage also asserts that evidence showed a connection between
table dancing and illegal sexual activity, which include "increased threat of the spread of
sexually transmitted diseases".

47.    In conjunction with my professional research, I have reviewed studies examining
whether a link exists between adult businesses and sexually transmitted diseases. One of
these is the report of Dr. J. R. Greenwood, Ph.D., M.P.H. Adjunct Professor, Public
Health UCLA School of Public (Formerly, Deputy Director, Public Health Disease
Prevention and Control, County of Orange, CA,) who performed a public health analysis
regarding adult entertainment facilities in Rancho Cordova California. The public health
report was undertaken in response to the proposed Rancho Cordova Adult-Business
Ordinance Number 22-2004 in which it is claimed that adult entertainment facilities are
related to the transmission of sexually transmitted diseases and present a public health
hazard.

48.    As part of his analysis the following was done: 1) The three adult facilities in

Rancho Cordova were visited and inspected, 2) the latest report (2002 data released in

July 2004) from the State of California on sexually transmitted diseases in California was

reviewed and 3) scientific literature related to the control and transmission of sexually

transmitted diseases was reviewed for recent transmission trends and current intervention

strategies.

49.    Dr. Greenwood concluded:

> A major premise, upon which Resolution No. 22-2004 was based,
> is that control of Adult Oriented Businesses has an impact on the
> spread of sexually transmitted diseases (STDs such as HIV/AIDS,
> syphilis and gonorrhea) within a community.  Dr. Greenwood
> concluded that while the premise might be laudable in its goal, it is
> not supported by data from any governmental disease control
> agency such as the California Department of Health Services or the
> Centers for Disease Control (1, 2).  **He concluded: "there are no
> data to support that they (sexually transmitted diseases) are
> spread at Adult-Oriented Businesses.**  As an example, HIV and
> syphilis continue to be spread among the population of men having
> sex with men (MSM) and salmonella infections are more
> commonly transmitted by contaminated food in Sacramento
> County.  It is far more likely that the STDs mentioned in this
> section are spread in motels, home bedrooms and hotels within the
> community where unprotected (i.e. no condom use) sexual
> intercourse takes place."

50.    Further, Dr. Greenwood concluded that because of their sexual orientation and the

restrictions of age of admission to Adult Oriented Businesses those persons most

susceptible to both having and transmitting disease would not be patrons of adult cabaret

establishments.  He notes that a recent review of STD control plans by both California

and federal agencies that have a mandate to control STDs demonstrates that no efforts are

underway to target Adult-Oriented Businesses as a source of STDs either nationally or

within California.  Prevention resources, however, are being spent to educate gay males

and adolescents and teens, three groups with increasing STD rates, about the dangers of

STDs and methods to prevent infection.  Neither of these two groups, either because of

their sexual orientation nor the restrictions of age of admission to Adult Oriented

Businesses, would be patrons of adult establishments.

51.     Dr. Greenwood also notes that since the start of the HIV epidemic in the early

1980's, the risk factors for becoming infected with HIV have remained the same – male-

to-male sexual contact, injection drug use and heterosexual intercourse with an HIV-

infected injection drug user or an HIV-infected bisexual male.  CDC HIV statistics

through 2003 show that approximately 75% of the cases continue to occur because of

male-to-male sexual contact and injection drug use and the heterosexual cases

(approximately 16% of the total) are linked to these risk groups.  HIV is spread by sexual

contact with an infected person, by sharing needles and/or syringes (primarily for drug

injection) with someone who is infected, or, less commonly (and now very rarely in

countries where blood is screened for HIV antibodies), through transfusions of infected

blood or blood clotting factors. Babies born to HIV-infected women may become

infected before or during birth or through breast-feeding after birth.

52.     Dr. Greenwood points out in his report that some people fear that HIV might be

transmitted in other ways; however, no scientific evidence to support any of these fears

has been found. If HIV were being transmitted through other routes (such as through air,

water, or insects), the pattern of reported AIDS cases would be much different from what

has been observed."  While all of the statistics quoted in this section are correct, they are

not related to the activities that take place in the Rancho Cordova Adult-Oriented

Businesses.  The major risk factors for HIV transmission, according to Dr. Greenwood do not apply to these businesses.

