# COMMUNICATION LAW AND POLICY

Volume 6        Spring 2001        Number 2

*The Journal of the Law Division of the Association for Education in Journalism and Mass Communication*

ARTICLES

THE JURISPRUDENCE OF PRECISION: CONTRAST SPACE AND NARROW TAILORING IN FIRST AMENDMENT DOCTRINE
    Matthew D. Bunker and Emily Erickson

RESPONSES TO INTERNET HATE SITES: IS SPEECH TOO FREE IN CYBERSPACE?
    Laura Leets

PLEADING THE FIFTH: MEDIA ECONOMICS, FREE AIR TIME AND THE FIFTH AMENDMENT
    Glenda C. Williams

GOVERNMENT REGULATION OF "ADULT" BUSINESSES THROUGH ZONING AND ANTI-NUDITY ORDINANCES: DEBUNKING THE LEGAL MYTH OF NEGATIVE SECONDARY EFFECTS
    Bryant Paul, Daniel Linz, and Bradley J. Shafer

LEA    LAWRENCE ERLBAUM ASSOCIATES, PUBLISHERS
       Mahwah, New Jersey        London

6 COMM. L. & POL'Y 355–391 (2001)
Copyright © 2001, Lawrence Erlbaum Associates, Inc.

# GOVERNMENT REGULATION OF "ADULT" BUSINESSES THROUGH ZONING AND ANTI-NUDITY ORDINANCES: DEBUNKING THE LEGAL MYTH OF NEGATIVE SECONDARY EFFECTS

BRYANT PAUL*
DANIEL LINZ**
BRADLEY J. SHAFER***

*Municipalities that prohibit "adult" businesses from operating in certain areas have justified these "zoning" regulations by advancing the idea that the presence of the business will have so-called "adverse, or negative secondary effects" on the surrounding community. Most recently, a plurality of the United States Supreme Court has upheld the extension of this doctrine beyond the zoning of adult businesses to the symbolic behavior within them in the form of ordinances banning nudity. This article abstracts and analyzes the methods and major empirical findings of studies conducted by United States municipalities, purporting to detect adverse secondary effects of adult businesses. With few exceptions the methods used in the most frequently cited studies are seriously and often fatally flawed. These studies, relied on by other communities throughout the country, do not adhere to professional standards of scientific inquiry and nearly all fail to meet the basic assumptions necessary to calculate an error rate—a test of the reliability of findings in science. Those studies that are scientifically credible demonstrate either no*

*Ph.D. candidate, Department of Communication, University of California, Santa Barbara.
**Professor, Department of Communication and Law and Society Program, University of California, Santa Barbara.
***Attorney, Shafer and Associates, P.C., Lansing, Michigan.

*negative secondary effects associated with adult businesses or a reversal of the presumed negative effect. The implications of the lack of evidence of adverse secondary effects for the regulation of performances within adult businesses are discussed.*

Since 1976, the United States Supreme Court has decided a series of cases focusing on whether the free speech clause of the First Amendment allows cities and states to enact legislation controlling the location of "adult" businesses.[1] These "zoning" regulations, which may prevent a sex-related business from operating, for example, within a certain number of feet from residences, schools and houses of worship or a given distance from one-another, have been predicated on the notion that cities and other municipalities have a substantial interest in combating so-called "negative secondary effects" on the neighborhoods surrounding adult businesses. These secondary effects have most often included alleged increases in crime, decreases in property values, and other indicators of neighborhood deterioration in the area surrounding the adult business. Typically, communities have either conducted their own investigations of potential secondary effects or have relied on studies conducted by other cities or localities.

In more recent years, the Court has considered the constitutionality of anti-nudity legislation passed by municipalities or states that have relied on the negative secondary effects doctrine as justification.[2] The Court in *Barnes v. Glen Theatre, Inc.* held that the State of Indiana could regulate nudity; with a plurality of the Court concluding that the government could undertake such regulation to protect the public order and morality.[3] In a concurring opinion, however, Justice Souter argued that the State had justified the ban on the basis of the *presumed* negative secondary effects on the surrounding community.[4]

Most recently, in *City of Erie v. Pap's A.M.*, the Court again held that municipalities have the right under appropriate circumstances to pass anti-nudity ordinances.[5] Again, however, the Court was fractured. Three justices agreed with Justice O'Connor's opinion that

---

[1] *See, e.g.,* City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Young v. Am. Mini Theatres, Inc., 427 U.S. 50 (1976).

