Supreme Court maintained that the court of appeals had placed an unnecessary burden of proof on the city, ruling that Renton—which had no adult businesses—could rely primarily on experiences of and studies produced by the nearby city of Seattle as evidence of a relationship between adult uses and negative secondary effects.[34] Thus, the Court ruled that the First Amendment does not require a city to conduct new studies or produce new evidence before enacting an ordinance, so long as the evidence relied upon is reasonably believed to be relevant to the problem the city faces.[35]

Since *Renton*, a number of cities, counties and states have undertaken investigations intended to establish the presence of such secondary effects and their connection to adult facilities. These studies have, in turn, been shared with other municipalities and generally serve as the basis for claims that adult entertainment establishments are causally related to harmful secondary side effects, such as increased crime and decreases in property values. Many local governments across the United States have relied on this body of shared information as evidence of the secondary effects of adult businesses. Further, in most cases, cities and other governmental agencies have used the findings of a core set of studies from other locales as a rationale for instituting regulation of such businesses in their own communities.

### Recent Applications of the Secondary Effects Doctrine

In 1991, the U.S. Supreme Court began down the road to expanding the "secondary effects" doctrine as a justification for a total ban on nude dancing. In *Barnes v. Glen Theatre, Inc.*,[36] the

---

[33] City of Renton v. Playtime Theatres, Inc., 748 F. 2d 527, 537 (9th Cir. 1984), rev'd, 475 U.S. 41 (1986).

[34] *Id.* at 50–51. *See* Northend Cinema, Inc. v. Seattle, 585 P.2d 1153 (1978). In *Northend*, the Washington State Supreme Court held that the city of Seattle had provided sufficient evidence of a need for a zoning code amendment aimed at preventing the secondary effects on the neighborhoods surrounding adult theaters. This evidence came in the form of "a long period of study and discussion of the problems of adult movie theaters in residential areas of the City." *Id.* at 1154–55. The city offered the Washington court a report, among other things, analyzing the City's zoning scheme and describing land uses around existing adult motion picture theaters. In addition, the trial court heard "expert testimony on the adverse effects of adult motion picture theaters on neighborhood children and community improvement projects." *Id.* at 1156. In *Renton*, the United States Supreme Court found that the city in question was entitled to rely on the evidence summarized in the Washington court's opinion. 475 U.S. at 50–53.

[35] *Renton*, 475 U.S. at 51–52

[36] 501 U.S. 560 (1991).

enforcement of Indiana's public indecency law, which prevented totally nude dancing by indirectly requiring a dancer to perform in no less than pasties and a G-string, did not violate the First Amendment's guarantee of freedom of expression.[37] Led by Chief Justice Rehnquist, a plurality found the anti-nudity ordinance in question was constitutional because it was aimed at protecting societal order and morality.[38] The Court had held in previous cases that such an objective represented a sufficient government interest.[39] Couching the decision as simply supporting a constitutionally protected time, place and manner restriction of expression, the plurality argued that the Indiana statute did not proscribe erotic dancing. Instead, the Chief Justice argued, it simply ensured that any such performance would include the wearing of scant clothing.[40]

Justice Souter's concurring opinion gave particular attention to the notion of a state's substantial interest in combating the secondary effects of adult entertainment establishments.[41] Justice Souter stated that the type of entertainment the Indiana statute was aimed at regulating was clearly of the same character as that at issue in a number of past decisions by both the Supreme Court[42] as well as lower courts.[43] He went on to suggest that it was therefore no leap to say that live nude dancing of the sort at issue in *Barnes* was "... likely to produce the same pernicious secondary effects as the adult films displaying 'specified anatomical areas' at issue in *Renton*."[44] Souter then applied the precedent set forth in *Renton*, stating:

> In light of Renton's recognition that legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects, the State of Indiana could reasonably conclude that forbidding nude entertainment of the type offered at ... the Glen Theatre's "bookstore" furthers its interest in preventing prostitution, sexual assault and associated crimes.[45]

