REPORT AMENDING REPORT OF AUGUST 30, 2003

**EVALUATING POTENTIAL SECONDARY EFFECTS OF ADULT
CABARETS IN DAYTONA BEACH FLORIDA:
A STUDY OF CALLS FOR SERVICE TO THE POLICE
IN REFERENCE TO ORDINANCE 02-496**

April 7, 2004

By

Daniel Linz
Professor of Communication, Law and Society
University of California at Santa Barbara
Department of Communication
Santa Barbara, CA 93106
Linz@comm.ucsb.edu


Randy D. Fisher
Associate Professor of Psychology
University of Central Florida
Orlando, Fl 32816-1390
rfisher@mail.ucf.edu


Mike Yao
Ph.D. Candidate
University of California at Santa Barbara
Department of Communication
Santa Barbara, CA 93106

# EVALUATING POTENTIAL SECONDARY EFFECTS OF ADULT CABARETS
## IN DAYTONA BEACH FLORIDA:
## A STUDY OF CALLS FOR SERVICE TO THE POLICE

## Executive Summary

In order to test the assumption that adult cabarets are associated with negative secondary effects, an extensive and detailed empirical study of criminal activity in and around these businesses in Daytona Beach, Florida was undertaken utilizing data provided by the Police Department.  We first ask: Does the presence of an adult cabaret in a neighborhood increase the occurrence of crime in Daytona Beach?

In order to answer this question we considered the entire city using census blocks as the unit of study.  We examined demographic variables previously used by criminologists and found to be related to criminal activity, such as a local area's population, age structure (especially the presence of young adults) and race/ethnic composition.  We also examined indicators of social disorganization such as housing vacancies and female-headed households.  Finally, we included a variable that measured the number of alcohol retail sale establishments in each block.

These variables, as expected, were statistically strongly related to crime events in the final analysis. We are able to account for crime events in Daytona Beach with a relatively high level of accuracy (explaining approximately 60 percent of the variability). The social disorganization variables and especially the presence of an alcohol beverage retail sale establishments in the blocks accounts largely for this explanatory power.  <u>The presence of an adult cabaret in the census block accounted for an insubstantial amount of explanatory power</u>.

We then asked: Does the presence of adult cabarets contribute to increased crime in the local vicinity of these establishments.  We focused on the areas surrounding the adult cabarets (1000 foot radius).  We found that far from being the source of crime activity, only one to three and half-percent of the crime events could be attributed to the adult cabarets themselves.  Instead, <u>other businesses</u> in the area, primarily alcohol-serving establishments that do <u>not</u> feature adult entertainment, accounted for far more crime events.

Because the City of Daytona Beach specifically maintained that the primary justification for it's regulation of nudity was because it was associated with increases in prostitution and sexual assaults we undertook a separate set of analyses using each sex crime type as an outcome variable.  <u>We found that often the adult cabarets accounted for zero or near zero percent of the sex crime activity in the near vicinity.</u>

Consequently, we conclude that there is not support for the City of Daytona Beach's theory that nudity is associated with increases in sex crime incidents such as prostitution or sexual assault.

**EVALUATING POTENTIAL SECONDARY EFFECTS OF ADULT CABARETS
IN DAYTONA BEACH FLORIDA:
A STUDY OF CALLS FOR SERVICE TO THE POLICE**

THE SUPREME COURT AND THE ASSUMPTION
OF NEGATIVE SECONDARY EFFECTS OF
ADULT BUSINESSES

Since 1976, the United States Supreme Court has decided a series of cases
focusing on whether the Free Speech clause of the First Amendment allows cities and
states to enact legislation controlling the location of "adult" businesses.[1] "Zoning"
regulations (e.g., laws or ordinances that, for example, prevent a sex-related business
from operating within a certain number of feet from residences, schools and houses of
worship, or a given distance from one-another) have been predicated on the notion that
municipalities have a substantial interest in combating so-called "negative secondary
effects" on the areas surrounding, among other establishments exotic dance businesses.
These secondary effects are generally said to include alleged increases in crime,
decreases in property values, and other indicators of neighborhood deterioration in the
areas surrounding "adult" businesses.  Typically, communities have either conducted
their own investigations of potential secondary effects or have relied on studies, reports
or other materials utilized by other cities or localities.

The rationale for the secondary effects doctrine was most completely laid out in
Renton v. Playtime Theatres, Inc., in 1986.  In Renton the Supreme Court considered the
validity of a Renton, Washington, municipal ordinance that prohibited any adult theater
from locating within 1,000 feet of any residential zone, family dwelling, church, park or
school.  The Court's analysis of the ordinance proceeded in three steps.  First, the Court

---

[1] *See e.g.*, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976); *City of Renton v Playtime Theatres Inc.*, 475 U.S. 41 (1986).

5

found that the Renton ordinance did not ban adult theaters altogether, but merely required that they be a certain distance from so-called sensitive locations.  The ordinance, the Court said, was properly considered to be a time, place and manner regulation.  The Court next considered whether the ordinance was content neutral or content based.  If the regulation were content based, it would be considered presumptively invalid and subject to the "strict scrutiny" standard.  The Court held, however, that the ordinance was not aimed at the content of the films shown at adult theaters, but rather at the secondary effects of such theaters on the surrounding community, namely at crime rates, property values, and the quality of the city's neighborhoods.  Given this finding, the Court stated that the ordinance would be upheld so long as the City of Renton showed that its ordinance was designed to serve a substantial government interest, such as a reducing crime rates or maintaining property values.

Most recently (in 2002), a plurality of the Supreme Court (Justice O'Connor joined by the Chief Justice, Justice Scalia and Justice Thomas), with Justice Kennedy's concurrence, added an important methodological caveat concerning the evidence necessary to validate the assumption that adult businesses cause secondary effects. The Court warned in <u>City of Los Angeles v. Alameda Books et al.</u> that:

> "This is not to say that a municipality can get away with shoddy data or reasoning.  The municipality's evidence must fairly support its rationale for its ordinance.  If plaintiff's fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the <u>Renton</u> standard.  If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance."

