

**SAINT LEO**
U N I V E R S I T Y
**Department of Criminal Justice**
**Dr. Terry A. Danner, Chair**

**Exploring the Causal Connection Between Adult Use
Enterprises and the Adverse Secondary Effect of Crime:
The Casselberry and Seminole County Experience**

This description of the present original criminological research targeting three

adult cabarets in Casselberry, Florida and one in unincorporated Seminole County Florida

is preceded by a summary of the critiques done by social scientists regarding the

conclusions and methodological rigor of prior research on the crime related secondary

effects of adult enterprises.  These prior studies have frequently been relied upon by

various governmental entities as compelling evidence of the adverse secondary effects

caused by the operation of adult use businesses.  This evidence has been used to support

the contention of a legitimate governmental interest in regulating where and how this

type of enterprise can be conducted.  Following that analysis will be a summary of the

original research conducted by the present author on 11 adult cabarets in the Tampa Bay

Area of Florida, a recent study done by the Fulton County Police Department, and one

conducted by three Criminologists for litigation in Charlotte, North Carolina.  The Tampa

Bay area and Charlotte studies addressed some of the methodological concerns raised by

the study critiques summarized below and produced conclusions about the connection

between this type of adult use enterprise and the secondary effect of crime.   Lastly, the

original criminological research conducted in Casselberry and Seminole County Florida

will be described.

## Evaluations of the Methodology and Conclusions of Past Studies

At the time of this writing, the present author was aware of only three written evaluations produced by social scientists regarding the quality of the methodology and conclusions found in the number of studies that have been used to justify the regulation of adult use enterprises. These analyses will be briefly described below in the order of their comprehensiveness.

### Dr. Terry A. Danner

The present author was commissioned by the plaintiff in Artistic Enterprises v. Warner Robins, GA [U.S. District Court, Middle District, Macon Division] to evaluate the methodology and conclusions of several "foreign studies" (those studies conducted in cities other then the one in which the business(s) in question are located) being used by the City of Warner Robbins to justify certain regulations they imposed on the plaintiff's adult cabaret. This analysis began with the criteria that: a) the research question should be clearly and objectively defined, b) a clear and objective articulation of the causal link between the variables being examined should be made, c) all reasonable alternative hypotheses should be considered, d) the strengths and weakness of the data being used should be considered, and e) the most sophisticated methodologies available given the circumstances of the research (usually the availability of data) be used. It cannot be emphasized enough that no social scientific study conducted in a natural environment will be flawless. The most professional and unbiased approach to this reality is to openly recognize the major flaws in the research conducted and to draw conclusions with these imperfections in mind. The objectivity and methodological quality that results from this kind of approach has been mostly missing in the studies considered below.

Los Angles (Hollywood), CA (1977)

The most serious problem with this research was that it did not take into account the numerous ways in which Hollywood is a unique ecological area. This was a failure to consider alternative hypotheses and a lack of rigor in the research design. Other serious problems were related to data analysis. For example, since crime rates are essentially a ratio of known crimes in a specific geographical area to its residential population, the use of this kind of statistic based on the residential population of a mostly commercial area produces very inflated estimates of number of crimes occurring per person. This effect occurs because, as compared to mostly residential urban areas, primarily commercial areas have a relatively low number of permanent residents counted by census takers, but a very high number of people who pass through for business and various other purposes. These types of fundamental research errors most likely occurred because the crime studies under consideration were not generally conducted by (or even reviewed by) properly trained research criminologists. A couple of glaring problems that would be routinely avoided by experienced criminological researchers were found in this study. They were: a) combining crime categories (for example, since the volume of reported larcenies in any jurisdiction vastly outnumber all other crimes, combining crime categories only reflects changes in larceny rates), and b) not recognizing that proactive typelaw enforcement activities could account for higher prostitution rates.

Saint Paul, MN (1977)

The objective nature of the causal connection being examined in this type of research is not usually well articulated and this often results in unwarranted conclusions. The specific research question in these studies should have been: *Do businesses that provide sexually explicit materials or performances increase the levels of crime in their neighborhoods of operation over and above the levels that would have occurred there without such enterprises present?* Although the study design of measuring changes in

crime volumes both before and after adult use enterprises are in operation is a valid approach to answering this question, the crime data needed to conduct such a "time series" analysis is often unavailable to researchers.   When this type of research design is not possible, the conclusions drawn must be tempered by the consideration of rival hypotheses that could account for the findings presented. The conclusion drawn in this research was that the data supported the belief that the businesses under study were responsible for increasing crime rates in the areas where they are located.  In addition to being plagued with some of the methodology problems described above, this conclusion was drawn without consideration of some very obvious rival hypotheses.  The researchers made a most serious deductive reasoning mistake by assuming that statistical correlation, by itself, is clear and convincing proof of causation.  It was determined that neighborhoods with high concentrations of sexually oriented businesses had higher rates of unemployment and poverty as well as lower levels of education.  The report concluded that the adult use businesses were the cause of neighborhood problems because people living in the area had reported problems with prostitution and prostitution related crimes. The only certain conclusion that could be drawn from the results of this research was that these businesses were located in areas that have had high levels of crime and other social problems.   Equally plausible rival hypotheses based on the data presented in this study could be that these adult oriented businesses had located in already economically depressed and problem plagued areas either to position themselves close to their target markets or to avoid areas that could mount well financed and organized opposition to their presence.

Phoenix, AZ (1979)

Causal conclusions were not warranted here based on the comparisons of complex urban areas that are different in ways other than just containing adult use establishments. There was also a problem with using crime rates, bundling crime categories, and ignoring the effect that proactive law enforcement can have on sex related crime rates.

