**Criminogenic Impact Analysis:**

**Peek-A-Boo Lounge of Bradenton**
**5412 14th Street West**
**Bradenton, FL**

**and**

**Temptations II**
**3824 U.S. 41 North**
**Palmetto, FL**

Dr. Terry A. Danner
Chair, Department of Criminology
Saint Leo University

## RESEARCH QUESTION

The research question that was posed for this study was whether or not there existed objective and quantifiable empirical evidence that suggested within a reasonable degree of social scientific certainty that two adult cabarets located in Manatee County, Florida have been criminogenic business enterprises in such a way that their operation has resulted in a significant and sustained increase in the crime volumes within the urban areas of their location. Although there has been previous research on the crime related "secondary effects" of adult businesses, these studies have been seriously flawed due to the kind of methodological errors that often result from a lack of peer review (See, for example: Danner, 1998). The present study of the Peek-A-Boo Lounge and Temptations II adult cabarets attempted to address those kinds of short comings through the use of findings and conclusions derived from the gathering and analysis of data within the framework and protocols of rigorous criminological research methodologies and this form of criminogenic impact analysis has been peer reviewed by criminologists at the Center for the Study of Law and Crime at the University of Florida in Gainesville, Florida as well as at conferences of the Academy of Criminal Justice Sciences (one of the two national-level professional associations for the disciplines of

criminology and criminal justice research).

Setting aside for present the question of methodological quality, there has also been a tendency to overgeneralize the findings of research done on specific establishments located within unique urban environments to all types of adult-use businesses located in a wide variety of urban settings. Research into the dynamics of the routine activities that affect crime volumes has suggested that diverse conditions (such as demographic trends or the ecological labeling of certain urban areas as places where more conventional norms of behavior are suspended) can have strong influences on neighborhood crime volumes. (Brantingham and Brantingham, 1981; Felson, 1998; Mazerolle, Kadleck, and Roehl; (1998)   Unlike some of the past research in this area, only these two businesses were the focus of the peer reviewed techniques for longitudinal crime trend analysis and there was no attempt to generalize the finding that emerged from this research to other related enterprises beyond the specific businesses in question.

## METHODOLOGY

Although much prior research in this area has been initiated for the purpose of providing evidence to prove preconceived assumptions that there is, in fact, a causal connection between adult-use enterprises and elevated crime volumes within their surrounding neighborhoods, this approach is inconsistent with traditional social scientific research protocols. It is a standard and accepted practice among the community of behavioral and social science researchers for all attempts to establish the validity of an assumed causal connection between two variables of interest (in this case the existence of an adult cabaret and local crime volumes) to begin with a *null hypothesis* (Maxfield and Babbie, 1995). Because many social variables appear to be connected but in fact are not, the methodology of proving causal connections between socially relevant phenomena (for example, yearly changes in the national unemployment rate and yearly changes in the national burglary rate) has been developed into a set of conservative techniques that begin by assuming no causal connection until such a linkage can be adequately proven. This approach is somewhat analogous to the "presumption of innocence" doctrine in criminal prosecution. That is, to conduct research objectively, the researcher must begin the analysis of

data by assuming that there is no actual linkage between the phenomena under consideration until clear and convincing evidence is found to allow for the rejection of the null hypothesis. Thus, the null hypotheses with which this research began were that: *1) There was no causal connection between the operation on the Peek-A-Boo Lounge adult cabaret and crime volumes in the urban area immediately surrounding it; and 2) There was no causal connection between the operation on the Temptations II adult cabaret and crime volumes in the urban area immediately surrounding it.*

The main criterion used in many previous studies to estimate the criminogenic secondary effects of adult use enterprises has been to simply measure the crime volumes in the area where the target business is located. The assumption has been that, if there are relatively high volumes of crime in the surrounding area, then the adult use enterprise was the cause. This is a fundamentally flawed approach. High crime volume areas often contain many businesses and activities that may be criminogenic and thus, the location of a target business in such an area is merely "guilt by location." On the other hand, a contrary finding should be much less likely, in that a uniquely criminogenic enterprise would surely elevate crime volumes if it operated within an otherwise low crime area. Following are the three statistical criteria that were used to produce evidence that might support the rejection of the null hypotheses stated above.

