1

1        UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF KENTUCKY
2             LOUISVILLE DIVISION

3

   KENTUCKY RESTAURANT CONCEPTS, )  Case No. 3:01-CV-374-H
4  INC., et al.,                 )
                                 )
5            Plaintiffs,         )
                                 )
6  VS.                           )
                                 )
7  CITY OF LOUISVILLE, et al.,   )
                                 )  November 13, 2001
8            Defendants.         )  Louisville, Kentucky

9

10        ********************************************

              VOLUME 1
11    TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
         BEFORE HONORABLE JOHN G. HEYBURN II
12            UNITED STATES DISTRICT JUDGE

13        ********************************************

14

   APPEARANCES:
15
   For Plaintiffs:        Bradley J. Shafer
16                         Shafer & Associates
                           3800 Capital City Blvd., Suite 2
17                         Lansing, MI 48906

18                         Allan S. Rubin
                           Rubin & Rubin
19                         24460 Telegraph Road
                           Southfield, MI 48037
20

21

22

                      Alan W. Wernecke, RMR, CRR
23                        Official Court Reporter
                        221 U.S. Courthouse
24                       Louisville, KY 40202
   Proceedings recorded by mechanical stenography, transcript
25 produced by computer.

1      MR. SHAFER:  Your Honor, if I could have just a

2   moment with --

3      THE COURT:  Yes.

4      MR. SHAFER:  Your Honor, at this point I would just

5   like to stop with Mr. Schreck, and I would like Mr. Rubin to

6   put Ms. Thomas on so we can get her on and off.  Then I'll

7   get back to Mr. Schreck.

8      THE COURT:  All right.

9      MR. RUBIN:  Good afternoon, Your Honor.  I call

10  Rebekah Thomas to the stand.

11      (REBEKAH THOMAS, called by plaintiffs, sworn.)

12  DIRECT EXAMINATION

13  BY MR. RUBIN:

14  Q.  Good afternoon, Your Honor.  Good afternoon, Miss Thomas.

15  How are you?

16  A.  Good.

17  Q.  Miss Thomas, I understand that you are a doctor?

18  A.  Yes, that's correct.

19  Q.  Could you tell the Court what you are a doctor in?

20  A.  I have a Ph.D. in physiology.

21  Q.  And at my request did you bring with you a copy of your

22  curriculum vitae?

23  A.  That is correct.

24      MR. RUBIN:  Counsel, I provided this to you

25  previously.

1    BY MR. RUBIN:

2    Q.  I'm going to show you what I have marked as Exhibit

3    Number 8, which is a copy of your curriculum vitae.  Can you

4    take a look at that?  Is what I have handed you as Exhibit 8

5    a true and accurate copy of your curriculum vitae?

6    A.  Yes, it is.

7    Q.  Does that contain your education and training in the

8    field of physiology as well as its subcategories?

9    A.  It contains a summary of the major part of my education.

10   It doesn't go into any specific details necessarily.

11   Q.  And can you tell the Court a little bit about your

12   education, your background and your experience in general?

13   A.  Okay.  I received a Ph.D. in physiology in 1995 from the

14   University of Texas Health Science Center at San Antonio.  In

15   obtaining that degree, it required me to do two years of

16   course work in which I was generally trained as a

17   physiologist, and physiology is the study of functions of

18   living organisms, and specifically I focused on human

19   physiology.  Physiology is a systems science, so we study

20   systems like the cardiovascular system, the nervous system,

21   the immune system, the respiratory system, musculoskeletal

22   system, et cetera, all systems of living organisms.

23   Q.  Does that include the study of immunology?

24   A.  That is correct.

25   Q.  Can you tell the Court what immunology is?

74

1    A.  Immunology is simply the study of the immune system.

2    Q.  Okay.  And do you deal with that topic as part of your

3    education and training?

4    A.  That's correct.  I'm specifically trained as a cell

5    physiologist.  That focuses specifically on individual cells,

6    the structure of those cells, the functions of each part of

7    the structure of those cells, how things get in and out of

8    cells, how the cells do what they are required to do, and

9    that would include immune cells and how they operate to

10   identify diseases, potential diseases, fight off those

11   diseases, et cetera.

12   Q.  Are you employed?

13   A.  I am.

14   Q.  Where are you employed at?

15   A.  I'm employed at Saint Leo University.

16   Q.  Now, are you familiar with adult entertainment

17   establishments known typically as cabarets?

