subjects graduated from high school and 55% had attended college. The majority of subjects had an annual income of more than $20,000, although 30% indicated a yearly income under $20,000. Over half of the persons in the sample considered themselves to be politically "liberal" to "very liberal" and 30% identified themselves as politically "conservative" to "very conservative." Seventy percent of the sample said they were "somewhat" to "very" religious, and 70% reported being either divorced or never married.

No subject reported having a business or personal relationship with anyone who works in this particular Deja Vu club or any Deja Vu club throughout the country. Only one subject reported having a business or personal relationship with someone in the exotic dance industry, but outside of Deja Vu. Only 15% of the subjects indicated that they had been to this particular exotic dance club before; the mean number of visits was 2. Eighty percent of the participants indicated that they have frequented other exotic dance clubs in the past; the mean number of prior visits to other clubs was 22.5. This mean was influenced by two respondents who reported having visited other clubs approximately 100 times. No subject reported being employed in any type of law enforcement occupation.

### Dependent Variables

*Erotic Communication.* The eight Erotic Communication items were summed to form composite scales for each subject (Cronbach's alpha = .90). The items were scored according to an "agree–disagree" response scale where 1 = strongly agree and 8 = strongly disagree. The means for both levels of nudity are displayed in Table 1. A $t$ test for paired samples revealed a significant difference between the nude and nonnude conditions on Erotic Communication, $t(23) = -2.05, p = .051, r = .40$. The direction of means indicate that patrons in the nude condition are more likely to be receiving an erotic message than patrons in the nonnude condition.

*Relational Communication.* The six Relational Communication questionnaire items were summed to form composite measures for each subject (Cronbach's alpha = .92). As on the Erotic Communication scale, a lower score on this composite scale represents more agreement. As can be seen in Table 1, Relational Communication scores in the nude condition are lower than those of the nonnude condition, $t(23) = -2.20, p = .038, r = .42$, with respondents indicating greater reception of relational communication messages.

*Social Messages.* The three social message variables were summed to form a composite measure (Cronbach's alpha = .67) in the same manner as the Relational Communication and Erotic Communication scales. An ANOVA performed on the scale variable revealed significantly lower scores (representing more agreement) for the nude condition, $F(1, 19) = 4.5, p = .047$. The mean responses to the individual social message items are also displayed in Table 1. Analysis of the responses to the individual items revealed that respondents reported significantly stronger agreement with the statement that the dancer "was free to do what she wanted to with her body," $t(23) = -2.23, p = .036, r = .43$, and the statement that "women are free to express themselves as freely as men," $t(23) = -2.07, p = .050, r = .40$, when they viewed the dancers in the nude condition.

*Affect.* The responses to the affect items were scored according to the same "agree–disagree" response scale that was used in other portions of the questionnaire. A lower score on this scale indicates participant agreement with the adjective. The means for these dependent measures are displayed in Table 1. The means show that nudity did not alter the subjects' reports of happiness or annoyance. However, subjects did report feeling more anxious in the nude dance condition, $t(23) = 2.44, p = .023, r = 46$.

Dancer attractiveness and level of entertainment were treated as covariates in the analyses. In no case were these variables significantly related to the dependent variables.

**Table 1.** Study 1: Mean Responses to Dances by Nudity

| | Dancer nudity | |
|---|---|---|
| Response | Nonnude | Nude |
| Erotic Communication | 31.25$_a$ | 26.54$_b$ |
| Relational Communication | 32.54$_a$ | 28.42$_b$ |
| Affect adjectives | | |
| "Annoyed" | 6.79$_a$ | 7.21$_a$ |
| "Anxious" | 5.83$_a$ | 5.04$_b$ |
| "Happy" | 3.50$_a$ | 3.04$_a$ |
| Social Messages | | |
| "Women can express themselves as freely as men" | 4.25$_a$ | 3.67$_b$ |
| "The dancer was free to wo what she wanted with her body." | 3.63$_a$ | 2.96$_b$ |
| "The female body is beautiful." | 1.96$_a$ | 1.71$_a$ |

*Note*: The minimum value of the Erotic Communication scale is 8, the maximum is 64. The minimum value of the Relational Communication scale is 6, the maximum is 48. Lower numbers indicate higher agreement with the evaluative statement. Means in the same row that do not share subscripts differ at $p < .05$ in the $t$ test for paired samples.

## STUDY 2

### Method

*Subjects*

Thirty-three male patrons of the Little Darlings dance club of Las Vegas, Nevada, were recruited for participation in the study.

*Design*

A 3 × 2 mixed, within-subjects and between-subjects factorial design was employed. In contrast to Study 1, in which nudity was treated as a within-subjects or repeated measures variable, nudity was treated as a between-subjects variable in the present study. The within-subjects variable in the present study was distance from patron. Each patron viewed dances either from a distance of (a) 4 feet, (b) 6 in., and (c) 6 in. with a brief touch from dancer.

*Materials*

As in Study 1, respondents were first asked to read and sign a consent form. When they finished, they completed a pre-dance questionnaire which included demographic questions, as well as a question on their prior visits to exotic dance clubs.

*Post-Dance Questionnaire.* After viewing the dances, the patrons completed the questionnaire assessing Relational Communication and Erotic Communication, and temporary affect states. The scales are identical to those reported in Study 1. The Social Message questions were omitted in Study 2. We dropped these items for two reasons. This study was primarily designed to assess the effects of the distance manipulations and no hypotheses were advanced for the Social Message dependent variables. In addition, elimination of the scale allowed participants to complete the questionnaire more quickly.

*Procedure*

The study was also conducted at the Little Darlings dance club, Las Vegas, Nevada. As in Study 1, all patrons visiting the club in the afternoon and early evening during August 19–23, 1995, were approached and recruited to visit a separate room to watch several dances. Instructions to patrons were modified to inform patrons that they would be asked to watch three rather than two dances.

