CPL Bibliography

# 375

# Exotic Dance Adult Entertainment: A Guide for Planners and Policy Makers

Judith Lynne Hanna

*Because exotic dance adult entertainment is a nationwide lightning rod for conflict, a comprehensive knowledge base is necessary. This bibliographic summary of literature addresses some misperceptions and notes new United States Supreme Court cases that can lead planners, policy makers, and government attorneys into legal difficulties over restrictions they try to impose on this industry. Costs to enact, enforce, and defend the restrictions may divert scarce resources. The multidisciplinary literature encompasses books, articles, court testimony, and court rulings on exotic dance written by researchers in anthropology, architecture, biology, criminology, economics, journalism, law, photography, planning, police work, psychology, real estate, and sociology, as well as accounts presented by former exotic dancers. Topics include First Amendment–related characteristics of exotic dance, its expressive components, performers, patrons, adversaries, and supporters; the validity of studies used to justify zoning, alcohol beverage control, and other restrictive ordinances; and legal justifications and limitations on regulating exotic dance.*

**Keywords:** adult entertainment; court decisions; effects; misconceptions; regulations

TABLE OF CONTENTS

  I. Introduction
 II. Bibliography
    A. Exotic Dance
      1. Dance, Communication, Art, Theater, and Adult Entertainment
      2. Dancers, Patrons, and Managers

JUDITH LYNNE HANNA (jlhanna@hotmail.com) (Ph.D., anthropology, Columbia University) is a senior research scholar in the Department of Dance at the University of Maryland, College Park. Author of more than three hundred articles, her eight books include *To Dance Is Human* and *Dance, Sex and Gender* (both University of Chicago Press) and *The Performer-Audience Connection* (University of Texas Press). Since 1995, she has conducted empirical research nationwide on exotic dance adult entertainment and served as an expert court witness in more than eighty related cases, from "obscenity" to a quadruple shooting resulting in two deaths. Her articles on exotic dance have appeared in, for example, *The New York Times; The Drama Review; Journal of Arts Management, Law and Society; City and Society; and Minnesota Law & Politics Web Magazine.*

*Journal of Planning Literature*, Vol. 20, No. 2 (November 2005).
DOI: 10.1177/0885412205277071
Copyright © 2005 by Sage Publications

Copyright 2005. Permission Granted by SAGE Publications

    a) Academic Studies
    b) Dancer Autobiographies and Reporter Accounts
   3. Dance Adversaries and Supporters
  B. Studies of the Impact of Exotic Dance
   1. Meta-Analysis of Studies Cited by Local Governments
   2. General Studies
   3. Crime
   4. Economic Impact
   5. Health
   6. Zoning
  C. Regulations and Legal Cases with National Importance
   1. Evidence for Justifying Governmental Interest
   2. Zoning
   3. Alcohol
   4. Obscenity
   5. Time, Place, Manner, and Incidental Burden
   6. Licensing
   7. Morality
   8. Overbreadth
   9. Dance Movements and Gestures

I. INTRODUCTION

Exotic dance adult entertainment is controversial and not widely understood. Because it is a lightning rod for conflict in many parts of the United States, a comprehensive knowledge base is necessary. There are prevailing *fallacies* that exotic dance causes the adverse secondary effects of crime, property depreciation, and disease (e.g., Paul, Linz, and Shafer 2001; Freeman and Linz 2002; Land et al. 2004). There may also be intemperate rhetoric (Munsil 1988, 1994), sensationalist media portrayals (e.g., the film *Showgirls*), and uninformed legislation and judicial findings. Countering these are scholarly studies of exotic dance, its nonverbal communication, and its impact on society that have appeared within the past decade (see bibliography below on exotic dance). Misperceptions lead planners, policy makers, and government attorneys into difficulties over the restrictions they try to impose on the exotic dance adult entertainment industry to protect "the public health, safety, morals, comfort, and neighborhood property values" or the "general welfare of the populace." This review argues that such restrictions serve no compelling government interest in a democracy. Laws usually already exist against crime; thus, singling out exotic dance club businesses among other businesses for special regulations may appear to be discriminatory.

Deliberations about exotic dance have been hampered by the absence of the results of relevant research (drawn from the arts, humanities, and social and behavioral sciences) on the relationship of the First Amendment to nonverbal communication, dance, and exotic dance. Several visits to a club, or titillating portrayals in cinema, television, or talk shows, provide insufficient bases for understanding exotic dance (Hanna 2004).

At issue are the reasons for regulating exotic dance clubs; the constitutionality of these regulations in light of recent U.S. Supreme Court decisions; whether exotic dance is "conduct" *or* "communication" and "expression" (Tiersma [1993] explains the distinction that affects its First Amendment—free speech—protection); what is obscene (determining community standards when multiple standards most likely exist, tolerance versus acceptance, and a juror's personal standards, Scott [1991]; indecency protection, Robbins and Mason [2003]); economic ramifications; who advocates regulations; and costs to enact, enforce, and defend the regulations. Disputes also arise about, for example, government use of unscientific negative effects studies; government use of studies of other jurisdictions that are irrelevant to time, place, and specific kind of adult business within its own jurisdiction; overbroad and vague regulations; what constitutes dance, theater, and artistic merit; and licensing and appeal procedures.

The "not in my backyard" (NIMBY) syndrome envelops adult entertainment. Some neighborhood residents claim exotic dance clubs cause problems and thus are an unwelcome development in their neighborhoods. Local governments cannot outright ban the clubs, which have some measure of First Amendment protection. So residents employ alternative mechanisms to curtail the clubs. They engage in an array of confrontational strategies. For example, some people picket clubs, call patrons' families and employers, slash tires in club parking lots, and make threatening calls to club owners. People work through their local governments to enact ordinances that try to eliminate the clubs or prevent them from opening (Munsil 1988, 1994; Kelly and Cooper 2000; Hanna 1999). Governments can also authorize vice squad raids, sting operations, stringent licensing requirements, and high criminal penalties for regulatory violations. When exotic dance club owners litigate and courts void laws, many localities may enact new legislation, which could lead to further lawsuits and more regulations.

However, there are examples of community support for exotic dancing. In response to Los Angeles regulations of exotic dance adult entertainment in 2003, 107,000 citizens signed petitions for a referendum against the regulations, resulting in Los Angeles

Copyright 2005. Permission Granted by SAGE Publications

rescinding the regulations (Pierson 2003). Citizens in Glendale, Colorado, voted lawmakers supporting regulations out of office. A former exotic dancer became mayor in Georgetown, Colorado. Grossman (2003) reported professional trend spotter Irma Zandl's recent forecast based on the responses of three thousand young people who are ethnically and geographically diverse and gender balanced: "Strippers are really setting the trends right now. I think strippers have become hugely important" (p. 52). The respondents said, "Striptease is cool."

Many citizens may not only object to regulations of exotic dance clubs because they infringe on civil liberties but may also object to the cost of regulations. "Dance police" can divert scarce resources from fighting crime that has victims. Forcing exotic dance adult entertainment clubs to comply with or litigate regulations can decrease the clubs' contribution to the economy (they pay taxes, employ people, purchase a range of goods and services, and sometimes attract new businesses to the neighborhood). Furthermore, resources paid by taxpayers are required to develop, enact, and enforce laws. If laws are challenged and government loses, the government pays court costs, attorney fees of the challenger (which have ranged from $35,000 to more than a million dollars), and often damages. For example, in *Gammoh v. City of Anaheim* (Superior Court, Orange County, California, Case 736182, 2004), a settlement for Anaheim's unconstitutional zoning ordinance cost the city two million dollars. (There was a prior related decision, 73 Cal.App.4th 186, 86 Cal.Rptr.2d 194 [1999], as well as an unreported decision from 2003.) In addition, a jury awarded a club owner $1.4 million for profits lost because the city of San Bernardino closed his club for four years, claiming the property was not an area zoned for adult cabarets. The city was liable under the Federal Civil Rights Act and had to pay attorney fees as well (*People v. Manta Management*, San Bernardino Superior Court, No. SCV 18157, 2004).

Conflict over exotic dance plays out in the courts. Overriding state law, the U.S. Supreme Court's decisions related to exotic dance adult entertainment (see section II.C for an explanation, list, and annotation of specific cases) have primarily been rooted in the governmental interest to protect the populace, alcoholic beverage regulations, zoning ordinances, and morality.

However, recent cases have changed the landscape for regulating adult businesses. Negative effect studies that localities have used in the past to justify ordinances recently have been challenged as to the quality and relevance to the specific jurisdiction. Critiques and new research have shown the past studies to be invalid as explained below (section II.B). The result is that it is now much harder for governments to overcome the many hurdles to withstand First Amendment challenges to their ordinances.

This multidisciplinary bibliography is based on a comprehensive reading of theoretical, descriptive, and empirical work by researchers in anthropology, architecture, biology, criminology, economics, journalism, law, photography, planning, police work, psychology, real estate, social work, and sociology related to exotic dance, as well as accounts by former dancers. The items were identified through library databases, bibliographies of published work, networking among researchers and attorneys, and several list-servs.

The bibliography follows this format: a summary annotation of the consensus of the citations in each section. Because the titles of references are self-explanatory within a topical grouping, an annotation for each specific reference would be redundant. However, major legal cases that have regulatory impact beyond a jurisdiction are annotated separately in section II.C.

Placing exotic dance adult entertainment in historical context contributes to its understanding. Using the human body as the instrument for both dance and sex has long made dance, generally, suspect or immoral in some people's eyes. Since early American history, there has been debate against all manner of dance and allegations of its dangers, such that one may wonder if anyone dared to dance (Wagner 1997). Ballet, recognized today as a fine art, was until the mid-1950s stigmatized and associated with the *demi-monde* (Hanna 1988, 2002). Foster (1996) shows the common thread of sexuality in ballet and exotic dance. Hostility to and titillation by dance continue today, especially with exotic dance adult entertainment (also called erotic, striptease, titty bar, topless, nude, table, couch, lap, go-go, and "gentleman's club" dance).

The 1980s saw a proliferation of upscale exotic dance establishments. The United States now has about three thousand adult entertainment clubs, as well as an annual national trade exposition and several exotic dance organizations and publications for club owners and for dancers. These organizations deal with issues such as litigation, club management, employee relations, sexual harassment, fire safety, theft, equipment, lighting and sound systems, and beverage and other services. The industry is estimated to be a $15 billion business. Average annual individual club revenues are estimated to be more than $500,000. Top-end clubs may net $100,000 monthly. See *Exotic Dancer's Club Bulletin* (ED Publications) and *White Paper 2005: A Report on the Adult Entertainment Industry* [in California] (Free Speech Coalition). Clubs pay substantial local and state taxes, and some contribute to local charities and work with their local Chambers of Commerce for the commu-

Copyright 2005. Permission Granted by SAGE Publications

nity welfare. The stocks of some exotic dance clubs are traded on the NASDAQ Stock Exchange (Schlosser 1997). PT Showclubs chain, with sixteen clubs in eight states, was traded on the American Stock Exchange in 2004.