53.     According to the American Public Health Association, transmission of syphilis "nearly always occurs during sexual intercourse."  Consequently, Dr. Greenwood concludes that the activities in Rancho Cordova Adult-Oriented Businesses do not lend themselves to syphilis transmission.  It is also important to note that the California Department of Health Services initiated an enhanced venue surveillance system for syphilis in 2000.  The three commonly reported venues reported by gay males (the segment of the population that has the most rapid increase in P&S syphilis rates) were the Internet, bathhouses and gay sex clubs.  No mention of Adult Oriented Businesses is present in the Department's report on syphilis that was released in 2004.

54.     Further, Greenwood notes that Chlamydia, like syphilis, are transmitted during sexual intercourse and not through other means of contact (with the exception of congenital infection during birth).  Consequently, there is no opportunity for chlamydia to be transmitted in Adult Oriented Businesses.  Additionally, the California Department of Health Services continues to report that case-based Chlamydia surveillance data by age have consistently shown the highest rates to be among adolescents and young adults.  For this reason juvenile hall facilities have been targeted as locations for Chlamydia surveillance activities.  Adult Oriented Businesses have not been selected for these studies.

55.     Greenwood also points out that gonorrhea is also transmitted through sexual intercourse and not casual contact.  While the case numbers within California and Sacramento County are relatively high (San Francisco, Alameda, Fresno, Long Beach,

Kern are higher) they are similar to other urban areas across the country and reflect

sexual activity, gender, age and ethnicity trends.  High-risk behavior, that is, unprotected

intercourse is the driving force behind these rates.

56.    Gonorrhea transmission within Adult-Oriented Businesses has also been used to

try and focus on the sanitation of these facilities and their potential for disease

transmission within a community.  Dr. Greenwood asserts that gonorrhea transmission

from inanimate objects is part of an urban legend that states that one can become infected

with gonorrhea from sitting on a contaminated toilet seat or touching an inanimate object

that has bodily fluids or semen.  No cases of transmission by this method have ever been

proven.

57.    STDs are transmitted during sexual intercourse or, as in the case of HIV infection,

IV drug use.  The Surgeon General and all other disease control organizations promote

protected intercourse (condoms) as a primary method to prevent STD transmission.

Adult-Oriented Businesses that promote lap dances and other forms of casual contact are

not the locations that facilitate transmission of these diseases.

58.    In summary, Dr. Greenwood opines: The City (of Rancho Cordova) does have a

substantial interest in adopting regulations, which will reduce unlawful sex acts and

prostitution as one possible method to reduce the incidence of sexually transmitted

diseases.  However, no data are available to support regulating Adult-Oriented

Businesses as a method of STD control.  According to Dr. Greenwood, the City would be

far better served to work with Sacramento County disease control programs to increase

sex education classes within high schools, increase the number of condom dispensers in

public restrooms and also support more STD and HIV screening in local medical clinics.

These activities have a proven record of success in controlling STDs. A copy of Dr. Greenwoods report is attached hereto as **Exhibit 15.**

59.     That I am also familiar with the testimony of Dr. Rebeka Thomas in the case THE STATE OF FLORIDA v. KATIE COLEMAN is also relevant here. (See THE STATE OF FLORIDA v. KATIE COLEMAN, EXCERPT OF TRANSCRIPT OF PROCEEDINGS, HILLSBOROUGH COUNTY COURTHOUSE, TAMPA, FLORIDA, APRIL 6, 2001). I had the opportunity to review this testimony as part of my professional research.