[2] *See, e.g.,* Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991); City of Erie v. Pap's A.M., 120 S. Ct. 1382 (2000).

[3] 501 U.S. at 567–68.

[4] *Id.* at 582–84 (Souter, J., concurring).

[5] 120 S. Ct. 1382.

Case 3:05-cv-00256-TMB   Document 53-8   Filed 10/12/2006   Page 4 of 8

combating negative secondary effects supposedly associated with adult businesses was a legitimate basis for the imposition of an anti-nudity regulation.[6] Most notable for the purposes of this article was, however, Justice Souter's partial concurrence and partial dissent, in which he significantly revised the position he took regarding secondary effects in *Barnes*. In *Pap's*, Justice Souter admitted that the evidence of a relationship between adult businesses and negative secondary effects is at best inconclusive.[7] He called into question the reliability of past studies that purported to demonstrate these effects and suggested that municipalities wishing to ban nudity must show evidence of an actual relationship between adult businesses and negative effects.[8]

The recent expansion of the secondary effects "doctrine" to include not only the zoning of adult businesses but now the regulation of the content of expression within these establishments, raises the question: How reliable and valid are the so called "studies" conducted by individual municipalities and shared nationwide with other municipalities attempting to regulate the location of, and most recently, erotic expression within, adult businesses? Examined in this article is the scientific validly of the research considered by municipalities across the country as a justification for the regulation of adult businesses.

## THE SUPREME COURT ON OBSCENITY

Early attempts to regulate adult businesses involved enforcement of obscenity laws. The United States Supreme Court rendered its first authoritative decision on obscenity in *Roth v. United States*.[9] The Court ruled that obscene material was not protected by the First Amendment to the Constitution. It defined obscene materials as those that "appeal to a prurient interest" in sex (defined as a shameful, morbid and unhealthy interest in sex) and are presented in a "patently offensive way."[10]

Through the 1960s, the *Roth* test was refined to reflect objections to the suppression of erotica. In *Kingsley International Pictures Corp. v. Regents*, the Court found that a film based on the erotic novel, *Lady Chaterly's Lover*, was not obscene under the *Roth* test.[11]

---

[6] *Id.* at 1393 (O'Connor, J., concurring).
[7] *Id.* at 1404–05 (Souter, J., concurring in part and dissenting in part).
[8] *Id.* at 1402–03 n.3.
[9] 54 U.S. 476 (1957).
[10] *Id.* at 488.
[11] 360 U.S. 684, 689–90 (1959).

The Court greatly expanded the scope of permissible sexual portrayals with its decision in *Memoirs v. Massachusetts*.[12] At issue was the literary work, *Memoirs of a Woman of Pleasure*, commonly known as *Fanny Hill*, by John Cleland. The Court ruled that the prosecution must prove to the jury's satisfaction that the work in question is "utterly without socially redeeming value." In the Court's view the First Amendment protection given to "socially redeeming ideas" was sufficient to override the accompanying portrayals of sexual activity.[13] Later, the Court further broadened its notion of permissibility by striking down another obscenity conviction in *Stanley v. Georgia*.[14] In this case, the defendant had been found guilty of possessing obscene materials in his home. The Supreme Court ruled that the First Amendment provides protection for the individual's right to receive information and ideas about sex.[15]

The body of social science research sponsored by the 1970 Presidential Commission on Obscenity and Pornography in the United States was the first systematic academic foray into the study of exposure to sexually explicit materials.[16] Consistent with the more liberal Supreme Court rulings in the 1960s, the Commission concluded that there were no scientifically demonstrated harmful effects from pornography and recommended legalization of all forms of sexually explicit communication.