---

[37]*Id.* at 561.
[38]*Id.* at 569.
[39]*See, e.g.*, Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61 (1973).
[40]*Barnes*, 501 U.S. at 587.
[41]*Id* at 582 (Souter, J., concurring).
[42]*See, e.g.*, California v. LaRue, 409 U.S. 109, 111 (1972); Renton v. Playtime Theaters, Inc., 475 U.S. 41 (1986); Young v. Am. Mini Theatres, Inc., 501 U.S. 560 (1991).
[43]*See, e.g.*, United States v. Marren, 890 F.2d 924, 926 (7th Cir. 1989) (arguing that prostitution is associated with nude dancing establishments); United States v. Doerr, 886 F.2d 944, 949 (7th Cir. 1989) (same).
[44]*Barnes*, 501 U.S. at 584.
[45]*Id.*

Thus, Justice Souter wrote that municipalities could *assume* that negative secondary effects result from nude dancing establishments when justifying regulation of such expression.

The Supreme Court most recently addressed the constitutionality of regulating adult entertainment in *City of Erie v. Pap's A.M.* A fractured majority upheld an Erie, Pennsylvania, ordinance that, like the statute considered in *Barnes*, required a dancer to wear at least pasties and a G-string during a performance.[46] A majority of five Justices agreed that the case called for the application of the *O'Brien* test. Further, a majority held that the Erie ordinance was aimed at the important government interest of combating the harmful secondary effects associated with nude dancing.[47] A plurality of four justices—*not* a majority of the Court—held that Erie had met this burden by relying on the evidentiary foundation[48] set forth in both *Renton* and *Young*.[49]

---

[46]120 S. Ct. 1382, 1384 (2000). In *Barnes*, Justice Souter used the secondary effects doctrine as a justification of the anti-nudity ordinance. 501 U.S. at 584 (Souter, J., concurring). In *Pap's*, the city adopted Justice Souter's reasoning and argued that the same devaluation of the surrounding areas attributed to adult businesses can be attributed to establishments featuring live nude entertainment. *See* 120 S. Ct. at 1394. The city argued that the government's vital interest in protecting and preserving the desirability of residential neighborhoods and business districts is a sufficient justification for the ordinance's incidental encroachment on protected expression. *See id.* at 1394.

[47]*Id.* at 1394. The Court cited the *Renton* precedent allowing municipalities to rely on secondary effects evidence produced by other, similar municipalities to fulfill the evidentiary burden. *Id.* None of the justices in the fractured majority explained, however, how the requirement of wearing pasties and a G-string would in fact reduce prostitution, sexual assaults or other problems associated with places where dancers appear nude.

[48]*Id.* Justice Scalia, joined by Justice Thomas, concurred with the Court's majority opinion, but for different reasons. The justices held that the Erie ordinance prohibits not merely nude dancing but the act of going nude at all—irrespective of whether it is engaged in for expressive purposes. *Id.* at 1398 (Scalia, J., concurring). He found the statute constitutionally permissible because it was a general law regulating conduct and not specifically directed at expression. *Id.* at 1401. As such, the ordinance was not subject to First Amendment scrutiny at all. *See id.* at 1401-02. Justice Scalia suggested that there was no need to consider the presence or absence of "secondary effects" because the government was well within its rights in regulating non-expressive behavior. *Id.* The opinion of Justice Scalia, when combined with that of Justice O'Connor, with whom Chief Justice Rehnquist, Justice Kennedy and Justice Breyer joined, left the Court with a 6-3 majority that the law was constitutional. Yet, there was no controlling opinion. In other words, the Court agreed that Erie can regulate nudity, but could not agree on why.

[49]*Renton*, 475 U.S. at 83; *Young*, 501 U.S. at 564.

### *Justice Souter's Partial Dissent in Pap's*

Only a plurality of justices agreed that the city of Erie had demonstrated *evidence* of a compelling government interest. Justice Souter disagreed.[50] In *Barnes*, he opined that the government could assume that "pernicious secondary effects" would result from the presence of nude dancing establishments.[51] In *Pap's*, however, Justice Souter demanded that cities such as Erie, interested in regulating nude dancing on the basis of adverse secondary effects, should be required to provide germane evidence of a relationship between nude dancing and these secondary effects.[52] Ruefully, Justice Souter stated:

> Careful readers ... will of course realize that my partial dissent rests on a demand for an evidentiary basis that I failed to make when I concurred in *Barnes*. ... I should have demanded the evidence then, too, and my mistake calls to mind Justice Jackson's foolproof explanation of a lapse of his own, when he quoted Samuel Johnson, "Ignorance, sir, ignorance." McGrath v. Kristensen, 340 U.S. 162, 178 (1950) (concurring opinion). I may not be less ignorant of nude dancing than I was nine years ago, but after many subsequent occasions to think further about the needs of the First Amendment, I have come to believe that a government must toe the mark more carefully than I first insisted. I hope it is enlightenment on my part, and acceptable even if a little late.[53]

In his opinion, Justice Souter questions the evidence used by municipalities of a relationship between adult businesses and negative secondary effects, concluding that such a relationship can no longer be presumed from past studies.[54] In support of his position, Justice Souter cited an amici brief that contained a condensed summary of the critique of existing secondary effects studies reported below.[55]

---

[50] *Id.* at 1402 (Souter, J., concurring in part and dissenting in part).
[51] *Barnes*, 501 U.S at 584 (Souter, J., concurring).
[52] 120 S. Ct. 1382 at 1403–04 (Souter, J., concurring in part and dissenting in part).
[53] *Id.* at 1405–06.
[54] *Id.*
[55] Brief for First Amendment Lawyers Association at 16–23, *id.* (No. 98-1161). Justice Souter stated:
> The proposition that the presence of nude dancing establishments increases the incidence of prostitution and violence is amenable to empirical treatment, and the city councilors who enacted Erie's ordinance are in a position to look to the facts of their own community's experience as well as to experiences elsewhere. Their failure to do so

### *Evaluating the Validity of Secondary Effects Studies*

Since the secondary effects doctrine appears to be expanding, it is imperative that it be based on solid evidence that the operation of an adult entertainment business has a deleterious effect on the surrounding community. Unfortunately, when municipalities have conducted studies in the past, there has not been a set of methodological criteria or minimum standards, to which the cities were required to adhere. Without such standards, cities may be relying on flawed databases. This problem is further compounded when courts allow previous studies, conducted in other cities, to supplant data collected in the city where the ordinance is being proposed. A flawed study replicates errors across localities. It makes little sense to generalize to the experiences of other cities on the basis of what may be an invalid investigation in the first place.

The basic requirements for the acceptance of scientific evidence, such as secondary effects studies, were prescribed by the Supreme Court in the 1993 case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[56] In *Daubert*, the Court held that there are limits on the admissibility of scientific evidence offered by "expert witnesses" in federal courts. The Court noted that scientific knowledge must be grounded in the methods and procedures of science and must be based on more than subjective belief or unsupported speculation.[57] Offering observations as to how this connection can be made, the Court provided a list of factors that federal judges could consider in ruling on a proffer of expert scientific testimony, including the notion of falsifiability, peer review and publication, error rate and adherence to professional standards in using the technique in question.[58]

Since a core set of studies has been and continues to be relied upon by hundreds of local municipalities as evidence of negative secondary effects, a central concern must be the methodological rigor, and therefore trustworthiness, of these studies. This is particularly true when the Supreme Court requires that a municipality establish that such regulations are necessary to further the governmental interest

---

councilors who enacted Erie's ordinance are in a position to look to the facts of their own community's experience as well as to experiences elsewhere. Their failure to do so is made all the clearer by one of the *amicus* briefs, largely devoted to the argument that scientifically sound studies show no such correlation.

*Id.* (Souter, J., dissenting).
[56] 509 U.S. 579 (1993).
[57] *Id.* at 590.
[58] *Id.* at 593–95.

of ameliorating secondary effects and that such regulations are no broader than is essential to the furtherance of such interest.[59]

To evaluate the validity of the secondary effects studies cited by communities across the country, this article will abstract and analyze the methods and major empirical findings in the relevant research. With few exceptions, the methods most frequently used in these studies are seriously and often fatally flawed. Specifically, these studies do not adhere to professional standards of scientific inquiry and nearly all universally fail to meet the basic assumptions necessary to calculate an error rate—a test of the reliability of findings in science. More importantly, those studies that are scientifically credible demonstrate either no negative secondary effects associated with adult businesses or a reversal of the presumed negative effect.