6

The purpose of the present study is to conduct the type of empirical analysis in the City of Daytona Beach that avoids both the collection of "shoddy data" and the use of (shoddy) "reasoning" as demanded in <u>Alameda Books</u>.   We ask whether a relationship, in fact, exists between adult cabaret businesses and negative secondary effects.  Further, this evidence is obtained in accordance with established methodological procedures so as to insure a high level of scientific reliability and, therefore, admissibility in a federal court.

## PAST EMPIRICAL RESARCH

<u>Methodological Problems With Past "Studies" in Other Municipalities</u>

Past studies and reports claim to have found crime associated with adult businesses, but lack the essential methodological features necessary to validate this asserted connection.  Paul, Linz and Shafer (2001)[1] found numerous problems among the most frequently cited "studies" by communities across the United States.  These authors reviewed over one hundred reports purporting to demonstrate adverse secondary effects from such businesses.  Specifically, our analyses of these reports focused on their methodological soundness.  We concluded that many of the studies are methodologically flawed, often fatally so.  Other studies, when examined closely, either show an absence of negative effects or the authors of the studies themselves disavow the presence of such effects.  Sometimes, we even found a reversal of the presumed effect wherein the presence of adult businesses was associated with fewer negative effects.

---

[2] Paul, B., Linz, D. & Shafer, B.J. (2001).  Government Regulation of Adult Businesses through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects.  <u>Communication Law and Policy</u>, 6. 2, 355-391.

This study was then submitted to the Supreme Court as an appendix to the friend of the court brief submitted by the First Amendment Lawyers Association (FALA) in the Paps case and was cited by Justice Souter in his dissenting opinion in that case. Following this submission an expanded version of the study was published in the peer reviewed scholarly journal Communication Law and Policy.  A copy of this article is attached to this report.

Briefly, in this article we point to four methodological problems common to these studies.  First, many reports do not compare information on crimes or property values with appropriately selected control areas.  Second, the data is often not collected over a sufficient period of time as to rule out momentary fluctuations in crime.  Third, reliable sources of data from the police are often not used or data based on stepped up police enforcement is relied upon.  Finally, improper methodological procedures with regard to the collection of opinion information are often employed.  We note that any information concerning the adverse effects of adult entertainment or nudity obtained without adherence to these rudimentary methodological requirements cannot be relied upon to reasonably infer that public nudity or adult entertainment is associated with adverse secondary effects.

The 2002 Daytona Beach Legislative Hearings and Anti-nudity Ordinance

In October 2002 Daytona Beach enacted an ordinance that prohibits public nudity in any place within the city.  Section 14 of the ordinance adopted the following article, which states:

Article VI.  Public Nudity
Sec. 62-181.  Intent
(a)      It is the intent of this article to protect and preserve the health, safety and welfare of the people of The City of Daytona beach by prohibiting any person from recklessly,

knowingly, or intentionally appearing nude in a public place, or recklessly, knowingly, or intentionally causing or permitting another person to appear nude in a public place within the city…

According to Daytona Beach a public nudity ordinance is necessary because "the appearance of persons in the nude in public places increases incidents of lewd and lascivious behavior, prostitution, sexual assaults and batteries."

Unfortunately, the information the City of Daytona had before it in 2002 cannot be relied upon to reasonably infer that public nudity or adult entertainment is associated with adverse secondary effects such as prostitution, sexual assaults and batteries. Many of the problems identified in Paul et al. (2001) were present in the information the City relied upon.

First, the Daytona Beach City Council had before it a detailed critique of existing the secondary effects studies from other cities that the City had relied on which accurately identified the methodological errors in the these studies that were similar to those in Paul et al. (2001) cited above (see Dr. Randy Fisher's report in the Council's record). The City ignored these errors.

The City Council also had before it a few unsystematically generated police reports that were the result of the police stepping up enforcement. No comparative information was presented to allow the City to determine if the problems coming to the attention of the police regarding criminal activity were lesser, the same or greater that problems associated with other businesses in comparable locations. Further, the information on crime activity did not cover a sufficient period of time to allow for a stable estimate of crime activity. Consequently, the City relied on improperly collected,

shoddy, data.  Such shoddy data could not be reasonably relied upon to conclude that there was evidence of adverse secondary effects.

The City also had before it the findings of the Fulton County Police Department that showed fewer calls for service to adult businesses that served alcohol, compared to nonadult alcohol serving establishments.  In this study the Fulton County Police Department conducted examined calls for police assistance and crimes occurring at, or in the vicinity of, adult entertainment establishments where alcohol was sold and consumed. The study was designed to determine if the consumption of alcoholic beverages in adult entertainment establishments contributed to increased crime in the vicinity of these establishments.  The study relied on data obtained through the Fulton County Police Department computerized incident and calls for service reporting program.  The time period covered by this study is for January 1, 1995 through May 31, 1997.  There were twelve establishments included in this study; six adult entertainment establishments that serve alcoholic beverages and six that served alcoholic beverages with no adult entertainment.

The results of the Fulton County study showed there was no statistical correlation between an increase in crime and adult entertainment establishments that serve alcoholic beverages.  However, there was, according to the police, a statistical correlation that would indicate that there are greater instances of calls for service and reported crime at non-adult entertainment establishments that serve alcoholic beverages.

Given the information before it concerning adult entertainment establishments from the Fulton County Study, the Daytona Beach City Council could not have properly reasoned that there were adverse effects for public nudity.

Recent Empirical Studies Show No Adverse Secondary Effects In Other Communities

Recently, we have conducted independent, reliable, studies using census data and modern analytical techniques to examine whether "adult" entertainment facilities, and particularly exotic dance establishments engender negative secondary effects. Unlike many of the previous reports, these studies do not suffer from the basic methodological flaws that were enumerated in Paul et al. (2001). Unfortunately, the Daytona Beach City Council did not consider these investigations despite the fact that the reports were available.

These reports describe analyses of calls for service to the police in the City of Fort Wayne, Indiana, Charlotte, North Carolina and Brevard County, Florida. In these studies there is no indication that, overall, crime rates are higher in the areas surrounding adult nightclubs. In fact, the data often show the reverse trend whereby crime incidents are lower in the areas surrounding the adult nightclubs compared to control locations. Copies of each of these reports are attached to the present study report.