Minneapolis, MN (1980)

Although this study also exhibited some of the methodological flaws described above, it used the most sophisticated methodology and protocols that had been employed up to that date. As part of a wide ranging study of bars and other adult use businesses commissioned by the Minnesota Crime Prevention Center, this research did consider rival hypotheses that could be supported by their data. For example, they concluded that, although they had found a correlation between sex oriented businesses and crime rates, this level of association was lower than for other social and economic variables such as income levels and the proportion of areas used for other commercial activities. They further pointed out that there are important social and economic forces that drive crime rates and concluded that the general character of neighborhoods influences both housing values and the concentration of adult use businesses. Finally, they concluded that there is a very weak statistical relationship between adult entertainment businesses and crime.

Indianapolis, IN (1984)

Although this research was also burdened with the kinds of methodological problems described above, two findings illustrate the importance of the consideration of rival hypotheses when making conclusions about the causal connection under consideration. First, they found that crime rates were higher in the residential parts of the study areas (which is contrary to what is generally found when comparing crime volumes in commercial and residential areas) and further, a survey of the residents of the study areas revealed their belief that the neighborhood had deteriorated before the businesses were opened.

Austin, TX (1986)

Calculating crime rates for 1984 and 1985 this study found that there were no clear differences between study and control areas in terms of Part 1 (which includes rape) crimes, but that there were higher sex-related crime rates in the study areas containing a variety of adult use businesses. It was interesting to note that the researchers pointed out

that most of the adult use businesses are clustered around major highways.  A well validated criminological model known as *routine activities theory* (Felson and Cohen, 1980), that describes how changes in urban areas influence crime trends, would suggest that crimes such as prostitution are, by marketing necessities, also often conducted in proximity to major highways because of the need for easy access by patrons. This is true regardless of the presence of adult use businesses and could confound the results of this study.  Again, the methodology used here was plagued with the kind of problems described in the other studies above and the findings alone did not warrant the conclusions that a causal connection existed between the location of adult use businesses and crime trends in the areas where they operate.

Garden Grove, CA (1991)

Using aggregated data from 1981 -1990 the findings of this study showed that although there were more assaults, robberies, burglaries, and thefts in areas containing adult use businesses than those with out such activities, the differences in sex related crimes was negligible.  Most importantly, after first warning the reader of the importance of following the kind of methodological considerations described above by the present author, the researchers that conducted this study then went on to ignore these very causality issues and draw conclusions from their findings in a manner contrary to their own admonitions

**Dr. Randy Fisher**

Dr. Fisher is a behavioral scientist currently on staff in the Department of Psychology at the University of Central Florida.   He has on a number of occasions been retained to evaluate the methodology and conclusions of various secondary effects studies used to justify a variety of ordinances regulating adult use businesses.  Over the course of evaluating the records used to support the need for adult use regulations in a

number of municipalities, Dr. Fisher consistently used five criteria to evaluate the empirical evidence: a) the objectivity of the evidence, b) the reliability and validity of the data, c) the appropriateness of the research design for demonstrating a causal relationship, d) statistical tests of significance, and e) the generalizability of the findings. After applying these criteria to essentially the same set of studies described above, he arrived at the following conclusions regarding the quality of the evidence presented.

<u>Objectivity</u>

This was an important issue for Dr. Fisher in that much of the record in support of the regulations was not empirical research, but only the assumptions, speculations and opinions of city officials and others concerned with the possible adverse secondary effects of adult use enterprises. Further, most of what were attempts to conduct empirical research had been conducted by city planning staffs whos services were most likely enlisted for the expressed purpose of finding evidence to support the need for such regulations. This said, it should be recognized that no social science research is completely objective. Thus, the main purpose of the insistence upon the use of widely accepted and rigorous methodologies is to insure that conclusions derived from the analysis of data are reasonably based upon the findings rather than the biases of those conducting the research. In all sciences, the method by which research is evaluated is "peer review." Researchers conducting similar studies are in the best position to evaluate the adequacy of methodologies and the objectivity of conclusions. Dr. Fisher found no record that any of the methodologies used in these studies was subjected to any peer review process.

Data Validity and Reliability

Dr. Fisher appropriately points out the deficiency of the crime data used in these studies. Unfortunately, criminologists frequently rely on this type of data primarily because it is usually the best available. Since most crimes involve clandestine activity, it is a very difficult behavior to count accurately. It is often referred to within the criminal justice sciences as the "dark figure." Of the various sources of information about the volume of criminal activity in a community, there are two types of crime data that are commonly used for informing public policy considerations. Neither sources of crime data are without challenges to their validity, but criminologist typically use the best data available while keeping in mind their limitations. "Crimes know to police" (CKP) are usually based on incident reports wherein a crime has been reported to or, are in some way discovered by, police officers. The FBI provides uniform crime definitions and these data are used on local, state, and federal levels. The validity and reliability of these data is dependant upon the reporting behavior of citizens and the record keeping practices of various law enforcement agencies. The other commonly used data source is "calls for police service" (CFS). These records, which are usually kept by the communication division of law enforcement agencies, document the locations to which police officers were sent and the reasons for which they were dispatched. CFS data are usually considered the inferior of the two possible sources primarily because the reason for which an officer was dispatched to a location may not always be the same as what actually happened there. Both types of data have validity problems, but both are widely used by criminologist because they are usually all there is. Dr. Fisher is correct to call attention to these data problem, but research using

this kind of data is common within the field of criminology and studies that make use of it are by no means always fatally flawed.