1.) **Low Macro Correlation:** If there is low correlation between the crime volume trends in the target grids and per grid averages for the larger geographical area in which target grids are nested, then this suggests that local activities are influencing crime volumes more than macro-level social and economic forces. Contrarily, if high correlations between target grids and mean per grid volumes for the larger areas are found, this would support the null hypotheses since it suggests that geographically more encompassing economic and demographic trends are the prime forces influencing crime volumes in the areas under study. For the purpose of making this comparison, annual mean per grid volumes for Manatee County were calculated. Because many of the crime reporting grids in Manatee County are primarily rural in nature, this biasing effect was reduced by computing the annual mean per grid trends for only those grids reporting greater

than 10 total crimes in 1999. These comparison means will be referred to as "Manatee County Corrected." For further comparison, annual mean crime volume per grid trends were also calculated for the more urban grid areas that reported greater than 100 total crimes in 1999. These comparison means will be referred to as "Manatee County Urban."

2.) **High Target Grid Correlation:** If there is strong correlation between the target grids that contain the two adult-use businesses under study, this would suggests evidence in support of rejecting the null hypotheses. The assumption underlying this criterion is that uniquely criminogenic enterprises would tend to have relatively similar effects on neighborhood crime trends. That is, if the activities that adult cabarets have in common do have significant secondary effects, then those affects should be generally uniform across locations.

3.) **Low Crime Location:** As described above, findings that show that both target business have been operating in high crime volume areas would, considered alone, neither support nor undermine the null hypothesis. Contrarily, it would be unusual to find a neighborhood that has for years endured a highly criminogenic business activity and still has a relatively low volume of recorded crime. A finding that either of the target grids has relatively low crime volume trends would be supportive of the null hypothesis.

A measure of covariance between annual changes in the statistical grids wherein the target enterprises are located, between both of the target grids and the Manatee County Corrected as well as Manatee County Urban average crime volume per grid trends was calculated for each of the six offense types considered. The statistic Pearson's product-moment correlation coefficient was used. For this coefficient a perfect positive correlation would be represented by a (1), a perfect negative correlation would be represented by a (-1), and no correlation at all would be represented by a (0). Positive correlation means that as one variable increases, the other also increases, and as one decreases, so does the other. Negative correlation means that as one increases, the other decreases. Zero correlation would mean that there is no detectable consistency between the way the two variables change over time. It is quite rare to have either perfect or no correlation between social variables. A correlation coefficient of .5 or greater is

considered as a high degree of correlation.   Even .2 or better can be considered a moderately

strong degree of correlation.

**Data**

For the primary purpose of assisting in the production of the Federal Bureau of

Investigation's *Uniform Crime Report* and the Florida Department of Law Enforcement's *Crime*

*in Florida Report*, the Manatee County Sheriff's Office records crime volume statistics for about

400 more-or-less uniformly sized "grids" within the county.  The data is categorized into seven

offense types: murder, rape, robbery, aggravated assault, burglary, larceny, and motor vehicle

theft. (The statistical rarity of murder within single grids warranted the exclusion of this offense

type from this analysis.)  This data was available only for the eight years of 1992 through 1999.

The Peek-A-Boo Lounge adult cabaret is located within a highly urbanized area in grid 2014

 (See Map 1 below) and the Temptations II adult cabaret is located in a significantly less

urbanized area in grid 901 (See Map 2

below).

**Map 1: Peek-A-Boo Lounge**



## Map 2: Temptations II



Any crime occurrence that comes to the attention of the Manatee County Sheriff's Office and for which there appears to be some evidence that it did, in fact, occur is recorded. The date and location of occurrence, as well as the type of crime reported is part these records, and the data thereby generated is used to make criminal justice policy and inform the public as to the extent of the crime problem in specific areas of the city. The main threat to the validity of this data is, of course, that not all crimes come to the attention of the police. Further, the proportion of crimes that are reported to the police vary by offense type. Some offenses such as motor vehicle theft have relatively high reporting level, and others such as petty larceny are much less frequently reported.