18   A.  I am.

19   Q.  How did you become aware of that?

20   A.  I have been asked to look into secondary effects

21   specifically involving disease transmission in adult use

22   establishments in the State of Florida.

23           MR. RUBIN:  May I approach, Your Honor?

24           THE COURT:  Yes.

25   BY MR. SHAFER:

1   Q.  I'm going to show you what I have had marked as Exhibit

2   Number 9, which is a copy of a report.  I would ask you to

3   identify it, please.

4   A.  This is a report of a study that I did in Pinellas

5   County, Florida, involving six adult use establishments known

6   as cabarets and the transmission of disease in those

7   establishments.

8   Q.  Is that true and accurate copy of that report?

9   A.  So far.  Yes, it is.

10  Q.  And let me just ask you this.  Do you have an opinion as

11  to whether or not the entertainment contained in adult

12  cabarets can cause either sexually transmitted diseases or

13  other diseases?

14  A.  In general, my observations have shown that there are no

15  specific risk behaviors exhibited at adult entertainment

16  cabarets that would put them in the category of risk for

17  transmission of disease.

18  Q.  Can you explain to the Court how it is that you came to

19  those opinions?

20  A.  Well, the first approach that I took was to contact the

21  Centers for Disease Control and Prevention and to see what

22  evidence they had gained as to the kinds of activities going

23  on in adult entertainment establishments and to see if they

24  had done studies or published studies about risks and

25  occupations of people who are involved in adult

1    entertainment.

2    Q.  And what is it that you found from the Centers for

3    Disease Control?

4    A.  I found absolutely nothing at first.  There was no

5    literature available from the Centers for Disease Control or

6    any of their subsidiaries, specific centers.  For example,

7    the Center for HIV, STD and TB prevention had no literature.

8    The American Social Health Association had no literature.

9    But I was advised to make a phone call to the reference

10   librarian at the CDC, and we had a conversation on the phone.

11   I identified specifically what I was looking for and then in

12   a more broad sense, and we did finally identify two studies

13   done that showed some correlation, albeit scant, between

14   adult entertainment and disease, but there was no evidence of

15   the dancing per se causing the transmission of disease.

16   Q.  And in reviewing that literature, what did you find?

17   A.  I found that the idea of exotic dancing or erotic dancing

18   to not be associated with any specific risk factors for the

19   transmission of disease beyond any other kind of activities

20   that would go on in nightclubs or bars or restaurants or

21   anything of that sort.

22   Q.  For example, you are sitting next to a court reporter,

23   correct?

24   A.  That's correct.

25   Q.  Is the health hazard any greater in an adult cabaret from

1  what you have observed than it is sitting next to the court

2  reporter here today?

3  A.  I would say no.

4  Q.  And can you explain to the Court why that is?

5  A.  Disease transmission has to involve specific parts of the

6  body in specific manners.  For example, most sexually

7  transmitted disease and a lot of other diseases in general

8  have to be introduced into the body in the right place at the

9  right time, and specifically we are talking about mucosal

10  membranes.  Those are membranes that line the nasal passage,

11  mouth, throat, respiratory passage, entire digestive tract,

12  reproductive tract, those parts of the body.

13  Q.  In your understanding of nude or semi-nude dance

14  activity, do those activities involve any of the risk

15  behaviors for transfer of that activity?

16  A.  Well --

17        MR. BROWN:  I object to the leading, Judge.

18        MR. RUBIN:  Let me see if I can rephrase it.

19        THE COURT:  That's okay.

20  A.  The risk behaviors identified by Centers for Disease

21  Control in terms of transmission of sexually transmitted

22  diseases include sexual intercourse, whether that be vaginal,

23  anal or oral.  It involves injected drug use.  It involves

24  taking blood, semen or vaginal secretions into the body.  It

25  involves direct contact with genital to genital, genital to

1    anal, genital to mouth contact with skin surrounding any of

2    those areas would involve transmission of disease.

3    Q.  And have you actually gone out to the adult cabarets here

4    in town and observed the types of activities that go on?

5    A.  I've gone to three cabarets in this city and observed.

6    Q.  Which three are those?

7    A.  I went to Deja Vu, PT's and the Godfather.

8    Q.  And did you observe any risk behaviors at any of those

9    cabarets?