As in Study 1, the eight dancers, all of whom were trained for this study by a professional choreographer, performed 3-min routines. Exactly the same routine was performed as in Study 1 with the following exceptions: In the present study, the patrons viewed performances at a 4-foot distance, a 6-in. distance, and a 6-in. distance with touch. In the 6-in./touch condition, the dancer briefly touched the man on the shoulders and with one long stroke down the arms. In the other distance conditions, she omitted this move.

To avoid confusion among the dancers, each dancer was asked to perform a three-dance sequence. A sequence was defined as an individual performance for each of the three patrons seated in separate alcoves. The dancer in a given sequence would perform (e.g., 6-in. distance) for one patron and then move to the next patron and perform the same dance (also 6-in. distance). The dance sequences were performed in a random order to control for order effects. Each subject saw three dances, one at each condition, each performed by a different dancer.

The between-subjects variable, nudity, was randomly altered in 2-hr blocks throughout the day.

After viewing dances, the patrons completed a questionnaire which included individual photographs of the dancers who had performed for them. Patrons were instructed to complete the questionnaire answering an identical series of questions for each dancer/dance separately.

**Results**

*Patron Demographic Profile*

Subjects ranged in age from 19 to 65 years with a mean of 35 years. The sample included 21 men who described themselves as "Caucasian," 4 who indicated they were "African American," 4 "Hispanic," and 3 "Asian." Ninety-nine percent of the subjects graduated from high school and 87% had attended college. Eighty-five percent of subjects reported an annual income of more than $30,000. Forty-nine percent of the persons in the sample considered themselves to be politically "liberal" to "very liberal" and 45% identified themselves as politically "conservative" to "very conservative." Sixty-one percent of the sample said they were "somewhat" to "very" religious and 54% reported being either divorced or never married. Fifty-three percent of the subjects said that they had never been to this particular exotic dance club, although 85% said that in the past they had frequented other exotic dance clubs.

*Dependent Variables*

In each analysis, the scales were subjected to a 2 × 3 ANOVA with proximity as the within-subject factor and nudity as a between-subject factor. Means for all dependent measures are reported for the nudity manipulation in Table 2 and proximity manipulation in Table 3.

Table 2. Study 2: Mean Responses to Dances by Nudity

| Response | Nudity | |
|---|---|---|
| | Nonnude | Nude |
| Erotic Communication | 37.17$_b$ | 26.37$_a$ |
| Relational Communication | 37.04$_b$ | 30.86$_a$ |
| Affect adjectives | | |
|   "Annoyed" | 6.44$_a$ | 7.04$_a$ |
|   "Anxious" | 6.29$_a$ | 5.65$_a$ |
|   "Happy" | 4.33$_b$ | 3.02$_a$ |

*Note*: The minimum value of the Erotic Communication scale is 8, the maximum is 64. The minimum value of the Relational Communication scale is 6, the maximum is 48. Lower numbers indicate higher agreement with the evaluative statement. Means in the same row that do not share subscripts differ at $p < .05$ in the $t$ test for paired samples.

Table 3. Study 2: Mean Responses to Dances by Proximity

| Response | Dancer–Patron proximity | | |
|---|---|---|---|
| | 6 in. w/touch | 6 in. | 4 feet |
| Erotic Communication | 25.6$_a$ | 32.6$_b$ | 36.6$_b$ |
| Relational Communication | 28.4$_a$ | 34.6$_b$ | 38.6$_c$ |
| Affect adjectives | | | |
|   "Annoyed" | 7.34$_a$ | 6.64$_b$ | 6.24$_b$ |
|   "Anxious" | 5.56$_a$ | 6.09$_a$ | 6.19$_a$ |
|   "Happy" | 2.73$_a$ | 3.82$_b$ | 4.42$_b$ |

*Note*: The minimum value of the Erotic Communication is scale 8, the maximum is 64. The minimum value of the Relational Communication scale is 6, the maximum is 48. Lower numbers indicate higher agreement with the evaluative statement. Means in the same row that do not share subscripts differ at $p < .05$ in the $t$ test for paired samples.

Case 3:05-cv-00256-TMB    Document 53-31    Filed 10/12/2006    Page 3 of 8

### Erotic Communication

*Nudity.* A repeated-measures ANOVA with proximity as a within-subject factor and nudity as a between-subject factor revealed nudity to have a significant effect on perceptions of Erotic Communication, $F(1, 31) = 8.61$, $p = .006$, omega-squared estimate of treatment magnitude = .187. Participants indicated they received a message of greater Erotic Communication from the dancers in the nude condition than in the nonnude condition.

*Proximity.* A repeated-measures ANOVA with proximity as a within-subject factor and nudity as a between-subject factor revealed a proximity main effect on Erotic Communication, $F(2, 62) = 7.91$, $p = .001$. Post-hoc analysis using a $t$ test for paired samples revealed that Erotic Communication scores between the 4-foot condition and the 6-in. condition were not significantly different, $t(32) = 1.35$, $p = .185$. A seemingly significant difference was found between the 6-in./touch condition and the 6-in. condition, $t(32) = 2.54$, $p = .016$ ($r = .42$). However, a Bonferroni adjustment made to control for Type I error (a critical value of alpha .01 was assigned to each of the three tests, yielding an overall alpha of .03) suggests that this difference must be viewed as only marginally significant. A significant difference was found between the 4-foot condition and the 6-in./touch condition, $t(32) = 4.18$, $p < .001$ ($r = .60$).

*Nudity × Proximity.* The analysis failed to reveal a significant interaction between nudity and proximity on Erotic Communication, $F(2, 62) = 1.53$, $p = .224$.

### Relational Communication

*Nudity.* A repeated-measures ANOVA with proximity as a within-subjects factor and nudity as a between-subjects factor revealed a significant main effect for nudity on Relational Communication, $F(1, 31) = 8.15$, $p = .008$, omega-squared estimate of treatment magnitude = .178. The direction of the means reveals that participants reported greater relational message communication in the nude dance condition than in the nonnude dance condition.