Exotic dance fits within the broader context of art forms that have moved (or are moving) from the margin into the mainstream (e.g., hip-hop). Dance forms on the margins often contribute to the Western aesthetic for innovation, and exotic dance is no exception. Exotic dance expression has influenced communication in other forms of dance. Renowned founder of the New York City Ballet George Balanchine featured a sexy burlesque striptease queen in "Slaughter on Tenth Avenue" (1936). He was inspired by his penchant after ballet performances when on tour in Paris to visit the Crazy Horse Saloon for the midnight striptease show (Bentley 2002). Jerome Robbins directed and choreographed the Broadway show "Gypsy" in 1959 based on the life of stripper Gypsy Rose Lee; revivals of "Gypsy" continue to be staged (one appeared in 2003 on Broadway). Modern dancer Mark Morris choreographed "Striptease." Broadway star Bob Fosse produced renditions of exotic dance in Broadway musicals. Jawole Willa Jo Zollar, head of the Urban Bush Women Company, has spoken of the influence on her dances of the strippers she saw in her childhood. The Pepatian troupe presented "Como Desnudarse" ("How to Undress") and "El Striptís" at the 92d Street Y in New York City. Some of Madonna's backup singers have used moves borrowed from strippers, while Madonna touches her crotch and grinds. Sensual stripper workouts surfaced at gyms, and students enroll in classes at universities and community centers to learn to love their bodies, to get in touch with their femininity and denied sexuality, and to feel comfortable with various stages of undress. Nudity has become pervasive on mainstream stages (beginning in 1842), in film, and on television.

REFERENCES

Bentley, Toni. 2002. *Sisters of Salome*. New Haven, CT: Yale University Press.
Foster, Susan Leigh. 1996. The ballerina's phallic pointe. In *Corporeality's: Dancing knowledge, culture and power*, edited by Susan Leigh Foster, 1-24. New York: Routledge.
Freeman, Lance, and Daniel Linz. 2002. Examining the relationship between businesses that comply with the "60/40" adult zoning regulations and surrounding property values in New York City. Unpublished paper.
Grossman, Lev. 2003. What's next? Trends: The quest for cool. *Time* 162 (10): 48-54.
Hanna, Judith Lynne. 1988. *Dance, sex, and gender: Signs of identity, dominance, defiance, and desire*. Chicago: University of Chicago Press.
———. 1999. Toying with the striptease dancer and the First Amendment. In *Play and culture studies*, Vol. 2, edited by Stuart Reifel, 37-55. Greenwich, CT: Ablex.
———. 2002. Dance under the censorship watch. *Journal of Arts Management Law and Society* 29 (1):1-13.
———. 2004. The First Amendment, artistic merit and nudity in Minnesota: Dance, criminal public indecency and evidence. *Minnesota Law and Politics Web Magazine*. Retrieved from www.lawandpolitics.com (click on MN & then web magazine).
Kelly, Eric Damian, and Connie Cooper. 2000. *Everything you always wanted to know about regulating sex businesses*. Planning Advisory Service Report Number 495/496. Chicago: American Planning Association. See Hanna, Judith Lynne. 2003. Review in *Journal of Planning Literature* 17 (3): 45-46.
Land, Kenneth C., Jay R. Williams, Michael E. Ezell, Bryant Paul, and Daniel Linz. 2004. An examination of the assumption that adult businesses are associated with crime in surrounding areas: A secondary effects study in Charlotte, North Carolina. *Law and Society Review* 38 (1): 69-103.
Munsil, Len. 1988. *The preparation and trial of an obscenity case: A guide for the prosecuting attorney*. Scottsdale, AZ: National Family Legal Foundation.
———. 1994. *How to legally stop nude dancing in your community*. Scottsdale, AZ: National Family Legal Foundation.
Paul, Bryant, Daniel Linz, and Bradley J. Shafer. 2001. Government regulation of "adult" businesses through zoning and anti-nudity ordinances: Debunking the legal myth of negative secondary effects. *Communication Law and Policy* 6 (2): 355-91.
Pierson, David. 2003. Lap-dance decision cheers strippers, patrons. *Los Angeles Times*, November 23, B3.
Robbins, H. Franklin, Jr., and Steven G. Mason. 2003. The law of obscenity—or absurdity? *St. Thomas Law Review* 15 (3): 517-44.
Schlosser, Eric. 1997. The business of pornography. *U.S. News and World Report*, February 10, 43-52.
Scott, Joseph E. 1991. What is obscene? Social science and the contemporary community standard of obscenity. *International Journal of Law and Psychiatry* 14:29-45.
Tiersma, Peter Meijes. 1993. Nonverbal communication and the freedom of "speech." *Wisconsin Law Review* 6: 1525-89.
Wagner, Ann. 1997. *Adversaries of dance: From the Puritans to the present*. Urbana: University of Illinois Press.

II. BIBLIOGRAPHY

A. *Exotic Dance*

1. DANCE, COMMUNICATION, ART, THEATER, AND ADULT ENTERTAINMENT

Under the umbrella of the First Amendment (see section II.C), exotic dance is a form of dance, art, and adult entertainment performed by a loosely organized dance company in a cabaret theater with mirrors to show dancers from different perspectives. Contemporary exotic dance usually has two sequential parts. In the first part, a dancer performs onstage for the audience as a whole to entertain and to showcase herself as an advertisement for the second part of the exotic dance. Generally, nudity climaxes a three-song performance in which the dancer appears on stage clothed for the first song, partially removes her clothes during the second, and strips to nudity at the end. In the second part of exotic dance, a performer dances in the audience area for individual patrons for a fee. This individual patron-

Copyright 2005. Permission Granted by SAGE Publications

focused dance takes place next to where the patron is seated, or in lap dancing (common in some clubs), also on a patron's thighs. The dancer artistically communicates to a patron, through body movement, proximity, touch, and dim light, the fantasy of "I am interested in you and you alone, I understand you, you're special and important to me." Most strippers are women, but some transvestites perform among them. Men also strip for women and for other men.

Stripping also occurs in peep shows, in which dancers perform in an enclosed space (e.g., the Lusty Lady in San Francisco and Seattle). But peep shows differ from exotic dance clubs in that exotic dance clubs are open theaters serving beverages and sometimes gourmet meals.

Dance is a form of nonverbal communication, a kind of "speech," more like poetry than prose that expresses emotions and ideas. Just as verbal language has vocabulary, semantics, syntax, and symbolism, so too does dance. Exotic dance, with its nudity and sexy movements, communicates the message that it is adult entertainment. There is a distinction between adult entertainment, usually subject to regulation, and other forms of stripping, for example, the revival of old-style strippers skilled in the art of seduction, who leave more to the imagination (see "The New Burlesque," *Los Angeles Times Calendar Weekend*, March 14, 2002, cover and pages 6-8). About 20 burlesque troupes from around the country recently gathered at two New Orleans nightclubs for Tease-O-Rama, a three-day celebration of the allure of old-fashioned striptease. Across the continent in Helendale, California, is the Exotic World Burlesque Museum Hall of Fame that hosts the Annual Striptease Reunion & Miss Exotic World to honor the past and present revival. Legends, such as Tempest Storm, join newcomers at these annual events.

In one nouvelle rendition of striptease, Americans can get a sensual toning, tightening, and titillating stripper workout at gyms from Los Angeles and San Francisco to New York and Miami. In *The New York Times Magazine*, Mary Tannen in "Pole Cats" (April 28, 2002, p. 82) reported that stripper-style pole dancing had become an exercise craze. Crunch Fitness in New York has been offering cardio striptease classes since October 2001, with mirrors and stripper moves, including sliding clothes back and forth between legs and pole work (performing erotic and acrobatic movements on a vertical pole in the middle of the stage). Those ashamed of their bodies or self-conscious people may prefer another nouvelle tradition, for example, a "therapeutic" class in "The Art of Exotic Dancing for Everyday Women" at the Learning Center in Malvern, Pennsylvania. The class has a companion 86-minute instructional video, a best-seller on Amazon.com.

So, as stripping flourishes in museums, gyms, colleges, and community centers, and seemingly no longer transgressive, the exotic dance called *adult entertainment* needs distinguishing characteristics. Otherwise, what makes it an adult business and subject to regulation? Note that nudity in exotic dance, as in other dance and art forms, communicates an array of messages depending on the performer and the patron's perception: eroticism, yes, but also nature, health, simplicity, beauty of the body as an art form, honesty, the body as God's gift and worthy of the gaze, innocence, independence, empowerment, demystification of the natural body, status of a popular culturally defined well-maintained body, parody of pretension, and being human (Wheeler and O'Neil [1999] provide illustrations of these multiple meanings of nudity in the performing arts).

Exotic dance movements are not sex but are choreographed to create sexual fantasy through patrons' "ocular penetration" (Hanna 1998b, 2002a, 2002b; Liepe-Levinson 1993, 1998, 2002 in II.A.2a; and references below). The movements, performed in high heels, derive from belly dance, burlesque, popular, Broadway theater, music video, jazz, and hip-hop, dance, cheerleading, and gymnastics. The common pole onstage serves as a prop and permits athletic stunts.

Rooted in an American tradition of parody, namely, American burlesque striptease entertainment and the pelvic and shimmy movements of Middle Eastern belly dance (first seen publicly at the 1893 Chicago World's Columbian Exposition), exotic dance is, by definition, supposed to be "naughty" adult play, a fanciful teasing that transgresses social decorum and dress codes in an ambience ranging from sedate to carnival-like (Allen 1991; Jarrett 1997). To be risqué, exotic dance discloses more of the body and uses different movements than are usually seen in public. Striptease (its first generation was from 1918 to 1945) most likely began when dancer Hinda Wassau's accidental strip to full nudity during a shimmy in 1928 evoked such a positive audience response that she incorporated her accident into future performances. Striptease became so popular that in 1937, the Minsky brothers, theater owners, convinced the U.S. House Immigration Committee to rule that the burlesque "striptease is an American art" and thereby prevent foreigners from practicing it in the United States.

When television captured public attention, support of lavish striptease productions diminished. Their full orchestras transformed into small bands, bands became jukeboxes, and elaborately choreographed routines and striptease to pasties and G-string turned into more daring full nudity (Urish 2004). Since the 1980s, traditional burlesque has spawned exotic dance in upscale, well-managed "gentlemen's clubs" run by successful

Copyright 2005. Permission Granted by SAGE Publications

businesspeople, in addition to a classical burlesque revival and the nouvelle renditions of sensual stripper workouts in gyms and classes for mainstream women.

Exotic dance can be viewed on three continua: art, play, and sexuality (Hanna 1998b). The continuum of art is from exotic dance, considered by some as "low brow art" (another example is popular social dance onstage), to "high brow art" (such as ballet). Exotic dance meets the criteria of art: skill acquired by experience, study, or observation; creative imagination; and communication. Each dance form has its own criteria for artistic merit. Exotic dance aesthetics center on physical appearance (body shape and tone, hair, makeup), costume (distinctiveness), movement (sexy, flexible, spirited, seductive, graceful strut and posture, balance on spiked heels, standard bumps-grinds-shimmy [pelvic thrusts and rotations and upper shoulder-torso vibration], smooth transitions between movements and positions whether prone, kneeling, standing, or elevated on the common floor-to-ceiling pole used for gymnastic movements, variety, balanced use of stage and interpretation of music), and personal style (creative uniqueness, connection with audience through personality, smile, eye contact, and charisma). Exotic dance competitions at local, state, and national levels, and patron tips and fees (for a dancer performing for an individual patron) recognize excellence.