60.     In her sworn testimony Dr. Thomas testified that since the City of Tampa had predicated its adult ordinance, which among other requirements, established a buffer zone between dancers and patrons she assumed that there would be data linking adult businesses and sexually transmitted diseases. According to Dr. Thomas, she attempted to evaluate whether or not the Centers for Disease Control maintained any records of adult entertainment businesses or adult entertainment issues as it pertains to the spread of sexually transmitted diseases.  She examined the Centers website which includes a complete publication of all Centers information and conducted a number of site searches, including using key words such as "female dancers and sexually transmitted diseases," "erotic dancing and sexually transmitted diseases," "exotic dancing and sexually transmitted disease," "dancing and sexually transmitted disease."  According to Dr. Thomas, she encountered no web pages, records, citations or health warnings associated with these topics the Centers for Disease Control website.

61.     Dr. Thomas also testified that she contacted the CDC by e-mail.  She indicated she was looking for data on sexually transmitted diseases and erotic and exotic dancing,

or female dancing.   She explained that the City of Tampa was using the transmission of

disease as justification for its ordinance.  She received the reply that the Center's do not

track that data, but if exists another area of the Centers' site may be helpful.  She went to

another search engine, did the same five, six, eight searches and she testified she "came

up empty again."

62.    Dr. Thomas concluded, that based upon the lack of scientific literature regarding

the link between adult businesses and sexually transmitted diseases maintained by the

Center's for Disease Control, that the Center for Disease Control has concluded that

studying whether such a link exists is not important enough for the CDC to attempt to

produce any evidence that erotic or exotic dancing will promote sexually transmitted

diseases.  In her opinion, the CDC, if such a link were likely, the CDC would track such

an issue, especially where a large industry would be involved in risk behavior. A Copy of

Dr. Thomas Testimony is attached hereto as **Exhibit 16.**

63.    Dr. Thomas also offered similar testimony in the case: KENTUCKY

RESTAURANT CONCEPTS, INC. v. CITY OF LOUISVILLE, NOVEMBER 13, 2001.

In the excerpt of transcript of preliminary injunction hearing before Honorable John G.

Heyburn II United States District Judge Dr. Thomas offered an opinion as to whether or

not the entertainment contained in adult cabarets can cause either sexually transmitted

diseases or other diseases. She stated that in general, her observations have shown that

there are no specific risk behaviors exhibited at adult entertainment cabarets that would

put them in the category of risk for transmission of disease. Like her testimony in Tampa,

she testified she also contacted the Centers for Disease Control and Prevention and to see

what evidence they had gained as to the kinds of activities going on in adult

entertainment establishments and to see if they had done studies or published studies about risks and occupations of people who are involved in adult entertainment. She testified she "found absolutely nothing."

64.     Dr. Thomas also testified that there was no literature available from the Centers for Disease Control or any of their subsidiaries.  For example, the Center for HIV, STD and TB prevention had no literature which would link adult businesses to STD's.  The American Social Health Association also had no literature. She testified that she found that the idea of exotic dancing or erotic dancing to not be associated with any specific risk factors for the transmission of disease beyond any other kind of activities that would go on in nightclubs or bars or restaurants or similar location.

65.     When asked the Question:  "Is the health hazard any greater in an adult cabaret from what you have observed than it is sitting next to the court reporter here today? She answered "No." She further testified that disease transmission has to involve specific parts of the body in specific manners.  For example, most sexually transmitted disease and a lot of other diseases in general have to be introduced into the body in the right place at the right time, and specifically we are talking about mucosal membranes.  Those are membranes that line the nasal passage, mouth, throat, respiratory passage, entire digestive tract, and reproductive tract.

66.     She also testified that in her understanding of nude or semi-nude dance activity, that these activities do not involve any of the risk behaviors for transfer of that activity. She noted that the risk behaviors identified by Centers for Disease Control in terms of transmission of sexually transmitted diseases include sexual intercourse, whether that be vaginal, anal or oral, involve injected drug use, taking blood, semen or vaginal secretions

into the body, direct contact with genital to genital, genital to anal, genital to mouth contact with skin surrounding any of those areas for transmission of disease to occur.

67.     Dr. Thomas also testified that she had also personally visited the adult cabarets in Louisville Kentucky, Déjà vu, PT's and Godfather's.  She noted she did not observe any risk behaviors at any of those cabarets.