A more politically conservative Court ruled, in *Miller v. California*, that "contemporary community standards" must be used to resolve the underlying questions of fact regarding "prurient interest" and "patent offensiveness."[17] By the late 1980s and early 1990s empirical studies estimating community standards for sexually explicit materials suggested that even in politically conservative communities, the majority of citizens actually found such materials non-obscene.[18]

---

[12] 383 U.S. 413 (1966).
[13] *Id.* at 418.
[14] 394 U.S. 557 (1969).
[15] *Id.* at 567–68.
[16] PRESIDENTIAL COMM'N ON OBSCENITY AND PORNOGRAPHY, TECHNICAL REPORTS OF THE PRESIDENTIAL COMM'N ON OBSCENITY AND PORNOGRAPHY (1970).
[17] 413 U.S. 15, 24–25 (1973).
[18] *See* Daniel Linz et al., *Estimating Community Tolerance for Obscenity: The Use of Social Science Evidence*, 55 PUB. OPINION Q. 80 (1991); Daniel E. Linz et al., *Measuring Community Standards for Sex and Violence: An Empirical Challenge to Assumptions in Obscenity Law*, 29 L. & SOC'Y REV. 127 (1995). Social science research suggests that communities may tolerate and/or accept for others, sexually explicit material involving consenting adults. However, sexual violence, the use of children in pornography and extreme forms of nonsexual violence are not tolerated. *See id.*

Recently, some feminists have argued that the traditional obscenity perspective, with its emphasis on sexual explicitness and its notion of offensiveness, moral corruption and shame, is misguided.[19] In their view, the regulation of pornography should not be a means for the government to preserve public morals. Instead, regulation should prevent harms to women, including sexual harassment, discrimination and sexual assault.

Efforts to change the legal system to allow women to address pornography's supposed harms were undertaken in the 1980s. The purpose of these laws was to permit women to address the harms claimed to have been done to them by pornography, both as individuals and as a class of persons. In the early 1980's, a model ordinance was introduced in Minneapolis, where it was rejected, and in Indianapolis, where it passed and became law for a time. The ordinance defined pornography as the "graphic sexually explicit subordination of women." Immediately after its passage, the Indianapolis ordinance was challenged. A federal district court declared the Indianapolis ordinance unconstitutional in *American Booksellers Association v Hudnut*, arguing that an ordinance that makes injuries of pornography actionable is unconstitutional under the First Amendment because the law prohibits expression of a point of view.[20] Social science research testing feminist socio-legal theory has examined pornography's effect on attitudes that justify violence towards women, undermine viewer sensitivity to female victims of rape and violence and increase discriminatory and sexually explicit behavior.[21]

Most recently, governments have shifted away from obscenity prosecutions and are attempting to regulate live performances in adult nightclubs across the United States. These regulations have often been based on the notion that government is permitted to ban behavior, such as nude dancing, if such laws can be shown to be "content neutral" and directed at curbing the so-called adverse secondary effects allegedly associated with adult businesses.[22] Law-

---

[19]*See* IN HARM'S WAY: THE PORNOGRAPHY CIVIL RIGHTS HEARINGS (Andrea Dworkin & Catherine A. MacKinnon eds., 1988); Catherine MacKinnon, *Not a Moral Issue*, 2 YALE L. & POL'Y REV. 321 (1984).

[20]Am. Booksellers Ass'n v Hudnut, 598 F. Supp 1316, 1320 (S.D. Ind. 1984), *aff'd*, 771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).

[21]*See* EDWARD DONNERSTEIN ET AL., THE QUESTION OF PORNOGRAPHY (1987).

[22]*See* Daniel Linz et al., *Testing Legal Assumptions Regarding the Effects of Dancer Nudity and Proximity to Patron on Erotic Expression*, 24 L. & HUM. BEHAV. 507 (2000). This social science investigation demonstrated that contrary to the assumption made by Chief Justice Rehnquist in *Barnes*, 501 U.S. 560 (1991), laws that prescribe putting pasties and G-string on exotic dancers are, in fact, not seen as content neutral. Results of a field experiment in which dancer nudity (nude vs. partial

360                                                    6 COMM. L. & POL'Y 355 (2001)

makers across the country have referred to a number of secondary effects studies undertaken by municipalities interested in "zoning" adult businesses as justification for regulating nudity in the business. The scientific validity of this research is the subject of this study.