### The Core Set of Frequently Cited Scientific Studies of Secondary Effects

Amassed for this study were a large body of laws enacted for the regulation of adult entertainment businesses and as many as possible of the empirical and non-empirical reports examining potential secondary effects of such businesses produced or purportedly relied upon by municipalities considering the issue. Often, the laws—usually municipal ordinances—contain "preambles" that specifically set forth which of the various "secondary effects studies" the municipality is relying on as justification for enacting the particular regulation. Presumably, these studies are listed in order to comply with the *Renton* requirement that a municipality rely upon evidence "reasonably believed to be relevant to the problem that the city addresses."[60]

The interest is in examining the methodological legitimacy of every "study" cited by municipalities as containing evidence of the relationship between adult entertainment businesses and negative secondary effects. Several steps were taken to obtain as many such studies as possible. First, several attorneys known for their experience and expertise in the arena of adult business regulation were contacted and asked to provide lists and, when possible, printed copies of studies that they were aware had been cited in municipal and state zoning ordinances. Second, the citations found in each of the obtained studies and zoning ordinances were scanned for additional studies on secondary effects. Finally, several additional individuals

---

[59]*See* Renton v. Playtime Theater, Inc., 475 U.S. 41 (1986); Young v. Am. Mini Theatres, Inc., 427 U.S. 50 (1976); United States v. O'Brien, 391 U.S 367 (1968)
[60]*Renton*, 475 U.S. at 51-52 n.26.

that have expert knowledge in the area of adult business regulation were asked to supplement the list of "studies."[61] In all, a total of 107 reports were eventually obtained. To be included in the analysis, each report must have been cited by at least one municipality as evidence of a relationship between adult entertainment businesses and negative secondary effects. Although it is more than likely that not every single "secondary effects study" is included in this review, the extensive literature search nevertheless resulted in a large and, more importantly, a representative number of such reports. This study has located, collected and analyzed the vast majority of "studies" that communities purport to rely upon when enacting regulations of adult businesses.[62]

First considered in detail are the four most frequently cited (and relied upon) studies of secondary effects: Indianapolis, Indiana (1984),[63] Phoenix, Arizona (1979),[64] Los Angeles, California (1977)[65] and St. Paul, Minnesota (1978).[66] As can be seen in Table 1, these studies have been cited as evidence of the relationship between adult entertainment businesses and negative secondary effects by no less than 27 different municipalities. The problems that have been found in these four reports in regard to misunderstandings of their "findings" and methodological failings (discussed in detail below) pertain as well to the next six most frequently relied-upon reports. Discussed next are these six studies, in brief, at the end of the review of the four

---

[61] All of the reports included in the analysis were obtained by contacting the specific communities and municipalities that originally sponsored or produced them.

[62] It should be noted that although the study began with 107 municipal reports addressing the relationship between adult entertainment businesses and negative secondary effects, and although a large percentage of these claim to report "scientific" evidence of such a relationship, this analysis found only 29 of these studies to contain empirical data. A number of the remaining 78 reports simply contained the minutes of city planning committee meetings during which options for the regulation of adult businesses were discussed. Others simply contained samples of arrest reports from inside adult entertainment businesses. Needless to say, such information did not meet even the most basic criteria for empirical evidence. However, such studies have been used (often consistently) as representing empirical evidence of the relationship between adult entertainment businesses and negative secondary effects.

[63] CITY OF INDIANAPOLIS, INDIANA, ADULT ENTERTAINMENT BUSINESSES IN INDIANAPOLIS—AN ANALYSIS (1984).

[64] CITY OF PHOENIX, ARIZONA, RELATION OF CRIMINAL ACTIVITY AND ADULT BUSINESSES (1979).

[65] CITY OF LOS ANGELES, CALIFORNIA, STUDY OF THE EFFECTS OF THE CONCENTRATION OF ADULT ENTERTAINMENT ESTABLISHMENTS IN THE CITY OF LOS ANGELES (1977).

[66] CITY OF ST. PAUL, MINNESOTA, NEIGHBORHOOD DETERIORATION AND THE LOCATION OF ADULT ENTERTAINMENT ESTABLISHMENTS IN ST. PAUL (1978).