The first of these studies was an examination of adult cabarets in the City of Fort Wayne, Indiana, which serve alcoholic beverages and provide exotic entertainment in the form of "pasties and g-string" dancing (Paul and Linz, 2002).[2] This study recently received a top award from the United States Department of Justice and thus has been vetted for its methodological soundness. Unlike previous reports prepared in other municipalities, specific attention was given to developing an empirical approach that fulfilled the requirements set out by the Supreme Court for the proper conduct of a social scientific inquiry.

---

[2] Paul, B. & Linz, D. (2002). Testing Assumptions Made by the Supreme Court Concerning the Negative Secondary Effects of Adult Businesses: A Quasi-Experimental Approach to a First Amendment Issue. Paper presented at the 2002 International Communication Association, Acapulco, Mexico.

A 1000 feet circumference surrounding each of eight exotic dance nightclubs in Fort Wayne was established.  Comparison areas were selected in the City of Fort Wayne and matched to the club areas on the basis of demographic features associated with crime and commercial property composition.  The number of calls to the police from 1997-2000 in the areas surrounding the exotic dance nightclubs was compared to the number of calls found in the matched comparison areas.  The analysis showed little difference, overall, between the total number of calls to the police reported in the areas containing the exotic dance nightclubs and the total number of offenses reported in the comparison areas.  We concluded there was little evidence of adverse secondary effects in the form of crime incidents in the City of Fort Wayne.

More recently, we conducted a study that sought to determine if a relationship exists between adult erotic dance clubs which presented "topless" dancing in Charlotte, North Carolina and negative secondary effects in the form of increased numbers of crimes reported in the areas surrounding the adult businesses (Linz, Land, Williams, Paul Ezell, in press).[3]  This study was conducted jointly by researchers at the University of California, Santa Barbara, and Duke University and is to date the only published, peer reviewed, study of adverse secondary crime effects.  For each of 20 businesses, a control site (matched on the basis of demographic characteristics related to crime risk) is compared for crime events over the period of three years (1998-2000) using data on crime incidents reported to the police.

We found that the presence of an adult nightclub did not increase the number of crime incidents reported in localized areas surrounding a club (defined by circular areas

---

[3] Linz, D., Land, K., Williams, J. Ezell, M. & Paul, B. (in press).  An Examination of the Assumption that Adult Businesses are Associated with Crime in Surrounding Areas: A Secondary Effects Study in Charlotte, North Carolina.  Law and Society Review.

with 500 and 1,000 feet radii) as compared to the number of crime incidents reported in comparable localized areas that did not contain such an adult business. Indeed, the analyses imply the opposite; namely, that the nearby areas surrounding the adult business sites have smaller numbers of reported crime incidents than do corresponding areas surrounding the three control sites studied.

The Brevard County study employed a similar methodology and yielded similar results. We concluded there that there was little empirical evidence for the presence of adverse secondary effects, in the form of total amounts of crime, surrounding the majority of adult dance clubs and that the County did not have sufficient basis for regulating such establishments on the presumption of "adverse secondary effects."

<u>The Present Study</u>

Aside from these studies, the only reliable information that could have provided the City of Daytona Beach with a reasonable basis for concluding that nudity is related to adverse secondary effects would have been obtained by systematically collecting police call-for-service information and adhering to the minimal methodological standards outlined above for a study of such data.

This would have included obtaining from the police department the computerized records of calls for service. This information is easily generated as most cities have a computerized aided dispatch (CAD) system. This system logs each call made to the police and each report generated by the police. It is not, therefore, an onerous task for the City to have obtained and analyzed these calls for service to determine whether secondary effects existed for nudity at alcohol serving establishments. Without such evidence the City has failed to demonstrate the existence of adverse secondary effects.

The research reported here is designed to rectify these problems and address the questions of whether and to what extent, if any, adult cabarets (several that serve alcohol and feature either topless or nude dancing) contribute to increased crime in the environment close to the facilities.  The City of Daytona Beach maintains that a public nudity ordinance is necessary because the appearance of persons in the nude in public places increases incidents of lewd and lascivious behavior, prostitution, sexual assaults and batteries.  In the study reported here we ask if there is any reliable evidence that the City's theory about such negative effects is correct.

In the present study we ask two questions.  The first question is: Once variables identified by criminologists to be related to crime events have been statistically controlled, does the presence of an adult cabaret featuring nude or semi nude entertainment in a census block increase the occurrence of these and other types of crime?  We then ask:  Within a localized area (1000 foot circumference) surrounding the adult cabaret, is crime clustered at the adult cabarets or do other businesses nearby attract more criminal activity?   Finally, we analyze sex crimes including rape and prostitution separately because of the City of Daytona Beach's specific theory that nudity increases prostitution and sexual assaults.

## DATA AND METHODS

Overview

The methodological approach taken here involves two procedures.  First, the calls for service to the City of Daytona Beach Police Department across census blocks as

defined by the 2000 United States Census Bureau are examined. Then, we hone in on the areas immediately surrounding the adult cabarets.

The first strategy is to measure the presence or absence of other community features identified at the census block level, city-wide, that may be related to criminal activity and then, once these factors are statistically controlled, examine the impact of the presence of an adult business on crime activity. These variables will be entered into a statistical analysis and will be permitted to explain as much variability in criminal activity as possible. A term will then be entered for the presence or absence of an adult cabaret in the neighborhood.

Secondly, we follow up the census block analyses with a more focused analysis on the areas immediately surrounding the adult cabarets (1000 foot radius). Regardless of what we find at the census block level, it may still be the case that the crime incidents that occur in the block containing the adult cabaret, however small or large, is clustered at the adult cabaret address. This more focused analysis by specific address is undertaken to determine if the adult cabarets have required special attention from the police or if other businesses and entertainment establishments in the immediate vicinity are more often the source of police attention.

Using Census Blocks for Analysis

The U.S. Census Bureau keeps track of geographic boundaries for tabulation purposes. In addition to political boundaries, such as states, counties and cities, the Census Bureau also creates census geography so that census data can be tabulated to smaller units. In this study we utilize the Census Bureau's geographic boundaries.