<u>Research Design and Causal Relationships</u>

Drawing conclusions about causal relationships based on the data derived from studies of natural social environments is always problematic.  Dr. Fisher correctly points out that the most valid conclusions about the causal link between two variables result from carefully controlled experiments where the only difference between the experimental and control groups is manipulated by the researcher.  Thereby, any differences in the dependant variable can be confidently attributed to the changes in the independent variable that was manipulated.  Unfortunately, whatever connections there might be between the operation of adult use businesses and the crimes occurring in the community where they are located are imbedded in a complex and fluctuating urban environment.  Dr. Fisher recognized this reality in his analysis of these studies and only expected them to use the best quasi-experimental research designs available under the circumstances.   One way that some of the better studies he reviewed attempted to draw reasonable causality conclusions was to compare the neighborhoods containing adult use businesses with "control areas."  *Control* area is an unfortunate choice of terms that comes from more rigorous research designs. Given the goals of the research being considered here, a control area would have to be similar in every way to the experimental area except that it contained one or more adult businesses and the "control areas" contained none.  Of course it is impossible to *control* for all of the conceivable differences between complex urban environments and thus a more accurate name would be "*comparison* areas."  Dr. Fisher found that the studies attempting to use such areas contained significant and serious difference that could in and of themselves

result in differential volumes of crime. For example, one would expect that an area containing more major transportation arteries would endure more crime than an area that contained fewer, regardless of the presence of a specific type of business. Due to these and other research design problems Dr. Fisher concluded that any crime volume changes attributed to adult use businesses found in these studies were unwarranted.

Tests of Significance

Although Dr. Fisher suggested their value for interpreting study findings, there has been disagreement among social scientists about the proper use of statistical tests of significance. These procedures were initially designed to determine the probability that the value of a variable of interest for a randomly selected sample varied from the population statistic only because of the random variance that occurs when a sample is selected from a larger population. For example, if we selected a neighborhood at random from a large urban area and found that the annual burglary rate there was higher than for the entire city, a significance test would tell us how likely it was that that difference was simply the result of random chance in picking that particular area of the city. Of course, the larger the difference, the less likely it occurred from just sampling error. Mathematicians who are more familiar with the underlying logic and assumptions of these statistical tests caution against using them when samples are not randomly selected. In the research being considered here, samples are never randomly selected. We pick particular urban areas because they do or do not contain adult use businesses. This is known as "*purposive sampling*" and the use of statistical tests of significance with this type of sample violates a critical assumption of these tests. Still, they can be easily calculated with most statistical analyses procedures and social scientists continue to disagree about the acceptability of this

practice with non-random samples. Since this "misuse" of significance testing occurs frequently in social science research, the practice continues unabated. It may be that Dr. Fisher found their absence in studies conducted by researchers not trained in the social sciences to be another indication of their lack of methodological sophistication and thus more evidence of the low quality of research in the area of adult use secondary effects. Lack of significance testing may or may not result from lack of research sophistication and does not automatically devalue the findings of a study.

Generalizability

Although, in the past, courts have allowed cities to use "foreign studies" regarding adverse secondary effects as sufficient justification for the enactment of adult use regulations (*City of Renton v. Playtime Theaters*, 1986), Dr. Fisher correctly finds fault with this practice. Routine activities theory suggests that the configuration of the urban environment in which a business is operated, the nature of that business, and the way it is managed can have much influence of the amount of criminal behavior it is capable of producing and inflicting on the community wherein it is located. To assume that an adult bookstore in Peoria, IL will have the same adverse secondary effects as a concentration of bars, adult movie houses, and adult cabarets in Hollywood, CA is indeed an unwarranted leap of faith. Of all the litigations over adult use secondary effects in which Dr. Fisher or the present author have been involved, not one governmental agency has conducted reasonably sound empirical research within their jurisdiction to determine the validity of the contention that adverse secondary effects are, in fact, occurring. Since this type research can be conducted with efficiency and reliability, it is unwise to make important public policy decisions without any reasonable attempt to learn the objective facts.

**Bryant, Linz, and Shafer**

To date, undoubtedly the most comprehensive evaluation of research conducted to determine the secondary effects of adult use businesses was published by Bryant, Linz, and Shafer (2001). Two social scientists and an attorney gathered together 107 municipal reports addressing adult use related secondary effects. Of these, only 29 contained empirical data. The methodology and conclusions of these studies were evaluated using standards put forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993) That is, the admissibility of scientific evidence offered by expert witnesses in Federal courts: a) must be more than subjective belief or unsupported speculation [conjecture], b) they should be falsifiable based on peer review and publication, c) they should contain error rates, and d) they should adhere to professional standards in using the techniques in question. The authors noted that: "A flawed study replicates errors across localities. It makes little sense to generalize to the experience of other cities on the basis of what may be an invalid investigation in the first place." (p. 366) Their analysis of the four most frequently cited studies revealed the following.

St. Paul MN (1978)

This study was the most methodologically sound, but did not find any support for the connection between adult use and crime. Since it used data from all areas of St. Paul, it ". . . examined the entire geographical study universe, negating the need for random assignment of control areas or the appropriate matching of selected control areas to the study area" (p. 377).

Hollywood, CA  (1977)

". . . although it is the third most relied upon piece of research that was found supposedly establishing the relationship between adult oriented businesses and negative social repercussions, the researchers never actually claim any significant support for such a connection."  Crime rates in census tracts with adult businesses were compared with those without.  No significant differences were found and no firm conclusion was made. A special police study finding high rates of certain offenses was probably the result of increased police activity.

Phoenix, AZ (1979)

The control areas used were of lower socioeconomic standing than the study areas, the data covered an insufficient time span, and the violent crime index and volume of child molestations were actually lower in study areas.

Indianapolis , IN (1984)

This was the most widely cited of all studies. The reviewers found that it contained equivocal findings regarding the relationship between adult businesses and adverse secondary effects.  It reported lower crime rates in all study areas.  Further, it used non-comparable areas, had no pre-opening measures, and the existence of alcohol serving adult businesses in the study areas confound the results.  It even provided evidence to the contrary of the adverse effect hypothesis in that a focused analysis of  a 1000 ft. radius around target businesses found lower crime than randomly chosen 1000 ft. circle in control areas.  Considering these four studies collectively, the reviewers concluded that their methodological weaknesses and equivocal evidence did not meet minimal standards of scientific evidence.

Upon reviewing all the empirical studies that they collected, these authors concluded:

- The studies were methodologically flawed and did not adhere to professional standards of scientific inquiry.