## FINDINGS

**<u>Rape</u>**

Figure 1 below displays the trends in annual rape volumes from 1992 through 1999 for grid 2014 containing the Peek-A-Boo Lounge and Grid 901 containing Temptations II. Also displayed in this graph are both the Manatee County Corrected and Manatee County Urban annual means per grid for the same time span that were calculated as benchmarks for

comparison.

As might be expected, rape volume trends for the Manatee County Urban areas tend to be consistently higher than for the Manatee County Corrected means.  Volumes in grid 2014 containing the Peek-A-Boo Lounge were generally higher than the Manatee County Urban trend and tend to vary over the eight years graphed, but are generally lower in the last five years than they were in the first three.  The trend for Grid 901 containing Temptations II was essentially isomorphic with the Manatee County Corrected means, until 1999 when there was a jump from two reported rapes in 1998 to eight in 1999.  Correlation coefficients for these trends are reported in Table 1 below.

**Figure 1: Rape**



**Table 1: Rape Trend Coefficients**

| Trends | M.C. Corrected | M.C. Urban | Peek-A-Boo | Temptation II |
|---|---|---|---|---|
| **M.C. Corrected** | | | | |
| **M.C. Urban** | .91 | | | |
| **Peek-A-Boo** | .62 | .72 | | |
| **Temptation II** | -.66 | -.53 | -.02 | |

Not surprisingly, the 1992 - 1999 annual per grid mean trends for Manatee County Corrected and Manatee County Urban were strongly correlated.  Since the relatively high urban crime volumes contribute disproportionately to the corrected county volumes, these trends would be expected to be similar in their year to year variance.  Significantly, the annual variance of rape volumes within the Peek-A-Boo Lounge grid was strongly related to both the Manatee County Urban and Corrected trends.  Annual variations within the Temptation II grid showed a strong negative correlation with the county trends.  Since the Peek-A-Boo Lounge grid was positively correlated with county trends and the Temptations II grid negatively correlated, it would be expected that there was little correlation between the two target grids.


**Robbery**

Figure 2 below displays the trends in annual robbery volumes from 1992 through 1999 for grid 2014 containing the Peek-A-Boo Lounge and Grid 901 containing Temptations II.  Also displayed in this graph are both the Manatee County Corrected and Manatee County Urban annual means per grid for the same time span that were calculated as benchmarks for comparison.

As expected, robbery volume trends for the Manatee County Urban areas tend to be consistently higher than for the Manatee County Corrected means.  Volumes in Grid 2014 containing the Peek-A-Boo Lounge were generally higher than the Manatee County Urban trend and tend to vary over the eight years graphed.  They rise from 1992 to peak at 30 in 1995 decline to 15 in 1997 and increase to 19 by 1999.  As for the offense of rape, the robbery trend for Grid 901 containing Temptations II was essentially isomorphic with the Manatee County Corrected means.  Correlation coefficients for these trends are reported in Table 2 below.

**Figure 2: Robbery** 



**Table 2: Robbery Trend Coefficients**

| Trends | M.C. Corrected | M.C. Urban | Peek-A-Boo | Temptation II |
|---|---|---|---|---|
| **M.C. Corrected** | | | | |
| **M.C. Urban** | .62 | | | |
| **Peek-A-Boo** | -.27 | -.15 | | |
| **Temptation II** | .59 | .62 | -.46 | |

Contrary to the rape trend findings described in the section above, the annual robbery volumes within the grid containing the Temptations II were correlated to county trends, whereas those within the grid containing the Peek-A-Boo lounge were not. There was also a moderate negative covariance between the robbery trends within these two target grids.