10   A.  I did not observe any risk behaviors.

11   Q.  Now, just because somebody is at a cabaret, does that in

12   any way increase their likelihood -- and I want you to assume

13   that somebody is dancing very close to somebody else -- does

14   that fact increase the risk behavior at all for sexually

15   transmitted disease as long as the patron is clothed?

16   A.  No, it does not.

17   Q.  And why is that?

18   A.  There has to be again, as I said, direct contact between

19   either mucosal membranes, which would involve something like

20   sexual intercourse, or there would have to be some sort of

21   genital to genital contact or contact of the skin immediately

22   surrounding the genitals or the anal area or the mouth.  I

23   did not see any of those activities taking place.

24   Q.  And absent that activity, disease transmission, certainly

25   sexually transmitted diseases, can it occur?

1    A.   It's extremely unlikely.

2    Q.   Now, you said that you conducted what you described as a

3    literature search?

4    A.   That's correct.

5    Q.   And you found nothing, correct?

6    A.   That's correct.  Except for those two papers that

7    could not correlate disease transmission with exotic

8    dancing.

9    Q.   Okay.  Now, is that something you normally do when you

10   research this kind of field?

11   A.   Yes, it is.  That's where you first start out, looking

12   for what's in the literature, what's been published.

13   Q.   You contacted the Centers for Disease Control and

14   Prevention?

15   A.   That's correct.

16   Q.   And they weren't able to provide you with any

17   information?

18   A.   That's correct.

19   Q.   And you observed -- you went out and actually observed

20   this activity?

21   A.   I went to seven cabaret clubs in Pinellas County to see

22   if I could see any risk behaviors being exhibited either by

23   entertainers, patrons or other employees of the

24   establishments.

25   Q.   And you were unable to observe any there?

1    A.   I was not able to observe any of those risk behav

2    there.

3    Q.   You did the same thing here in Louisville?

4    A.   That's correct.

5    Q.   And you weren't able to observe any risk behaviors

6    here?

7    A.   That's correct.

8    Q.   And did you ever contact anybody else to see if there was

9    any information relative to the transmission of diseases as

10   it relates to exotic dancing?

11   A.   I specifically contacted the CDC after conducting my

12   literature search and finding nothing to ask a specific

13   question, and I asked them if it was their opinion that

14   exotic dancing was in fact a risk behavior for the

15   transmission of disease.  I specifically asked them about

16   what is commonly called a lap dance, whether there's physical

17   contact between the dancer and the patron, and --

18   Q.   The -- I'm sorry.  Go ahead.  Finish your answer.

19   A.   The CDC referred me back to the American Social Health

20   Association, and they came back with a response.  I guess if

21   you would like, I could actually quote what their response

22   was.  This is found in my report submitted into evidence.

23   Q.   Certainly.

24   A.   It says, "A person cannot become infected with STD

25   through a lap dance.  There have been no cases of STD

1    transmission through lap dancing and a fully-clothed person."

2    That particular lap dance had to do -- my question was when

3    the dancer was completely nude.

4    Q.   When the dancer is completely nude?

5    A.   Yes.  And they said there was no risk of disease

6    transmission.

7    Q.   Is the Centers for Disease Control and the organization

8    they referred you to typical of the types of organizations

9    professionals in the health care profession rely upon?

10   A.   In terms of disease transmission, they are the

11   organization to turn to.  It is their responsibility.  They

12   are a Government organization, and it is their responsibility

13   to involve people in research and studying diseases, how they

14   are transmitted, and more recently how to prevent the

15   transmission of those diseases.

16   Q.   So would it be fair to say that it's your opinion that

17   close personal proximity dances closer than say perhaps three

18   feet, as long as the patron is clothed and there's none of

19   these risk behaviors that you have identified, represents no

20   more risk of disease than sitting in the courtroom next to

21   the court reporter essentially?

22   A.   I would essentially agree with that, yes.

23          MR. RUBIN:  Thank you, Your Honor.  I'll pass the

24   witness.

25          THE COURT:  Let me ask a question before you ask.

1    Where is the provision in the old ordinance which prohibits

2    sexual -- well, that is the prohibitive language of the

3    statute that prohibits dancers from doing certain things?

4             MR. RUBIN:  Your Honor, there is none in the old

5    statute.

6             THE COURT:  Okay.

7             MR. SHAFER:  Your Honor, the enforcement, I think

8    Mr. Schreck will confirm this, I don't remember the number,

9    but there's a KAR that they utilize in certain Kentucky

10   statutes.