*Proximity.* The repeated-measures ANOVA with proximity as a within-subjects factor and nudity as a between-subjects factor revealed significant main effect for proximity on Relational Communication, $F(2, 62) = 18.60$, $p = .001$. Post-hoc analysis using a $t$ test for paired samples revealed statistically significant differences between the 4-foot condition and the 6-in. condition, $t(32) = 2.62$, $p = .013$ ($r = .43$), between the 6-in./touch condition and the 6-in. condition, $t(32) = 4.26$, $p < .0001$ ($r = .61$), as well as between the 6-in./touch condition and the 4-foot condition, $t(32) = 5.03$, $p < .0001$ ($r = .67$). All of these differences are acceptable under the Bonferroni adjustment made to control for Type I error (a critical value of alpha of .01 was assigned to each of the three tests, yielding an overall alpha of .03).

*Nudity × Proximity.* The analysis failed to reveal an interaction between proximity and nudity on the Relational Communication scale, $F(2, 62) = 1.89$, $p = .160$.

### Affect Adjectives

*Happiness.* A repeated-measures ANOVA with proximity as a within-subjects factor and nudity as a between-subjects factor revealed nudity to have a significant effect on happiness, $F(1, 31) = 5.07$, $p = .031$, omega-squared estimate of treatment magnitude = .11. The direction of the means indicates that subjects were happier in the nude dance condition.

A repeated-measures ANOVA with proximity as the within-subjects factor and nudity as the between-subjects factor revealed proximity to have a significant effect on happiness, $F(2, 62) = 8.82$, $p = .001$. The $t$ tests for paired samples revealed that no differences occurred between the 4-foot and 6-in. conditions, $t(32) = 1.56$, $p = .129$, but that there were differences in reported happiness between the 6-in. and 6-in. with touch conditions, $t(32) = 2.95$, $p = .006$ ($r = .47$). The largest difference was found between the 4-foot and the 6-in. with touch conditions, $t(32) = 3.80$, $p = .001$ ($r = .56$). The direction of the means indicates that men reported being happier as the dancer moved closer and then touched them.

*Annoyance.* A repeated-measures ANOVA with proximity as a within-subjects factor and nudity as the between-subjects factor revealed that proximity had a significant effect on whether or not the subjects reported feeling annoyed, $F(2, 62) = 5.17$, $p = .008$. Paired-sample $t$ tests revealed that there was not a significant difference between the 4-foot and 6-in. conditions, $t(32) = 1.28$, $p = .209$, but there was a significant difference between the 6-in. and 6-in. with touch conditions, $t(32) = 2.48$, $p = .018$ ($r = .41$). The largest difference was found between the 4-foot and the 6-in. with touch conditions, $t(32) = 2.63$, $p = .013$ ($r = .42$). The direction of the means indicates that the subjects reported feeling less annoyed with closer dancer proximity and touch.

*Anxiousness.* A repeated-measures ANOVA with proximity as a within-subjects factor and nudity as the between-subjects factor revealed that proximity has no significant effect on whether or not the subjects reported feeling anxious, $F(2, 60) = .88$, $p = .421$. Similarly, the between-subjects ANOVA revealed that nudity did not affect the reported level of anxiousness, $F(1, 30) = .944$, $p = .339$.

## DISCUSSION

We hypothesized that nude dancing compared to semi-clad dancing would communicate a message of greater eroticism. The results from Study 1 confirm this expectation. The men judged nude and clothed dances to be communicating significantly different erotic messages. Specifically, patrons indicated that the nude dance conveyed a significantly more "erotic," "sexy," "alluring," "seductive," and "stimulating" message than the clothed dance. We also hypothesized that nude dancing compared with semi-clad dancing would communicate a message of greater relational intimacy to men. The results indicated that dancers who were nude were judged as more likely to have expressed messages of relational intimacy than clothed dancers. Specifically, subjects indicated that the nude dancer compared to the clothed dancer was expressing to them the fantasy that she wanted to be "romantically involved with them," "thought they were special people," "liked them more," and was "personally interested in them." In addition, we hypothesized that men who viewed the nude dancers would experience greater positive affect reactions than males who viewed semi-clad dancers. Male patrons reported more anxiousness

after a nude dance compared to clothed dances, but no differences were found on measures of happiness and annoyance.

Finally, we hypothesized that nude dancing would be more likely to convey social-cultural messages such as freedom of expression and the idea that the female body is beautiful than semi-clad dancing. Patrons indicated the nude compared to the non-nude dancers were more likely to be conveying the message that "women can express themselves as freely as men" and that the "dancer was free to do what she wanted with her body."

The findings from Study 1 are consistent with the research reviewed above on men's reactions to female nudity. We noted above that men report greater sexual arousal, increased interest, greater positive affect, and more favorable attitudes toward objects associated with female nudity. With the exception of a lack of increased patron happiness, the findings comport with the previous research. The fact that nude dancers also communicated a clearer message of intimacy than clothed dancers suggests that they were successfully producing performances of what has been termed "counterfeit intimacy" (Enck and Preston, 1988; Goffman, 1959). Essentially, these clubs are environments where men have the opportunity to view women, who are usually strangers, revealing private details of their anatomy. The fact that the dancer is nude may fuel the customer's illusion that sexual intimacy with the dancer is possible—a message that is not conveyed in the clothed condition. Finally, our findings are congruent with the anthropological perspective that the dancers are expressing the social messages of liberation, messages of sexual freedom and female beauty.

In Study 2, we modified the design so that patrons saw three dances in one of six situations: 6 in. away and touching, 6 in. away and no touching, or 4 feet away, each under either nude of non-nude conditions. Dancer nudity produced similar results to Study 1. As in Study 1, dancer nudity had a significant impact on subjects' affect and their perceptions of the erotic and relational messages being communicated by the dancer. The patrons indicated they received stronger messages of erotic communication from the dancers who were nude compared to those who were clothed. Results on the Relational Communication measure were also similar to the first study. Men who saw nude dances reported that the dancers were more interested in them personally, liked them more, considered them to be special people, and were more interested in them romantically. Results on the mood measures revealed that subjects who saw the nude dancers reported feeling "happier" than the patrons who saw clothed dancers, but differences on the other mood measures such as "annoyed" or "anxious" failed to reach significance.