Several court cases have recognized exotic dance as a theater art. For example, in *Iowa v. Marshall* (Iowa District Court for Scott County, Case No. SRCR202583, May 8, 1998), "the Court does conclude that dance, even nude dance, may be an art.... That the dance performed at the Southern Comfort Free Theater for the Performing Arts is not dance as performed at Hancher Auditorium, the Galvin Fine Arts Center, or the Adler Theater is a difference of degree or quality, not a difference of kind." In 2004, a company's self-identification as a Performing Arts Theater in Mills County, Iowa, kept it from falling within the jurisdiction of an ordinance for sexually oriented businesses.

The play continuum ranges from child and family play to adult fantasy play and entertainment (including exotic dance). The sexuality continuum goes from fantasy (including exotic dance) to sex. The meanings of exotic dance come from the meanings of social behavior, movements, and sensory elements in contemporary mainstream everyday life. These meanings have a history.

REFERENCES

Allen, Robert Clyde. 1991. *Horrible prettiness: Burlesque and American culture*. Chapel Hill: University of North Carolina.

Barranger, Milly S. 1995. *Theatre: A way of seeing*. 4th ed. Belmont, CA: Wadsworth.

Fine, Gary Alan. 1991. Justifying fun: Why we do not teach exotic dance in high school. *Play and Culture* 4: 87-99.

Hanna, Judith Lynne. 1983. *The performer-audience connection: Emotion to metaphor in dance and society*. Austin and London: University of Texas Press.

———. 1987. *To dance is human: A theory of nonverbal communication*. Rev. ed. Chicago: University of Chicago Press.

———. 1988. *Dance, sex, and gender: Signs of identity, dominance, defiance, and desire*. Chicago: University of Chicago Press.

———. 1997. Creativity in Ubakala, Dallas youth, and exotic dance. In *Creativity in performance*, edited by R. Keith Sawyer, 141-67. Norwood, NJ: Ablex.

———. 1998a. Exotic dance in Seattle: The First Amendment and anthropology. *AnthroWatch* (Columbia University anthropology alumni Newsletter) 16 (1): 4-6.

———. 1998b. Undressing the First Amendment and corseting the striptease dancer. *The Drama Review*, T158, 42 (2): 38-69, Summer.

———. 2002a. Dance under the censorship watch. *Journal of Arts Management Law and Society* 29 (1): 1-13.

———. 2002b. If this is stripping, what is adult entertainment? *Exotic Dancer Bulletin* 7 (3): 62.

———. 2003. Arte posta a nu (Dancers' climax arouses controversy in U.S.). *Gesto (Revista do Centro Coreográfico do Rio)* (Brazil), June, 24-29.

Jarrett, Lucinda. 1997. *Stripping in time: A history of erotic dancing*. London: Pandora.

Urish, Ben. 2004. Narrative striptease in the nightclub era. *Journal of American Culture* 27 (2): 157-65.

Wagner, Ann. 1997. *Adversaries of dance: From the Puritans to the present*. Urbana: University of Illinois Press.

Wheeler, J. Joshua and Robert M. O'Neil. 1999. *Amici curiae brief of the Thomas Jefferson Center for Protection of Free Expression, Alley Theatre, Association of Performing Arts Presenters, Kathleen Chalfant, Dance/USA, Tony Kushner, the Looking Glass Theatre Co., Terrence McNally, Oregon Shakespeare Company, Yvonne Rainer, Rachel Rosenthal, Theater Artaud, Theatre Communications Group, and the Walker Art Center, in support of Pap's A.M. 98-1161 in the Supreme Court of the U.S.*

—Note, in the following litigation (affidavits, reports, depositions, testimony, and court proceedings), Hanna reported her research on the First Amendment implications of ordinances designed to regulate exotic dance: the nonverbal communicative dimensions of dance that convey meaning (use of time, space, and effort, parts of the body moved and how, costume, lighting, distance between dancer and patron, and touch); how exotic dance is a form of dance, theater art, and adult entertainment; and criteria for artistic merit in exotic dance. In 1995, an American Institute of Certified Planners expert on the effects of exotic dance and a lawyer representing dancers and owners of exotic dance clubs discovered Hanna's anthropological research on dance as nonverbal communication through *Books in Print*. They asked her to be an expert court witness in a First Amendment case and apply to exotic dance the semiotic, sociolinguistic paradigm she had used to study dance in Africa, on school playgrounds, and in American theaters. Since then, she has visited more than 104 clubs and worked on more than eighty legal cases. Hanna has conducted research not only in exotic dance clubs but also in courtrooms, judge's chambers, city and county council meetings, club neighborhoods, newspapers, radio, and television. As part of this process, she analyzed court cases and legislation and interviewed dancers, club owners, personnel, patrons, dance club neighbors, and other community members. The court cases are listed chronologically.

a. State of Washington Superior Court, King County.
   *Ino Ino, Inc. v. City of Bellevue*, 95-2-02025-9, 1995.
   *Ronda Remus v. City of Bellevue*, 94-2-27797-9, 1995.

Copyright 2005. Permission Granted by SAGE Publications


b. Municipal Court of Seattle, Washington.
   *City of Seattle v. Darcy Poole*, 260398, 1996.
c. State of Washington Superior Court, King County.
   *Beverly Bailey v. Deja Vu-Lynnwood*, 92-2-23359-2; *Clarissa Freeman v. Deja Vu-Lynnwood*, 93-2-02968-3; *Howard Blake v. Deja Vu-Lynnwood*, 93-2-03017-7, 1996.
d. U.S. District Court, Clark County, Nevada.
   *Rojac Corporation v. Clark County*, A341884, Dept. xii, 1996.
e. U.S. District Court, Southern District of Florida.
   *International Food and Beverage, Inc. v. City of Ft. Lauderdale*, 96-6577-Civ-Hurley, 1996.
f. State of Washington Superior Court, King County.
   *Furfaro v. City of Seattle*, 96-2-02226-8, 1997.
g. Commonwealth of Virginia Circuit Court, City of Roanoke.
   *Commonwealth of Virginia v. Girls, Girls, Girls*, criminal action 97-957 & 971, 1997.
h. U.S. District Court, Northern District of Ohio.
   *J.L. Spoons, Inc. v. City of Brunswick*, 1:97CV3269, 1998.
i. U.S. District Court, Northern District of Texas, Dallas.
   *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 3-97-Cv-1331-r, 1998.
j. State of California Superior Court, San Bernardino County.
   *Pritchett v. Tom L. Theatres, Inc.* SCV23015, 1998.
k. State of New York County Court, Tompkins.
   *New York State v. Langer*, 98-078A, 98-078B, 98-978C and 98-079, 1998.
l. District of Columbia Department of Consumer and Regulatory Affairs Alcoholic Beverage Control Board.
   *Protest Hearing v. 1720 H Street Corp.*, 35901-98062P, 1999.
m. U.S. District Court, Middle District of Tennessee.
   *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County* (Nashville 1997 Adult Ordinance Challenge), 3-97-1066, 1999.
n. State of Illinois Cook County Liquor Commission.
   *Cook County v. Licensee Loumar Corporation*, 1999.
o. State of Wisconsin Circuit Court, St. Croix.
   *East of the River Enterprises II, L.L.C. v. City of Hudson* (1999 Adult Ordinance Complaint), 99CV211, 1999.
p. State of Florida 18th Circuit Court, Seminole County.
   *McKee v. City of Casselberry*, 99-CA1430-16E, 1999; *Koziara v. Seminole County*, 99-CA511-16P, 1999.
q. U.S. District Court, District of Arizona.
   *Sunset Entertainment, Inc. v. Joe Albo*, 98-2099 PHY RGS, 1999.
r. U.S. District Court, Northern District of Ohio.
   *J.L. Spoons, Inc. v. O'Connor*, 1:98CV2857, 1999.
s. State of Minnesota 1st Judicial District Court, Criminal Division, Goodhue County.
   *State of Minnesota, County of Goodhue, City of Cannon Falls v. Jessica Nicole Ann*, T6-00-5844, 2000.
t. State of Minnesota 1st Judicial District, Court Criminal Division, Goodhue County.
   *State of Minnesota, County of Goodhue, City of Cannon Falls v. Carla Shalon Lyons*, T6-00-0004631, 2000.
u. U.S. District Court, Middle District of North Carolina.
   *Giovani Carandola, Ltd. v. George Bason*, 147 Supp.2d (M.D.N.C.) 2001.
v. U.S. District Court, Eastern District, Pennsylvania.
   *Conchatta, Inc. t/d/b/a/ Club Risqué on the Delaware v. Col. Paul J. Evanko*, 01-1207, 2001.
w. State of Florida 13th Judicial Circuit, Hillsborough County.
   *State of Florida v. Shawna Bohne*, 00-CM-024008, 2001.
x. State of Florida 6th Judicial Circuit, Pinellas County.
   *State of Florida v. Laurie A. Anstine*, 00-20520MOANO, 2001.
y. U.S. District Court, Northern District of Texas, Dallas.
   *Millennium Restaurants Group v. City of Dallas*, 3-01CV-0857-G, 2001.
z. State of Minnesota 7th Judicial District Court, Criminal Division, Benton County.
   *State of Minnesotav. Amy Jo Draeger*, T2-01-2143, 2002.
aa. State of Florida 18th Judicial Circuit Court, Seminole County.
   *McKee v. City of Casselberry*, No. 99-ca1430-16e; *Koziara and Derienzo v. County of Seminole*, 99-ca511-16p, 2002.
bb. State of Minnesota 7th Judicial District Court, Criminal Division, Benton County.
   *State of Minnesota v. Brandy Lee Morcomb*, TX-01-2147, 2002.
cc. U.S. District Court, Northern District of Illinois, Western Division.
   *R.V.S., LLC. v. City of Rockford*, 03-C-50048, 2003.
dd. U.S. District Court, Northern District of Texas, Dallas.
   *Fantasy Ranch, Inc. v. City of Arlington*, 3:03-CV-OO89-R, 2003.
ee. U.S. District Court, Southern District of Mississippi, Jackson.
   *A & C Entertainment et al. v. City of Jackson*, 3:01CV88WS, 2003.
ff. State of Florida 6th Judicial Circuit, Pinellas County.
   *State of Florida v. Shannon Malnick*, 03-12309MOANO, 2003.
gg. State of Illinois, Civil Trial Division, Lake County.
   *XLP Corp. d/b/a/ Dancers, Baby Dolls, 41 News and Video Magic v. County of Lake*, 99-0788, 2003.
hh. U.S. District Court, Northern District of Ohio.
   *J.L. Spoons et al. v. Kenneth Morckel et al.*, 1:04CV0314, 2004.
ii. U.S. District Court, Middle District of North Carolina.
   *Giovani Carandola, Ltd. v. Ann Scott Fulton*, 1:01CV115, 2001, 2004
jj. Superior Court of New Jersey, Bergen County.
   *Lighthouse Restaurant Services, Inc. v. Township of South Hackensack*, No. BER-L-5025-3, 2004.