68.     Dr. Thomas concluded that dancing very close to someone does not increase the risk behavior for sexually transmitted disease as long as the patron is clothed.  She testified that there has to be direct contact between either mucosal membranes, which would involve something like sexual intercourse, or there would have to be some sort of genital to genital contact or contact of the skin immediately surrounding the genitals or the anal area or the mouth.  She testified that she did not see any of those activities taking place.  She further concluded that absent that activity, sexually transmitted diseases transmission is extremely unlikely. A Copy of Dr. Thomas Louisville Testimony is attached hereto as Exhibit 17. A copy of Dr. Thomas report submitted in support of her testimony is attached as Exhibit 18.

69.     ***In summary, public health experts Dr. Rebekka Thomas and Dr. Jeffery Greenwood have concluded that there is no relationship between adult businesses and sexually transmitted diseases or other public health ill effects. In my professional opinion, such testimony casts direct doubt on the City of Anchorage' conclusion that Adult Businesses are associated with Sexually Transmitted Diseases or other negative heath effects.***

70.     The City of Anchorage also maintains that solicitations for sexual favors occurred during dances and that drugs were frequently passed during tipping.  The City of

Anchorage also maintains that regulation of the distance between dancer and patron was necessary to prevent significant criminal activity that has historically and regularly occurred in adult entertainment establishments, including breaches of the peace, and organized crime.  Finally, the City of Anchorage also claims that regulation of the distance between dancer and patron was necessary because a lap dance also invites sexual assault since the patron has an opportunity to touch the dancer's genitals, anus, or breast without the dancer's consent.

71.    ***Properly conducted field research with exotic dance club entertainers and employees have found no support for the allegations of misconduct among performers in the adult industry.***

72.    Anthropologist Judith Hanna a Ph. D trained at Columbia University and currently a senior research scholar at the University of Maryland, has authored numerous books and articles on dance and urban studies (e.g., *Dance, Sex and Gender*, University of Chicago Press).  Further, she has also extensively examined the working conditions of the dancers. Her research includes investigations of over 100 exotic dance clubs and interviews with more than 500 dancers, patrons and community members.

73.    Dr. Hanna has also conducted a field study in Charlotte North Carolina. A description of this study may be found in the report entitled: Reality and myth: What neighbors say about exotic dance clubs; a case study in Charlotte, North Carolina, 2001.  The contents of this report is summarized in Dr. Hanna's peer reviewed article: "Exotic Dance Adult Entertainment:  A Guide for Planners and Policy Makers," *Journal of Planning Literature*, Vol. 20,No.2 (November

2005) (**See Exhibit 19**).  This study is an anthropological, qualitative case study that reports on the perspectives of residents and business neighbors of three exotic dance clubs.  These clubs were chosen to reflect three different kinds of economically developed neighborhoods.  The primary goal of this case study was to provide information on the extent and quality of residents' and business operators' perceptions of the impact of the exotic dance club on the quality of life in the neighborhood.

74.     Dr. Hanna observed the three dance clubs during both daytime and nighttime hours of operation.  Managers and dancers in each business were interviewed about their perceptions of what takes place at and around the club and neighbors reactions to the club.  Reports about exotic dance clubs in the Charlotte Observer newspaper were also examined to obtain historical background for the case study.

75.     The findings indicated that despite negative publicity in the newspapers, out of 91 interviews with three adult business, neighboring residents and business operators, 18 dancers and three managers, there were no reports of adverse secondary effects- crime or property depreciation-as a result of the presence of these adult businesses.  Overall, the majority of the neighbors believed that the adult businesses caused no harmful effects on their neighborhoods.

76.     Several business operators in the exotic dance club neighborhoods commented on the positive benefits of being close to an adult business.  They said the clubs attracted customers who became their clients.  For example, a car service operator said the clubs provided an enjoyable place for customers to wait while having their cars serviced. Many local residents said the problems that exist in the neighborhoods of exotic dance clubs

have nothing to do with adult entertainment.  Neighbors of the exotic dance clubs complained about other factors: over development of the neighborhood area, congestion, noise etc.