## THE ZONING OF ADULT ENTERTAINMENT BUSINESSES AND THE FIRST AMENDMENT

Beginning with the 1976 case, *Young v. American Mini Theatres, Inc.*,[23] several United States Supreme Court decisions have provided guidance as to what constitutes permissible government regulation of the location of adult entertainment establishments, given the protection provided by the Free Speech Clause of the First Amendment.[24] The Court has normally subjected ordinances that restrict the location of adult businesses to an evaluation under the framework for content restrictions on symbolic speech set forth in the four-part test in *United States v. O'Brien*.[25]

Justice Powell applied the four-part *O'Brien* test in his plurality opinion in *Young*.[26] In that case, the Court upheld a Detroit zoning ordinance that regulated the location of adult theaters. The ordinance mandated that adult theaters not locate within 1,000 feet of any two other "regulated uses" or within 500 feet of a residential area. The Detroit ordinance did not attempt to eliminate adult entertainment; rather its aim was to disperse such businesses in an effort to minimize so-called negative secondary effects. In uphold-

---

clothing) and dancer proximity significantly altered the message of erotic performances. *See* Linz et al., *supra* note 22.

[23] 427 U.S. 50 (1976).

[24] *See id.*; City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991); City of Erie v. Pap's A.M., 120 S. Ct. 1382 (2000).

[25] 391 U.S. 367, 376–77 (1968). The landmark decision sets forth a series of criteria courts must consider when determining the constitutionality of government suppression of speech. For a restriction to pass the *O'Brien* test, the courts must consider (1) whether the regulation is within the constitutional power of government, (2) whether it furthers an important or substantial governmental interest, (3) whether that interest is unrelated to suppression of free expression and (4) whether the restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.*

[26] *Young*, 427 U.S. at 79–82 (Powell, J., concurring). Most important for present purposes, the Court suggested that the Detroit ordinance passed the second prong of the *O'Brien* test because it was aimed at preserving the stability of the city's residential and commercial neighborhoods. *Id.* at 73. The Court noted that a city's interest in protecting the quality of urban life is one that must be accorded high respect. *Id.*

ing this ordinance, the plurality opinion of the Court reaffirmed the doctrine that a government regulation must have a real and substantial deterrent effect on legitimate expression before it will be invalidated.[27] The Court said the ordinance was not an invalid prior restraint on protected expression because it had neither the intent nor the effect of suppressing speech but was aimed at controlling the secondary effects caused by adult businesses on surrounding uses.[28]

In another landmark decision regarding a municipality's attempt to control secondary effects allegedly caused by adult businesses, *City of Renton v. Playtime Theatres, Inc.*, the Court upheld a Renton, Washington, zoning ordinance that, although not banning adult businesses altogether, did prohibit them from locating within 1,000 feet of any residential zone, church, park or school.[29] The Court held that the Renton ordinance did not restrict First Amendment rights, as the purposes of the ordinance were unrelated to the suppression of speech and the restrictions were the least intrusive means by which to further the government's interests.[30] Part of the precedent set by *Renton* is a three-prong test stipulating that an ordinance must: (1) Be content neutral and aimed only at curbing secondary effects, (2) provide alternate avenues of communication and (3) further a substantial governmental interest.[31]

Further, the Court stated for the first time that a city interested in restricting the operation of adult businesses was not required to show adverse impact from the operation of adult theaters in its own community, if no such experience existed, but could instead rely on the experiences of other cities as a rationale for supporting the passage of an ordinance.[32] The court of appeals had found that "because the Renton ordinance was enacted without the benefit of studies specifically relating to 'the particular problems or needs of Renton,' the city's justifications for the ordinance were 'conclusory

---

[27] *Id.* at 60.

[28] *Id.* at 73 n.34 (plurality opinion). The Court remarked that the city of Detroit had offered evidence that a concentration of "adult" movie theaters causes the area to deteriorate and become a focus of crime. Further, no such relationship was found for theaters showing other types of films. *Id.* This marks the first time the Court explicitly mentions the term "secondary effects." The Court suggests that "[i]t is this secondary effect which these zoning ordinances attempt to avoid, not the dissemination of 'offensive' speech" that allows the Court to find the Detroit ordinances constitutionally sound. *Id.*

[29] 475 U.S. 41 (1986).

[30] *Id.* at 83.

[31] *Id.*

[32] *Id.* at 50–53.