NEGATIVE SECONDARY EFFECTS                                                                 369

TABLE 1: TEN MOST FREQUENTLY REFERENCED STUDIES AND MUNICIPALITIES THAT REFERENCED THEM IN DRAFTING LEGISLATION REGULATING ADULT BUSINESSES

| |
|---|
| 1. **Indianapolis, Ind. (1984):** |
| Dallas (1986), The Bronx (1995), Ramsey (1990), Manchester, N.H., Brooklyn, Minn. Beaumont (1982), St. Paul, Minn. (1987/1988), Times Square, N.Y. (1993), Newport News, Va. (1996), Kansas City, Mo. (1998), Falcon Heights, Minn. (1994), Fridley, Minn., Brooklyn Park, Minn., Manatee County, Fla., Lynnwood, Wash. (1990), Oklahoma City (1986), New Hanover County (1989), Rochester/Olmsted (1988), Seattle (1989), St. Cloud, Minn. (1982), St. Croix (1993), St. Paul (1994) |
| 2. **Phoenix, Ariz. (1979):** |
| Dallas (1986), The Bronx (1995), St. Paul (1994), Ramsey (1990), Manchester, N.H., Brooklyn, Minn., St. Paul, Minn. (1987/1988), Times Square, N.Y. (1993), Newport News, Va. (1996), Minnesota (1989), Kansas City, Mo. (1998), Falcon Heights, Minn. (1994), Fridley, Minn., Brooklyn Park, Minn., Manatee County, Fla., New Hanover County (1989), Rochester/Olmsted (1988), St. Cloud, Minn. (1982) |
| 3. **Los Angeles, Cal. (1977):** |
| Dallas (1986), The Bronx (1995), Broward County, Fla., Times Square, N.Y. (1993), Newport News, Va. (1996), Garden Grove (1991), Bellevue, Wash. (1987), Manhattan (1994), Seattle (1989), St. Cloud, Minn. (1982), St. Paul, Minn. (1994), St. Croix (1993), Brooklyn Park, Minn. |
| 4. **St. Paul, Minn. (1987):** |
| Dallas (1986), Ramsey (1990), St. Paul, Minn. (1987/1988), Times Square, N.Y. (1993), Minnesota (1989), Bellevue, Wash. (1987), Brooklyn, Minn., Falcon Heights, Minn. (1994), Brooklyn Park, Minn., Manatee County, Fla., Lynnwood, Wash. (1989), Rochester/Olmsted (1988) |
| 5. **Austin, Tex. (1986):** |
| Dallas (1986), The Bronx (1995), Manchester, N.H., Broward County, Fla., Kansas City, Mo. (1998), Manatee County, Fla., Manhattan (1994), Seattle (1989), St. Cloud, Minn. (1982), St. Paul, Minn. (1994) |
| 6. **St. Paul, Minn. (1987/1988):** |
| Brooklyn, Minn., Times Square, N.Y. (1993), Minnesota (1989), Kansas City, Mo. (1998), Falcon Heights, Minn. (1994), Fridley, Minn., Rochester/Olmsted (1988), St. Cloud, Minn. (1982), St. Paul, Minn. (1994) |
| 7. **Amarillo, Tex. (1977):** |
| Dallas (1986), Beaumont (1982), Newport News, Va. (1996), Manatee County, Fla., New Hanover County (1989), St. Croix (1993), St. Paul, Minn. (1994) |
| 8. **Detroit, Mich. (1972):** |
| Beaumont (1982), Times Square, N.Y., (1993), Bellevue (1987), New Hanover County (1989), St. Croix (1993) |
| 9. **Beaumont, Tex. (1982):** |
| Dallas (1986), Newport News, Va. (1996), Manatee County, Fla., New Hanover County (1989), St. Croix (1993) |
| 10. **Kent, Wash. (1982):** |
| Des Moines, Wash., Bellevue, Wash. (1987), Lynnwood, Wash. (1990), Seattle (1989) |

most frequently cited studies. Accordingly, the concerns that are outlined below apply to all of the "top ten" relied upon "secondary effects studies." And, virtually all of the reports that have been analyzed have these same failings, often because they themselves relied upon earlier "studies" that contained the same flaws discussed below.