Tracts are a relatively permanent statistical subdivision of a county delineated by

a local committee of census data users for the purpose of presenting census data.  Census tract boundaries normally follow visible features, but may follow governmental unit boundaries and other non-visible features, and they always nest within counties.  Census tracts are designed to be relatively homogenous units with respect to population characteristics, economic status, and living conditions at the time the users established them.  They usually contain 1,500 to 8,000 people.  There are approximately 66,000 tracts nationwide.  The City of Daytona Beach has 32 Census Tracts.

Our units of analysis are Census Blocks located within these census tracts. Census Blocks are the smallest entity for which the U.S. Census Bureau collects and tabulates census information. There are about 8.5 million blocks nationwide.  The City of Daytona Beach has 2787 Census Blocks.

Block Level U.S. Census Demographic Information

The 2000 United States Census measures general demographic characteristics of each block.  These variables include, among others, measures of population, sex and age, race, relationships in household, household type measured at the block level.  These demographic characteristics are used to control for social features in the environment that may co-vary with the frequency of crime incidents.

Our analysis strategy will first entail entering these census variables into a statistical analysis to control for the effects of these characteristics on crime incidents. After we control for demographic features, we then examine the relative contribution of the presence of an alcohol-selling establishment in the neighborhood.  Finally, after we have controlled for this variable, we then examine the impact of having an adult cabaret in the block on crime incidents.

<u>Locating the Adult Cabarets and Alcohol Selling and Serving Establishments with
Geographic Mapping Software</u>

A comprehensive list of adult cabarets in Daytona Beach was generated.  The

following establishments were examined in the present study:

| Name | Street Address |
|---|---|
| Pink Pony (Topless) | 642 N. Ridgewood Avenue |
| Red Eyed Jacks (Nude) | 642 N. Ridgewood Avenue |
| The Beach Beauty Club (Topless) | 1001 Main Street |
| Molly Brown's Boutique I (Topless) & II (Nude) | 542 Seabreeze Blvd. |
| Lollipops Gentlemen's Club (Topless) | 643 North Grandview Ave. |
| The Shark Lounge (Topless) | 730 East International Speedway Blvd. |

The geographic information system computer program Maptitude was then used

to locate the Census Block within Census Tract for each.  **Figure 1** illustrates the location

of the adult cabarets within the City of Daytona Beach delineated by census tract and

block.

We obtained a comprehensive list of licensees in Daytona Beach permitted to sell

alcoholic beverages by the Florida Division of Alcoholic Beverages and Tobacco, Bureau

of Licensing.  Only those licensed for "Retail Alcoholic Beverage Sale" were included in

the analysis.  These business addresses were also plotted within the census block and

census tract.  **Figure 2** illustrates the location of the retail alcoholic beverage businesses

within the City of Daytona Beach delineated by census tract and census block.  Only the

areas immediately surrounding the adult cabarets are illustrated in the figure and a 1000

feet circle has been drawn around each cabaret.  As can be seen from the figure with the

adult cabarets are located in the geographic center of areas densely packed with retail

alcohol selling businesses.

<u>Measuring Crime and Disorder Incidents</u>

For the analyses below we rely on a selection of crime incident report data collected by the City of Daytona Beach Police Department Computer Automated Dispatch (CAD).  This included records of calls for service and dispatches from March 20, 1999 to April 30, 2003--approximately four years.  **Table 1** displays the total calls for service and percentage by year.  **Table 2** displays the number of calls for service by crime incident type.  As can be seen from **Table 2**, the crime types are differentiated by subtype (i.e. Assault and Battery: gun, hands and feet, knife/other cutting instrument, other dangerous weapon, all other, etc.).  The frequency and percentage of the total for each incident type is displayed in the table.

These subtypes were then grouped into super-ordinate categories such as Assault and Battery, Robbery, and Larceny etc.  These were further grouped into the following more all-inclusive categories: Crimes Against Persons, Crimes Against Property, Sex-related Crimes, Other Minor Crimes and Drug Related Crimes.   A Total Crimes category was also employed.  The following crime groupings were used in the study as the primary crime incident outcome variables.

**Crimes Against Persons**
A & B (Assault and Battery)
Offense against family
Offense against children
Kidnapping/abduction
Homicide
Robbery
Stalking
Domestic violence

**Property Crimes**
Arson
Auto theft
B & E (Burglary)
Destruction of city property
Larceny
Vandalism

**Sex Crimes**
Rape
Prostitute
Sex offenses
Obscene phone calls

**Other Minor Crimes**
Disturbance
Disorderly conduct
Drunkenness
DUI

**Drug Related offenses**
Narcotics
Narcotics complaints

**Total Crime Incidents**

Table 3 displays a breakdown of calls for service by the super-ordinate

categories.  As can be seen from the table, crimes against persons comprised

approximtely17 percent of crime incidents, crimes against property comprises the large

majority of incidents (32.4 percent), sex crimes are relatively infrequent (approximately

four-percent) and "other minor" crimes comprise approximately 26 percent of the total incidents, drug related crimes six-percent and all other crimes 14 percent of the total. The "all other crimes" category was only used in subsequent analyses when "Total Crime Incidents" is employed as an outcome variable.

**Table 4** displays a breakdown of the sex crimes category by type.  Prostitution was by far the most predominate crime event coming to the attention of the police—over two thirds of the incidents involved prostitutes.  Other sex offenses comprised over 20 percent of the crime events, while rape was relatively infrequent--about nine percent of the sex crime events.  The smallest category, obscene phone calls was retained in the zero-order analysis but eliminated from further regression analyses.

Plotting the Crime Incident Calls for Service by Address

The calls for service and dispatch data were then plotted using the Maptitude GIS software.  Initially, an attempt was made to plot all calls based upon the street name and address using the "very strict" location criterion option (only those addresses for which an exact street name and number match to those stored in the Maptitude software are plotted).  This resulted in the plotting of roughly 88-89% of all calls for service.  Using the "normal" criterion that allows for some misspelling of street names by the police the remaining addresses were plotted allowing for an additional 6-7% plotting rate.  The remaining 5% of the calls were not plotted.

RESULTS

Predicting Crime Incidents in Daytona Beach Using Neighborhood Features, Demographic Variables, Social Disorganization Variables, Alcohol Retail Establishments and the Presence of Adult Cabarets

An analysis reported below was designed to answer the question: Once we have controlled for social characteristics of the immediate neighborhood (census block) known to be related to crime and community disorder, what is the effect of the presence of an adult cabaret in a census block on crime events? This comprehensive form of analysis is necessary to insure that once other sources of variability in crime incidents known from past research are statistically controlled the effect of the adult cabaret as a source of crime and disorder in the area may manifest itself.