- The most methodologically adequate showed equivocal results or the opposite of negative secondary effects.

- They used no or improper control areas.

- The validity of much of the data was questionable.

- There were insufficient study times to compare before/after or long term trends.

- ". . . these unsound studies have been repeatedly misused as evidence across a large number of other municipalities. . . . Thus, the potential exists that as many as 22 zoning ordinances have been founded on a false premise about the substantial governmental interest in regulating the location of these businesses." P. 388

- These flawed studies are also being used to regulate expressive behavior <u>within</u> adult businesses.

<u>Summary</u>

When social research is being evaluated for its quality and thus acceptability as evidence to be used for public policymaking decisions, at least six criteria should be considered:  a) Is the research question articulated in a clear and concise manner so that any causal connections can be objectively evaluated?  b) Is the research design adequate for testing the causal linkage under examination?  c) Are the threats to the validity of the

14

data being used articulated and is it the best available data?  d) Have the research design and techniques used been peer reviewed?  e) Are plausible rival hypotheses based on the findings being considered?  f) Are findings from a specific research setting being generalized to other areas?  The studies reviewed by the social scientist above have fared poorly under the scrutiny of these considerations.  Better quality research in this area can and has been done.  Some examples are summarized below.

### The Tampa Bay Area Studies

The present author has conducted a number of empirical studies designed to measure and document crime related adverse secondary effects in the communities directly surrounding adult cabarets in Manatee County, Pinellas County, and Tampa, Florida.  Although, as stated above, no social scientific study conducted in a natural urban environment will ever be found to be flawless, these empirical studies were conducted with the goal of being as objective and methodologically rigorous as possible given the amounts of time, resources, and data available.

**Manatee County**

The research question that was posed for this study was whether or not there existed objective and quantifiable empirical evidence that suggested within a reasonable degree of social scientific certainty that two adult cabarets located in Manatee County, Florida have been criminogenic business enterprises in such a way that their operation has resulted in a significant and sustained increase in the crime volumes within the urban areas of their location. .  It is standard and accepted practice among the community of behavioral and social science researchers for all attempts to establish the validity of an assumed causal connection between two variables of interest (in this case

the operation of adult cabarets and changes in local crime volumes) to begin with a *null hypothesis* (Maxfield and Babbie, 1995). Because many social variables appear to be connected but in fact are not, the methodology for proving causal connections between socially relevant phenomena  (for example, yearly changes in the national unemployment rate and yearly changes in the national burglary rate) has been developed into a set of conservative techniques that begin by assuming no causal connection until such a linkage can be adequately proven.  This approach is somewhat analogous to the "presumption of innocence" doctrine in criminal prosecution. That is, to conduct research objectively, the researcher must begin the analysis of data by assuming that there was no actual linkage between the phenomena under consideration until clear and convincing evidence is found to allow for the rejection of the null hypothesis.  Thus, the focus of this study was expressed as the null hypotheses: *1) There was no causal connection between the operation on the Peek-A-Boo Lounge adult cabaret and crime volumes in the urban area immediately surrounding it; and 2) There was no causal connection between the operation on the Temptations II adult cabaret and crime volumes in the urban area immediately surrounding it.* The goal of the gathering and analyzing crime data then was to produce enough evidence for a clear and convincing rejection of these hypotheses.

The data used in this study was of the *Crimes Known to Police* type provided by the Manatee County Sheriff's Office.  It was categorized into six offense categories: rape, robbery, aggravated assault, burglary, larceny, and motor vehicle theft. This data was available only for the eight years of 1992 through 1999.  Since the two enterprises under consideration had both been opened prior to 1992, no before and after comparisons were possible.  However, there other criteria for examining the data were used.

<u>Low Macro Correlation</u>

For each crime category, the eight years of crime volume data in the statistical grids containing the target businesses was correlated with the same crime volume trends for all of Manatee County. A high level of correlation would suggest that crime trends in the areas containing the business were consistent with the trends for the entire county and thus would be evidence that the crime levels in the areas containing the target businesses were being primarily influenced by *macro forces* such as economic or demographic trends. Thus, high correlation coefficients support the null hypothesis and low coefficients would not.

<u>High Target Grid Correlation</u>

The assumption underlying the attempts to regulate adult use businesses has been that they are somehow uniquely criminogenic enterprises. Although it was stated above that perhaps not all forms of adult use are the same, two adult cabarets located in the same county might be expected to produce similar adverse secondary effects. Thus, if there were strong correlations between the grids that contained the two adult-use businesses under study, this would suggest evidence in support of rejecting the null hypotheses. Low correlations would support the null hypotheses by suggesting that community dynamics played a more important role if influencing crime volumes in the areas under examination than did the presences of the adult cabarets.

<u>Low Crime Location</u>

As stated above, the fact that an adult use business was located in a high crime area, is not in and of itself certain evidence that the crime problem was caused by that business' operation   However, if the areas containing the businesses in question were

found to contain unusually high crime volumes relative to countywide averages, then this finding would be some evidence in support of rejecting the null hypotheses. Much more decisively, if an adult use business were found to be operating in an area without a significant crime problem, then this would be strong evidence in support of the null hypothesis.

**Table 1: Manatee County Null Hypothesis Evidence Summary**

| Offense | LMC | | HTGC | LCL | |
|---|---|---|---|---|---|
| | Peek-A-Boo | Temptation | | Peek-A-Boo | Temptation |
| Rape | NO | YES | NO | NO | YES |
| Robbery | YES | NO | NO | NO | YES |
| Ag. Assault | YES | YES | NO | NO | YES |
| Burglary | NO | YES | NO | NO | YES |
| Larceny | YES | NO | YES | NO | YES |
| M.V.T. | NO | YES | NO | NO | YES |

Considering the totality of the evidence generated by the analysis of the data used in this study there was, within a reasonable degree of social scientific certainty, insufficient evidence to support the rejection of the null hypothesis for either the Peek-A-Boo Lounge or Temptations II. The preponderance of the evidence relevant to the Peek-A-Boo Lounge supported the null hypothesis that there was no causal connection between its operation and annual crime volume variance in the statistical reporting grid wherein it is located. The evidence supporting the null hypothesis for Temptations II was overwhelming. It strongly supported the null hypothesis that there was no causal connection between its operation and annual crime volume variance in the statistical reporting grid wherein it is located.