**Aggravated Assault**

Figure 3 below displays the trends in annual aggravated assault volumes from 1992 through 1999 for grid 2014 containing the Peek-A-Boo Lounge and Grid 901 containing Temptations II. Also displayed in this graph are both the Manatee County Corrected and Manatee County Urban annual means per grid for the same time span that were calculated as benchmarks for comparison. It was clear from Figure 3 that although the annual aggravated assault volumes in the grid containing the Peek-A-Boo Lounge were consistently higher than for the Manatee County Urban Grid means, those same volumes in the Temptations II grid were much lower than for the Urban Grid means and very consistent with the annual aggravated assault per grid means for the Manatee County Corrected trend. Correlation coefficients for these trends are reported in Table 3 below.

**Table 3: Aggravated Assault Trend Coefficients**

| Trends | M.C. Corrected | M.C. Urban | Peek-A-Boo | Temptation II |
|---|---|---|---|---|
| **M.C. Corrected** | | | | |

**Figure 3: Aggravated Assault**



| | | | | |
|---|---|---|---|---|
| **M.C. Urban** | .84 | | | |
| **Peek-A-Boo** | .18 | -.09 | | |
| **Temptation II** | -.02 | -.03 | -.40 | |

Table 3 revels that although the aggravated assault trends for the Manatee Corrected and Urban Trends were strongly corrected, the target grids were not correlated with either of these trends nor were they correlated with each other.  Interestingly, there was a moderate negative correlation between the two target grids meaning that their year to year variations in aggravated assault volumes tended to often be in opposite directions.

**Burglary**

Figure 4 below displays the trends in annual burglary volumes from 1992 through 1999

for grid 2014 containing the Peek-A-Boo Lounge and Grid 901 containing Temptations II.  Also displayed in this graph are both the Manatee County Corrected and Manatee County Urban annual means per grid for the same time span that were calculated as benchmarks for comparison.

Figure 4 shows that the burglary volume trends within the grid containing the Peek-A-Boo Lounge are higher than for the Manatee County Urban trend line although they are generally lower in the last six years of the available data than they were in the first two years.  As was true for other offense trends described above, the burglary trends within the grid containing Temptations II were very consistent with the burglary volume means for the Manatee County Corrected benchmark.    Correlation coefficients for these trends are reported in Table 4 below.

**Table 4: Burglary Trend Coefficients**

| Trends | M.C. Corrected | M.C. Urban | Peek-A-Boo | Temptation II |
|---|---|---|---|---|
| **M.C. Corrected** |  |  |  |  |
| **M.C. Urban** | .86 |  |  |  |

**Figure 4 Burglary**



| | | | | |
|---|---|---|---|---|
| **Peek-A-Boo** | .68 | .76 |  |  |
| **Temptation II** | -.13 | -.05 | -.12 |  |

Table 4 shows that for burglary there was a strong correlation as expected between the two benchmark trend lines.  Further, the trend line for the grid containing the Peek-A-Boo Lounge was also strongly correlated with both of these comparison trends.  The burglary volume

**Figure 5 Larceny**



trend for the grid containing the Temptation II was not well correlated with either of the comparison trends or the grid containing the Peek-A-Boo Lounge.

**<u>Larceny</u>**

Figure 5 below displays the trends in annual larceny volumes from 1992 through 1999 for grid 2014 containing the Peek-A-Boo Lounge and Grid 901 containing Temptations II.  Also

displayed in this graph are both the Manatee County Corrected and Manatee County Urban annual means per grid for the same time span that were calculated as benchmarks for comparison.

Figure 5 shows that the larceny volumes within the grid containing the Peek-A-Boo

Lounge were consistently higher than for the County Urban and Corrected trends.  The year to year volumes for the grid containing Temptations II were much lower than the County Urban trends and very consistent with the County Corrected trend line.   Correlation coefficients for these trends are reported in Table 5 below.