11            MR. MCCLURE:  111.053.  KAR, Kentucky

12   Administrative Regulations.

13            THE COURT:  And -- say that again.

14            MR. MCCLURE:  KAR 111.053.

15            THE COURT:  Must be something else in front of the

16   KAR.

17            MR. KING:  That's not correct, Your Honor.

18            MR. SCHRECK:  804 KAR 5 --

19            THE COURT:  804 KAR what ?

20            MR. SCHRECK:  5:060.

21            MR. MCCLURE:  My fault.  I quoted you the old

22   ordinance.

23            THE COURT:  Just so I can understand, so the old

24   ordinance other than -- is there anyplace where it prohibits

25   sexual activities?  Other than saying if you are licensed as

1    a cabaret and if you are licensed as an adult cabaret, then

2    you have to be clothed in certain ways, is there any other

3    prohibitive language in the ordinance?

4          MR. SHAFER:  Well, first of all, I don't think

5    that --

6          MR. RUBIN:  Yes, Your Honor.  The answer would be

7    yes.  It would be under the description of sexual activities

8    in the definitional section.

9          THE COURT:  I see that.

10          MR. RUBIN:  Then as it's carried over into --

11          THE COURT:  That's what I was looking for.

12          MR. SHAFER:  Your Honor, although it's got my

13    handwriting on it or just my underlining and notes, I do have

14    that KAR.

15          THE COURT:  Can I see it?  I saw the definition of

16    sexual activities.  As I was looking through it, I couldn't

17    find out --

18          MR. SHAFER:  Your Honor, I actually have a clean

19    one that doesn't have my underlining.  There you go.

20          MR. RUBIN:  I'm not quickly finding it either.  I

21    may have misspoken.

22          THE COURT:  Do you know the answer to that?

23          MR. BROWN:  To which one, Judge?

24          THE COURT:  To the question of where or if there is

25    prohibitive language in the ordinance that says -- I know in

1    order to be licensed, you got to wear certain things or can't

2    wear certain things, but --

3              MR. BROWN:  You must wear at least certain things.

4              THE COURT:  Yeah, but other than that, is there any

5    language which says you can't --

6              MR. SHAFER:  Your Honor, as an officer of the

7    court, I've read this thing backwards and forwards 20 times,

8    if not more, and I don't think there's anything in there.

9    It's really the criminal statutes and the KAR.  I think

10   Mr. Schreck could testify as to what they have used in the

11   past.  I think he did answer a question that I did ask him

12   about the KAR's, what they have used in the past to enforce

13   various laws in regard to what they perceive to be illegality

14   on the premises.

15             THE COURT:  So that -- I know we are going a little

16   bit out of order here, but if I could just ask Mr. Schreck or

17   his counsel.  I'm just trying to understand this.  In terms

18   of enforcement of the activity that is going on in a licensed

19   adult facility, is it this statute that you are enforcing,

20   this KAR that you are enforcing?

21             MR. SCHRECK:  That is the one provision regarding

22   the activity itself other than other state laws like

23   prostitution.

24             THE COURT:  Sure.  What is this -- so what you are

25   enforcing is whether there is lewd, immoral or obscene

1  entertainment going on?

2      MR. SCHRECK:  As well as the state of dress.

3      THE COURT:  Right.  As well as the state of dress.

4  But not limited to public display or actual simulated sex

5  acts, fondling, touching, et cetera.  Okay.  So if I

6  understand your testimony, it was that, and correct me if

7  I'm wrong, you were having difficulty enforcing this

8  provision?

9      MR. SCHRECK:  As the activities at these places

10  have changed, it became more and more difficult to do so.

11      THE COURT:  Okay.  If I could ask, I don't mean to

12  interrupt this witness, but why was that?

13      MR. SCHRECK:  Well, the distance between the

14  entertainers and the patrons, the distance between the

15  entertainers and the entertainers and the patrons kept

16  getting smaller and smaller?

17      THE COURT:  So you were having difficulty

18  determining whether there was fondling or touching going

19  on?

20      MR. SCHRECK:  Yes.

21      THE COURT:  Okay.  So that's the part of it, you

22  were having difficulty?