In addition, we hypothesized that dancers would be judged as conveying a different message to patrons depending on the distance they performed from the patron. Specifically, we hypothesized that dancers who performed 6 in. from the patron (intimate zone) will be perceived as communicating a more intimate relational message than dancers performing 4 feet (personal-public zone) from the patron. Further, we proposed that dancers who perform 6 in. from the patron and touch him will be perceived as communicating a more intimate relational message compared to dancers who perform either 6 in. away and do not touch him or 4 feet from the patron.

The proximity factor manipulated in Study 2 produced differences on the erotic, relational, and mood measures. First, subjects reported that in the 6-in. touch condition, dancers were more likely to convey messages of erotic communication than in the 4-foot condition. No differences were found between the 6-in./no touch and 4-foot conditions for erotic communication. Thus, the strongest effect for erotic communication was found for the condition in which the dancer touched the patron. Dancer–patron proximity also affected judgments of relational communication. Subjects' evaluation of dancer relational communication differed at each of the three levels of proximity. Men rated the dancers who touched them as communicating significantly more relational intimacy than the dancers who remained at 6 in. and did not touch them. In turn, dancers who performed at 6 in. were judged to be communicating more relational intimacy than the dancers who performed at 4 feet. Third, the results for the mood measures showed that touching significantly altered respondents' reported affect, but subject mood was unaffected by dancing at the other proximities. Specifically, subjects who were touched by the dancers reported feeling significantly happier and less annoyed than those subjects who saw dancers at 6 in. with no touch and at 4 feet.

These findings were expected on the basis of previous research and theory on haptics and proxemics. We hypothesized on the basis of Hall's (1973) "zones" or distance categories for social interaction that a dance performed at 6 in. from the patron would communicate a more intimate message to men than the dances performed at 4 feet. Our data showed that patrons perceived a message of greater relational intimacy at the closer distances. A distance of 6 in. falls within Hall's "intimate zone." It is likely that men who viewed dances in the 6-in. condition and in the 6-in. with touch condition interpreted the dancers' close proximity and brief touch to be a sign of an intimate interaction.

Expectancy violation theory (Burgoon, 1978) would also suggest that men expect women who move into a zone of 6 in. to be advancing a message of intimacy. The patron may sense that this physical immediacy is a violation of the expected distance a stranger would keep, but the situation has several markers indicating that such a violation is favorable. First, the dancer is physically attractive and expectancy violations by attractive targets are interpreted in a positive light (Burgoon & Walther, 1990). Second, touch by an attractive target in an intimate setting is usually interpreted as a sign of positive support (Heslin, 1974; Heslin & Alper, 1983; Heslin et al., 1983; Jones & Yarbrough, 1985).

### Study Limitations

There are at least four possible limitations to the present study. First, it is unclear how far the findings of this study can be generalized to other venues, persons, or situations involving nude dancing. Second, we do not measure or compare the dancer's intended message with the men's perceived message. Third, it may be argued that we have merely observed the propsensity among males to be interested in and aroused by a closely positioned nude woman. Differences in subject judgments about the messages conveyed by dancers are a function of this male attraction to nude women. Fourth, it is possible that we have merely demonstrated reductions

in intensity or graphicness of the messages conveyed and that we have not shown that a conceptually *different* message is being communicated by nude versus clothed dancers across the various distances. We discuss each of these limitations below.

We are hesitant to extend the findings of this study to other venues or situations involving nude dancing. While we are confident that the findings are generalizable to male patrons of adult nightclubs throughout the country, we are reticent to conclude that the findings will generalize to female patrons or male homosexual patrons of adult clubs. As we noted in the introduction, social psychological research suggests that female responses to male nudity are quite different than male responses to female nudity. Further, there is no reason to assume that female patrons would indicate that closer dancer proximity conveys more intimacy. Finally, reactions to male nudity among male homosexuals and ideas about proximity are likely to be far different from the conceptions of heterosexual males in the presence of females. Additional research is needed to clarify these issues before the findings of this study can be generalized to these populations.

Second, it can be argued that this experiment misses the important First Amendment question at stake in this debate because we did not formally test the message the dancer intended. Rather, we concentrated instead on measuring the message received by the dance club patrons. Traditionally, First Amendment law is concerned with the speaker's right to communicate, not necessarily the effects of that communication on others. A criticism of the study, therefore, may be that because we did not measure the intended message as a part of our design, we are unable to determine if the dancer thought she was communicating a different message under nude versus clothed conditions or at varying distances.

We assert that studying what the dancer thinks she is communicating is not directly responding to the legal question posed in *Barnes*. The argument made by Chief Justice Rehnquist is that requiring clothing does not deprive the dance of whatever erotic *message* it conveys. The focus of the law by the Chief Justice's assertion then is on the message being communicated, not the intentions of the speaker. A study designed to detect changes in speaker intention as a function of nudity or distance may be interesting, but it would fail, in fact, to address the constitutional question raised in *Barnes*. Furthermore, as social scientists, we have come to believe that we can most reliably investigate the characteristics of a message by examining its effects on an intended receiver rather than questioning senders about their intentions.

A third criticism of our study may be that instead of detecting changes in the perception of erotic or relational messages, we have merely observed the propensity among males to be pleased by a nude female body at close distances. It may be argued that we have only empirically demonstrated the obvious: that men who go into a nude dance club are happy to be as close as possible to naked women and that the positive evaluations of the experience of being close to a nude woman in some way drive or motivate patrons to make congruent evaluations concerning intimacy and eroticism. If this were the case, however, we might have expected patrons to respond uniformly to each of the dependent measures. Instead, we found that as the dancer moved from 4 feet to 6 in., men reported that the dancers were more likely to express relational intimacy, though we found no differences in erotic

messages or men's reported affect in this condition. We consider this lack of uniformity in subject responses among the dependent variables contrary to the notion that men's positive reaction to the women at a close proximity simply carried over to every evaluation of the dancers.