*2. DANCERS, PATRONS, AND MANAGERS*

Socially redeeming values exist for many participants engaged in legal exotic dance performances. About one-third of the performers are putting themselves through college and graduate school with earned income and flexible schedules. Single women, single mothers, and married women dance, all doing an artistic role-playing job (Hanna 1998b). Former dancers have written doctoral dissertations in social work, anthropology, women's studies, and theater arts on "gentlemen's clubs," disproving misconceptions about exotic dance and contributing to the destigmatization of dancers (e.g., Frank 2002; Liepe-Levinson 2002). Some exotic dancers and patrons say exotic dancing is safe sex—fantasy—in an era of AIDS and other sexually transmitted diseases. Dancers provide a kind of therapy for some patrons who need someone to listen to their problems nonjudgmentally. Watching and fantasizing about exotic dancers, or getting suggestions from dancers on how to please a woman, sometimes can save a marriage by rekindling a romantic flame. Of course, attractive women in any setting can threaten a weak marriage. Peter S. Statts, Division of Pain Medicine at Johns Hopkins University, reported to the American Pain Society meeting, October 1999, that envisioning pleasurable sexual fantasies increased pain tolerance,

Copyright 2005. Permission Granted by SAGE Publications

improved mood, reduced worry and tension, and enhanced participants' feelings of self-worth.

Today's well-managed exotic dance clubs provide sexual fantasy, entertainment, and aesthetic appreciation. Laws, club rules, and circulating floor managers work to maintain law-abiding establishments and to promote positive experiences for dancers and patrons. Many club owners and managers try to work with their neighbors to solve problems that arise, for example, trash, noise, parking, or signage.

In the past, some exotic dancers had performed in carnival tents (Meiselas 1975) and small "dives" where illegal acts were alleged to have occurred, and dancers had negative experiences (such sleazy establishments still remain in some places). Some dancers were verbally abused, targets of tossed objects, and physically groped by patrons and managers. "Has-been" dancers performed in what was called "varicose alley."

Contemporary exotic dance clubs are said by some people to exploit, oppress, and degrade performers. But most exotic dancers freely choose to dance and control their own artistic communication, as noted in both the academic studies and dancer autobiographies below. These entertainers consider themselves independent subjects, not submissive objects. The exotic dancer placing her body within a financial transaction reduces herself to a commodity no more than a model's, actor's, or athlete's choice to be professional and earn a livelihood using his or her body.

Throughout the history of exotic dance, some dancers have been hurt by comments on their physical appearance. For example, a patron asked a flat-chested dancer, "Why the hell are you dancing?" Dancers who have bad nights receiving little remuneration from tips or private dances often have hurt egos and anxiety about paying their bills. Many dancers, however, say social stigma causes them the most grief. Some cannot tell people in their family, school, or community about their dancing. Dancers' contributions to good causes may be rejected. For example, in Washington, D.C., Deloris Dickson has owned an exotic dance club for more than 40 years. She and a number of the club's 100 dancers and their families have struggled with the trauma of breast cancer. Yet, when the women tried to give $5,000 from an entire day's work to the National Breast Cancer Coalition, the coalition wanted nothing to do with it (Marc Fisher, "Charity's Gaffe Smacks of Burlesque Act," *Washington Post*, June 3, 2004, p. B1). Physical and psychological violence against exotic dancers has come primarily from some vice squad misbehavior (Hanna 1998a) and radical moralists. The press perpetuates social stigma by identifying a woman involved in a crime by her stripper profession, even if she left it long ago. Even research data about pornography (which does not include exotic dance, although some Americans call it soft porn) and rape from four countries—the U.S., Denmark, Sweden, and West Germany—suggest that pornography does not represent a blueprint for rape. Rather, it is an aphrodisiac, food for sexual fantasy (Kutchinksy 1991). Aggression against dancers occurs for the same reasons as violence against women in general (e.g., in the armed services, law offices, churches, corporations, automobile plants, and elsewhere).

Of course, as in any industry, there can be misbehaving, rude performers, patrons, and managers (e.g., Angier 1976; Mattson 1995; Burana 2001; Dee 2002; Eaves 2002). Dancers usually ask patrons to desist from inappropriate behavior, and if the patrons are uncooperative, the dancers alert managers, who ask the patrons to leave. Dancers may be penalized or fired for misbehavior.

Dancers often complain to owners or leave clubs where there is poor management. Issues arise over independent contractor versus employee status (Fischer 1996); the amount dancers pay to perform (as artists rent space for an art show); overbooking of dancers; and clubs fining dancers for violating club policies, and at times even requiring sexual favors for preferred performance schedules or other perks. At least one dancer successfully sued for sexual harassment (the owner wrongly assumed that because dancers performed nude, men could enter the dancer's dressing room at will—however, dancers act onstage but are women entitled to their privacy offstage).

Ownership of exotic dance clubs varies: single proprietors, partnerships that may include doctors and lawyers, and corporations with a chain of clubs. Some owners/managers have worked up the ladder from being doormen, ushers (bouncers), bartenders, or dancers. More owners of upscale establishments are businesspeople, for whom the club is but one of their several enterprises. As in any business, the quality of management varies.

Patrons, mostly men but increasingly women and couples, vary by age, income, profession, ethnicity, religion, and motivation for attending exotic dance clubs. They have social, aesthetic, and therapeutic reasons. Some patrons are lonely, unhappy, shy, or lacking relationship skills who need understanding listeners and/or attention from attractive women, perhaps as a spouse once was. Some men gain a sense of safety with exotic dancers who are perceived as "vulnerable" in their nudity and not competitors or judges. A one-on-one experience with a beautiful showgirl is a magnet for some patrons. Clubs provide a refuge, a place to hang out, relax, and be entertained. Some patrons just like to view and/or fantasize about a variety of women and

Copyright 2005. Permission Granted by SAGE Publications

still remain faithful to their own partner. A man can feel manly and dominant when he pays for a dance, without having to try to relate to a woman and risk failure. Bachelor parties celebrate and "educate" the groom by arranging for him to be onstage with the dancers who poke fun at marital consummation. Macho men find male identity, bonding, and dominance through fantasy. Many men (and increasingly women) who frequent the clubs seek aesthetic pleasure in the beauty and gracefulness of the nude female body. Some businessmen and women bring clients to what they perceive as the pleasant ambience of upscale establishments to seal business deals. While some women may feel uncomfortable in these environs, others enjoy them.

to patron on erotic expression. *Law and Human Behavior* 24 (5): 507-533.

Margolis, Maxine L. 1994. *Little Brazil: An ethnography of Brazilian immigrants in New York City*. Princeton, NJ: Princeton University Press.

Ronai, Carol Rambo, and Carolyn Ellis. 1989. Turn-ons for money: Interactional strategies of the table dancer. *Journal of Contemporary Ethnography* 18:271-98.

Shteir, Rachel. 2004. *Strippers: The untold history of the girlie show*. New York: Oxford University Press.

Skipper, James K., and Charles H. McCaghy. 1971. Stripteasing: A sex-oriented occupation. In *Studies in the sociology of sex*, edited by James M. Henslin, 275-96. New York: Appleton-Century Crofts.

Sloan, Lacey. 1997. A qualitative study of women who work as topless dancers. Ph.D. diss., University of Houston.

Tiersma, Peter Meijes. 1993. Nonverbal communication and the freedom of "speech." *Wisconsin Law Review* 6:1525-89.

Urish, Ben. 2004. Narrative striptease in the nightclub era. *Journal of American Culture* 27 (2): 157-65.

a. ACADEMIC STUDIES

Angioli, Michael D. 1982. Body image perception and locus of control in semi-nude and nude female dancers. PhD diss., United States International University.

Boles, Jacqueline Miles. 1973. The nightclub stripper: A sociological study of a deviant occupation. PhD diss., University of Georgia, Athens.

Demovic, Angela. 1993. Strippers in New Orleans: A preliminary study. *Human Mosaic* 27 (1-2): 19-28.

Fischer, Carrie Benson. 1996. Employee rights in sex work: The struggle for dancers' rights as employees. *Law and Inquiry: A Journal of Theory and Practice* 14 (2): 521-54.

Frank, Katherine. 1998. The production of identity and the negotiation of intimacy in a "gentleman's club." *Sexualities* 1 (2): 175-201.

———. 1999. Intimate labors: Masculinity, authenticity and consumption in five gentleman's clubs. PhD diss., Duke University.

———. 2002. *G-strings and sympathy: Strip club regulars and male desire*. Raleigh, NC: Duke University Press.

Halperin, Rona Hildy. 1981. Female occupational exhibitionism: An exploratory study of topless and bottomless dancers. PhD diss., United States International University, San Diego.

Hanna, Judith Lynne. See references in the Introduction and in sections II.A.1, II.A.3, II.B.2, and II.B.3.

———. 1998a. Exotic dance in Seattle: The First Amendment and anthropology. *AnthroWatch* (Columbia University anthropology alumni Newsletter) 16 (1): 4-6.

———. 1998b. Undressing the First Amendment and corseting the striptease dancer. *The Drama Review*, T158, 42 (2): 38-69, Summer.

Jarrett, Lucinda. 1997. *Stripping in time: A history of erotic dancing*. London: Pandora.

Kutchinsky, Berl. 1991. Pornography and rape: Theory and practice? Evidence from crime data in four countries where pornography is easily available. *International Journal of Law and Psychiatry* 14:47-64.

Liepe-Levinson, Katherine. 1993. A striptease poetics. PhD diss., City University of New York.

———. 1998. Striptease: Desire, mimetic jeopardy, and performing spectators. *The Drama Review* 42 (2, T158): 9-37.

———. 2002. *Strip show: Performances of gender and desire*. New York: Routledge.

Linz, Daniel, Eva Blumenthal, Edward Donnerstein, Dale Kunkel, Bradley J. Shafer, and Allen Lichtenstein. 2000. Testing legal assumptions regarding the effects of dancer nudity and proximity

b. DANCER AUTOBIOGRAPHIES
AND REPORTER ACCOUNTS

Angier, Roswell. 1976. ". . . A kind of life." *Conversations in the Combat Zone*. Danbury, NH: Addison House.

Beasley, Juliana. 2003. *Lapdancer*. New York: Power House Books.

Bruce, Honey, with Dana Benenson. 1976. *Honey: The life and loves of Lenny's Shady Lady*. Chicago and New York: QP, Playboy Press.

Burana, Lily. 2001. *Strip city: A stripper's farewell journey across America*. New York: Hyperion (Talk Miramax Books).

Dee, Tonya. 2002. *The definitive manual for topless dancers or "Hey Mister, why are you sitting there with my money in your pocket?"* 8th ed. P.O. Box 273601, Boca Raton, FL 33427.

Eaves, Elisabeth. 2002. *Bare: On women, dancing, sex, and power*. New York: Knopf.

Feindel, Janet. 1988. *A particular class of women*. Vancouver, Canada: Lazara.

Fisher, Marc. 2004. Charity's gaffe smacks of burlesque act. *Washington Post*, June 3, B1.

Futterman, Marilyn Suriani. 1992. *Dancing naked in the material world*. Buffalo: Prometheus.

Lee, Gypsy Rose. 1957. *Gypsy*. London: Futura.

Lewin, Lauri. 1984. *Naked is the best disguise: My life as a stripper*. New York: William Morrow.

Mattson, Heidi. 1995. *Ivy league stripper*. New York and Berkeley, CA: Arcade Publishing.