77.    *In summary, I conclude that properly conducted field research with exotic dance club entertainers and employees have found no support for the allegations of misconduct among performers in the adult industry. Therefore, it is my opinion that any conclusion by the Municipality of Anchorage that adult businesses cause such effects represents "shoddy data and reasoning" as it is contrary to the scientific evidence which finds no such effects.*

78.    In my professional capacity, I have also conducted field experiment in order to test the assumptions by the Supreme Court in *Barnes v. Glen Theatre, Inc* (1991) and the Ninth Circuit Court of Appeals in *Colacurcio v. City of Kent* (1999) that government restrictions on dancer nudity and dancer-patron proximity do not affect the content of messages conveyed by exotic dancers.  A field experiment was conducted in which dancer nudity (nude vs. partial clothing) and dancer-patron proximity (4 feet; 6 in.; 6 in. plus touch) were manipulated under controlled conditions in an adult nightclub.  After male patrons viewed the dances, they completed questionnaires assessing affective states and reception of erotic, relational intimacy, and social messages.  *Contrary to the assumptions of the courts, the results showed that the content of messages conveyed by the dancers was significantly altered by restrictions placed on dancer nudity and dance-patron proximity.*  These findings are interpreted in terms of social psychological responses to nudity and communication theories of nonverbal behavior.  This study has been peer-reviewed and published as:  Linz, D., Blumenthal, E., Donnerstein, E., Kunkel,

D. Shafer, B.J. & Lichtenstein, A. (2000). Testing Legal Assumptions Regarding the Effects of Dancer Nudity and Proximity to Patron on Erotic Expression. *Law and Human Behavior*, 24, 5, 507-533. A copy of this study is attached as **Exhibit 20.**

79.    That in addition to conducting a critical review of the evidence relied up by the City of Anchorage, I have also been retained to undertake a scientifically and methodologically sound analysis of purported secondary effects in the City of Anchorage. Specifically, I have been asked to determine, using scientifically sound principles, whether adult businesses have been the cause of secondary effects in the City of Anchorage. In order to undertake this analysis, I have requested and received crime activity information from the City of Anchorage.

80.    That we are currently undertaking a scientifically and methodologically sound analysis of purported secondary effects in the City of Anchorage. This information includes crime incident data for a five-year period including: 1) Crime date and time 2) Crime type 3) Crime address, and 4) Geo-coded coordinates. I am currently analyzing this crime activity information from the City of Anchorage. Complete analyses of these data are expected by December 1, 2006.

81.    That I have obtained preliminary findings using analyses techniques that we have employed in the past and have been vetted by peer review. Our analyses to date indicate to me that there are no adverse secondary effects associated with adult businesses in Anchorage. These preliminary findings are consistent with published research findings we have obtained in the past.

82.    That information congruent with this opinion has been provided to me by Kathy and Carol Hartman, owners of adult businesses in Anchorage and plaintiffs in this case.

They have provided me with a preliminary analyses of calls for service requests for several business addresses in Anchorage obtained from Chief Morgan from 1998 through 2003.  These analyses show that all of adult businesses, whether they serve alcohol or not, had fewer police calls than did the other alcohol serving establishments in the community that have no adult entertainment.   Further, According to the "Descriptive Analysis of Sexual Assaults in Anchorage Alaska" the rates of forcible rape none of the adult cabarets are located in the "hot spots. "   While these findings are preliminary they are consistent with our findings in our current analyses and consistent with research in other communities regarding the lack of secondary effects for adult businesses when compared to other entertainment venues.

83.     Based upon each of the forgoing reasons, I preliminarily conclude that presently, no evidence exists which would suggest Adult Businesses, such as the Plaintiff's, cause or contribute to secondary effects in Anchorage.

Dated: 10/11/06

_____
Daniel Linz, Ph.D

Subscribed and sworn to before me this
11 ᵗʰ ____ day of October, 2006

_____
Notary Public

ERIC N. SHAPIRO
Commission # 1401070
Notary Public - California
Santa Barbara County
My Comm. Expires Mar 14, 2007

43