THE BASIC REQUIREMENTS FOR THE ACCEPTANCE
OF SCIENTIFIC EVIDENCE

In an attempt to prevent the proliferation in courtrooms of "junk science," the United States Supreme Court in *Daubert* held that there are limits on the admissibility of scientific evidence offered by "expert witnesses" in federal courts.[67] The Court opined that scientific knowledge must be grounded "in the methods and procedures of science" and must be based on more than "subjective belief or unsupported speculation."[68] Thus, the Court said, "the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability."[69] In a footnote, the Court observes that "[i]n a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*."[70] Offering "some general observations" as to how this connection can be made, the Court provided a list of factors that federal judges could consider in ruling on a proffer of expert scientific testimony: (1) The "key question" is whether the theory or technique under scrutiny is testable, borrowing Karl Popper's notion of falsifiability.[71] (2) Although publication was not an absolute essential, the Court noted that peer review and publication increased "the likelihood that substantive flaws in methodology will be detected."[72] (3) Error rate.[73] (4) Adherence to professional standards in using the technique in question.[74] (5) Finally, though not the sole or even the primary test, general acceptance could "have a bearing on the inquiry."[75]

While it may not be necessary to hold municipalities to each of these considerations when weighing the validity of evidence substan-

---

[67] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993).
[68] *Id.* at 599.
[69] *Id.* at 590.
[70] *Id.* n.9.
[71] *See id.* at 593 (citing KARL POPPER, CONJECTURES AND REFUTATIONS 37 (5th ed. 1989)).
[72] *Id.*
[73] *See id.* at 594.
[74] *See id.*
[75] *Id.* at 593–94.

tiating the existence of secondary effects research with adult businesses, at least two factors are indispensable. It is at least a testable proposition that secondary effects may result from adult establishments, or else a study would not have been undertaken in the first place. It can be further presumed that a lengthy peer review and publication process may be unlikely due to the sense of urgency when communities tend to address these issues. In addition, the general acceptance requirement is held to have a bearing but is not an absolute consideration. The third and fourth factors, however, the calculation of an error rate and adherence to professional standards in using techniques or procedures, need to be applied to these studies in order to ensure "evidentiary reliability." Without this reliability, there is no basis to determine whether there is a substantial or important governmental interest involved, whether a specific piece of legislation is "necessary" in order to further that interest, or whether it is "reasonable" for a municipality to rely upon such a study as a basis for enacting legislation.[76]

In a scientific study, the error rate refers to the probability of accepting a result as true, when in fact it is false.[77] The rate is an indication of the reliability of a finding. An error rate is determined by first calculating an estimation of a population characteristic (a statistic) that summarizes the data that have been collected and then asking how likely it is that that statistical value would be obtained by chance alone. The error rate is the degree of chance a scientist will allow. In the social sciences, it is conventional to set the error rate at five percent or less (that is, a researcher will tolerate an error rate of five times out of 100 that the results may be obtained by chance).[78]

Unless certain assumptions are met, statistical tests cannot be applied to the data, and an error rate cannot be calculated. Most impor-

---

[76]This is perhaps the most important notion underlying this research. Results suggesting no reliable and/or valid evidence of a relationship between negative secondary effects and adult entertainment businesses would mean that the courts would need seriously to reconsider whether municipalities indeed have a substantial interest in regulating such uses. At the very least, it would suggest that most, if not all, municipalities with codified restrictions on adult uses have based their justification of such restrictions (according to the requirements set forth in *Young* and *Renton*) on inaccurate data.

[77]*See* JACOB COHEN & PATRICIA COHEN, APPLIED MULTIPLE REGRESSION/CORRELATION ANALYSIS FOR THE BEHAVIORAL SCIENCES 166–76 (2d ed. 1983); DAVID C. HOWELL, STATISTICAL METHODS FOR PSYCHOLOGY 349–50 (4th ed. 1997); GEOFFREY KEPPEL, DESIGN AND ANALYSIS: A RESEARCHER'S HANDBOOK 164–65 (3d ed. 1991); ROBERT R. PAGANO, UNDERSTANDING STATISTICS IN THE BEHAVIORAL SCIENCES 215–16, 384 (5th ed. 1998).

[78]*See* COHEN & COHEN, *supra* note 77, at 21.