Several variables investigated by others have been found to be important as predictors of crime activity. These include measures of racial composition, family structure and the presence of motivated offenders. These social variables have been examined on the basis of the theory that a local area's population, age structure (especially the presence of young male adults), and its race/ethnic composition can affect both the size of the pool of motivated crime offenders and the presence of suitable targets for predatory crimes. Variables that have been investigated and have been found to be most important as predictors of crime activity include measures of racial composition (number of African Americans and racial heterogeneity), family structure (as measured by number of single-parent households), economic composition (as measured family income), and the presence of motivated offenders, primarily males between the ages of 18 and 25 (see, e.g., Miethe & Meier, 1994).[4]

In addition, it is necessary to control for neighborhood business and housing characteristics that may contribute to social disorganization such as the presence of vacant houses and lots. Specific land uses are not only important in themselves but they

---

[4] Menthe, T. D., & Meier, R. F. (1994). Crime and Its Social Context: Toward an Integrated Theory of Offenders, Victims, and Situations. Albany, NY: State University of New York Press.

also operate in interaction with variables that are indicative of social disorganization. The presence of alcohol serving establishments or bars identifies areas that might be particularly attractive for potential offenders (Roncek and Maier, 1991; Sherman et al., 1989; Stark, 1987).

The list of population, general demographic characteristics and social disorganization variables and alcohol retail sale establishments measured at the census block level included in the analyses appears immediately below. Once these variables are statistically controlled, the effect of the variable measuring the presence or absence of an adult cabaret in the block is examined.

---

**Variable Group 1 (Population and area controls)**
- Population
- Area

**Variable Group 2 (demographics)**
- Median age
- Male population over 18
- Age 15 – 19
- Age 20 – 25
- Number of Blacks

**Variable Group 3 (social disorganization)**
- Number of households with children under 18
- Number of households with spouse
- Number of married households
- Number of households with female as head of household
- Number of non-family households
- Number of vacant house units

**Variable Group 4 (alcohol serving establishments)**
- Number of retail alcohol serving and selling locations

**Variable Group 5 (adult cabarets)**
- Presence or the absence of gentlemen's clubs in the census block

---

<u>Zero-Order Correlations</u>

The zero-order correlations between the variables listed above and the number of calls for service to the police per census block were computed.  These correlations are displayed in **Table 5**.  The pattern of correlations revealed small to moderate but stable correlations between several of the demographic characteristics of the census block neighborhood and calls for service for crime and disorder.  Several of the larger correlations between crime and demographic variables and crime and social disorganization characteristics such as number of female headed households, number of young males, and number of non family members in household conformed to the findings of other researchers cited above.  Consistently among the highest correlations for all crime outcome variables was the presence of an alcohol retail establishment in the block. There are small, but statistically significant, zero-order correlations between the presence of an adult cabaret in a block and crimes against persons, other minor offenses, drug related crimes and total crime incidents.

**Table 6** displays the correlations between the variables above and sex crimes broken down by individual type within census blocks that had at least one such crime. Overall, the correlations here are much lower.  The strongest association among all of the correlations was obtained between the alcohol retail selling establishment variable and sex offenses.  The variables measuring the presence of young people, young males, blacks, female-headed households as well as the presence of retail alcohol serving establishments were significantly correlated with rape incidents.  There was not a significant zero-order correlation between the presence of an adult cabaret and rape.

There were statistically significant correlations between the presence of adult cabarets and sex offenses and prostitution.

<u>Hierarchical Regression Analyses</u>

A series of hierarchical multiple regression analyses were conducted at the census block level, for those blocks with at least one crime incident, with crimes against person, crimes against property, other minor offenses, drug related crimes and total crimes as dependent variables (sex crimes are examined separately below). The population, demographic, social disorganization and alcohol businesses predictor variables were entered into the regression equation in the first four blocks followed by a final block measuring the presence or absence of an adult cabaret.

There are analyses reported below where there are small but statistically significant relationships due to the exceptionally large N (sample size) employed in the analyses (at times over 1,100 census blocks). Below, we favor "strength" over a technical "significance." In this regard, we follow what has been called the Hays' "testmanship" dictum, which states that with sufficiently large N virtually any difference between compared means (or correlations between two variables) becomes statistically significant.[5]

---

[5] Hays' observations in this respect are worth a verbatim quote. "There is surely noting on earth that is completely independent of anything else. The strength of an association may approach zero, but it should seldom or never be exactly zero. If one applies a large enough sample of the study of any relation, trivial or meaningless as it may be, sooner or later a significant result will almost certainly be achieved. This kind of problem occurs when too much attention is paid to the significance tests and too little to the degree of statistical association the finding represents. This clutters up the literature with findings that are often not worth pursuing and which serve only to obscure the really important predictive relations that occasionally appear."

Consequently, in the analyses below we acknowledge Kerlinger's admonition that the strength of a relationship is of primary importance; the significance of the relationship is ancillary to the question of how much of the variance has been accounted for.[6]

We most often focus on the so called "effect size" as an indication of the importance of one or several variables in "explaining" or accounting for the variability in crime incidents across census blocks in Daytona Beach.  As a simple rule of thumb, Cohen (1988)[7] suggests that a "small" effect has a mean correlation (or Beta) coefficient of 0.10 (i.e. explains 1% of the variance since $R^2$=1%), a "medium" effect has a coefficient of 0.30 (i.e. explains 9% of the variance), and a "large" effect has a coefficient of 0.50 (i.e. explains 25% of the variance).  Any effect size approaching 1 percent is therefore essentially trivial; any effect size below 1 percent is extremely suspect as an indicator of an important effect even though such trivial amounts of variance explained may be technically statistically significant.