**Pinellas County**

The research question that was posed for this study was whether or not there existed objective and quantifiable empirical evidence that suggested within a reasonable degree of social scientific certainty that seven adult cabarets located in Pinellas County, Florida had been criminogenic business enterprises in such a way that their operation has resulted in a significant and sustained increase in the crime volumes within the urban areas of their location.

<u>Post-Opening Crime Trends</u>

For the longitudinal analysis contained in this study, the offenses reported to police from within the grid where a target business was located were counted and categorized into three major crime categories: Violent Crimes (Assault/Battery, Sexual Assault, Aggravated Assault/Battery, and Robbery), Property Crimes (Grand Larceny, Petit Larceny, Burglary, Criminal Mischief) and Public Order Crimes (Driving Under the Influence, Drug Offenses, Lewd/Lascivious Behavior [Including Exposure of Sexual Organ and Prostitution], and Adult Use Ordinance Violations).  Ten- year trend graphs (1991 - 2000) of the crimes volumes reported for each of the adult-use establishments under consideration and for each of the three crime categories were constructed.  Each graph contains the "Pinellas County Corrected" trend line for the relevant crime category and a correlation coefficient that was calculated as a measure of the covariance between the crime trend in the target grid and Pinellas County as a whole.  The ten year crime volume trend line also allows for a before opening/after opening comparison for four of the business that were opened after 1991.

<u>Macro Correlation</u>  .

For the purpose of making this kind of comparison, the ten-year trends of annual "mean per grid" crime volumes for Pinellas County were calculated.  A correlation coefficient was calculated for the annual crime volume trends for each of the three crime categories in each of the seven target grids and for their Pinellas County means per grid counterparts.

<u>Grid Crime Density</u>

As described above, findings that showed that a target business has been operating in high crime volume areas would, considered alone, neither support nor undermine the null hypothesis.  Contrarily, it would be unusual to find a neighborhood that has for years endured a highly criminogenic business activity and still had a relatively low volume of recorded crime.  A finding that the target grids have relatively low crime volume trends would be strongly supportive of the null hypothesis.\

The most robust statistical test used in this analysis was the calculation of correlation coefficients that measured covariance between the 10-year annual crime volume trends within the target grids and trends for the same time span and offense types of Pinellas County means.  As described above, a grid can be experiencing both high and increasing crime volumes, but if those volumes are correlated to some degree with the crime trends for similar offenses within a much larger geographic and cultural unit (in this case all Pinellas County), then this is strong evidence that local crime trends are being driven by more pervasive economic and demographic forces rather than by specific neighborhood activities.   Considering all the covariance found in the areas herein studied as displayed in Table 2, the mean correlation coefficient was $r = .39$.  This suggested that,

**Table 2:  Pinellas County Null Hypothesis Evidence Summary**

| Offense Category | Pearson's  r | Relative Volume | Post-Opening Increase |
|---|---|---|---|
| Christen's Violent | .44 | Lower | NA |
| Christen's Property | .16 | Higher | NA |
| Christen's Public Order | .24 | Mostly Lower | NA |
| Diamond Doll Violent | .38 | Lower | NA |
| Diamond Doll Property | .24 | Lower | NA |
| Diamond Doll Public Order | .21 | Mostly Lower | NA |
| Jake's Violent | .65 | Higher | NO |
| Jake's Property | .82 | Higher | NO |
| Jake's Public Order | .86 | Higher | YES |
| Show Girls Violent | .46 | Higher | NO |
| Show Girls Property | .48 | Higher | NO |
| Show Girls Public Order | .71 | Higher | YES |
| Silk Stockings Violent | .29 | Mostly Higher | NO |
| Silk Stockings Property | .22 | Higher | NO |
| Silk Stockings Public Order | .44 | Lower | YES |
| Sweethearts Violent | .45 | Mostly Higher | YES |
| Sweethearts Property | -.47 | Higher | NO |
| Sweethearts Public Order | .42 | Mostly Higher | YES |

collectively, the crime trends in the six grids tested were strongly affected by macro level criminogenic forces.  The two locations that produced markedly lower levels of covariance were the property offenses trends in grid 409 (Christine's Cabaret) and grid 254 (Sweethearts).

In terms of relative crime volumes, 10 of the 16 locations and crime category combinations had crime volumes at least generally higher than the corresponding Pinellas County corrected means.  This finding was not unexpected in that routine activities

theory suggests that the probability of crimes occurring increases as greater numbers of people interact.   All of the businesses examined here (with the exception of Mermaids) are located in highly commercialized areas and on major traffic arteries.  Further, 5 of the 12 businesses opened after 1991 had measurable post-opening increases. All of these 5 business and offense combinations showed marked correlation with Pinellas County corrected mean trends that suggest that post-opening increases may have been a spurious association resulting from businesses opening during a county wide increase in the annual volume of a certain offense type.  Also, the post-opening increases were often not sustained as might be expected if it is assumed that a uniquely criminogenic enterprise was exerting its effect on the neighborhood in a consistent manner from year to year. That is, why would a business be strongly criminogenic one year and then not in another year?