Table 5 reveals an interesting set of larceny trend interrelationships.  Although the correlation coefficients for the relationship between the larceny trends within the grid

**Table 5: Larceny Trend Coefficients**

| Trends | M.C. Corrected | M.C. Urban | Peek-A-Boo | Temptation II |
|---|---|---|---|---|
| **M.C. Corrected** | | | | |
| **M.C. Urban** | .86 | | | |
| **Peek-A-Boo** | -.10 | .07 | | |
| **Temptation II** | .58 | .51 | .31 | |

containing the Peek-A-Boo Lounge and the two comparison trend lines are extremely low, there was a moderate relationship between the trends for the two target grids and the grid containing the Temptations II was also moderately correlated with both the Corrected and Urban Larceny trend lines.  This statistical anomaly may be the result of the strong increase in larcenies within the Peek-A-Boo grid that occurred in 1995 and 1996 while at the same time the county volumes remained relatively stable.

**Motor Vehicle Theft**

Figure 6 below displays the trends in annual motor vehicle theft  volumes from 1992 through 1999 for grid 2014 containing the Peek-A-Boo Lounge and Grid 901 containing Temptations II.  Also displayed in this graph are both the Manatee County Corrected and Manatee County Urban annual means per grid for the same time span that were calculated as benchmarks for comparison.

Figure 6 shows that the annual volume of motor vehicle thefts in the grid containing the Peek-A-Boo Lounge were generally higher than for the County Urban trend line except in 1995

**Figure 6: Motor Vehicle Theft**



when the volume was slightly less.  This was followed by a sharp and sustained increase from 1996 to 1999.  As for other offense categories, the grid containing Temptations II closely mimicked the County Corrected motor vehicle theft trend line.   Correlation coefficients for these trends are reported in Table 6 below.

**Table 6: Motor Vehicle Theft Trend Coefficients**

| Trends | M.C. Corrected | M.C. Urban | Peek-A-Boo | Temptation II |
|---|---|---|---|---|
| **M.C. Corrected** | | | | |
| **M.C. Urban** | .54 | | | |
| **Peek-A-Boo** | -.10 | .60 | | |
| **Temptation II** | -.47 | -.50 | -.24 | |

     Table 6 reveals a moderately strong correlation between the two benchmark trend lines, as well as between the annual motor vehicle theft volume trend for the grid containing the Peek-A-Boo Lounge and its corresponding  County Urban trend.  The trend line for the Temptation II is negatively correlated with the two benchmark lines as well as with the Peek-A-Boo annual

trend.

## CONCLUSIONS

Table 7 below summarizes the findings described above in terms of the answers they produce that are relevant to the three criteria posed for gathering evidence regarding the rejection or support of the null hypotheses that the operations of the Peek-A-Boo Lounge and Temptations II are causally linked to the annual measures of reported crime volumes within the grids were they are located: 1.) Low Macro Correlation (LMC); 2.) High Target Grid Correlation (HTGC); and 3.) Low Crime Location (LCL).

**Table 7:   Null Hypothesis Evidence Summary**

| Offense | LMC | | HTGC | LCL | |
|---------|-----------|------------|------|-----------|------------|
|         | Peek-A-Boo | Temptations | | Peek-A-Boo | Temptations |
| Rape | NO | YES | NO | NO | YES |
| Robbery | YES | NO | NO | NO | YES |
| Ag. Assault | YES | YES | NO | NO | YES |
| Burglary | NO | YES | NO | NO | YES |
| Larceny | YES | NO | YES | NO | YES |
| M.V.T. | NO | YES | NO | NO | YES |

## Peek-A-Boo Lounge

As displayed in the table above, the grid containing the Peek-A-Boo Lounge experienced annual variations in reported volumes of rape, burglary, and motor vehicle theft over the eight year period analyzed here in a manner that was consistent with the annual variations of volumes for those crimes in Manatee County as a whole.  For these three crimes, this is significant evidence that the changing annual volumes are being strongly influenced by larger demographic and social forces that have a wide influence beyond the boundaries of this area.  For example, national burglary rates have been declining over that same time period, and although there is

debate as to what is causing that steady decline, it is obvious that the forces at work are of a more national rather than local scope. For these three crimes, the null hypotheses regarding the Peek-A-Boo Lounge is strongly supported. As for robbery, aggravated assault, and larceny, Table 7 indicates low macro-correlation. This means that it is possible that more local effects are influencing annual variations in the reported volumes of these three offense categories. The data used in this study was insufficient to pinpoint the source of this variance within the target grid, so that although these findings do not support the null hypothesis for the Peek-A-Boo Lounge, they do not, considered alone, provide much evidence for its rejection.