23      MR. SCHRECK:  And the fact that there's not that

24  many law enforcement folks out there that do this, and we

25  were very quickly recognized.  By the time they flick the

1  switch or do whatever else and notify these entertainers

2  that they had a tendency to be able to get away a little

3  quicker.

           THE COURT:  What?

           MR. SCHRECK:  To change their behavior.

           THE COURT:  Okay.  Go ahead.  You are finished with

7  her?

           MR. RUBIN:  I pass the witness.

9  CROSS EXAMINATION

10 BY MR. BROWN:

11 Q.  Dr. Thomas, just to be clear, you are not a medical

12 doctor?

13 A.  I'm not a medical doctor, that's correct.

14 Q.  Where is Pinellas County, Florida?  I'm not familiar with

15 it.

16 A.  It's south of Tampa Bay kind of -- is it south or north,

17 but it's right around the Tampa Bay area.  It's a county --

18 Tampa Bay is in Hillsborough County.  That neighbors Pinellas

19 County.

20 Q.  My next question would be where is Saint Leo, Florida?

21 A.  Saint Leo, Florida, is just north of Tampa Bay, about 20

22 miles north and east.

23 Q.  Is it also in Pinellas County?

24 A.  No.  It is in Pasco County.

25 Q.  All right.  With regard to your curriculum vitae, had you

1    done any particular studies or reports concerning adult

2    entertainment uses prior to the one that's been introduced

3    here today?

4    A.  No, I had not.

5    Q.  So the report that's been submitted to the Court today

6    is your first report vis-a-vis an adult entertainment use?

7    A.  That is correct.

8    Q.  And with regard to that report, who asked you to prepare

9    this report?

10   A.  I did that report in response to a question about whether

11   or not there were disease transmissions, secondary effects

12   going on in those Pinellas County cabarets.  I was asked to

13   do that by the attorney that was defending those clients in,

14   not a lawsuit, but in a hearing considering the

15   constitutionality of the three-foot ordinance that's present

16   in Pinellas County.

17   Q.  All right.  Were you paid for this report?

18   A.  Yes, sir.

19   Q.  Now, did you testify in that proceeding?

20   A.  Yes, I did.

21   Q.  And when was that?

22   A.  It was earlier this year.  The exact month escapes me.

23   If I had my calendar with me, I could probably look back and

24   say.  I want to say April or May, sometime around then.

25   Q.  Could you tell me what court it was in?

1    A.   Pinellas County.

2    Q.   Is it your understanding it was a state court?

3    A.   I believe it was a county court.  It could have been a

4    district court.

5    Q.   But you did actually testify in that proceeding?

6    A.   Yes, sir.

7    Q.   All right.  Now, in the study that you have presented to

8    the Court and presented to us, why don't you describe -- I

9    know you have a section here listed "methods."

10   A.   Yes.

11   Q.   For lay purposes, tell me what you did as a basis of your

12   study to reach a conclusion.

13   A.   I wanted to go anonymous.  I had -- previous to my doing

14   this study, I had never personally met any of the club

15   owners.  I was not known to them.  They were not known to me.

16   I wanted to go into these clubs anonymously, them not knowing

17   who I was or why I was there, and just observe normal

18   behavior.  So I took a male companion with me, a friend of

19   mine, and we went to the various clubs as patrons, observing

20   the dancers sitting as patrons in these clubs and observing

21   both dances on stage, employees milling about the clubs, and

22   in some instances even what they call private dances.

23   Q.   Now, did this same companion accompany you to each of the

24   I believe it was seven clubs you visited?

25   A.   Yes, sir, he did.

89

1   Q.  Did you stay together during the time you were in the

2   clubs?

3   A.  Stay together?

4   Q.  Did you sit together?

5   A.  Yes, we did.

6   Q.  So you would have been viewed as a couple?

7   A.  Yes.

8   Q.  Did you order any lap or private dances?

9   A.  My male companion did, yes.

10  Q.  Then you separated, or you stayed with him?

11  A.  He separated at that point, but I was in a position where

12  I could observe what was going on.

13  Q.  All right.  Was it critical to you in making your

14  conclusion that you were in a position to observe what was

15  going on?

16  A.  It was critical to me only as a casual observer, not to

17  influence in any way the outcome of the private dance.

18  Q.  I understand that.  But in order to make the

19  determination that there wasn't any type of sexual activity

20  or touching going on, wouldn't it be critical for you to be

21  able to observe that?