Lastly, there may be concern that our dependent variable measures were not sensitive to qualitative changes in message content—rather, they simply measured reductions in intensity or graphicness of the messages conveyed by the dances. Inadvertently, we may simply have confirmed Chief Justice Rehnquist's assertion that banning nudity "simply makes the message slightly less graphic," rather than changing it conceptually.

Exactly what constitutes a reduction in the intensity of a message as opposed to the perception of an altogether different message is an intriguing problem in the social sciences.[8] There are no hard and fast rules for judging when an effect is merely a subtle quantitative shift or a more "meaningful" change to a qualitatively different outcome. We would argue that the degree of a change that must be present in a dependent variable before we call it noticeably "different" in the area of social perception or attitude change is often a matter of several factors. Among the most important considerations are the statistical significance, reliability, or replicability of the finding, the size of the effect, and the presence of accompanying changes in other variables or social psychological processes logically related to the outcome. A finding or an effect that can be reliably produced, that is moderate to large in magnitude, and accompanied by changes in other variables conceptually related to the dependent variable, may be said to represent a "meaningful" effect. Although the effect is measured in increments or registered in terms of quantitative gradations of intensity, it may be representative of new or "different" state due to its reliable, substantiality, and consistent relationship with other social psychological processes.

In this study, we have established that the changes in erotic and relational

---

[8]The inference that changes in intensity of responses are representative of fundamental shifts in perceived meaning are not unique to this study, but endemic to the interpretation to findings in many social science inquiries. In the fields of cognitive, clinical, and social psychology there are many examples of changes in the meaning of a stimulus as a result of subtle changes in its intensity or gradation. For example, it is well documented in the field of cognitive psychology that the intensity of a light can be so low as to fall below the point where a human can report seeing it. However, when that light is made only slightly brighter, most humans report that they detect it. This threshold is termed "just noticeable difference" (JND) and to the observer it is the difference between seeing "darkness" or "lightness." It is important to note that after this threshold of intensity is crossed, the observer does not report seeing a "shade of lightness" or a stimulus that is "less dark." Instead, the observer reports a qualitative difference, seeing a light when he or she did not see it before. Similarly, it can be argued that perception of change in the intensity of messages in the present study may reflect a psychological shift to a qualitatively different message rather than a mere shift in message intensity. Another area of social science inquiry where changes in intensity measured quantitatively are held to represent qualitative differences include the study of political attitudes and voting. It is generally accepted practice, for example, to use Likert scales or other measures that ask respondents to indicate the intensity of their beliefs and to interpret a change in intensity on these scales as an indication of a substantive change in attitude in areas such as political attitudes and voting. A potential voter may hold a positive or negative view of a political candidate and his or her positions on the issues and this approval increases or decreases in intensity. Eventually, the intensity of the approval or disapproval reaches a threshold at which time the person decides to either vote or not vote for the candidate. While changes in the attitude toward the candidate are measured in intensity, there is a critical point at which the voter's disapproval crosses to approval and an altogether different attitude toward the candidate takes hold in the voter's mind.

messages due to our manipulation of nudity and dancer proximity are reliable. Further, at least with regard to one indicator of "meaningful" change, effect size (a calculation of the magnitude of change in the dependent variable caused by the independent variable), the findings represent moderate to large effects for the social sciences.

Further strengthening our argument that differences in intensity can be interpreted as important changes in meaning is the fact that other logically related variables are also altered. Shifts in the degree of eroticism and relational intimacy reported by men exposed to the dancers were accompanied by shifts in other psychological processes. Specifically, differences in patron detection of intensity of message communication across the conditions of the experiment were accompanied by a changes in affect. In Study 2, for example, patrons not only reported detecting greater erotic communication, but also reported more happiness and less annoyance in the 6-in. with touch condition compared to other conditions. In this same study patrons in the nude condition also reported less anxiety compared to men who viewed semi-clad dancers. This change in affect, in combination with the change in the perception of the message being communicated, suggests that the patron is experiencing something more than a mere shift in intensity of the message. Not only does the patron indicate that he is receiving an erotic message of greater intensity, but he also "feels" differently in one condition versus another. As a result of the shift in intensity of the message, a "new" or "different" psychological state is created in the patron rather than a mere extension of an existing state.

A relatively simple procedural modification may allow us more clearly to demonstrate changes in meaning. Future research would benefit from the use of a semantic differential scaling procedure in which respondents are asked to choose between two opposite adjectives that would provide additional documentation of the differences between messages communicated in nude and clothed, close or distant conditions. Researchers could employ an instrument in which subjects respond to opposite terms representing polar extremes along a meaning dimension. Subjects could be asked to respond to a numerical continuum anchored by opposite adjectives. For example, a scale could be anchored by the world "erotic" and, at the other end of the continuum, "frigid," "chaste," or "repulsive." The benefit of this questionnaire technique is that, by definition, different meanings anchor each end of the scale and changes in the direction of responses would represent a clearer shift toward an alternate message.

### The Legal Implications of Rejecting the "Null" Hypotheses in *Barnes* and *Ino, Ino, Inc.*

In *U.S. v. O'Brien* (1968), the Supreme Court ruled that if the government can assert that an important interest is at stake it may regulate symbolic behavior if under part (c) of the test the restriction is "unrelated to the suppression of free expression. . . ." The courts in both *Barnes* and *Ino, Ino, Inc.* argue that the restrictions imposed by law are not directed at the expressive content of the erotic dance, but, rather, at the presentation of such performances either in the nude or too close to the patron. Their conclusion, in tandem, is that precluding nudity and close proximity only affects "non-communicative elements" of erotic performance dance and does not, therefore, affect or impinge upon the content of such erotic expression. Overall, data from both of our studies strongly suggest that the courts in both *Barnes* and *Ino, Ino, Inc.* have erroneously concluded that regulating nudity and dancer proximity does not substantially hinder the dancer's message.