Meiselas, Susan. 1975. *Carnival strippers*. New York: Farrar, Straus and Giroux.

"Misty." 1973. *Strip!* Toronto: New Press Toronto.

Reed, Stacy. 1997. All stripped off. In *Whores and other feminists*, edited by Jill Nagle, 179-88. New York: Routledge.

Scott, David A. 1996. *Behind the G-string: An exploration of the striper's image, her person, her meaning*. Jefferson, NC: McFarland.

Snowden, Lynn. 1994. *Nine lives: From stripper to schoolteacher: My yearlong odyssey in the workplace*. New York: Norton.

Sundahl, Debi. 1987. Stripper. In *Sex work: Writings by women in the sex industry*, edited by Frédérique Delacoste and Priscilla Alexander, 175-79. San Francisco: Cleiss.

Suren, Asuncion, and Robert Stiefvater. 1998. Topless dancing: A case for recreational identity. In *Sex tourism and prostitution: Aspects of leisure, recreation, and work*, edited by Martin Oppermann, 107-15. Elmsford, NY: Cognizant Communications.

Copyright 2005. Permission Granted by SAGE Publications

*3. DANCE ADVERSARIES AND SUPPORTERS*

Exotic dance is a moral and emotional powder keg. Localities across the United States, with the urging of some of their constituents (such as the Religious Right and some feminist groups), attack exotic dance on the bases of alleged crime, property depreciation, disease, obscenity, being a public nuisance, and demeaning women—without reliable, trustworthy evidence that exotic dance causes these problems. For some antagonists, the fight against the clubs is a crusade.

On the grounds of alleged negative effects, adversaries pressure governments to pass ordinances designed to force exotic dance clubs out of business and prevent others from opening. Examples include laws hostile to exotic dance that prescribe zoning requirements and land use regulation; rezoning areas previously zoned for adult entertainment clubs and giving the power to a review board to deny a business because of lack of "wholesomeness"; and requiring extensive procedures for licensing of dancers, clubs, and managers. Regulations can include hours of operation, amount of body disclosure, types of exotic dance movements permitted, whether and how dancers may touch themselves and patrons, visibility of dancing onstage and offstage at a patron's table side; club illumination and other physical configuration characteristics of a facility, distance and buffer zone between dancer and patron, and manner of tipping. The amount of regulatory control over exotic dance clubs depends on whether or not alcohol is sold on the premises. Efforts are made to declare exotic dancing a public nuisance. Utah passed a gross receipts "sin tax" on adult cabarets, on the false assumption of a cause-and-effect relationship between adult business and persons who commit sex crimes; the tax is earmarked for treatment of sex offenders (McCullough 2004).

Laws are often written so vaguely or with overbreadth that people do not know what is permitted so as to act accordingly. Government officials have options of using different measurements for distance between clubs and, for example, schools (door to door or boundary line to boundary line), police have wide discretion, and arrests are made by officers without taking notes or agreeing on the rationale for the arrests.

Violation of ordinances regulating adult entertainment may result in the arrests of the dancer, club owner and manager, and patron; criminal charges; closing of clubs; and defensive legal action. The result is costly to taxpayers and exotic dance stakeholders (dancers, club owners and staff, club food, beverage, sound, lighting, and furnishings suppliers).

In part a backlash against the 1960s sexual revolution, adversaries of sexuality have not been able to eliminate nudity and sensuality on mainstream stages, television, or the cinema. Thus, many turn to the weaker target veiled in mythology, namely, local exotic dance clubs. Some religious and conservative groups (such as the American Decency Association, American Family Association, Community Defense Counsel, Family Research Council, Focus on the Family, Leadership Institute, National Family Legal Foundation, and National Law Center for Children and Families) provide model legislation to try to eliminate exotic dance clubs, help draft legislation, and help defend legislation in court (Munsil 1988, 1994). Their attorneys, Bruce Taylor and Scott Bergthold, are seen in numerous courts.

A social class basis appears to exist. Several courts and numerous observers have noted that nudity is usually acceptable in opera and "high art" theaters, for the "wine-drinking quiche eaters," but not in exotic dance clubs for what used to be "beer-drinking pretzel eaters." Yet today, some gentlemen's clubs serve high-end alcoholic beverages and four-star meals. Club advertisements and signs (e.g., a silhouette of a nude dancer) are sometimes at issue when parents drive their children past the clubs and do not want to discuss sexuality with the youngsters. Well-managed clubs try to accommodate their neighbors.

Supporters of exotic dance (see references II.A) defend women's freedom to control their own exotic dance work without state interference, police harassment, or male dominance. Attacks against exotic dancing, supporters remind us, recall the rationalization of totalitarian countries that eat away at human rights (Ellis, O'Dair, and Tallmer 1988, 8). Exotic dancers have also defended their occupation on the grounds of values, art, entertainment, celebration of the female body and sexuality, self-empowerment, economic opportunity, and legitimate work. They rebut the charge of female dancers being subject to abuse any more than women in society at large.

Contrary to the opinions of adversaries of adult entertainment, architect Arthur Cotton Moore believes exotic dance clubs are an asset to cities. In his book, *Powers of Preservation: New Life for Urban Historic Places* (Moore 1998), he says that exotic dance clubs in the city contribute to the quality of life. They make the city an exciting place to go: "There are functions of a city which rarely make it inside the covers of city planning treatises. These functions have two characteristics: They gain their appeal being sharply different from (discontinuous) and more permissive than the general ethos and morality of the surrounding area and they are elemental, genetic, and as old as the first human settlement" (p. 204). Moore continues, "Human contact is the most powerful and represents the last basic advantage of the city in an anti-urban, electronically equipped

Copyright 2005. Permission Granted by SAGE Publications

fearful world. Clearly, the most common manifestation of human contact is represented by perfectly respectable theaters, nightclubs, bars, dance halls, and restaurants where the mating and dating rituals of relationships can take place. People want to go on dates 'where it's happening' and that still is somewhere in the city. This suggests that in this population the underlying driving force for going to the city is a sexual force" (p. 204). Moore notes that tourists and conventioneers visit cities that have such excitement. The "empty nesters," mostly older and affluent people, are also drawn by the excitement of the city, which makes them feel young again (p. 209). "My idea is to use permissive activity as one more arrow in the badly depleted quiver of the dedicated preservationist and urbanist" (p. 207). Moreover, he observes, "The preservation of old buildings and sexually permissive activities have a scenographic affinity which can be exploited so that together they become another reliable economic rehabilitation resource for the city of the future" (p. 209).

The defense of exotic dance includes the participation of such organizations as the First Amendment Lawyers' Association (FALA), American Civil Liberties Union (ACLU), People for the American Way, National Coalition Against Censorship, Coalition for Free Expression, Free Speech Coalition, Thomas Jefferson Center for the Protection of Free Expression, Association of Performing Arts Presenters, and Dance/USA.

REFERENCES

Ellis, Kate, Barbara O'Dair, and Abby Tallmer. 1988. Introduction. In *Caught looking: Feminism, pornography & censorship*, edited by Kate Ellis, Beth Jaker, Nan D. Hunter, Barbara O'Dair, and Abby Tallmer, 4-9. Seattle, WA: Real Comet.

Hanna, Judith Lynne. 1999. Toying with the striptease dancer and the First Amendment. In *Play and culture studies*, Vol. 2, edited by Stuart Reifel, 37-55. Greenwich, CT: Ablex.

———. 2000. Gentlemen's clubs, councils and courtrooms: Dance scholarship moves into public policy. *DCA [Dance Critics Association] News* 7: 16-18.

———. 2001. Wrapping nudity in a cloak of law. *New York Times*, July 29, Arts & Leisure Section, 14, 18.

———. 2003. Exotic dance adult entertainment: Ethnography challenges false mythology. *City and Society* 15 (2): 165-93.

McCullough, Andrew W. 2004. A new sort of "sin" tax in Utah. *Exotic Dancer*, April/May, 18.

Moore, Arthur Cotton. 1998. *Powers of preservation: New life for urban historic places*. New York: McGraw-Hill.

Munsil, Len. 1988. *The preparation and trial of an obscenity case: A guide for the prosecuting attorney*. Scottsdale, AZ: National Family Legal Foundation.

———. 1994. *How to legally stop nude dancing in your community*. Scottsdale, AZ: National Family Legal Foundation.

B. Studies of the Impact of Exotic Dance

Singled out among businesses, exotic dance has been charged with causing adverse secondary effects. A review of the *Washington Post*, the *New York Times*, U.S. Department of Justice Office of Justice Programs' reports, and several list-servs dealing with adult entertainment, prostitution, and other crime since 1995 reveal no evidence of such problems disproportionate to exotic dance businesses. The literature related to exotic dance adult entertainment shows that even with complete nudity, alcohol, and contact between dancer and patron, exotic dance is no more likely to be linked with prostitution, drugs, sexually transmitted diseases, property depreciation, or harm to children and juveniles (who are not admitted to adult entertainment venues in any case) than dancing in restaurants, community centers, municipal theaters, and hotels. Every business or organization has its "bad apples" and illegal transgressions, and exotic dance clubs are not immune. What transpires outside the business property is unknown. The Catholic church is not blamed for the *convictions* for pedophilia and rape by some clergy; rather, efforts are made to stop and punish the transgressions.

In a three-part study in Charlotte, North Carolina, Land et al. (2004), McCarthy and Renski (2001), and Hanna (2001) found exotic dance clubs caused no negative effects. None of the 100 residents and business operators located within 1,000 feet of each of three exotic dance clubs reported any negative effects from the clubs. Several businesses in the clubs' neighborhoods said the clubs brought in business. Some businesses used the club as a landmark to find their establishment.

Most studies cited by localities nationwide as evidence that exotic dance clubs cause adverse primary or secondary effects do not meet the basic requirements for the acceptance of scientifically valid evidence prescribed in *Daubert v. Merrell Dow*, 509 U.S. 579 (1993) or the research methodology in Darwin G. Stuart's *Urban Indicators: Their Role in Planning*, published by the American Society of Planning Officials [now the American Planning Association], Planning Advisory Service, Report No. 281, Chicago, June 1972. The few studies that meet Daubert or social science criteria for evidentiary value demonstrate either no deleterious impact associated with adult businesses or, in fact, positive effects (economic development in their neighborhoods).

Paul et al. (2001) analyzed for scientific validity more than 110 studies that local governments most frequently cite. Freeman and Linz (2002) critiqued studies of property value. The methodological problems with the studies (noted in the meta-analysis account below) include the lack of evidentiary literature on negative effects of exotic dance clubs.

Linz's work in articles and court cases identifies four requirements for a valid study of secondary effects caused by adult businesses: Do the studies answer or violate the following principles: (1) "Compared to

Copyright 2005. Permission Granted by SAGE Publications

what?" Did the study employ a properly selected control or comparison point? (2) "Is this just a one-time fluke?" Did the study employ a time frame long enough to detect a stable pattern of secondary effects? (3) If crime is measured, "is the crime measured according to a reliable source?" and "did the government go looking for more crime to justify its legislation?" (4) "Did the investigators talk only to people who would give them answers they wanted to hear?"