**Tables 7-11** display the results of the hierarchical regressions.

Crimes against persons.  **Table 7** displays the results of the hierarchical regression analysis employing crimes against persons as an outcome variable.   The model accounts for 63 percent of the variability in these crime incidents across census blocks.  The first set of variables measuring area size and population accounted for 17 percent of the variability.  The addition of the demographic variables set added another 18 percent to the explanatory power of the model.  The addition of the social disorganization variables contributed 12 percentage points to the model's explanatory power.   The addition of

---

[6] Kerlinger, F.N. & Pedhazur, E.J. (1973). Multiple regression in behavioral research. New York: Holt, Rinehart, and Winston.
[7] Cohen (1988) (*Statistical power analysis for the behavioral sciences*, 2nd edition. Hillsdale, NJ: Erlbaum.)

alcohol serving establishments added another 15 percent to the model's predictive power. Finally, the term measuring the presence of an adult cabaret was statistically significant but contributed no meaningful additional explanatory power to the model (approximately one and one half-percent).

Crimes against property. **Table 8** displays the results of the hierarchical regression analysis employing property crimes as an outcome variable.   The model accounts for 57 percent of the variability in these crime incidents across census blocks. The first set of variables measuring area size and population accounted for 16 percent of the variability.  The addition of the demographic variables added another four percent to the explanatory power of the model.  The addition of the social disorganization variables contributed five percentage points to the model's explanatory power.  The addition of alcohol serving establishments contributed another 31 percent to the model's predictive power.  Finally, the term measuring the presence of an adult cabaret in the block was not statistically significant and contributed no additional explanatory power to the model.

Other less serious offenses. **Table 9** displays the results of the hierarchical regression analysis employing other less serious crimes as an outcome variable.  The model accounts for 49 percent of the variability in these crime incidents across census blocks.  The first set of variables measuring area size and population accounted for approximately six-percent of the variability.   The addition of the demographic variables set also added eight-percent to the explanatory power of the model.  The addition of the social disorganization variables contributed another seven percentage points to the model's explanatory power.  The addition of alcohol serving establishments contributed another 26 percent to the model's predictive power.  Finally, the term measuring the

presence of an adult cabaret was technically statistically significant but contributed a trivial amount of explanatory power to the model (two-percent).

Drug related offenses.  **Table 10** displays the results of the hierarchical regression analysis employing drug related crimes as an outcome variable.  The model accounts for 23 percent of the variability in these crime incidents across census blocks.  The first set of variables measuring area size and population accounted for less than one percent of the variability.  The addition of the demographic variables set added eight-percent to the explanatory power of the model.  The addition of the social disorganization variables contributed another four percentage points to the model's explanatory power.   The addition of alcohol serving establishments contributed another eight-percent to the model's predictive power.  Finally, the term measuring the presence of an adult cabaret was statistically significant and accounted for five percent of the variability.

We undertook additional multiple regression analyses wherein we excluded the census block containing Pink Pony/Red Eyed Jacks from the analyses (a series of multiple regression analyses were undertaken excluding each census block with a cabaret).  **Table 11** presents the results of these analyses.  The beta coefficient drops in size from .225 to .07.  Or, in terms of variance explained, this represents a drop from five-percent to one-half of one-percent (.0049) of the variance explained.  This is an indication that the census block or area containing Pink Pony/Red Eyed Jacks accounts for the strength of the relationship between the adult cabaret variable and drug incidents.

However, while the block where the Pink Pony/Red Eyed Jacks cabaret is the location of a relatively large number of drug crime incidents there is no evidence that the Pink Pony/Red Eyed Jacks cabaret address is the primary source of these incidents. **Table**

**12** indicates that the Pink Pony/Red Eyed Jacks address accounted for less than one incident per year.

Total Crime. **Table 13** displays the results of the hierarchical regression analysis employing total crime as an outcome variable. The model accounts for a 53 percent of the variability in these crime incidents across census blocks. The first block measuring area size and population accounted for about nine-percent of the variability. The addition of the demographic variables set added ten-percent to the explanatory power of the model. The addition of the social disorganization variables contributed another seven percentage points to the model's explanatory power. The addition of alcohol serving establishments contributed another 30 percent to the model's predictive power. Finally, the term measuring the presence of an adult cabaret was technically statistically significant but contributed a small and meaningless amount of explanatory power to the model (one-percent).

Examining the Total Crime Incidents Within the 1000 Feet Areas Near Adult Cabarets

To summarize the findings so far, there was a strong positive relationship between presence of retail alcohol selling establishments (not including the adult cabarets) and crime incidents. We found that the presence of an adult cabaret in a census block did not add any meaningful explanatory power to our models.

We followed up the census block regressions with an analysis more centrally focused on the adult cabarets (1000 foot radius). We ask: Is the crime that does occur in the 1000 feet area surrounding the adult cabaret due to the adult business or due to other businesses located in the immediate vicinity. We undertake a further analysis to answer this question. **Tables 14-18** display the results of this more focused address analyses.

The Lollipops Gentlemen's Club Area.  **Table 14** presents the frequency of total crime incidents by address in the 1000 feet area surrounding the Lollipop's Gentlemen's Club.  As can be seen from the table only three percent of the calls for service to the police is to the Lollipop's address.  A nearby establishment, the 600 N. Niteclub, an alcohol serving establishment, accounts for 1183 calls to the police or 20 percent of the total calls for service to the police in the area.  This nightclub, in addition to Razzels Night Club, Fuel and Gossip Night Club, all alcohol serving establishments and Water's Edge Hotel collectively account for approximately 38 percent of the calls for service to the police in the area surrounding Lollipop's.

The Molly Brown's One and Two Area. **Table 15** presents the frequency of total crime incidents by address in the 1000 feet area surrounding Molly Brown's I and II. A similar pattern of results as reported above are found due primarily to the overlap in the 1000 feet boundaries between this cabaret and Lollipop's.

Beach Beauty Club area.  Similar results were found for the Beach Beauty Club area, but more dramatic.  These results are displayed in **Table 16**.  The adult cabaret accounts for only one percent of the total crime events in the area.  The Adams Mark Hotel, Saxony Beach Motel, Ocean Inn Beach Motel and an empty lot account for over 35 percent of the police dispatches to the area.

Shark Lounge area.  **Table 17** presents the frequency of total crime incidents by address for the Shark Lounge area.  As with the other adult cabarets, The Shark Lounge address itself accounts for a very small number of incidents requiring the attention of the police--approximately two percent of the crime events.  The Daytona Inn, Fountain

Beach Resort, Streamline Hotel and Surfview Motel and Ocean Front Apartments, considered together, account for 22 percent of crime events.