Calls for Service Data

For the purpose of evaluating the police activity at specific businesses, a further analysis using *calls for police service* type data was done by comparing a sample of 12 restaurants and alcohol serving establishments with six of the adult use businesses being considered here.  The number of calls for service, excluding alarms and information visits, were counted for time periods that varied from 8 to 32 months (depending on the data available).  Per month averages for each establishment were calculated and these 18 businesses were then rank ordered by the magnitude of their means.  The results of this analysis further reinforced the routine activities theory contention that public gathering places create policing problems as a result of bringing people together into situations that could lead to criminal behavior.  There was little evidence found in this analysis that

suggested that the adult cabarets here examined were uniquely criminogenic in a manner that was unlike many non-adult oriented food serving and entertainment enterprises. Given the evidence here examined and within a reasonable degree of social scientific certainty the 7 null hypotheses posited in the methodology section above remain intact. The assumption that these adult cabarets were producing crime related secondary effects in the areas where they are located remains unproven by these findings.

**Tampa – The Mons Venus**

Because the Tampa Police Department has maintained high quality *crimes known to police* data since 1980, this study was the most sophisticated and compelling study of the three conducted by the present author.  In addition to using twenty-one years of crime data and "crime per grid" averages for all Tampa, it included the use of similarly zoned comparison areas and a prostitution arrest data set.

The research question that was being considered in this study was whether or not there is objective and quantifiable evidence that the Mons Venus adult cabaret has been a criminogenic business enterprise in such a way that its operation has resulted in a significant and sustained increase the crime volumes within the urban area of its location.

Analysis of the summary table below reveals that, except for motor vehicle thefts, the average amount of crime for each category was lower after the mons venus opened in 1983 than before.  As compared to the other CI grids in Tampa, had similar or lower mean volumes of all crime categories with the exception of robbery, larceny and motor vehicle theft.  And lower than the all Tampa per grid averages for all crime types except larceny and motor vehicle theft..  Finally, there was evidence of macro correlation with both the comparison areas and for all Tampa in all crime types but rape and larceny.  For

**Table 3:  Mons Venus Null Hypothesis Evidence Summary**

| Offense Category | 1980-82 Means Grid 120 (Before) | 1983-00 Means Grid 120 (After) | 1983-00 Means CI Grids (After) | 1983-00 Means Tampa (After) | 1983-00 Grid 120 & CI Correlation | 1983-00 Grid 120 & Tampa Correlation |
|---|---|---|---|---|---|---|
| Rape | 1.7 | 1.6 | 1.9 | 2.4 | .29 | -.03 |
| Robbery | 23 | 16.1 | 12.7 | 18.4 | .27 | .29 |
| Agg. Assault | 29 | 23.9 | 21.3 | 29 | .46 | .63 |
| Sim. Assault | 43 | 31.6 | 31.3 | 39.8 | .78 | .69 |
| Burglary | 39.3 | 34.1 | 42.8 | 53.5 | .76 | .58 |
| Larceny | 281 | 176 | 96.8 | 97.1 | .01 | .31 |
| M.V.T. | 20 | 52.4 | 23 | 24.9 | .90 | .89 |
| Drugs | NA | 1989-00 21.6 | 1989-00 21.5 | 1989-00 34.7 | .74 | .67 |

rape, the target grid trend was moderately correlated with the comparison areas, but not all Tampa.  For larceny, the target grid was correlated with all Tampa, but not the comparison areas.

Five years of data regarding non-forcible sex offenses, such as indecent exposure and lewd behavior, was also available from the Tampa Police Department.   Analysis of this data showed that the annual volume of such offenses in the grid containing the Mons Venus had always been lower than for the comparison areas.  With the exception of the year 2000, they were generally lower than the average volume of non-violent sex offense per grid for all Tampa.  For the five years of data available, the average number of non-violent sex offenses per year for the target grid was 3.6, for all Tampa 5.4, and for the comparison area 10.9.

The Tampa Police Department provided data for all prostitution cases in Tampa for the year 2000.  Accompanying a list of these arrests is was a map that plotted their location. The list showed no prostitution arrests in that area.  Further, A scanning of the

calls for service to the Mons Venus' street address 2040 North Dale Mabry Highway also showed no prostitution calls for service in 1998 - 2000.

Within a reasonable degree of social scientific certainty, the longitudinal analysis of crime data provided by the Tampa Police Department produced insufficient evidence for rejection of the null hypothesis that there was no measurable causal connection between the operation of the Mons Venus adult cabaret and the fluctuation of crime volumes within its immediate surrounding area.

### Fulton County Georgia Study

On 04.16.97, the Board of Commissioners of Fulton County Georgia adopted a resolution directing the Fulton County Police Department to research the crime related secondary effects of six adult entertainment establishments located within that county. On 06.13.97 the Police Department issued a report entitled Study of Calls for Service to Adult Entertainment Establishments Which Serve Alcoholic Beverages: January 1995 – May 1997. Contained in this report was a description of the analysis of "calls for police service" data in which the six alcohol serving adult establishments were compared with six alcoholic beverage serving non-adult entertainment establishments. For the 2 1/2 years of the study, the Fulton County Police responded to the six adult establishments 728 times and to the non-adult 1718 times. Focusing on "alcohol related" calls (Public Drunkenness, Drunk & Disorder/Fight, Driving Under the Influence, and Illegal Alcohol/Drugs) the non-adult establishments totaled 178 calls for police service and the adult totaled 81. The authors concluded " . . .there is no statistical correlation that shows that there is an increase in crime at adult entertainment establishments serving alcoholic beverages. However, there is a statistical correlation that there is greater instances of calls

for service and reported crime at non-adult entertainment establishments that serve alcoholic beverages.

## Secondary Crime Effects Study in Charlotte, NC

A report dated 06.07.01 and entitled *Three Studies of the Secondary Effects of Adult Nightclubs in Charlotte – Mecklenburg County* described the results of original research done on 20 alcohol serving adult cabarets in the Charlotte-Mecklenburg area of North Carolina.  One of the studies focused on the effect these businesses had on property values, another was about local attitudes towards these enterprises, and a third examined the secondary effect of crime.  Following is a summary of the crime study entitled *Are Adult Dance Clubs Associated with Increases in Crime in Surrounding Areas? A Secondary Crime Effects Study in Charlotte, NC*.  It was conducted by Professors Kenneth C. Land, Jay R. Williams, and Michael E. Ezell of Duke University.