Table 7 also reveals that, with the exception of larceny, the annual variance in reported crime volumes that occur within the grid containing the Peek-A-Boo Lounge are inconsistent with annual variations that occur within the grid containing Temptations II. As described above, this suggests that the characteristics of the neighborhoods in which these two adult cabarets are located has had a stronger influence on crime volumes than does the operation of these similar enterprises. Again, the underlying assumption in this conclusion is that if a certain type of business is uniquely criminogenic, that effect should be consistently measurable across urban environments. This evidence supports the null hypotheses for both the Peek-A-Boo Lounge and Temptations II.

Finally, all the graphs above and Table 7 show that the Peek-A-Boo Lounge is definitely located in a relatively high crime area of Manatee County. As discussed above, if an enterprise is alleged to be significantly criminogenic, there should (more or less by definition) be high crime volumes in the crime reporting grid where it is located. However, it is difficult to specify the process by which the routine activities that characterize the operation of an adult cabaret would result in high levels of offending across such a wide spectrum of crime categories. This finding does not support the null hypothesis, nor does it alone provide sufficient evidence for its rejection.

## Temptations II

Table 7 suggests that the annual crime volume variance measured within the grid where

Temptations II is located was influenced my macro level forces only for the offense categories of robbery and larceny. Its less urbanized nature and relatively low crime levels would explain this incongruence in that whatever forces are influencing crime volume variance in more urbanized areas are manifesting themselves differently here. For the offenses of robbery and larceny, this finding strongly supports the null hypothesis.

As described in the conclusions regarding the Peek-A-Boo Lounge discussed above, the finding displayed in Table 7 that there was low target grid correlation for all offense types except larceny was strong evidence in support of the null hypothesis. Further, the finding that there have been relatively low volumes of reported crime in this grid over the eight years of data analyzed in this research is also strong evidence in support of the null hypothesis regarding Temptations II.

Considering the totality of the evidence generated by the analysis of the data used in this study there was, within a reasonable degree of social scientific certainty, insufficient evidence to support the rejection of the null hypothesis for either the Peek-A-Boo Lounge or Temptations II. The preponderance of the evidence relevant to the Peek-A-Boo Lounge supported the null hypothesis that there is no causal connection between its operation and annual crime volume variance in the statistical reporting grid wherein it is located. The evidence supporting the null hypothesis for Temptations II was overwhelming. It strongly supported the null hypothesis that there is no causal connection between its operation and annual crime volume variance in the statistical reporting grid wherein it is located.

<u>References</u>

Danner, Terry A. (1998). *Adult Use Establishments and Crime: Searching for a Causal Link.* Unpublished analysis done for *City of Warner Robbins v. Teasers, GA.*

Brantingham, P.J. and Brantingham, P.L. (1981) "Mobility, Notoriety, and Crime: A Study in the

Crime Patterns of Urban Nodal Points." *Journal of Environmental Systems,* 11(1): 89-99.

Felson, Marcus (1998). *Crime in Everyday Life. Second Edition.* Thousand Oaks, CA: Pine Forge Press.

Maxfield, M.G. and Babbie, E. (1995). *Research Methods for Criminal Justice and Criminology.*. Belmont Heights, CA: Wadsworth Publishing.

Mazerolle, L.G., Kadleck, C. and Roehl, J. (1998). "Controlling Drug and disorder Problems: The Role of Place Managers. *Criminology, 36(2)* 371-401.

# Criminogenic Impact Analysis

## Peek-A-Boo Lounge of Bradenton
## 5412 14th Street West
## Bradenton, FL

## and

## Temptations II
## 3824 U.S. 41 North

**Palmetto, FL**


**Dr. Terry A. Danner**

_____

**Chair, Department of Criminology**
**Saint Leo University**


**12/08/00**