22  A.  I was observing that.  I not only observed that with my

23  male companion, but I observed other private dances with

24  people who were unknown to me.

25  Q.  When did you visit the clubs that are located here in

90

1  Louisville?

2  A.  Last night.

3  Q.  And tell me the circumstances under which you visited

4  those clubs.

5  A.  I went with two other people to those clubs.

6  Q.  Who were those people?

7  A.  Daniel Linz.  Your name escapes me.

8        MR. MCCLURE:  Bob McClure.

9  BY MR. BROWN:

10  Q.  That was last night?

11  A.  That's correct.

12  Q.  Did you stay with them during the period of time that you

13  were in the club?

14  A.  Yes.

15  Q.  And I believe you already testified that you didn't

16  observe any --

17  A.  Risk behaviors, that's right.

18  Q.  Pardon me?

19  A.  I did not observe any risk behaviors for transmission of

20  disease.

21  Q.  At the clubs last night?

22  A.  That's correct.

23  Q.  Have you ever been to any of the adult entertainment

24  clubs in Louisville before?

25  A.  No.

1          MR. BROWN:  I don't believe I have any other

2     questions for you, Dr. Thomas.  Thank you.

3          MR. RUBIN:  Just a minute on redirect.

4     REDIRECT EXAMINATION

5     BY MR. RUBIN:

6     Q.  When you were at the clubs either last night or at the

7     ones in Florida, did you have any problem observing how close

8     the dancers were, for example, to the patrons?

9     A.  No.

10    Q.  Would you have been able to determine whether or not

11    there was contact going on or not just from your own casual

12    observations?

13    A.  In some cases, no.

14    Q.  In other cases?

15    A.  It just depends on where I was in reference to how many

16    dancers there were and how many stages there were in the

17    club.  But at any given point in time, I could have easily

18    observed any of the stages or dancers.

19    Q.  Okay.  Now, why did you think it was important to go to

20    the clubs?

21    A.  Well, in the absence of substantial literature, obviously

22    the CDC does not see this as a significant risk behavior, and

23    so I just wanted to go see for myself if that indeed was --

24    it was just pure scientific curiosity.

25    Q.  As I understand it, you conducted a literature search,

92

1    found no risk factors, and no literature in the medical

2    community that would indicate there was any public health

3    concerns with exotic dancing, the spread of disease, period,

4    correct?

5    A.   That's correct.

6    Q.   You had training and education on the spread of disease?

7    A.   That's correct.

8    Q.   And you went and used both what you learned from the CDC,

9    your training and education, and you observed actual

10   activity, correct?

11   A.   That's correct.

12   Q.   And you reached the same conclusion no matter how you

13   came out to it that no matter how you look at it, this

14   activity is not a public health concern, correct?

15   A.   That's correct.

16   Q.   And that we have the same public health concern sitting

17   here in the courtroom as that activity represents in

18   actuality, correct?

19   A.   That's correct.

20              MR. RUBIN:   Thank you.   Nothing further.

21              THE COURT:   All right.   Thank you.

22              MR. SHAFER:   You want to knock off?

23              THE COURT:   How are we doing?   It would be helpful

24   for me to be able to knock off.   If it was something --

25              MR. SHAFER:   The only thing I would ask, Your

1    Honor, is if we could get the corporate addendum by tomorrow

2    morning and the back side for that cabaret application, that

3    would help.

4            MR. KING:  That's no problem.  We will have that.

5            THE COURT:  Let's see.  We will start tomorrow at

6    9:30.  I think -- we might go through part of lunch,

7    depending on how long all this is going to take.  We do have

8    a naturalization tomorrow that will be in the other courtroom

9    that I have to do.  How long do you think this whole thing is

10   going to take, the full three days, two and a half days?

11           MR. SHAFER:  Sometime maybe Thursday afternoon.  I

12   don't know that we will go to 5 on Thursday.

13           THE COURT:  That you will be finished?

14           MR. SHAFER:  Well, my guess is they will put their

15   case on when they examine Mr. Schreck up there.  He's their

16   listed witness.

17           THE COURT:  Okay.  Sounds fine.  9:30 tomorrow

18   then.  Thank you very much.

19       (Proceedings adjourned for the day.)

20                C E R T I F I C A T E

21       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

22   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23

24   _____        November 19, 2001
     ALAN W. WERNECKE, RMR, CRR     DATE
25   Official Court Reporter