Specifically, Chief Justice Rehnquist offered the opinion in *Barnes* that "the requirement that the dancers don pasties and a G-string does not deprive the dance of whatever erotic message it conveys." The results of Studies 1 and 2 suggest that dancers' donning pasties and a G-string *does* deprive the dance of a statistically significant amount of eroticism and substantially alters the message conveyed when the dancer is nude. We also observed substantial changes in the relational and social messages of dances performed nude versus clothed.

Additional null hypotheses were offered by judges when ruling on whether proximity affects a dancer's ability to convey an erotic message. The Washington State Supreme Court (*Ino, Ino, Inc. v. City of Bellevue*, 1997) reasoned that a 4-foot distance between the dancer and the patron was sufficient "to see the dancer's entire body and expressive activity," and thus was not a regulation of the content of the dancer's message. The results of Study 2 suggest that keeping dancers at a certain distance also deprives the dance of a significant amount of the erotic message conveyed when the entertainers are closer to the patron. We also observed substantial changes in the relational messages of dances performed at 4 foot, and at 6 in. plus touch from the patron.[9]

In both studies, for both the nudity and proximity effects, the changes in the perception of the messages communicated by dancers are "moderate" to "large" by social science standards. Given the reliability and size of the effects, expert witness testimony concerning the results of these psychological studies could be offered to courts to establish that the current attempts by the government to regulate the nudity and distance components of erotic dance violate the First Amendment guarantee of freedom of speech, in that such regulations are directed at the *content* of the expression itself.

### REFERENCES

Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S. Ct. 2486, 115 L.Ed. 2d 504 (1991).
Baron, R. A. (1974). Sexual arousal and physical aggression: the inhibiting influence of "cheesecake" and nudes. *Bulletin of the Psychonomic Society*, 3, 337–339.
Bradac, J. J., O'Donnel, M. O., & Tardy, C. H. (1984). Another stab at a touchy subject: Affective meanings of touch. *Women's Studies in Communication*, 7, 38–51.

---

[9]If the data were to indicate that patrons still view these dances as erotic when restricted, just less so, the study results may speak more clearly to part (d) of the *O'Brien* test rather than part (c). With regard to part (d), Justice Rehnquist reasoned that requiring the dancers to wear at least "pasties" and a "G-string" was narrowly tailored to achieve the state's purpose, without significantly abridging First Amendment freedoms. The question is whether this is, in fact, more than an incidental restriction greater than essential to the furtherance of the state's interest. This is essentially a normative question concerning balancing the state's interest in addressing a significant social problem by regulating speech against the citizen's First Amendment rights. The question of how to balance these competing interests is beyond the scope of social science inquiry.

messages due to our manipulation of nudity and dancer proximity are reliable. Further, at least with regard to one indicator of "meaningful" change, effect size (a calculation of the magnitude of change in the dependent variable caused by the independent variable), the findings represent moderate to large effects for the social sciences.

Further strengthening our argument that differences in intensity can be interpreted as important changes in meaning is the fact that other logically related variables are also altered. Shifts in the degree of eroticism and relational intimacy reported by men exposed to the dancers were accompanied by shifts in other psychological processes. Specifically, differences in patron detection of intensity of message communication across the conditions of the experiment were accompanied by a changes in affect. In Study 2, for example, patrons not only reported detecting greater erotic communication, but also reported more happiness and less annoyance in the 6-in. with touch condition compared to other conditions. In this same study patrons in the nude condition also reported less anxiety compared to men who viewed semi-clad dancers. This change in affect, in combination with the change in the perception of the message being communicated, suggests that the patron is experiencing something more than a mere shift in intensity of the message. Not only does the patron indicate that he is receiving an erotic message of greater intensity, but he also "feels" differently in one condition versus another. As a result of the shift in intensity of the message, a "new" or "different" psychological state is created in the patron rather than a mere extension of an existing state.

A relatively simple procedural modification may allow us more clearly to demonstrate changes in meaning. Future research would benefit from the use of a semantic differential scaling procedure in which respondents are asked to choose between two opposite adjectives that would provide additional documentation of the differences between messages communicated in nude and clothed, close or distant conditions. Researchers could employ an instrument in which subjects respond to opposite terms representing polar extremes along a meaning dimension. Subjects could be asked to respond to a numerical continuum anchored by opposite adjectives. For example, a scale could be anchored by the world "erotic" and, at the other end of the continuum, "frigid," "chaste," or "repulsive." The benefit of this questionnaire technique is that, by definition, different meanings anchor each end of the scale and changes in the direction of responses would represent a clearer shift toward an alternate message.

### The Legal Implications of Rejecting the "Null" Hypotheses in *Barnes* and *Ino, Ino, Inc.*

In *U.S. v. O'Brien* (1968), the Supreme Court ruled that if the government can assert that an important interest is at stake it may regulate symbolic behavior if under part (c) of the test the restriction is "unrelated to the suppression of free expression. . . ." The courts in both *Barnes* and *Ino, Ino, Inc.* argue that the restrictions imposed by law are not directed at the expressive content of the erotic dance, but, rather, at the presentation of such performances either in the nude or too close to the patron. Their conclusion, in tandem, is that precluding nudity and close proximity only affects "non-communicative elements" of erotic performance dance and does not, therefore, affect or impinge upon the content of such erotic expression. Overall, data from both of our studies strongly suggest that the courts in both *Barnes* and *Ino, Ino, Inc.* have erroneously concluded that regulating nudity and dancer proximity does not substantially hinder the dancer's message.