The problems (noted by many methodologists) that have diminished findings that exotic dance clubs cause a deleterious impact include the following: Studies usually lack control sites matched with exotic dance club sites as well as measures before and after the presence of a club in a particular location. Data are not collected over several years to distinguish a relatively unstable or a onetime blip in increases or decreases in crime. Studies of sexually oriented businesses conducted in the 1970s are not applicable to "gentlemen's clubs" that first developed in the 1980s. Studies have not demonstrated that a single adult business, standing alone, has any negative secondary effects. Indeed, studies have focused on concentrations of adult businesses.

There is no study that has specifically examined the impact of a particular dance or type of dance or kind of expression taking place inside an adult business. None of the studies explored, for example, whether nudity, seminudity, simulated nudity, stage design, or dancer-patron interaction had an impact on a neighborhood's quality of life.

Adult entertainment clubs in poor neighborhoods have higher crime than establishments in other neighborhoods, but correlation is not causation, as noted in any methods textbook. Change in police surveillance may account for crime rates. Police calls by a club, especially in a high-crime neighborhood, may not indicate a troublesome club but, rather, club policy to maintain a safe and lawful establishment. (In fact, police often encourage such calls so potential problems are not permitted to develop.) Although some studies group a variety of adult businesses together and find they cause problems, there is no evidence that exotic dance clubs are responsible for any of them. Sometimes police reports are proven false in court. Some crime reports used in studies do not reflect convictions. Charges for prostitution sometimes mean sexy dancing for money or "come on" fantasy talk about solicitation and sex.

Opinion surveys of appraisers constitute speculation, not empirical evidence of a valid relationship between exotic dance clubs and their actual impact on property values. A "potential" negative impact is not a real impact.

Whereas in the past, local governments did not have to conduct their own studies to justify their ordinances, the *City of Erie v. Pap's A.M.* (2000) Supreme Court decision (and, especially, the opinion of Judge Souter) held that the validity of the underlying proof of the need for regulations can be challenged. Evidence local governments provide to justify regulations to combat the allegedly harmful side effects of exotic dance (the judicially created secondary-effects doctrine) has to be relevant to the locality in question.

*1. META-ANALYSIS OF STUDIES*

McLaughlin, R. Bruce. 1994. *Adult uses: Zoning and land use issues, a technical update* [*MDII Entertainment, Inc. v. City of Dallas*, 393CV2093T, U.S. District Court].

———. 1998. [*Baby Dolls Topless Saloons, Inc., d/b/a Baby Dolls Saloon-East, et al. v. City of Dallas*, Civil Action, 3-97-CV-1331-R, U.S. District Court, Northern District of Texas, Dallas Division].

———. 2001. *Summary of analyses of the valid portions of local government adult use studies*. Indian Rocks Beach, FL: McLaughlin Consulting Services, Inc. (727-595-7634).

Paul, Bryant, Daniel Linz, and Bradley J. Shafer. 2001. Government regulation of "adult" businesses through zoning and anti-nudity ordinances: Debunking the legal myth of negative secondary effects. *Communication Law and Policy* 6 (2): 355-91. Reprinted in Patricia E. Salkin, ed. 2002. *Zoning and planning law handbook*. Eagan, MN: West Publishing. Evaluated more than 110 studies for scientific validity.

*2. GENERAL STUDIES*

American Planning Association. 1997. Erotic and exotic uses. American Planning Association National Planning Conference, APA-7179 (tape recording, Chicago: Teach-em).

Ellis, Kate, Barbara O'Dair, and Abby Tallmer. 1988. Introduction. In *Caught looking: Feminism, pornography & censorship*, edited by Kate Ellis, Beth Jaker, Nan D. Hunter, Barbara O'Dair, and Abby Tallmer, 4-9. Seattle, WA: Real Comet.

Hanna, Judith Lynne. 2001. *Reality and myth: What neighbors say about exotic dance clubs: A case study in Charlotte, North Carolina*. 2001. Charlotte, NC: Tarheel Entertainment Association, presented to City of Charlotte Zoning Board.

Hudson, David L., Jr. 2002. *Adult entertainment and the secondary-effects doctrine: How a zoning regulation may affect First Amendment freedoms* (First Reports 2, 1). Nashville, TN: First Amendment Center (1 800-830-3733; puborder 02-F03).

Kelly, Eric Damian, and Connie Cooper. 2000. *Everything you always wanted to know about regulating sex businesses*. Planning Advisory Service Report Number 495/496. Chicago: American Planning Association. See Hanna, Judith Lynne. 2003. Review in *Journal of Planning Literature* 17 (3): 45-46.

Moore, Arthur Cotton. 1998. *Powers of preservation: New life for urban historic places*. New York: McGraw-Hill. Proposes exotic dance clubs in urban center buildings to preserve them and to enliven the city.

Schlosser, Eric. 1997. The business of pornography. *U.S. News and World Report*. February 10, 43-52.

Tepper, Steven Jay. 2001. Culture, conflict and community: Struggles over art, education and history in American cities. PhD diss., Princeton University.

*3. CRIME*

Exotic dance is alleged to be a prelude to or an advertisement for prostitution. However, there is no evidence of convictions disproportionate to the adult entertain-

Copyright 2005. Permission Granted by SAGE Publications

ment industry. Exotic dance and prostitution are distinct activities in the United States. In well-run clubs in most jurisdictions, omnipresent security (doormen, floor men, and video monitors) oversees the facility to be in compliance with the law. In addition, performers monitor each other, and managers terminate a dancer who has contact with a patron outside the club. Men who misbehave are asked to leave the club.

In some localities, such as San Francisco, local government leaders have tolerated prostitution that is not on the street. (Kay [1999] interviewed ten dancers in three clubs.) However, prostitution cases that attract media attention are police charges, often not leading to convictions, and allegations about athletes. For example, in Atlanta's multimillion-dollar Gold Club 2001 case, employees testified that celebrities and professional basketball, baseball, and football players often received sexual favors from strippers. (A television show was made about the sex scandal.)

There is also a myth that exotic dance attracts illegal drugs. However, again, this problem is not disproportionately present in the adult entertainment industry. For example, illegal drugs are present in numerous schools and universities. Exotic dance security staff members usually monitor club activity; some managers periodically check dancers' lockers and even employ drug-sniffing dogs to be absolutely certain drugs are not on the premises.

The studies below demonstrate that crime is not any more problematic in the exotic dance industry than in most other businesses. In fact, two police studies conducted at different times found that exotic dance clubs that served alcohol and had live nude dancing had no negative impact on crime, although there were problems with clubs that only served alcohol and had no nude dancing (Fuller and Miller 1997; Phifer and Fulton County Police Department 2001). A comparison of crime-related and public order–related calls for police service between three exotic dance adult entertainment clubs (a total of 27 calls) and three licensed alcohol beverage establishments (a total of 138 calls) in Prince George's County, Maryland, in 2002, found no association between the presence of exotic dance clubs and crime-related secondary effects. Although there was a triple homicide in the parking lot of one exotic dance club, the detective handling the case said this incident could have happened anywhere.

The Land et al. (2004) empirical study sought to determine whether a relationship exists between adult exotic dance clubs and increased numbers of crimes reported in the areas surrounding the adult businesses in Charlotte, North Carolina. For each of 20 businesses, a control site (matched on the basis of demographic characteristics related to crime risk) was compared for crime events during a period of three years (1998-2000) using data on crime incidents reported to the police. The study found that the presence of an adult nightclub does not increase the number of crime incidents reported in localized areas surrounding the club (defined by circular areas of 500- and 1,000-foot radii) compared with the number of crime incidents reported in comparable localized areas that do not contain such an adult business. Indeed, the analyses imply the opposite, namely, that the nearby areas surrounding the adult business sites have smaller numbers of reported crime incidents than do corresponding areas surrounding the three control sites studied. These findings are interpreted in terms of the business mandates of profitability and continuity of existence of the businesses.

There have been some unusual exotic-dance–specific charges. A patron has alleged harm from a dancer's breast hitting his face. At his bachelor party in a Fort Wayne, Indiana, club, Justin Scheidt claims that while he was onstage for the ritual of being teased, two dancers held him down at the base of the strip pole, while a third dancer cannon-balled down the pole from about six feet up and landed on his genitals. Although he said to stop, the two other dancers did the same, causing him excruciating pain and inability to consummate his marriage on his honeymoon due to "serious and permanent injuries."

REFERENCES

Danner, Terry A. (Terry.danner@saintleo.edu). 2000. *Criminogenic impact analysis, Peek-A-Boo Lounge of Bradenton (5412 14th Street West Bradenton, FL) and Temptations II (3824 U.S. 41 North Palmetto, FL)*, December 6 [*Peek-A-Boo Lounge, Inc. et al. v. Manatee County, Florida*, 99-2707-CIV-T-25C, U.S. District Court, Middle District of Florida].

———. 2001a. *Criminogenic impact analysis: Seven adult cabarets located in Pinellas County*, April 26 [*State of Florida v. Laurie A. Anstine*, 00-20520MOANO, Pinellas County Division of Local Ordinance Violation, Circuit State Court of Florida, 6th Judicial District of Florida].

———. 2001b. *Do adult cabarets affect neighborhood crime volumes?* [*State of Florida v. Shawna Bohne*, 00-CM-024008, Circuit State Court of Florida, 13th Judicial District, Hillsborough County].

———. 2001c. *The effect of the Mons Venus adult cabaret [Tampa] on neighborhood crime volumes: An empirical analysis of longitudinal data*, April 1 [*City of Tampa v. Joe Redner, d/b/a the Mons Venus*, 96-2399, Circuit State Court of Florida, 13th Judicial District, Hillsborough County].

———. 2003. *Adult cabarets and crime-related secondary effects*. [*State of Florida v. Shannon Malnick*, 03-12309MOANO. State of Florida 6th Judicial Circuit, Pinellas County].

Fisher, Randy (rfisher@mail.ucf.edu). 1999. *Do adult businesses have adverse secondary effects? Have the nude clubs of Casselberry been shown to have adverse secondary effects? A preliminary report*. [*Christy McKee and Margaret K. Morgan v. City of Casselberry*, 99-CA1430-16E; *Pauline Koziara and Kathleen Derienzo v. Seminole County*, 99-CA511-16P, Circuit State Court of Florida, 18th Judicial District, Seminole County].

———. 1990s. *Evidence for the harms of adult entertainment: A critical evaluation* (Cafe Erotica in St. Johns County. Gary Edinger attorney).

Copyright 2005. Permission Granted by SAGE Publications

Case 3:05-cv-00256-TMB     Document 53-37     Filed 10/12/2006     Page 14 of 19

CPL Bibliography 375    129

———. 1990s. *Evidence for the harms of adult entertainment: A critical evaluation* [Broward County] prepared for Luke Lirot re: several clubs owned at the time by Michael Peter.

———. 2001a. *Adequacy of the evidence of "adverse secondary effects" on which Pinellas County's Adult Code was based* [*State of Florida v. Laurie A. Anstine*, Case No. 00-20520MOANO. Circuit State Court of Florida, Division of Local Ordinance Violation, 6th Judicial District, Pinellas County].

———. 2001b. *Do adult businesses have adverse secondary effects? The Tampa Record* [*City of Tampa v. Joe Redner, d/b/a the Mons Venus*, Case No. 96-2399 (No. 99-10057) Circuit State Court of Florida, 13th Judicial District, Hillsborough County].