Pink Pony/ Red Eyed Jacks area.  **Table 18** presents the frequency of total crime incidents by address for the Pink Pony/Pink Eyed Jacks area.  As with the other adult cabarets, The Pink Pony/Red Eye Jacks address itself accounts for a very small number of incidents requiring the attention of the police--approximately three and one half-percent of the crime events.  Two addresses, considered together, 600 N. Ridgewood and 713 N. Ridgewood account for nearly 19 percent of crime events.

Focus on Sex Crime Incidents

The City of Daytona Beach specifically maintained that the primary justification for the regulation of nudity was that it was associated with secondary effects such as increases in prostitution and sexual assaults.  We focus here on a using sex crimes as an outcome variable.  We examined sex offenses, rape and prostitution incidents.  We undertake additional hierarchical regression analyses of sex crimes by individual type below.

**Table 19** presents the results of the hierarchical regression analysis using sex offenses as the outcome variable.  The model accounts for a relatively small amount of variability in these crime incidents.  The only variable that is statistically significant is the presence of an alcohol retail sale business in the block—accounting for 16 percent of the variability in sex offense incidents.  The variable measuring the presence of an adult cabaret in the block is not a statistically significant and accounts for no additional variability.

**Figure 3** displays the geographical location of the sex offense incidents relative to the location of the adult cabarets in Daytona Beach.  Inspection of the figure indicates that with the exception of one business, the adult cabarets are not centered in the midst of sex offense incidents.  While the Beach Beauty Club appears to be placed in the midst of sex offenses on either side of it, the area immediately surrounding the address appears free of such activity.  This is an indication that the adult cabaret is not the source of the sex offense incident activity but borders a significant cluster of such incidents most notably the cluster occurring west of the cabaret.

**Table 20** presents the results of the hierarchical regression analysis using rape incidents as the outcome variable.  The model accounts for a relatively small amount of variability in these crime incidents—approximately 15 percent.   The first block measuring area size and population accounted for about three-percent of the variability.  The addition of the demographic variables added no significant explanatory power of the model.  The addition of the social disorganization variables contributed another five percentage points to the model's explanatory power.  The addition of alcohol serving establishments contributed another five-percent to the model's predictive power.  Finally, the term measuring the presence of an adult cabaret was not statistically significant**.**

**Figure 4** displays the geographical location of the rape incidents relative to the location of the adult cabarets in Daytona Beach.  Inspection of the figure indicates that rape incidents are not clustered around the adult cabarets but are very widely dispersed throughout the entire area.  If there is any association visible from inspection of the figure there appears to be some shared geographical proximity between rape incidents and alcohol serving establishments.

**Table 21** presents the results of the hierarchical regression analysis using prostitution incidents as the outcome variable.  The model accounts for a moderate amount of variability in these crime incidents—approximately seventeen-percent.  The addition of the social disorganization variables contributed most of the percentage points to the model's explanatory power.  The addition of alcohol serving establishments contributed no statistically significant and meaningless amount to the model's predictive power.  Finally, the term measuring the presence of an adult cabaret was statistically significant, but accounted for only two percent of the variability.

**Figure 5** displays the geographical location of the prostitution incidents relative to the location of the adult cabarets in Daytona Beach.  Inspection of the figure indicates that prostitution incidents are clustered around three areas of Daytona Beach but the geographical center of these clusters has little to do with the location of the adult cabarets with the exception of the Pink Pony/Red Eyed Jacks location.

Inspection of **Figure 5** prompted us to undertake additional analyses without the Pink Pony/One Eyed Jacks businesses in the regression model.  **Table 22** presents the results of this analysis.  As can be seen from the table, exclusion of the census block with the Pink Pony/Red Eyed Jacks business from the adult cabaret variable reduced the relationship to the a nonsignificant level (in fact, a Beta of zero was obtained).  Systematically eliminating the other cabarets from the variable in a series of additional multiple regressions failed to eliminate the statistically significant relationship between the adult cabaret and prostitution.

This additional analysis demonstrates that the census block with the Pink Pony/Red Eyed Jacks cabaret is primarily responsible for the small but significant

association between adult cabarets and prostitution found in the hierarchical analysis. Once the census block with Pink Pony/Red Eyed Jacks business is removed from the mix, there is not a relationship between prostitution incidents and adult cabarets in the city of Daytona Beach.

<u>Examining the Sex Offenses, Prostitution and Rape Incidents Within the 1000 Feet Areas Near Adult Cabarets</u>

In a more focused follow-up analysis we ask:  Are the sex crimes that occur in the 1000 feet area surrounding the adult cabaret due to the adult business or found at other addresses located in the vicinity.  We undertook a further analysis to answer this question.  **Table 23** displays these results.

A preliminary point regarding the results in **Table 23** should be made.  It would be expected that if the presence of adult cabarets are responsible for more sex crimes, a significant clustering of such crime activity in the location that contain two such cabarets should be apparent.  We would expect, therefore, that the Lollipops and Molly Brown's I and II area to be an especially active area with regard to sex crime incidents.  This is not the case.  As can be seen from **Table 23** the area encompassing Lollipops and Molly Browns has the lowest number of all types of sex related crime incidents compared to areas with only a single adult cabaret.  Next, we examine each of the adult cabaret areas individually.

<u>The Lollipop's Gentlemen's Club area</u>.  The area had a total of 22 prostitution incidents.   One prostitution incident is attributable to the Lollipop's address.  A total of 14 rape incidents came to the attention of the police in the vicinity of Lollipop's.  Zero

rape incidents occurred at the Lollipop's address.  A total of 85 sex offense incidents occurred in the vicinity.  Only two such incidents occurred at the Lollipop's address.

The Molly Brown's One and Two Area.  The area has a total of 22 prostitution incidents.  Zero prostitution incidents occurred at Molly Brown's address.  There were a total of 14 incidents of rape in the vicinity.  Zero rape incidents occurred at Molly Brown's address.  A total of 80 sex offense incidents occurred in the area.  Four occurred at Molly Brown's address.