For the purpose of using the most rigorous research design possible in a natural setting, the investigators created "study areas" of 500 and 1000 feet around each adult cabaret.  They then created three "comparisons areas of the same size that were matched based on demographic characteristics know n to influence community crime rates.  These variables were: total population size (1997), percentage of female headed households, percentage black, percentage of 18 – 29 year olds, percentage divorced, and median household income.  Data for this analysis was 1998 – 2000 crimes known to police aggregated into: total reported crimes, total UCR crimes, total UCR violent crimes, total UCR property crimes, sex crimes (with rape added) and all other offenses.  The study areas containing the adult cabarets were all found to have

lower crime volumes for all categories than did the comparison areas containing no

adult cabarets.  The investigators explained these findings by suggesting that  " . . .

the adult nightclub business in the late – 1990s in many respects is quite unlike that of

the 1960s and 1970s when these establishments were relatively new on the

entertainment scene in American society.  Adult nightclubs have been subjected to

over two decades of municipal zoning restrictions across the country, and they

usually must comply with many other regulations as well.  . . . the establishments

themselves have evolved more closely into businesses – establishments with

management attention to profitability and continuity of existence. To meet these

objectives, it is essential that the management and/or owners of the clubs provide

their customers with some assurance of safety.  Accordingly, adult nightclubs,

including those in Charlotte appear to have better lighting in their parking lots and

better security surveillance that is standard for non-adult-nightclub business

establishments." (pp. 30 – 31)

## The Casselberry and Seminole County Study

### The Research Problem

Predicates 5 and 13 of Seminole County Ordinance No. 98-49 suggests the belief

that the public nudity that occurs in adult cabarets creates adverse secondary effects such

as prostitution, attempted rape and rape.  Predicate 9 of the City of Casselberry Ordinance

No. 98-922 expresses a similar belief that such nudity combined with alcohol

consumption causes (using a more generic phrase) "undesirable behavior".  The adult

cabarets in question are *Circus-Circus* (located in unincorporated Seminole County,

Florida), and three in Casselberry, Florida: Club Juana (Casselberry Police Patrol Zone

1D), *Rachel's* (Casselberry Police Patrol Zone 3B), and Cabaret Internationale (Casselberry Police Patrol Zone 1B).

The essential research question being addressed here is whether or not there is attainable evidence of a causal connection between viewing public nudity  (and in the case of the Casselberry Ordinance while consuming alcohol) and the commission of criminal behaviors.  To avoid confusion, the specifics of this relationship must be considered.  The literature describing research on the connection between alcohol consumption and criminality is voluminous and far beyond the scope of issues being considered here.  It is sufficient to point out that criminological research has concluded that there is a connection between alcohol consumption and violent crime (See for example: Fagan, 1990).  There is also much evidence that the more common alcohol serving establishments that do not offer nudity as entertainment are associated with increased crime volumes in the areas where they are located (see for example: Roncek & Bell, 1981 or Roncek & Maier, 1991).  The issue is thus more narrowly framed as: Is there empirical evidence to suggest that the presence of nudity alone (or in an alcohol serving establishment) increases the probability of criminal behavior in a way that is unique to the combination of these factors?  Thus, conforming to the protocols of empirical social science research, the null hypothesis is: There is no causal connection between the observation of nudity with or without the simultaneous consumption of alcohol that has occurred in the four establishments specified above and crime related secondary effects that result from the inclusion of nudity as part of the activities that occur in these establishments.  Put more plainly, the search here is for evidence that

inclusion of nudity into the equation influences either the type or volume of criminal behaviors that these adult cabarets might generate.

**The Research Design**

The design of criminological research conducted in natural settings depends primarily upon the nature of the causal connections being examined and the availability of data that can be used to test the null hypothesis. Here, the most parsimonious way to test the null hypothesis is to examine trends in criminal activity that occurred prior to the enactment of the ordinances specified above to the trends occurring after enactment. The assumption here is that upon compliance with these ordinances, the nudity that they were designed to prohibit was no longer a factor in the operation of these establishment. Further, one would expect that if the crime related predicates of these ordinances are accurate, their enactment should have had some measurable impact on reducing the alleged secondary effects that the public nudity is thought to have created.

Available data suggested two research approaches. The Florida Department of Law Enforcement keeps detailed data on the yearly trends of certain "Index" offenses for the State of Florida as well as for each city and county. This data is provided to them by law enforcement agencies and is know as "crimes known to police." (A more complete description of this form of crime data was given above.) Of the index crimes for which this trend data is available, the crime of rape (also referred to as sexual battery) appears to be most relevant to the sexual aggression that the observation of nude entertainment might be expected to fuel. Thus, the rape rates for Florida, unincorporated Seminole County, Casselberry, and an averaging of the other main cities in Seminole County (Altamonte Springs, Longwood, Oviedo, Sanford, Winter Springs, & Lake Mary) was

used to compare three years prior to the enactment of the above specified ordinances (1996 – 1998) with three years after enactment (1999 – 2001).  The assumption of this design was that if the ordinance predicates specifying belief in a connection between nudity in adult cabarets and sexual assault are valid, enactment should have resulted in some noticeable reduction in local rape rates.  Because the City of Casselberry has three adult cabarets located within a relatively small area, the resulting changes in rape trends there after enactment of ordinance 98-922 would be powerful evidence for testing the null hypothesis.