Specifically, Chief Justice Rehnquist offered the opinion in *Barnes* that "the requirement that the dancers don pasties and a G-string does not deprive the dance of whatever erotic message it conveys." The results of Studies 1 and 2 suggest that dancers' donning pasties and a G-string *does* deprive the dance of a statistically significant amount of eroticism and substantially alters the message conveyed when the dancer is nude. We also observed substantial changes in the relational and social messages of dances performed nude versus clothed.

Additional null hypotheses were offered by judges when ruling on whether proximity affects a dancer's ability to convey an erotic message. The Washington State Supreme Court (*Ino, Ino, Inc. v. City of Bellevue*, 1997) reasoned that a 4-foot distance between the dancer and the patron was sufficient "to see the dancer's entire body and expressive activity," and thus was not a regulation of the content of the dancer's message. The results of Study 2 suggest that keeping dancers at a certain distance also deprives the dance of a significant amount of the erotic message conveyed when the entertainers are closer to the patron. We also observed substantial changes in the relational messages of dances performed at 4 foot, and at 6 in. plus touch from the patron.[9]

In both studies, for both the nudity and proximity effects, the changes in the perception of the messages communicated by dancers are "moderate" to "large" by social science standards. Given the reliability and size of the effects, expert witness testimony concerning the results of these psychological studies could be offered to courts to establish that the current attempts by the government to regulate the nudity and distance components of erotic dance violate the First Amendment guarantee of freedom of speech, in that such regulations are directed at the *content* of the expression itself.

### REFERENCES

Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S. Ct. 2486, 115 L.Ed. 2d 504 (1991).
Baron, R. A. (1974). Sexual arousal and physical aggression: the inhibiting influence of "cheesecake" and nudes. *Bulletin of the Psychonomic Society*, 3, 337–339.
Bradac, J. J., O'Donnel, M. O., & Tardy, C. H. (1984). Another stab at a touchy subject: Affective meanings of touch. *Women's Studies in Communication*, 7, 38–51.

---

[9] If the data were to indicate that patrons still view these dances as erotic when restricted, just less so, the study results may speak more clearly to part (d) of the *O'Brien* test rather than part (c). With regard to part (d), Justice Rehnquist reasoned that requiring the dancers to wear at least "pasties" and a "G-string" was narrowly tailored to achieve the state's purpose, without significantly abridging First Amendment freedoms. The question is whether this is, in fact, more than an incidental restriction greater than essential to the furtherance of the state's interest. This is essentially a normative question concerning balancing the state's interest in addressing a significant social problem by regulating speech against the citizen's First Amendment rights. The question of how to balance these competing interests is beyond the scope of social science inquiry.