———. 2001c. *Evidence for the "adverse secondary effects" of adult entertainment: The Manatee County record* [*Peek-A-Boo Lounge, Inc., et al. v. Manatee County, Florida*, 99-2707-CIV-T-25C, U.S. District Court, Middle District of Florida].

Fuller, Ron, and Sue Miller. 1997. *Fulton County [Georgia] police study of calls for service to adult entertainment establishments which serve alcoholic beverages, January 1995-May 1997*, County Attorney's Office, 404 730 5719 [*Flanigan's Enterprises Inc. of Georgia d/b/a Mardi Gras v. Fulton County, Georgia and Fulton County Board of Commissioners* (U.S. Court 00-11152; District Court 98-02441-CV-GET-1) 242 Federal 3rd 976 2001 11th Federal Circuit Court].

Hanna, Judith Lynne. 2003. Legal predicate: High number of calls for service. Presentation to the Prince George's County Council Public Hearing for CB-86, November 26.

Kay, Kerwin. 1999. Naked but unseen: Sex and labor conflict in San Francisco's adult entertainment theaters. *Sexuality and Culture* 3: 39-67.

Land, Kenneth C., Jay R. Williams, Michael E. Ezell, Bryant Paul, and Daniel Linz. 2004. An examination of the assumption that adult businesses are associated with crime in surrounding areas: A secondary effects study in Charlotte, North Carolina. *Law and Society Review* 38 (1): 69-103.

Paul, Bryant Paul, and Daniel Linz. 2002. Testing assumptions made by the Supreme Court concerning the negative secondary effects of adult businesses: A quasi-experimental approach [Fort Wayne, Indiana]. Paper presented at the International Communication Association Conference, Seoul, Korea, July 18.

Phifer, Major W. D., and Accreditation Staff of the Fulton County Police Department. 2001. Alcohol and non-adult entertainment establishments statistical analysis from 1/1/98 to 12/31/00. Fulton County: Police Department.

Scott, Michael S. 2001. *Assaults in and around bars*. Problem-Oriented guides for Police Series, No. 1. Washington, DC: COPS (Community Oriented Policing Services), U.S. Department of Justice. Exotic dance was not an issue.

## 4. ECONOMIC IMPACT

Exotic dance clubs are alleged to cause property depreciation. But the studies below (critiques of studies localities have used and ones that provide new site-specific research) show no evidence that exotic dance clubs have a negative impact on real estate values near them. Indeed, exotic dance clubs often attract business. For example, car repair facilities take advantage of patrons who stop at the clubs for lunch; in Ft. Lauderdale, Loehmann's, an upscale women's discount dress store, opened up across the street from the Gold Club. Law-abiding adult entertainment clubs may be woven into the mainstream of everyday life. If so, it certainly raises questions about the need for special zoning for them.

REFERENCES

Fisher, Randy (rfisher@mail.ucf.edu). 1996. *Positive economic impact of the Mons Venus: The impact of the performers' incomes* [*City of Tampa v. PM Realty*, 96-02397, Circuit State Court of Florida, 13th Judicial District, Hillsborough County].

———. 1999. *Have adult businesses lowered property values in Casselberry?* [*Christy Mckee and Margaret K. Morgan vs. City of Casselberry*, 99-CA1430-16E; *Pauline Koziara and Kathleen Derienzo v. Seminole County*, 99-CA511-16P, Circuit State Court of Florida, 18th Judicial District, Seminole County].

Freeman, Lance, and Daniel Linz. 2002. Examining the relationship between businesses that comply with the "60/40" adult zoning regulations and surrounding property values in New York City. Unpublished paper.

McCarthy, George W. (mac@webjogger.net), and Henry Renski. 2001. *Measuring secondary effects using spatio-temporal estimation of real estate price appreciation*. Charlotte, NC: Tarheel Entertainment Association, submitted to Charlotte Zoning Board.

Mellish, G. Hartley (gmellish@tampaybay.rr.com). 2000. *An economic analysis* (damages of police raids and effect of ordinance) [*Alexis v. Pinellas County*, 98-672-CIV-T-26-E, U.S. District Court, Middle District of Florida].

———. 2001. *An economic analysis* (effect of ordinance on Mon Venus, impact on revenues of dancer and community, economic impact of the adult entertainment industry on communities) [*City of Tampa v. Joe Redner*, 99-10057, Circuit State Court of Florida, 13th Judicial District, Hillsborough County].

Schauseil, Richard (rickywahoo@hotmail.com). 1996. *Market study and report: Club Flamingo, Ybor City* [*City of Tampa v. PM Realty and Investment*, 96-02397, Circuit State Court of Florida, 13th Judicial District, Hillsborough County].

———. 1999. *Market study and report: Mons Venus, Tampa* [*City of Tampa v. Joe Redner DBA: Mons Venus*, Case No. 96-2399, Circuit State Court of Florida, 13th Judicial District, Hillsborough County].

———. 2000. *Market study and report: Peek-a-Boo Lounge and Temptation II* [*Peek-a-Boo Lounge, Inc., et al. v. Manatee County, Florida*, 99-2707-CIV-T-25C, U.S. District Court, Middle District of Florida].

———. 2001. *Market study and report: Cristine's Cabaret, Jake's Cabaret, Showgirls, Diamond Dolls, Sweethearts, Silk Stockings, and Mermaids* [*State of Florida v. Laurie A. Anstiene*, 00-20520-MOANO, County Court, Misdemeanor Division, Pinellas County, Florida].

———. 2002. *Subject properties: In Seminole County, Florida* [*McKee and Morgan v. City of Casselberry, Florida*, 99-CA1430-16E; *Koziara and Derienzo v. Seminole County*, 99-CA511-16P, Circuit State Court of Florida, 18th Judicial District, Seminole County, Florida].

## 5. HEALTH

Some ordinances have preambles to justify regulations that are "necessary" to prevent exotic dancers from causing disease. But there is no verifiable evidence of a relationship between exotic dance and disease. They may cause no more health problems than restaurants, shopping malls, or churches.

REFERENCE

Thomas, Rebekah J. (rebekah.thomas@saintleo.edu). 2001. *The effect of adult use entertainment activities on transmission of disease* [*State of Florida v. Laurie A. Anstiene*, 00-20520MOANO, Pinellas County Division of Local Ordinance Violation, Circuit State Court of Florida, 6th Judicial District].

Copyright 2005. Permission Granted by SAGE Publications

*6. ZONING*

Zoning is used to designate areas where adult entertainment may operate. There are centralized and dispersal models, where communities either try to concentrate adult entertainment activities in one central area, or attempt to scatter them throughout the community. Controversy arises over proposed changes in required distances of exotic dance clubs from schools, churches, and residential areas, and definitions of these, as well as economic development that changes an area designated for exotic dance clubs, as indicated in the work cited below. Federal law says exotic dance clubs cannot be banned and sites for them are required, excluding sites such as in the ocean or other area that lacks infrastructure for a business.

REFERENCES

McLaughlin, R. Bruce. 2003. *City of Rockford, Illinois, alternative avenues of communication for adult uses planning review* [U.S. District Court, Northern District of Illinois, Eastern Division, *R.V.S., LLC. v. City of Rockford*, 03-C-50048].

Weinstein, Alan. 1997. Land use and the First Amendment: Recent developments in land use, planning and zoning law. *Urban Law* 29 (3): 387-298.

*C. Regulations and Legal Cases with National Importance*

This section presents legal cases that have guided the national debate. Not trained in law, I have drawn upon the interpretations that appear in legal pleadings, analyses, and decisions on cases with which I have been involved. The U.S. Constitution, Supreme Court's decisions related to exotic dance adult entertainment, and circuit courts following the Supreme Court override state law. Sometimes it takes time for the impact of these decisions to take shape. Listed below are first the most recent Supreme Court decisions within each category that prevail over earlier cases.

Under the umbrella of the First Amendment, dance is the communication of expressive content. A regulation directed at content or viewpoint will not withstand judicial scrutiny. Courts have upheld reasonable time, place, and manner regulations that are content neutral, for example, *Kev, Inc. v. Kitsap County* (1986). The Fourteenth Amendment antidiscrimination and due process clauses also protect exotic dance adult entertainment.

The U.S. Supreme Court's decisions concerning exotic dance adult entertainment have been primarily rooted in, for example, governmental interest to protect the populace, *United States v. O'Brien* (1968); alcoholic beverage regulations, *California v. La Rue* (1972); the Supreme Court's first recognition of First Amendment rights for exotic dance as communication, albeit at a superficial level, obscenity, *Miller v. California* (1973); zoning ordinances to cope with adverse secondary effects, *Young v. American Mini Theatres* (1976); and morality, *Barnes v. Glen Theatre* (1991).

There are three recent court cases related to regulating exotic dance adult entertainment that change what governments can do and make it more difficult to overcome the many hurdles to withstand challenges to their ordinances:

> *City of Los Angeles v. Alameda Books* (2002): See C.1, Evidence for Justifying Governmental Interest, below, for further discussion.

Now governments must provide a factual basis for their regulations that plaintiffs can challenge by demonstrating that the government's evidence does not support the regulations or furnishing evidence that disputes the government's factual findings. This case weakens *City of Renton v. Playtime Theatres* (1986), which held the government could use studies of other jurisdictions if the local government reasonably believed the studies to be applicable to its own circumstances.

> *City of Erie v. Pap's A.M.* (2000)

The secondary effects rationale for regulations replaced the moral rationale of *Barnes v. Glen Theatre* (1991).

> *44 Liquormart v. Rhode Island* (1996)

When Prohibition ended, the Twenty-First Amendment gave state and local governments the authority to regulate establishments that serve alcohol. However, this authority does not override the First Amendment.

Although nude dancing has been recognized as expressive and at the outer margins of First Amendment protection, the courts have not, until recently, addressed other nonverbal communicative dimensions of dance: use of time, space, and effort, parts of the body moved and how; costume; distance between dancer and patron; and touch—all of which can convey meaning.

*1. EVIDENCE FOR JUSTIFYING GOVERNMENTAL INTEREST*

*R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004).

See Zoning below.

*City of Los Angeles v. Alameda Books Inc.*, 535 U.S. 425 (2002).

Copyright 2005. Permission Granted by SAGE Publications

Although a five-four decision upheld the city ban on multiple adult businesses in one building, the majority did not agree on a single rationale. Only four found that Los Angeles could rely on a 1977 study of adult businesses in general to justify the ordinance at issue. The others supported the position, noted above, that governments must fairly support the rationale for an ordinance, show a factual basis for their regulations, and consider "how speech will fare" (not attack speech). Plaintiffs challenging an ordinance must have the opportunity to cast doubt on its rationale by demonstrating that the government's evidence does not support its rationale or by furnishing evidence that disputes the government's factual findings. Justice Souter, in formulating a legal test based on empirical verification, argues that the weaker the empirical evidence concerning secondary effects, the more likely the governmental action is not content neutral.

*Flanigan's Enterprises Inc. v. Fulton County*, 242 F.3d 976 (11th Cir. 2001).

Nude dancing in establishments licensed to sell liquor may not be banned without a factual basis to support the claim that they are connected with negative secondary effects. A city cannot reasonably rely upon data from other localities that contradicts good local data.

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000).