Beach Beauty Club area.  The same results were found for the Beach Beauty Club area, but more dramatic.  The area has a total of 87 prostitution incidents.  Zero prostitution incidents occurred at the Beach Beauty Club address.  A total of 19 rape incidents occurred in the vicinity.  Zero rape incidents occurred at the Beach Beauty Club address.  The area had a total of 185 sex offense incidents.  There were zero such incidents at the Beach Beauty Club address.

Shark Lounge area.  The area had a total of 357 prostitution incidents.  Zero prostitution incidents occurred at the Shark Lounge address.  There were a total of 17 incidents of rape in the vicinity.  Zero rape incidents occurred at the Shark Lounge address.  A total of 72 sex offense incidents occurred in the area, one at the Shark Lounge address.

Pink Pony/Red Eyed Jacks Area.  The area had a total of 610 prostitution incidents.  Only two prostitution incidents occurred at the Pink Pony/Red Eyed Jacks address.  There were a total of 18 incidents of rape in the vicinity.  Zero rape incidents occurred at the Pink Pony/One Eyed Jacks address.  A total of 26 sex offense incidents occurred in the area, whereas three occurred at the Pink Pony/Red Eyed Jacks address.

In summary, while there were in some cases relatively large numbers of sex crimes in the vicinity of the adult cabarets, the cabaret addresses themselves are not the source of these sex crime incidents. In many cases the cabarets register zero crime incidents.

Finally, it should also be recalled that we are utilizing approximately four-years of police call information. Therefore, aside from the locations showing zero sex crime events, where such events are found for the adult cabaret address there is less than one crime incident per year.

Comparing Sex Crime Incidents for Alcohol Serving Establishments With and Without Adult Entertainment

**Tables 24-26** present the "top ten" alcohol serving establishment addresses to which police have been dispatched for incidents of prostitution, sex offenses and rape. As can be seen from the tables alcohol serving establishments that do not feature adult entertainment have far more sex crime incidents than the adult entertainment locations (see **Table 23**).

Especially notable is the pattern of occurrences for rape incidents. Recall that there were zero rape incidents at the adult locations (see **Table 23**). In contrast, there were as many as four to five rape incidents at certain alcohol serving establishment addresses that do not include adult entertainment. In fact, the top ten alcohol serving establishment addresses listed in **Table 24** accounted for 29 rape incidents in the community of Daytona Beach, compared to zero such incidents at alcohol serving establishments that featured adult entertainment.

In summary, the appearance of persons in the nude or semi nude in public places such as adult cabarets <u>does not</u> appear to increase incidents of lewd and lascivious behavior, prostitution or sexual assaults and batteries.

## SUMMARY AND IMPLICATIONS

In order to test the assumption that adult cabarets are associated with negative secondary effects, an extensive and detailed empirical study of criminal activity in and around these businesses in Daytona Beach was undertaken utilizing data provided by the Daytona Beach Police Department. We employed a series of increasingly narrow foci -- ranging from an analysis of the Daytona Beach as a whole using census blocks as the unit of analysis to an address-specific analysis of police activity -- in order to test the assumption that adult cabarets had a deleterious effect on the areas around them in terms of increased crime. We also focused on specific sex crimes including rape incidents, prostitution incidents and other sex offenses separately because of the City of Daytona Beach's specific theory that nudity increases sex crimes, especially prostitution and sexual assaults.

<u>Summary of Findings</u>

We are able to account for crime events in Daytona Beach with a moderately high level of accuracy using variables found by other researchers to be related to crime. The results of the analysis employing crimes against persons as an outcome variable accounted for over 60 percent of the variability in these crime incidents across census blocks. The analysis employing property crimes as an outcome variable accounted for over 50 percent of the variability in these crime incidents across census blocks. The analysis employing total crime as an outcome variable accounts for a 50 percent of the

variability in these crime incidents across census blocks.  The social disorganization variables and especially the presence of an alcohol beverage retail sale establishments in the blocks (that did <u>not</u> feature adult entertainment) accounts largely for this explanatory power.   The presence of an adult cabaret in the census block explained only to a trivial amount of variability in crime incidents when these other variables were considered.

        <u>From these analyses we are able to reliably conclude that once we control for variables known to be related to crime there is not a meaningful relationship between the presence of an adult cabaret in the neighborhood and crime events</u>.

        The more focused address-specific analyses confirmed this conclusion.  Only one to three and one half-percent of the crime activity in the 1000-foot vicinity of the adult cabaret is due to the adult cabarets themselves.  Nightclubs that serve alcohol but that do not feature adult entertainment, or motels in the area, account for large numbers of calls. The adult cabarets appear to be located in the geographic center of areas densely packed with retail alcohol selling businesses and motels, which account for a far larger proportion of crime activity.

        <u>Our models do less well, overall, in predicting sex crimes.  However, adult cabarets as with other types of crime, are generally not associated with these crimes.</u> Separate analyses of these crime incidents showed there was no relationship between presence of adult cabarets and rape and sex offenses.  The crime event density maps displayed in the figures above show that rape incidents are widely distributed geographically and have little to with the location of adult cabarets.

        The maps also show that there are readily identifiable areas of the Daytona Beach that have very dense clusters of prostitution activity <u>but these prostitution clusters are</u>

generally not associated with adult cabarets—with one exception, the census block and immediate vicinity surrounding the Pink Pony/Red Eyed Jacks cabaret.  But, while this cabaret appears to be located in the midst of a higher prostitution incident area there is no evidence it is itself a source of such activity.

A more focused address-specific analysis confirms these conclusions.  Nearly universally, the adult cabarets themselves account for virtually none of the sex crime activity in the vicinity.  Consequently, we conclude that there is no support for the City of Daytona Beach's theory that adult cabaret establishments that feature nudity are associated with increases in prostitution or sexual assaults.

In summary, we found no evidence of negative effects in the form of crime, especially sex crimes, stemming from the adult cabarets that feature nudity or topless entertainment in Daytona Beach.   The appearance of persons in the nude or semi nude in public places such as adult cabarets does not appear to increases incidents of lewd and lascivious behavior, prostitution or sexual assaults and batteries.  Instead, we found that the presence of alcohol serving establishments that do not feature nudity or topless entertainment are the most reliable predictor of crime events in Daytona Beach including rape.

38

Respectfully submitted:


_____

Daniel Linz