The second research approach incorporated the same pre/post enactment design, but used "calls for police service" data provide by the Casselberry Police Department. Although it is important to note here that a wide variety of police activity would be included in monthly averages of calls for service, these data would include reports of criminal behaviors such as prostitution, lewd and lascivious behavior, and other public disorder crimes not contained in Index "crime reported to police" data.  Further, since these data were disaggregated by "Police Patrol Zones" (See Appendix 1) and each adult cabaret in Casselberry is located in a separate zone, it was possible to examine pre/post enactment police activity volumes (pre enactment = 01.98 – 12.98 and post = 01.99 – 12.99) in relatively small subdivisions of the city.  The null hypothesis was tested by this design in that a post enactment reduction of police activity in a patrol zone containing an adult cabaret would suggest that crime related secondary effects were being were being affected.  This would further suggest that the assumed connections between nudity, nudity and alcohol consumption, and crime contained in the ordinances' predicates were essentially valid and thus the null hypothesis should be rejected.  Also, using calls for

police service, it was possible to measure trends in police activity in Zone 3B before, during, and after Rachael's adult cabaret was closed for business to determine the impact that it's closing might have on police activity levels in that zone.

**Findings**

Rape Trends

Figure 1 below displays the 1996 to 2001 annual rape rate trends for Florida, unincorporated Seminole County, the mean of Seminole County cities (excluding Casselberry) and Casselberry. The graph shows that from 1996 to 2001, Florida has experienced a steady decline in the rate of reported rapes per 100,000 persons.

**Figure 1: 1996 – 2001 Rape Rates**



Unincorporated Seminole County has also shown a general decline in rates. Interestingly, the mean rape rate for cities other than Casselberry showed a marked

decline after 1998.  On the other hand Casselberry, which should have experienced the

most dramatic decline in sexual assaults due to its concentration of adult cabarets,

showed a post enactment decrease in 1999 similar to the entire State of Florida and also

Seminole cities combined, but then experienced a strong increase in 2000 and 2001.  The

mean rape rate in Casselberry for the three-year (1996 – 1998) prior to the enactment of

the 98-922 ordinence was 30 per 100,000 residents and in the three years after enactment

(1999 – 2001) it increased to 38.

Pre-Post Enactment Police Activity

**Table 1: Casselberry Pre and Post Enactment Police Activity by Patrol Zones**

| Patrol Zone | Pre-Enactment Monthly Mean | Post-Enactment Monthly Mean | Difference | Significance Level* |
|:---:|:---:|:---:|:---:|:---:|
| 1B | 277 | 400 | +123 | 0.004 |
| 1D | 232 | 262 | +30 | 0.072 |
| 3B | 322 | 397 | +75 | 0.0038 |

Table 1 above displays the results of the Casselberry patrol zone analysis of calls

for police service.  There was a significant increase in police calls for service after the

01.99 enactment of Ordinance 98-922 in Patrol Zone 1B containing Cabaret

Internationale.  There was a non-significant (using the .05 level of significance criteria)

increase in Patrol Zone 1D containing Club Juana.  There was a significant increase in

Patrol Zone 3B containing Rachel's.

Police Activity Trends During Rachel's Closing

One adult cabaret provided a unique research design opportunity by closing for

about a year.  Although this closing occurred post enactment, the business was operating

as an adult use enterprise.  Figure 2 below graphs the monthly volume of calls for police

service for 01.00 to 03.02 in Patrol Zone 3B containing Rachael's.  It is interesting to

note that the monthly number of calls for service in 3B appear to be more-or-less

unaffected by the operation of this adult cabaret.

**Figure 2: Patrol Zone 3B Calls for Police Service**



## Conclusions

The null hypothesis that there is no causal connection between the operation of

adult cabarets and crime related secondary effects could have been confidently rejected if

the methodologies and data used in this research would have shown a post ordinance

enactment decrease in forcible rapes, a post enactment decrease in the volume of calls for

police service within the patrol zones containing such establishments, and a decrease in

the police activity in Zone 3B after the closing of Rachael's.  None of the above

conditions were satisfied and thus the null hypothesis cannot be rejected.  It is important

to note here that the data available from the Seminole County Sheriff's Office was not

aggregated in a manner that would allow for hypothesis testing in the forms used above,

but that, given the proximity and similarity of the adult cabaret Circus-Circus to the other

three establishments, there was no clear reason why the results would have significantly

varied.  Within a reasonable degree of social scientific certainty, there was no evidence

produced by this research that would allow for the conclusion that these establishments

are uniquely criminogenic in a way that would inflict adverse crime related secondary

effects on the communities in which they are located.

## References

Bryant, Paul, Linz, Daniel, and Shafer, Bradley. (2001) "Government Regulation of 'Adult Businesses' Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects," *Communications  Law and Policy 6*:355-391.

Danner, Terry A. (1998).  *Adult Use Establishments and Crime: Searching for a Causal Link.* Unpublished analysis done for *City of Warner Robbins v. Teasers, GA.*

Fagan, John (1990). Intoxication and aggression. In M. Tory & J. Wilson (Eds.), *Drugs, and crime, crime and justice: A review of research, Vol. 13* (pp. 241 – 320) Chicago, University of Chicago Press.

Fisher, Randy (2001). *Evidence for the harms of Adult Entertainment: A critical evaluation* – Reports submitted to courts in St. Johns and Broward Counties, Fl.

Fisher, Randy (2001). *Do adult businesses have adverse secondary effects?  The Tampa Record* Reports submitted to courts in Tampa, Fl.

Fisher, Randy (2001). *Do adult businesses have adverse secondary effects?  The Warner Robins Record* Reports submitted to courts in Macon, GA.

Linz, Daniel and  Bryant, Paul (2001). *Three Studies of the Secondary Effects of Adult Nightclubs in Charlotte – Mecklenburg County.*

Maxfield, M.G. and Babbie, E. (1995). *Research Methods for Criminal Justice and Criminology.* Belmont Heights, CA: Wadsworth Publishing.

Roncek, D. and Bell, R. (1981). "Bars, blocks, and crimes." *Journal of Environmental Systems*, 11(1), 35-46.

Roncek, D. and Maier, P. (1991). Bars, blocks and crime revisited: Linking the theory of routine activities to the empiricism of 'hot spots'. *Criminology*, 29(4), 725-753.

# APPENDIX 1