Burgoon, J. K. (1978). A communication model of personal space violations: Explications and an initial test. *Human Communication Research*, 4, 129–142.
Burgoon, J. K. (1983). Nonverbal violations of expectations. In J. M. Wiemann & R. P. Harrison (Eds.), *Noverbal interaction* (pp. 77–111). Beverly Hills, CA: Sage.
Burgoon, J. K. (1992). Applying a comparative approach to expectancy violation theory. In J. G. Blumer, J. M. McLeod, & K. E. Rosengren (Eds.), *Comparatively speaking: Communication and culture across time and space* (pp. 53–69). Newbury Park, CA: Sage.
Burgoon, J. K., & Aho, L. (1982). Three field experiments on the effects of violations of conversational distance. *Communication Monographs*, 49, 71–88.
Burgoon, J. K., Buller, D. B., & Woodall, W. G. (1996). *Nonverbal communication: The unspoken dialogue*. Now York: Harper Collins.
Burgoon, J. K., & Hale, J. L. (1987). Validation and measurement of the fundamental themes of relational communication. *Communication Monographs*, 54, 19–41.
Burgoon, J. K., & Hale, J. L. (1988). Nonverbal expectancy violations theory: Model elaboration and application to immediacy behaviors. *Communication Monographs*, 55, 58–79.
Burgoon, J. K., & Le Poire, B. A. (1993). Effects of communication expectancies, actual communication, and expectancy disconfirmation on evaluations of communicators and their communication behavior. *Human Communication Research*, 20, 67–96.
Burgoon, J. K., Stacks, D. W., & Burch, S. A. (1982). The role of interpersonal rewards and violations of distancing expectations in achieving influence in small groups. *Communication*, 11, 114–128.
Burgoon, J. K., & Walther, J. B. (1990). Nonverbal expectancies and the consequences of violations. *Human Communication Research*, 17, 232–265.
Burgoon, J. K., Walther, J. B., & Baesler, E. J. (1992). Interpretations, evaluations, and consequences of interpersonal touch. *Human Communication Research*, 19, 237–263.
Colacurcio v. City of Kent, 163 F.3d 545 (9th Circuit, 1998).
Derlega, V. J., Lewis, R. J., Harrison, S., Winstead, B. A., & Costanza, R. (1989). Gender differences in the initiation and attribution of tactile intimacy. *Journal of Nonverbal Behavior*, 13, 83–96.
Dima Corporation v. Town of Hallie, U.S. Court of Appeals (7th circuit) (1999).
Donnerstein, E., Donnerstein, M., & Evans, R. (1975). Erotic stimulation and aggression: Facilitation or inhibition. *Journal of Personality and Social Psychology*, 32, 237–244.
Dragu, M., & Harrison, A. (1988). *Revelations: Essays on striptease and sexuality*. London: Nightwood.
Enck, G. E., & Preston, J. D. (1988). Counterfeit intimacy: A dramaturgical analysis of an erotic performance. *Deviant Behavior*, 9, 360–381.
Forsyth, C. J., & Deshotels, T. H. (1997). The occupational milieu of the nude dancer. *Deviant Behavior*, 18, 125–142.
Goffman, E. (1959). *The presentation of self in everyday life*. Garden City, NY: Anchor Press/Doubleday.
Gould, J. (1992). Topless uncovered. *Redbook*. 179, 118, 120, 144, 146.
Greenbaum, P. E., & Rosenfeld, H. M. (1980). Varieties of touching in greetings: Sequential structure and sex-related differences. *Journal of Nonverbal Behavior*, 5, 13–25.
Hale, J. L., & Burgoon, J. K. (1984). Models of reactions to changes in nonverbal immediacy. *Journal of Nonverbal Behavior*, 8, 287–314.
Hall, E. T. (1973). *The silent language*. Garden City, NY: Anchor Press.
Hanna, J. (1995). *An anthropologist looks at undressing the First Amendment and corsetting the striptease dance*. Paper presented at the First Amendment Lawyers Association, Chicago, Illinois.
Henley, N. M. (1977). *Body Politics*. Englewood Cliffs, NJ: Prentice-Hall.
Heslin, R. (1974, May). *Steps toward a taxonomy of touching*. Paper presented at the annual convention of the Midwestern Psychological Association, Chicago.
Heslin, R., & Alper, T. (1983). Touch: A bonding gesture. In J. M. Wiemann & R. P. Harrison (Eds.), *Nonverbal interaction* (pp. 45–75). Beverly Hills, CA: Sage.
Heslin, R., & Boss, D. (1980). Nonverbal intimacy in airport arrival and departure. *Personality and Social Psychology Bulletin*, 6, 248–252.
Heslin, R., Nguyen, T. D., & Nguyen, M. (1983). The meaning of touch: The case of touch from a stranger or same sex person. *Journal of Nonverbal Behavior*, 7, 147–157.
Ino, Ino, Inc. v. City of Bellevue, 132 Wash.2p 103, 937 d.2d 154, (Washington 1997).
International Eateries of America. Inc. v. Broward County, 941 F.2d 1157, 1161 (11th Cir. 1991). J & B entertainment, 152 F.3d at 370.
Jones, S. E., & Yarbrough, A. E. (1985). A naturalistic study of the meanings of touch. *Communication Monographs*, 52, 19–56.
Judd, B. B., & Alexander, M. W. (1983). On the reduced effectiveness of some sexually suggestive ads. *Journal of the Academy of Marketing Sciences*, 11, 156–168.
KEV. Inc., v. Kitsap County 793 F.2d 1053 (9th Circuit, 1986).
Kinsey, A. C., Pomeroy, W. B., & Martin, C. E. (1948). *Sexual behavior in the human male*. Philadelphia: Saunders.
Kinsey, A. C., Pomeroy, W. B., Martin, C. E., & Gebhard, P. H. (1953). *Sexual behavior in the human female*. Philadelphia: Saunders.
LaTour, M. S., & Henthorne, T. L. (1994). Female nudity in advertisements, arousal and response: A parsimonious extension. *Psychological Reports*, 75, 1683–1690.
LaTour, M. S., Pitts, R. E., & Snook-Luther, D. C. (1990). Female nudity, arousal, and ad response an experimental investigation. *Journal of Advertising*, 19, 51–62.
Le Poire, B. A., & Burgoon, J. K. (1994). Two contrasting explanations of involvement violations: Expectancy violations theory versus discrepancy arousal theory. *Human Communication Research*, 20, 560–591.
Le Poire, B. A., & Burgoon, J. K. (1996). Usefulness of differentiating arousal responses within communication theories: Orienting response or defensive arousal within nonverbal theories of expectancy violation. *Communication Monographs*, 63, 208–230.
Mano, K. D. (1983). A club of one's own. *Playboy*. 29. 197–206.
Nakatomi Investments. Inc v. City of Schenectady 949 F.Supp.988 (N.D.N.Y. 1997).
Nguyen, M. L., Heslin, R., & Nguyen, T. D. (1976). The meaning of touch: Sex and marital status differences. *Representative Research in Social Psychology*, 7, 13–18.
Nguyen, T. D., Heslin, R., & Nguyen, M. L. (1975). The meaning of touch: Sex differences. *Journal of Communication*, 25, 92–103.
R.A.V. v. City of St. Paul 505 45 377, 112 S. Ct. 2538, 20 L.BJ.2d 305 (1992).
Ronai, C. R., & Ellis, C. (1989). Turn-ons for money: Interactional strategies of the table dancer. *Journal of Contemporary Ethnography*, 18, 271–289.
Rosenswasser, S. M., Adams, V., & Tansil, K. (1983). Visual attention as a function of sex and apparel of object: Who looks at whom? *Social Behavior and Personality*, 11, 11–15.
Rynne, M. K. (1992). Exotic nights: A young woman photographs the modern world of strippers. *American Photo*. May/June, 38–43.
Schwartz, N., & Clore, G. L. (1988). How do I feel about it? The informative function of affective states. In K. Fiedler & J. Forgas (Eds.), *Affect, cognition, and social behavior: New evidence and integrative attempts* (pp. 44–62). Toronto: Hogrefe.
Stauffer, J., & Frost, R. (1976). Male and female interest in sexually-oriented magazines. *Journal of Communication*, 26, 25–30.
Symons, D. (1979). *The evolution of human sexuality*. Oxford: Oxford University Press. Triplett Grille, Inc. v. City of Akron, 40 F.3d 129. 134 (6th Cir. 1994).
U.S. v. O'Brien. 391 U.S. 367 88 S. Ct. 1673, 20 L.Ed.2d 672 (1968).
Ward v. Rock Against Racism 491 U.S. 781, 109 S. Ct. 2746, 105 L.Ed.2d. 661 (1989).
Zillmann, D., Bryant, J., Comisky, P. W., & Medoff, N. J. (1981). Excitation and hedonic valence in the effect of erotica on motivated inter-male aggression. *European Journal of Social Psychology*, 11, 233–252.
Zillmann, D., & Sapolsky, B. S. (1977). What mediates the effect of mild erotica in annoyance and hostile behavior in males? *Journal of Personality and Social Psychology*, 35, 587–596.
Zuckerman, M., and Lubin, B. (1965). *Manual for the Multiple Affect Adjective Checklist*. San Diego, CA: Educational and Industrial Testing Service.