Governments may ban secondary effects–justified (not morality-based) nude dance with time, place, and manner regulations as a way to combat negative secondary effects. Although a locality may rely on secondary effects studies done by other cities or judicial opinions that discussed them, their evidence now can be challenged as to its quality and relevance to the locality's own jurisdiction.

*Daubert v. Merrell Dow*, 509 U.S. 579 (1993).

This case against a pharmaceutical company held that the trial judge is responsible to ensure that experts' testimony both rests on a reliable foundation and is relevant to the contested issue. (See Federal Judicial Center. 1994. *Reference manual on scientific evidence*. Rochester, NY: Lawyers Cooperative Publishing, for case law on the use of surveys.)

*United States v. O'Brien*, 391 U.S. 367, 377 (1968).

A government regulation is justified if (1) it is within the constitutional power of the government, (2) it furthers an important or substantial governmental interest, (3) the governmental interest does not suppress free expression, and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to further that interest. Statutes should be narrowly tailored and not be irrational, arbitrary, or capricious.

2. ZONING

*R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004).

A locality may not use its zoning power to regulate any type of dancing without offering sufficient evidence to support its rationale that the dancing causes adverse secondary effects. The governmental interest for imposing content-based time, place, and manner restrictions may only be upheld if a connection can be made between the negative effects and the regulated speech. Otherwise the regulations violate the First Amendment. Open and explicit hostility toward and disapproval of the speech itself is not a permissible purpose for a regulation.

*Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Florida*, 11th Cir. (2003).

Regulations that dictated the physical layout of a club, permitted the sheriff to search the premises without a warrant, and banned nudity were overturned. The court emphasized the differences between zoning ordinances (evaluated under standards for time, place, and manner) and public nudity ordinances (evaluated under the four-part test set forth in *O'Brien*) and used in *Barnes* and *Pap's A.M.* A key issue in the analysis of a secondary effects–justified "content-based zoning ordinance" is "how speech will fare" under the ordinance, a new requirement in a time, place, and manner analysis. To meet its burden of justification imposed by *City of Renton v. Playtime Theatre, Inc.* (1986), a city must have studies or other evidence submitted preenactment and allow its evidence to be challenged.

*Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524 (9th Cir. 1993).

The court said that the economics of site location is a valid consideration.

*Woodall v. City of El Paso*, 959 F.2d 1305 (5th Cir. 1992)

It is illegal for cities to attempt to ban, regulate, or impose excessive location requirements because they object to their sexually explicit messages.

Copyright 2005. Permission Granted by SAGE Publications

132   *Journal of Planning Literature*

*City of Renton v. Playtime Theatres*, 475 U.S. 41, 106 S.Ct. 925 (1986).

An ordinance must serve a substantial governmental interest. Government must rely on evidence to justify content-neutral restrictions of time, place, and manner on expressive conduct. A local government may rely on studies from other jurisdictions documenting "adverse secondary effects" of adult uses, if the local government reasonably believes the studies to be applicable to its own circumstances. Renton had no adult entertainment and consequently had no alternative but to look to outside studies. Requiring a set distance of a club from the location of any residential area, school, park, or church also requires that there be alternative locations.

*Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981).

A zoning law cannot be overbroad in proscribing all live entertainment, including nude dancing.

*Young v. American Mini Theatres Inc.*, 427 U.S. 50, 96 S.Ct. 2440 (1976).

Zoning to disperse entertainment and require separation from any residential area is permissible if governments can show proof of adverse secondary effects. This is the beginning of the secondary-effects doctrine. Governments must allow for reasonable alternative locations.

3. ALCOHOL

*44 Liquormart v. Rhode Island*, 517 U.S. 484 (1996).

Liquor regulation permitted by the Twenty-First Amendment does not override the First Amendment.

*New York State Liquor Authority v. Bellanca*, 452 U.S. 714 (1981).

The state can regulate establishments serving alcohol.

*Doran v. Salem Inn, Inc.* 422 U.S. 922 (1975).

The justices view nude dancing as expression warranting constitutional protection in establishments without alcohol.

*California v. La Rue*, 409 U.S. 109 (1972).

When prohibition ended with the Twenty-First Amendment, state and local governments were given authority to regulate establishments that serve alcohol. The Alcohol Board of Control could ban nude dancing at premises licensed by it. Prohibition is nothing more than a time, place, or manner regulation of speech.

4. OBSCENITY

*The People [City of Anaheim] v. Janini*, Super. Ct. No. Ap-11129 (1999).
*The People [City of Anaheim] v. Ly*, Super Ct. No. AP-11130 (1999).

Lap dancing is legal, not prostitution. Anaheim's ordinance banning lap dancing was preempted by the state penal code, which already outlaws prostitution and lewd conduct. The court referred to the 1920s' taxi dancing, the sale of a body-rubbing dance for a dime, that continues to this day but at a higher price.

*Pope v. Illinois*, 481 U.S. 497 (1987).

A determination of obscenity must assess the social value of the material from the standpoint of a "reasonable person" using national standards rather than local community judgments.

*Brockett v. Spokane Arcades Inc.*, 472 U.S. 491 (1985).

The Court did not intend to characterize as obscene material that provided only normal, healthy sexual desires. Justice White said "lust" implied a normal, healthy interest in sex.

*Miller v. California*, 413 U.S. 15 (1973).

Obscenity is one of the few categories of expression the First Amendment does not safeguard, but the Court laid out guidelines for determining whether a dance qualifies as legally obscene. All three prongs of the definition must be satisfied for a work to be constitutionally obscene: (1) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (2) whether the work depicts, or describes in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.
Supreme Court decisions following *Miller* have held that the states may provide their own geographic definition of the community or not define it at all.

*Roth v. United States*, 354 U.S. 476 (1957).

"Obscene utterance" as determined by community standards was not protected by the First Amendment.

Copyright 2005. Permission Granted by SAGE Publications

*5. TIME, PLACE, MANNER, AND INCIDENTAL BURDEN*

See *Peek-A-Boo* under Zoning above (C.2).

*Colacurcio v. City of Kent*, 163 F.3d 545 (9th Cir. 1998).

The Court upheld a 10-foot buffer zone between patron and performer, failing to recognize that stage dances (performed for everyone) and private table dances (dances performed for a specific patron) convey different messages. The Court left open the issue of the buffer zone causing financial harm to businesses.

*Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2753, 104 L.Ed.2d 661 (1989).

Content-neutral time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.

*City of Renton v. Playtime Theatres*, 475 U.S. 41, 106 S.Ct. 925 (1986).

Government must rely on evidence to justify its decision that there is an important governmental interest in reasonable time, place, and manner restrictions on expressive conduct. A local government may rely on studies from other jurisdictions documenting "adverse secondary effects" of adult uses, if the local government reasonably believes the studies to be applicable to its own circumstances.

*Kev, Inc. v. Kitsap County*, 793 F.2d 1053 (9th Cir. 1986).

Government may impose reasonable restrictions on the time, place, and manner of protected activity under the First Amendment.

*6. LICENSING*

*Dream Palace v. County of Maricopa (AZ)*, CV-97-02357 SMM (9th Cir. September 27, 2004).

A county could not publicly release sensitive information (dancers' stage names, addresses, and phone numbers) submitted by employees on their permit applications because this could expose them to harassment from "aggressive suitors" or people opposed to the industry.

*City of Littleton, Colorado v. A.J. Gifts*, D-4, LLC, 2004 WL 1237360 (2004).

For an "adult business" licensing scheme to satisfy First Amendment requirements, the licensing scheme must provide assurance of speedy access to the courts for review of adverse licensing decisions and also provide assurance of a speedy court decision. However, judicial review of adverse licensing decisions in accordance with states' ordinary review procedures was sufficient to satisfy First Amendment requirements.

*FW/PBS, Inc. V. City of Dallas* 493 U.S. 215 (1990).

Licensing provisions may not constitute a prior restraint on freedom of expression. Government should make a licensing decision in a specific brief time period and provide the possibility of challenge of its determination through prompt judicial review and judicial decision; free speech rights would be denied through inaction.

*7. MORALITY*

See *City of Erie v. Pap's A.M.* in II.C.1, Evidence for Justifying Governmental Interest, overriding Barnes.

*Barnes v. Glen Theatre*, 111 S.Ct. 2456 (1991).

Nude dancing is a form of expression entitled to a measure of First Amendment protection, but states may ban it in the interest of "protecting order and morality" without proof of localized effects. Justice Byron R. White said that by prohibiting nude dancing, a state inevitably prohibited the communication of an idea because "the nudity itself is an expressive component of the dance. . . . It is only because nude dancing performances may generate emotions and feelings of eroticism and sensuality among the spectators that the state seeks to regulate such expressive activity." Justice David Souter said it was the "secondary effects," prostitution, sexual assault, and associated crimes, of clubs like the Kitty Kat Lounge that justified Indiana's rule. The Fifth, Sixth, Seventh, Eight, and Eleventh Circuit Courts treated Justice Souter's opinion as holding in *Barnes*. Subsequently, *Erie v. Pap's A.M.*, 529 U.S. 277 (2000) further placed the rationale for regulation on secondary effects.

*8. OVERBREADTH*

*Spoons v. Kenneth Morcke*, 1:04CV0314 (2004). U.S. District Court for the Northern District of Ohio Eastern Division.

The ban on nudity, simulated sex, self-touch, and "improper conduct of any kind . . . that would offend the public's sense of decency" is unconstitutional under the First and Fourteen Amendments and overbroad.

Copyright 2005. Permission Granted by SAGE Publications

Lacking evidence of adverse secondary effects, the regulation serves no governmental interest.

*Giovani Carandola v. George Bason*, 303 F.3d 507 (4th Cir.2002).

The regulations on exotic dance adult entertainment had overbroad application.

*Ways v. City of Lincoln*, 274 F.3d (8th Cir. 2001).

The prohibition of "sexual contact" was overbroad because it covered any business or commercial establishment.

*Déjà vu of Nashville, Inc. v. Metro Government.* 274 F.3d (6th Cir.2001).

The ordinance was not upheld on grounds of overbreadth.

*Triplett Grille v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994).

A ban on public nudity cannot sweep within its ambit expressive conduct not generally associated with prostitution, sexual assault, or other crimes.

*9. DANCE MOVEMENTS AND GESTURES*

*Dream Palace v. County of Maricopa (AZ), CV-97-02357 SMM* (9th Cir. September 27, 2004).

A regulation that bans "sex acts, normal or perverted, actual or simulated" amounts to a ban on nude dancing, a constitutionally protected activity. "If Elvis' gyrating hips can fairly be understood to constitute a simulated sex act, one can fully appreciate the potential scope of the restrictions placed on erotic dancers in Maricopa County," Judge Diarmuid F. O'Scannlain wrote for a three-judge panel.

*Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000).

Government cannot outlaw particular movements and gestures of exotic dance because they would deprive the dancers of a repertoire of expressive elements with which to communicate an erotic, sensual message. Protected expression cannot be unconstitutionally burdened.

ACKNOWLEDGMENTS

I appreciate the helpful comments of Mark Kernes, Kerwin Kay Brook, Wayne B. Giampietro, Ira Weiner, and William John Hanna on portions of earlier drafts of this bibliography.

Copyright 2005. Permission Granted by SAGE Publications